**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PARTICLE HEALTH INC. | Civil Action No. _____ |
| *Plaintiff,* | |
| v. | COMPLAINT |
| EPIC SYSTEMS CORPORATION | JURY TRIAL DEMANDED |
| *Defendant.* | |

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ........................................................................................1

II.    PARTIES ....................................................................................................................10

    A.     Plaintiff...............................................................................................................10

    B.     Defendant............................................................................................................11

III.   JURISDICTION AND VENUE ..................................................................................11

IV.   THE RELEVANT MARKET(S) AND EPIC'S MONOPOLY POWER ............................12

    A.     Electronic Health Records Software ....................................................................12

    B.     EHR Provision Services ......................................................................................17

    C.     Payer Platforms ..................................................................................................21

V.    REGULATORY EFFORTS TO BRING DOWN HEALTHCARE COSTS—AND EPIC'S
EFFORTS TO STYMIE THAT REGULATION .................................................................26

VI.   PARTICLE INNOVATES AND BEGINS TO THREATEN EPIC'S MONOPOLY IN THE
PAYER PLATFORM MARKET .........................................................................................28

VII.  EPIC'S SCHEME TO MAINTAIN ITS MONOPOLY IN THE PAYER PLATFORM
MARKET ...........................................................................................................................32

    A.     Epic Suddenly Cut Off Particle Customers' Access to EHRs, Based on Nothing But
Pretext...........................................................................................................................33

    B.     Epic Began (and Continues) to Obstruct the Onboarding of New Particle Customers ..41

    C.     Epic Began (and Continues to Pursue) a Fear, Uncertainty, and Doubt Campaign
Against Particle..............................................................................................................46

    D.     Epic Repeatedly Tried to Overload Particle's Systems With Avalanches of Healthcare
Provider Requests ..........................................................................................................54

    E.     Epic Abused the Carequality Dispute Process to Harm Particle's Growth ...................55

    F.     Epic's Conduct Lacks Any Non-Pretextual, Procompetitive Justification.....................63

VIII. HARM TO COMPETITION ........................................................................................66

IX.   ANTITRUST INJURY ................................................................................................67

X.    INTERSTATE TRADE AND COMMERCE ................................................................68

XI.   CAUSES OF ACTION ................................................................................................68

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)
MONOPOLIZATION .........................................................................................................68

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)
ATTEMPTED MONOPOLIZATION ...................................................................................69

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)
MONOPOLY LEVERAGING .............................................................................................70

FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) ...... 71

FIFTH CAUSE OF ACTION VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 340 ¶5, ET SEQ. ................................................................................................................ 72

SIXTH CAUSE OF ACTION TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS .............................................................................................................................. 73

SEVENTH CAUSE OF ACTION TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS ...................................................................................................... 73

EIGHTH CAUSE OF ACTION DEFAMATION .......................................................................... 74

NINTH CAUSE OF ACTION TRADE LIBEL ............................................................................ 75

JURY TRIAL DEMANDED ............................................................................................................ 77

PRAYER FOR RELIEF .................................................................................................................... 77

## I.    PRELIMINARY STATEMENT

1.      Epic Systems Corporation ("Epic") is a behemoth in the provision of software to healthcare providers across the country. Its primary product is a system for maintaining electronic health records ("EHR"), which have come to almost entirely replace the paper patient files long used by medical professionals.

2.      As its name implies, Epic is massive—it is a monopolist in the EHR software market. Nearly every large healthcare provider in the nation uses Epic's EHR platform and software. Over three-quarters of the U.S. population have electronic health records within an Epic database. An ever-growing problem in today's healthcare system, however, is that Epic obtained that position by promising efficiencies, streamlined processes, and, most importantly, cost-savings. But, that proved to be a Faustian bargain for healthcare providers nationwide, because Epic has used its position of dominance to worm its way to the core of the U.S. healthcare system and stamp out competition in a wide variety of interrelated markets, thereby generating billions of dollars for itself.

3.      Epic's EHR platform is hugely expensive, often involving upfront installation costs of hundreds of millions of dollars. After incurring such large costs of entry, very few healthcare providers are willing or able to switch EHR platforms. This is a broad source of power for Epic. As one commentator put it, "[w]ithin a few years, any significant discussion of healthcare strategy in the U.S. will require the active participation and support of Judith Faulkner, the founder and CEO of Epic, and her executive team."

4.      By providing the software that stores the majority of American medical records, Epic gains control over a crucial resource: the medical records themselves. When a healthcare provider uses an EHR platform to collect, store, and organize medical records, the EHR company typically gains control over the distribution of those records to third parties, such as other

1

healthcare providers or health insurance providers. In the U.S., somewhere between 81-94% of patients have at least one medical record stored in an Epic EHR. Epic is thus by far the dominant supplier of electronic medical records to third parties.

5.      The problem this lawsuit addresses is that Epic is now attempting to use its power over EHRs to expand its dominance into the fledgling market for "payer platforms." A payer platform is a relatively new type of software platform that allows health insurance providers (also known as "health plans" or "payers") to efficiently request and instantaneously retrieve large numbers of medical records directly from the EHR platforms that generate and store them. In addition to obtaining the records at scale, payer platforms allow users to store the records, run analytics, and conduct other business-critical tasks within a self-contained system. Until recently, payers obtained medical records—which are a critical part of their business—through a cumbersome, manual process. Payer platforms digitize and automate this process, helping health plans drastically improve their performance by reducing error-driven denials, providing better health-enhancing services to members, and generating more complete pictures of their members' health and risk. The Epic Payer Platform ("EPP") is by far the largest payer platform in the nation.

6.      Epic released EPP in 2021, and, as the first payer platform, quickly gained customers. But, although the new market was growing rapidly, no competitors emerged to challenge EPP during the first few years of its existence. That was because of a calculated move by Epic to stifle competition. No competitors could challenge EPP because Epic made it commercially impossible for any payer platform other than EPP to access records stored in Epic's EHR software. Without the ability to pull Epic-stored records—which constitute a substantial majority of all medical records in the United States—and provide those records to payers at scale, any hypothetical competing payer platform was dead on arrival.

7.      Plaintiff Particle Health Inc. ("Particle"), however, solved this problem and is the only competitor in the payer platform market ever to pose a meaningful threat to EPP's market share. Founded in 2018, Particle began offering its services a few years later. Particle's platform, like EPP, provides both a record retrieval service, which allows users to interface with EHR companies like Epic to smoothly request medical records at scale, and an analytics service, which allows users to efficiently store and monitor trends in the medical records they request.

8.      For most of its existence, Particle did not cater to payers, instead offering a platform for traditional healthcare providers and health tech companies to use to retrieve medical records automatically and at scale. Epic has historically allowed platforms like Particle to retrieve Epic-stored medical records for traditional healthcare providers. Federal regulations require that EHR companies like Epic make their records widely available for "treatment" purposes, which has led to a system of centralized exchange networks through which EHR companies make their records available in response to "treatment" requests. One aspect of these exchange networks is that they allow platforms like Particle to plug in and pull records at scale. Epic, for its part, has generally been content to allow platforms like Particle to retrieve its records for traditional healthcare providers because that activity does not threaten Epic's dominion over payers.

9.      In 2023, Particle became the first competitor to figure out how to compete with EPP by being the first to recognize and respond to a seismic shift in how payers operate. Historically, payers have been unable to utilize the exchange networks to obtain and retrieve medical records because traditional payer use cases for medical records have not been considered "treatment." In recent years, however, increasing numbers of payers have begun to offer certain treatment-related services to their members and members' doctors, as more organizations have come to realize the value of innovative value-based care arrangements. The services offered by these so-called "pay-

viders" include, for example, creating personalized treatment recommendations for their members' doctors. Particle was the first to realize that payers offering these services legitimately needed records to assist physicians with providing "treatment," and could therefore, under certain circumstances, utilize the centralized exchange networks to obtain medical records through the most efficient means currently available. Under HIPAA and the rules of those networks, those same payers can then rightfully use the records for "secondary" purposes more typically associated with health insurance, like population health analytics or processing claims.

10.    The pay-vider trend opened the door to competition in the payer platform market, because that new class of payer had every right to access medical records through the centralized exchange networks and therefore could utilize platforms other than EPP, like Particle. That increased competition also substantially benefited ordinary consumers, because it encouraged their payers to offer broader treatment-related services as part of their health plan coverage, and it allowed payers to save on costs due to the existence of a competing payer platform (which translates into better health plan coverage, for less). Particle quickly began to assist payers who offer innovative "pay-vider" services with obtaining medical records, both directly (through customer relationships with certain payers) and indirectly (through contracts with other payer software vendors to integrate Particle's payer platform capabilities into their software for specific payers). The payers who Particle has assisted, either directly or indirectly, include major companies like Blue Cross Blue Shield of Michigan and Blue Shield of California, as well as up-and-coming payers like Curative and Clover Health. As the first company to introduce viable competition to the payer platform market, Particle was on a meteoric growth path.

11.    Epic first became aware of Particle's entry into the payer platform market in late 2023, when it learned that a Particle customer was utilizing the Particle platform to provide EHRs

to Blue Cross Blue Shield of Michigan. Epic immediately began to raise baseless complaints with Particle to intimidate it into exiting the market, each to no avail. A few months later, in March 2024, with the rising threat that Particle posed to its dominant EPP product, Epic decided that it had had enough of fair competition. Why? Because the payer platform market is one where early entry is key, and where early dominance essentially means the winner takes all. As Epic's dominance in EHRs shows, early entrants to these markets enjoy substantial lock-in effects and inertia. Knowing that from personal experience, Epic therefore set out to eliminate any whiff of competition in this relatively new market, so it could continue to extend its dominance and erect an impregnable moat around payer platforms. Epic accordingly began a multi-pronged campaign to destroy Particle and actively snuff out competition, which only meaningfully showed up once Particle began its recent, swift growth.

12.    *First*, Epic has leveraged its chokehold over EHRs to coerce Particle's customers—both its newer payer customers and its older healthcare provider customers—into ending their relationships with Particle. Because Epic is the dominant supplier of EHRs to third parties, nearly every one of Particle's customers using its platform must request EHRs from Epic. For Particle's customers, those records are an essential part of their business. Keenly aware of its EHR dominance and the power that provides over Particle's customers, Epic began in March 2024 to suddenly and arbitrarily deny Particle customers (including Particle's traditional healthcare provider customers) access to Epic-stored records. Though it has since offered a shifting series of pretextual justifications for its behavior, Epic's desire to crush Particle has remained clear beneath it all: after cutting off their access to essential medical records, Epic informed Particle customers that it would resume supplying them with those records ***if and only if*** they stopped using Particle's competing platform. Faced with catastrophic business losses, some have done just that, while many

others have threatened to do so, requiring Particle to provide them with substantial monetary concessions. The threat of losing access to Epic records has also scared off prospective customers. As one (now lost) prospective Particle customer put it: "*While [we were] bullish on our use case by being under the Particle umbrella our advisors felt we would be under additional scrutiny. Our ability to be successful as a company is tied to our access to the [Health Information Exchange] and Particles current dispute [with Epic] puts this connection at risk*."

13.     *Second*, at the same time Epic began coercing Particle's existing customers to end their relationships with Particle, it began to obstruct Particle's onboarding of new customers and expansion of its relationships with existing customers, further stifling Particle's ability to compete. When Particle onboards a new customer or adds a new record endpoint for an existing customer (such as a new doctor's office in an existing customer's network), Epic must add that customer to its "directory" in order for Particle to begin retrieving Epic-stored medical records on its behalf. This approval process typically occurs automatically, and was never a problem before Particle entered the payer platform market. Approval consistently took no more than two days. As soon as Epic commenced its anticompetitive campaign, however, it began to drastically slow-walk the approval process for new Particle customers, including traditional healthcare provider customers. Epic instituted a new policy that *every* new Particle customer had to be individually approved by a single, arcane executive committee affiliated with Epic that has treated every new customer with extreme skepticism. That new policy, which lasts to this day, applies *only* to Particle customers; no other group of organizations is required to consistently obtain manual approval from Epic. Indeed, aside from a few isolated instances, Particle is not aware of any non-Particle customers that have had to obtain manual approval *at all*.. Epic's new policy has made an onboarding process that previously took a maximum of *two days* now often take over *a month*—and, in the case of at

least one Particle customer, almost **three months**. By adopting this policy, Epic has dramatically and transparently increased the risks for healthcare organizations to associate with Particle, by unapologetically putting a target on their backs and making sure they know that fact.

14.    *Third*, at the same time Epic began coercing Particle's customers to end their relationships with Particle, it embarked on a market wide campaign to destroy trust in Particle. Beginning in April 2024, Epic directed thousands of statements to the healthcare community that baselessly (and vaguely) claimed that Epic had cut off Particle customers because Particle introduced "security and privacy risks," and allowed "potentially inappropriate disclosures of protected health information." Those claims were (and are) not only false; they are inconsistent with the pretextual explanations Epic itself has given for its actions when forced to explain its reasons in detail. Epic repeated these claims multiple times to thousands of healthcare providers, including eventually claiming—with absolutely no basis—that Particle had "admitted wrongdoing." The actual substance of Epic's supposed reasons for cutting off Particle customers has nothing to do with any alleged "security and privacy risks" they face or "wrongdoing" by Particle, despite what its statements insinuated. But, by repeatedly issuing (and doubling down on) vague and ominous statements alluding to such risks, Epic destroyed public trust in its only meaningful competitor to date in an industry where privacy and security are paramount concerns. These tactics have so far paid off: as soon as Epic began its campaign, Particle began to struggle to obtain new business and keep the old, in contrast with the rapid expansion in market share it saw before.

15.    *Fourth,* Epic has repeatedly tried to overwhelm Particle and thereby prevent it from operating on a competitive basis by directing its statements about supposed "security and privacy" risks to hundreds of Epic's own healthcare provider customers, and then telling those providers to

request more information from Particle about what Epic knew were non-issues. These efforts were meant to inundate Particle with hundreds of inbound inquiries from healthcare providers, much the same as hackers shut down websites through distributed denial-of-service (DDoS) attacks that overwhelm a website with supposedly benign but, in reality, malicious traffic. Because Particle remains a small company, it simply does not have the resources to both run its operations as normal and assist hundreds of healthcare organizations with investigations into what they have been misled to believe are real issues. As a result, Epic's tactic of weaponizing concerns over privacy obligations to overwhelm Particle with information requests has drained Particle's resources and severely disrupted its operations, further hindering its ability to compete.

16.    *Fifth*, Epic has bogged Particle down and further smeared its name by bringing a manufactured dispute against it within a standard-setting organization called Carequality, and by using its outsized influence over that organization to improperly obtain a result that favors Epic, regardless of the merits. Carequality is, in its own words, "the nation's largest healthcare data sharing platform." It is a private non-profit body that oversees and administers a contractual framework that healthcare organizations, including Epic and Particle, join to facilitate the smooth flow and exchange of medical records between them for "treatment" purposes, and to ensure interoperability. At the same time that Epic cut off records access to Particle's customers and began its smear campaign against Particle, Epic also initiated a dispute against Particle within Carequality's private dispute resolution process. Epic's claims hinged on an allegation that three Particle *customers* (not Particle itself) applied an incorrect designation to certain medical record requests they made through Particle's platform. However, Epic did not identify—and to this day still has not identified—anything indicating that Particle was or should have been aware that any customers misused its platform, such as deficiencies in Particle's onboarding or screening

processes. Although disputes between Carequality members have traditionally been informal and relied on negotiated resolutions, Epic insisted on filing a formal dispute (the first in Carequality history) and drew it out, forcing an unprecedentedly slow and formal process while rebuffing five separate efforts by Particle to reach a negotiated resolution. All of this had the purpose and effect of further draining Particle's resources and subjecting it to sustained scrutiny in the public eye.

17.     After receiving comprehensive written submissions and evidence and holding a full hearing, the Carequality Steering Committee ***fully agreed*** with Particle's arguments, expressly finding that Particle did absolutely nothing wrong, that Epic's allegations against Particle had no basis in fact, and that Particle acted within the law and Carequality rules. And yet, in a clear indication of Epic's strong influence over that body, the Steering Committee nevertheless imposed a "corrective action plan" on Particle that gave Epic much of what it wanted ***while expressly disclaiming*** any finding of wrongdoing by Particle. That unprecedented result can be explained only by the outsized power and influence over Carequality that Epic has purposefully cultivated. As by far the largest supplier of medical records to the Carequality framework, Epic knows that Carequality could not exist (and is, in fact, entirely irrelevant) without its voluntary participation. Throughout the years, Epic has repeatedly extracted concessions from Carequality by threatening to leave the organization, and it hangs this threat over Carequality's head like a Damocles sword, improperly manipulating the organization. On information and belief, Epic's improper coercion of Carequality allowed it to obtain a resolution to the dispute that further burdened Particle, even though the Steering Committee was expressly unable to find any merit in Epic's allegations of wrongdoing. This result further hinders Particle's ability to compete and is yet another example of Epic's anticompetitive tactics.

18.     The impact on Particle of Epic's anticompetitive conduct has been severe and threatens its very existence. Particle's market share and revenue had been growing exponentially prior to Epic's exclusionary campaign. Just a few months after Epic began its conduct, however, Particle's revenue growth dropped so sharply and so dramatically that it was barely able to meet *one third* of its previous projections, which up to that point it had regularly exceeded. And, unfortunately, that downward trend is continuing, all because of Epic's anticompetitive campaign.

19.      If left unfettered, Epic's conduct will snuff out meaningful competition in the still-fledgling payer platform market, relegating yet another market to Epic's monopoly control. That outcome would not only harm the customers of payer platforms (health plans), but also the patients, doctors, and hospitals affected by prices and plans that payer platforms establish for their health care reimbursements. Even putting that aside, Epic's increasingly obstructive efforts to box out Particle also create inefficiencies and delays in the treatments actual patients need and receive, thereby harming the very constituents Epic purports to help. Without meaningful competition, Epic will be allowed to provide a worse product for higher price, which will in turn have cascading effects on the scope and price of plans that payers provide. Only the antitrust and other claims in this Complaint, and the injunctive relief sought herein, can preserve robust competition in the payer platform market, and remedy the extensive harm Epic has already caused.

## II.     PARTIES

### A.     Plaintiff

20.     Plaintiff Particle Health Inc. ("Particle") is a privately-held corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 104 W 27th St, New York, New York 10001.

**B.**     **Defendant**

21.     Defendant Epic Systems Corporation ("Epic") is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 1979 Milky Way, Verona, Wisconsin 53593.

22.     Epic is the largest provider of health information technology in the United States, and its products and services are used primarily by large U.S. hospitals and health systems to access, organize, store, and share electronic medical records. As discussed in further detail below, a substantial majority of large hospital systems use Epic's electronic health records systems software and the vast majority of patients in the United States have electronic health information stored in Epic's software products. Epic operates across the United States, including in the Southern District of New York, where it transacts substantial business.

23.     Epic also offers a variety of other healthcare software to various entities within the healthcare system, including but not limited to payer platforms.

### III.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question jurisdiction), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Clayton Antitrust Act, 15 U.S.C. § 15(a).

25.     This Court has supplemental jurisdiction to adjudicate the related state law claims under 28 U.S.C. § 1367 because these claims are so related to the claims arising under Title 15 that they form part of the same case or controversy.

26.     This Court has personal jurisdiction over Epic pursuant to Federal Rule of Civil Procedure 4(h)(1)(A) and the New York long-arm statute because (a) Epic transacts substantial

business in this District; and (b) Epic directed the tortious and otherwise illegal conduct from which these claims arise toward this district, where Particle resides.

27.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Epic, as an entity subject to this Court's jurisdiction, resides in this District and because a substantial part of the events or omissions giving rise to the claims and affecting interstate commerce occurred in this judicial District.

### IV.    THE RELEVANT MARKET(S) AND EPIC'S MONOPOLY POWER

28.     The relevant market in which Epic and Particle compete is the payer platform market. There are, however, other aspects of Epic's business that inform how and why it has the power to foreclose competition in the payer platform market. Although Particle's claims do not depend on whether these other aspects of Epic's wide-ranging business are defined as relevant antitrust markets, it nevertheless notes that they may be considered in that way and, as noted herein, therefore contribute to certain types of antitrust and other liability. Those other aspects of Epic's business are its dominance over EHR Software and the provision of EHRs.

### A.    Electronic Health Records Software

29.     The first type of product (and, in the alternative, relevant market) at issue in this case is Electronic Health Records Software. An Electronic Health Record ("EHR") is a patient's medical history stored and maintained in electronic format. An EHR often contains critical patient information such as a patient's medical history, diagnoses, medications, treatment plans, immunization dates, allergies, radiology images, and laboratory and test results. Due to their electronic form, EHRs have substantial, unique benefits over paper records, including that a patient's medical history can be more easily stored in one central location, sent between medical care providers, accessed immediately, and physically take up less space. Using EHRs also

enhances accuracy, given that they involve electronic data entry and a number of checks to ensure accuracy.

30.     Electronic Health Records are maintained in Electronic Health Record Software ("EHR Software"). EHR Software allows healthcare facilities to add, update, maintain, and delete patient EHR data, along with user interfaces that allow medical professionals and patients to use and interact with the EHR data. For example, here is a snapshot of Epic's EHR interface (with all patient information redacted):



31.     Hospitals deploy EHR Software to streamline their operations and avoid the use and maintenance of unreliable paper records. EHR Software also allows for increased interconnectivity between and among healthcare practitioners and facilities so that all healthcare professionals have a single, accurate view of the patient's medical history and profile.

32.     From a practical perspective, there are no reasonably interchangeable substitutes for EHR Software. The entire purpose and use of the software is as a centralized location for a uniform type of EHRs, which are in turn specifically designed and used for medical care purposes. Other types of electronic record software do not have that same use case or application, and are therefore not the types of product to which customers would turn for the same essential purpose.

13

33.    Customers of EHR Software recognize that it constitutes a unique type of product and that other types of software are not reasonably interchangeable with EHR Software. Furthermore, EHR Software has unique pricing and price-demand curves vis-à-vis other types of software, including software in the healthcare industry. Because of these facts, a hypothetical monopolist of EHR Software (or actual monopolist, like Epic) can profitably implement a small but substantial, non-transitory increase in price ("SSNIP"), because EHR Software users would not switch to other types of products in sufficient numbers to make the increase unprofitable.

34.    The geographic scope of the EHR Software Market is the United States. There are few, if any, groups of healthcare facilities that span across multiple countries. Moreover, the United States has a unique regulatory regime that controls how EHR Software is designed and implemented in the United States.

35.    Epic is a monopolist in the EHR Software Market. Epic's Software contains at least one electronic health record from more than **280 million** patients in the United States, and generates **$4.6 billion** in annual revenue.[1] Its market share measured by the percentage of patients with at least one electronic record is approximately 81%, as the total population of the United States is approximately 345 million.[2]

36.    Epic's dominant market position has put the company in a monopolistic position—one that's thwarting industry competition, stifling innovation, and exerting an undue amount of control over the employees, partners and customers with whom Epic works. As  a result, Epic has

---

[1]  https://www.forbes.com/companies/epic-systems/?sh=3caf699ca11b; https://www.cnbc.com/2024/08/16/epic-systems-customers-will-use-tefca-to-exchange-health-records-.html.

[2]  On its website, Epic indicates that it has at least one EHR for more than 325 million patients. https://www.epic.com/about/. If that is a reference to United States patients, that is approximately 94%.

grown while competitors have stagnated: between 2017 to 2022, Epic added almost 100,000 new hospital beds to its EHR network, while not a single competitor made a net gain of beds during that same period. As one healthcare network CEO put it, Epic's system "has tentacles that go out through amazing networks."[3] Moreover, Epic is well-positioned to perpetuate its market dominance, as "[m]ore than 90% of medical students and residents now train on Epic."[4]

37.    While harmful to doctors and patients, Epic's monopoly has been lucrative for its secretive private owners. "Epic Systems founder Judy Faulkner built an empire pioneering—and later dominating—electronic medical records."[5] Ms. Faulkner's 47% stake in Epic has been estimated to be worth $7.4 billion.[6]

38.    Unsurprisingly, there is widespread recognition that Epic is a monopolist. For example, one doctor has written:[7]

> EPIC cornered the market with an awful product and a virtual monopoly. It's not just rules/regulations - it's an actual POS software we're forced to use. EHRs could actually be helpful if they were engineered correctly. But not while EPIC is the only option . . . .

---

[3]  *The Billionaire Who Controls Your Medical Records*, Katie Jennings, Fortune, https://www.forbes.com/sites/katiejennings/2021/04/08/billionaire-judy-faulkner-epic-systems/?sh=489c3fe7575a.

[4]  *How Epic won over academic medical centers*, Giles Bruce, Becker's Healthcare, https://www.beckershospitalreview.com/ehrs/how-epic-won-over-academic-medical-centers.html.

[5]  *The Billionaire Who Controls Your Medical Records*, Katie Jennings, Fortune, https://www.forbes.com/sites/katiejennings/2021/04/08/billionaire-judy-faulkner-epic-systems/?sh=489c3fe7575a.

[6]  *Judy Faulkner's wealth climbs to $7.4B*, Naoimi Diaz, Becker's Healthcare, https://www.beckershospitalreview.com/ehrs/judy-faulkners-net-worth-sees-increase.html.

[7]  https://x.com/drkevinknopf/status/1151990148587872256?s=46.

Almost 10 years ago, academic commentators recognized that "Epic is creating an emerging monopoly in the USA."[8] Since then, Epic's dominance has only grown—and dramatically so.

39.    This market power is enforced by the overwhelming lock-in effects of Epic's Software. Installing Epic involves massive nine- (and, in some instances) ten-figure investments, with over two-thirds of that cost coming in the form of upfront fees.[9] For example, when Partners HealthCare adopted Epic software, it incurred $1.6 billion in expenses.[10]

40.    Among EHR vendors, Epic has a notorious reputation for lock-in effects that make it prohibitive for healthcare organizations to switch EHR vendors after installing Epic. As put succinctly by one source, "Epic knows switching costs are too high to move to another vendor, as there are large-scale losses in productivity, time spent, and resources in changing behavior and moving to a computerized EHR system in the first place."[11] Epic has been described as "a collective organism that acquires knowledge and technology from external sources and then forcibly assimilates their clients into its drone army."[12]

41.    These facts indicate that as an economic matter, clients that have selected Epic Systems as their EHR Software have little choice but to continue using Epic Systems and are

---

[8]    *Implications of an emerging EHR monoculture for hospitals and healthcare systems*, Ross Koppel and Christoph Lehmann, Journal of the American Medical Informatics Association Vol. 22, Issue 2 (March 2015), https://academic.oup.com/jamia/article/22/2/465/695841.

[9]    *Id.*

[10]    *Why Doctors Hate Their Computers*, Atul Gawande, https://www.newyorker.com/magazine/2018/11/12/why-doctors-hate-their-computers.

[11]    *Epic EHR Systems: The Role of Network Effects*, Harvard Business School, https://digital.hbs.edu/platform-digit/submission/epic-ehr-systems-the-role-of-network-effects/.

[12]    *Healthcare's Epic Problem & the Audacity of Liberating Patient Data*, 4sightHealth, https://www.4sighthealth.com/healthcares-epic-problem-the-audacity-of-liberating-patient-data/.

16

beholden to Epic Systems. Very few large healthcare organizations have switched away from Epic after installing Epic's EHR Software.

42.    In addition to the Epic-specific switching costs and lock-in effects its EHR customers face, new entrants to the EHR Software market also face substantial barriers to new entry. For one, there are incredibly high hard costs, time requirements, and expertise required to develop EHR Software in the first place. Further, putting aside Epic itself, there are substantial lock-in effects and switching costs from selecting and then implementing EHR Software. There are also substantial network effects once an EHR Software provider achieves any sort of scale. As Epic's own case demonstrates, those network effects build on each other over time, making it extremely difficult for new entrants to participate in the market. EHR Software providers must also comply with significant and varied regulatory schemes.

**B.    EHR Provision Services**

43.    The second type of product—or, in this case, service—at issue in this dispute is the provision of medical records to third parties ("EHR Provision Services"). This type of service (or, in the alternative, relevant market) is related to, but distinct from, EHR Software. Whereas EHR Software generates and stores medical records, EHR Provision Services, as the name implies, involve the provision of the records *themselves* to users other than the parties who generate them. Whereas the customer base for EHR Software includes only hospitals and other healthcare providers who have need to generate medical records, the customer base for EHR Provision Services includes healthcare researchers, analytics companies, health plans, and patients in addition to other healthcare providers—in short, any party who needs to obtain existing medical records generated by a third party. The same companies that supply EHR Software also supply records as part of their EHR Provision Services.

17

44.     EHR Provision Services are a unique type of service with no reasonable substitutes. When an individual or organization needs to access the information contained within a patient's electronic medical records—whether for treatment, research, or insurance claims processing—nothing other than medical records will serve the user's purposes. Furthermore, consumers of EHR Provision Services recognize that they constitute a unique type of service and that other types of service are not reasonably interchangeable with them. Furthermore, EHR Provision Services have unique pricing and price-demand curves vis-à-vis other types of service, including services in the healthcare industry. Thus, a hypothetical monopolist of EHR Provision Services can profitably implement a SSNIP, because users with need to obtain medical records would not switch to other types of service providers in sufficient numbers to make the increase unprofitable.

45.     The geographic scope for EHR Provision Services is the United States. The existing networks that facilitate the exchange of EHRs, such as Carequality (discussed further below), generally operate at a national level. Far fewer, if any, systems exist to facilitate the exchange of medical records across international borders. In addition, the exchange of health records via EHR Provision Services is governed by domestic private standards and public regulations, including laws like the 21st Century Cures Act, that are unique to the United States.

46.     Standard-setting organizations, such as Carequality, play an important role for EHR Provision Services. The process of medical records exchange poses substantial practical challenges, including ensuring uniformity and consistency in the process for requesting records, ensuring that parties with control over records make them available to EHR Provision Service providers, and ensuring that the records themselves are interoperable in format. When they function as they should, such organizations can help overcome these difficulties by providing uniform standards and processes, and by ensuring that participants abide by them. These

18

organizations, including Carequality, operate by allowing healthcare-related entities to join a voluntary contractual framework that requires participants to abide by a uniform set of rules and request or provide medical records through a centralized system. The result is that a party who wishes to request a medical record maintained, for example, by Epic, need not go to Epic directly in some cases. Instead, that party can request a record through a centralized framework, and Epic will receive that request and provide the record pursuant to its contractual obligations under the EHR exchange organization's agreement. Critically, the centralized system created by networks like Carequality allows third-party platforms, such as Particle, to plug in using APIs and retrieve medical records for their users *at scale*.

47. EHR Provision Services and EHR Software are closely intertwined, and the market share of EHR Software providers generally mirror those same companies' share of EHR Provision Services. This is because, by providing the software that healthcare providers use to store the medical records they generate, companies like Epic gain control over the records themselves and, as a result, become the suppliers of those records when providing EHR Provision Services. Thus, a company that supplies its EHR Software to more hospitals will control more medical records and, accordingly, a larger share of EHR Provision Services.

48. To this point, Epic's dominance over the EHR Software market translates to dominance and monopoly power over EHR Provision Services. Because Epic provides the software that stores a substantial (and growing) majority of medical records in the United States, it also supplies a substantial and growing majority of the records provided with EHR Provision Services. Indeed, Epic's share of EHR Provision Services is even *larger* than its share of EHR Software—between 81-94% of patients in the U.S. have at least one Epic EHR in their file, which is a much higher percentage than any other EHR Software provider. Because 81-94% of patients

have at least one Epic-stored EHR, Epic effectively holds the keys to the medical history for 81-94% of patients, allowing it to substantially control the output for the country's EHR Provision Services as a whole.

49.    As with Epic's dominant market share in EHR Software, Epic's even more dominant share EHR Provision Services lends Epic the power to control output in that market. This power is borne out by direct evidence: by threatening to withhold its supply of medical records, Epic has been able to coerce users of medical records to abandon otherwise profitable relationships with Particle (among others). This power is further borne out by the fact that, due to the nature of EHR Provision Services, rivals' ability to expand is sharply limited: the number of records rivals can supply via EHR Provision Services is directly tied to the number of healthcare providers that use their EHR Software. Rival EHR Provision Service providers cannot expand their record output to counteract an output limitation by Epic unless they can gain additional users of their EHR Software, but Epic's monopolistic entrenchment over EHR Software prevents them from doing so. Moreover, barriers to new entry for EHR Provision Services are extremely high, because all potential entrants must, as a prerequisite to even consider market entry, establish themselves and gain a customer base in the completely separate EHR Software market, which itself has high barriers to entry. Finally, the market demand elasticity for EHR Provision Services is low: parties that obtain medical records via EHR Provision Services almost invariably have some specific, pressing need for those records—whether for intaking new patients or processing insurance claims. Users of EHR Provision Services are exceedingly unlikely to respond to an increase in price or reduction in the quality, convenience, or availability of the services by exiting the market entirely. All of these factors, alone and combined, mean that Epic has an extremely high degree of control

over the output of EHR Provision Services: if it decides to restrict output, there is little that customers or competitors can do about it.

50.    Because between 81-94% of patients in the U.S. have *at least* one Epic EHR in their medical file, any party requesting medical records will, by necessity, need to request at least one record from Epic between 81-94% of the time, or else not obtain a patient's full medical record history. This independently gives Epic substantial power over entities in need of EHR Provision Services, regardless of the price of those services, because it essentially makes Epic a "must have" option for any requesting party that wants to ensure it has access to a complete medical picture for more than 6-19% of U.S. patients (*i.e.*, essentially any and all of the parties requesting such records).

51.    In addition, although networks like Carequality allow the exchange of medical records for all legal purposes, including healthcare operations and research, Epic has chosen to only provide records through the Carequality framework for "treatment" purposes—the bare minimum to meet its legal requirements. Due to Epic's decision, Carequality's only effective use is for "treatment" requests. For parties seeking to obtain EHR provision services from Epic for *other* purposes, Epic severely restricts the options. Those parties must typically request records directly from the healthcare providers that use Epic's EHR software using manual processes, or purchase Epic's Payer Platform for extremely high prices. Critically, the methods by which Epic makes records available for non-treatment purposes is a closed system and does *not* allow third-party platforms, like Particle, to plug in and retrieve Epic-stored records at scale for non-Epic customers.

### C.    Payer Platforms

52.    The core relevant market at issue in this case is the payer platform market. This is the market in which Epic and Particle compete.

21

53.     Payer platforms are software platforms that allow payers to consolidate multiple aspects of their business on a single platform, including by providing them the ability to retrieve EHRs at scale through smooth, automated processes, and then to store and analyze those records. Competitors within the Payer Platform market sell and license such software.

54.     Historically, in order to obtain medical records, payers had to request them manually from the suppliers of medical records, such as healthcare providers or, later, Epic. In either case, both before and since the rise of EHRs, the payer would have to request the records through comparatively inefficient means (like email) and receive them through even more inefficient means (like fax). Even once the records were received, there was no scalable system for centralizing, storing, aggregating, or analyzing them. Thus, the introduction of payer platforms allows payers to both more easily obtain medical records and more effectively use them to process claims and assess risk. It also allows payers to consolidate those tasks into a single platform, thereby increasing efficiencies and reducing costs.

55.     Payer platforms like Epic's and Particle's join together multiple complementary services to create a new product that provides distinct value to customers. The first is record retrieval functionality. The exact method of retrieval varies by product, but the common thread is that payer platforms interface directly with EHR platforms to pull medical records *digitally*, *instantaneously*, and *at scale*, vastly increasing the efficiency of the process. The second service payer platforms offer is a centralization and storage service. By using a payer platform to request and obtain medical records, users automatically receive digital versions of the records in a centralized, organized, and searchable/sortable database, rather than from a fax machine or email, which then requires manually filing or sorting the records the payer received. Third, payer

platforms offer various analytics services tailored to payer needs, allowing payers to aggregate large data sets to monitor their members' health and risk.

56.    Payers consistently need to utilize all of these functions, and offering a single platform that integrates these operations and allows payers to utilize them at scale substantially reduces payers' costs and eliminates the friction associated with juggling multiple applications and vendors. In addition, the ability to retrieve medical records *instantaneously* and *at scale* is a function that no other type of product or service available to payers can fulfill, as all alternative methods for obtaining medical records are manual processes that take time and cannot efficiently scale. Payer platforms thereby provide a unique customer benefit that generates unique demand. One testament to the unique demand that payer platforms generate is how rapidly the market has grown since their introduction just a few years ago. As a result of the unique demand they generate, there are no reasonably interchangeable substitutes for payer platforms. Other types of platform software or methods for retrieving medical records do not have the same use case or application, and are therefore not the types of product to which customers of payer platforms would turn for the same essential purpose. Furthermore, customers of payer platforms recognize that they constitute a unique type of product and that other types of software are not reasonably interchangeable with payer platforms. Furthermore, payer platforms have unique pricing and price-demand curves vis-à-vis other types of software, including software in the healthcare industry.

57.    Furthermore, payer platforms cost much less on a per-record basis than traditional, manual services that assist with medical records. Because of this and the other facts cited above, a hypothetical monopolist of payer platforms can profitably implement a SSNIP, because payer platform users would not switch to other types of products (e.g., traditional services that assist with medical records) in sufficient numbers to make the increase unprofitable. Payers also have not

found it in their interest to switch back to those traditional, manual methods because they lack the core utility and functionality of payer platforms.

58.    The geographic scope of the payer platform market is the United States. The United States, at both the federal and state level, has a unique regulatory scheme that controls how payers operate and run their business. Furthermore, payers insure United States citizens and residents, and are therefore located within the United States. Providers of payer platforms are accordingly located within the United States.

59.    Epic is a monopolist or is dangerously likely to become a monopolist in the payer platform market. As of November 2023, every single one of the seven largest health plans in the country used Epic's EPP, with that network growing rapidly.[13]    EPP's customers include such health insurance giants as Aetna, Anthem, Blue Cross Blue Shield, Humana, and Highmark, among others. Given the recent introduction of the payer platform market, those health insurance companies that do *not* use EPP typically have not yet begun to use a payer platform at all, and still obtain their medical records through fax and other manual processes. However, more payers enter the market every day as the unique purpose and use these platforms provide becomes more apparent and the inertia typical of large payers gives way to market forces. It is because the market is growing so rapidly that Epic's efforts to exclude competition come at such a critical point. Many payers who have not yet entered the market remain up for grabs. If Epic can stave off competition at this critical juncture, the number of uncommitted payers will eventually dwindle to next to nothing and the market's high switching costs will take effect, allowing Epic's dominant position to crystallize.

---

[13]    https://www.beckershospitalreview.com/ehrs/epic-expands-reach-among-payers-retail-disruptors.html

60.     Epic's control over EHR Software and/or EHR provision services also establish and reinforce its market power in the payer platform market, as Epic has the ability to exclude competition from the payer platform market. Payer platforms and EHRs are complementary products; all users of payer platforms request and use EHRs as a fundamental input for their overall business. By withholding access to EHRs, threatening to withhold access, or making payers fear they cannot receive EHRs from Epic software, Epic can cripple a competitor's current and future business prospects virtually overnight. This is exactly what happened in this case, as discussed further below.

61.     Epic also has the ability to control prices in the payer platform market. EPP is higher-cost than Particle. It is lower-quality. It is not a preferred solution, but Epic is able to charge these higher prices and not compete on price with competitors such as Particle due to its dominance of the payer platform market.

62.     As of today, on information and belief, EPP has over 90% market share in the payer platform market. The only significant competitor to have ever arisen in the payer platform market is Particle itself. To Particle's knowledge, no other company has introduced a platform that allows payers to automatically request and retrieve medical records at scale, and that integrates the functions of requesting, receiving, storing, and analyzing medical records, such that a payer would view it as a commercially viable alternative to EPP. Although Particle offers a product that effectively competes with EPP, its customer base remains small compared to the payer platform empire that Epic has quickly amassed since launching EPP, as Epic entered the payer market far more recently. And, although Particle was growing at an exponential rate, that growth abruptly tailed off due to Epic's anticompetitive conduct. Epic therefore no longer has any competitors threatening to take away any meaningful share from it in the payer platform market.

63.    There are also substantial barriers to new entry in the payer platform market. A payer platform provider must, in the first instance, design and implement a platform capable of receiving, integrating, and making useful a number of different types of inputs for a payer's business. Further, similar to EHR Software, there are substantial lock-in effects and switching costs from selecting and then implementing a payer platform. Epic specifically magnifies the lock-in effects of its systems, meaning that the customers it has already obtained (which is the vast majority of them to date) face even higher switching costs than typical payer platform users. Payer platform providers must also comply with significant and varied regulatory schemes. And any payer platform that is not Epic must be able to circumnavigate the artificial barriers to entry that Epic erects in this market, such as the conduct described herein.

## V.    REGULATORY EFFORTS TO BRING DOWN HEALTHCARE COSTS—AND EPIC'S EFFORTS TO STYMIE THAT REGULATION

64.    The quality of healthcare in the U.S. is on par with other developed nations, but the cost of healthcare is nearly double that of comparable countries.[14] The result is that many Americans lack health insurance or cannot afford coverage for their medical needs. As of 2023, the cost of healthcare in the U.S. was about $12,555 per capita, whereas the comparable average in other developed countries was just $6,651.[15] Thus, the federal government has turned to legislation, regulation, and private litigants to help address this issue.

---

[14]  *See* Josh Barro, "The American Health Care System Sucks," Business Insider, dated October 31, 2013, available at https://www.businessinsider.com/the-american-health-care-system-sucks-2013-10 (last accessed May 20, 2022).

[15]  "Peterson-KFF, "How does health spending in the U.S. compare to other countries?," dated January 23, 2024, available at https://www.healthsystemtracker.org/chart-collection/health-spending-u-s-compare-countries/#GDP%20per%20capita%20and%20health%20consumption%20spending%20per%20capita,%202022%20(U.S.%20dollars,%20PPP%20adjusted) (last accessed September 13, 2024).

65. In December 2016, Congress passed the 21st Century Cures Act ("Cures Act"), which included numerous provisions designed to reduce the cost of healthcare. As particularly relevant to this lawsuit, the Cures Act required that EHR be interoperable with other healthcare software systems and prohibited "information blocking" by EHR providers. Rules implementing this provision of the Cures Act were finalized in 2020. Those rules define information blocking as a practice that "is likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information."[16] By its express terms, the Cures Act applies to health information technology developers such as Epic.[17]

66. Epic fought these efforts tooth and nail. As one article put it, "Epic is doubling down on its monopolistic hold on American health care and would be blocking vital improvements in it."[18] In an effort to undermine the Cures Act, Epic engaged in a full-throated campaign to block the flow of patient data out of its systems and into the hands of patients, doctors, and vendors that could help improve healthcare. Epic CEO Judy Faulkner even pressured Epic's largest clients to go on record in opposition to the goal of increasing interoperability, stating: "HHS needs to hear from you so they understand that you are [sic] feel these issues are important. Very little time is left."[19] In an eerie portent of things to come, Epic assured its clients that wide access to EHR would be available for exchange between healthcare systems—when Epic became the sole provider of IT services for all healthcare systems.

---

[16] 42 U.S.C.§ 300jj–52(a)(1)(A).

[17] *Id*. at .§ 300jj–52(a)(1)(B)(i).

[18] *Epic's call to block a proposed data rule is wrong for many reasons*, Kenneth D. Mandl and Isaac S. Kohane, https://www.statnews.com/2020/01/27/epic-block-proposed-data-rule/.

[19] *Epic CEO Judy Faulkner asks hospitals to oppose HHS' interoperability rule*, Heckers Hospital Rule, https://www.beckershospitalreview.com/ehrs/epic-ceo-judy-faulkner-asks-hospitals-to-oppose-hhs-interoperability-rule.html.

67.    Epic also threatened to sue the U.S. Department of Health and Human Services ("HHS") over Cures Act rulemaking.[20] Epic's purported justification for the suit was "patient privacy" but this was merely a smokescreen to protect its business interests. And, ultimately, its efforts failed. The Cures Act and associated rules went into effect.

## VI.    PARTICLE INNOVATES AND BEGINS TO THREATEN EPIC'S MONOPOLY IN THE PAYER PLATFORM MARKET

68.    One of the key difficulties that payers have faced historically is obtaining medical records at scale. Payers need to quickly access large quantities of medical records in order to process a constant stream of claims from their members and understand population risk. As discussed above, before the rise of payer platforms, payers had to obtain healthcare information record-by-record through manual requests, often receiving them by fax machine or other time- and effort-intensive means. This led to massive inefficiencies, resulting, for example, in weeks-long delays in processing claims if human error led to a medical record being forgotten, misrouted, or lost.

69.    Epic's EPP was the first platform that allowed payers to automatically request and instantaneously receive records at scale. Its release in 2021 represented the advent of the payer platform market as it is defined herein, quickly displacing older services and technologies that sought to assist payers with medical records but which could not deliver them quickly and at scale. Between 2021 and late 2023, EPP's customer base expanded rapidly. However, despite the rapidly growing interest in this new type of software platform, no competitors initially emerged to challenge EPP in the first few years of its existence.

---

[20] *Tahir* et al., "Epic's Faulkner warns of lawsuit for interop rules," dated XX, available at https://subscriber.politicopro.com/article/2020/01/epics-faulkner-warns-of-lawsuit-for-interop-rules-1869015 (last visited May 20, 2022).

70.     EPP's lack of competitors was not due to any special aspect of EPP itself. Instead, it was due to the fact that Epic had leveraged its preexisting dominance in EHR Software and EHR Provision Services to ensure that no competing payer platform could pull records from Epic's EHR systems at scale; specifically, by making such pulls technologically impossible. The only payer platform that could facilitate access to Epic-stored medical records in a scalable way was EPP. It was thus no wonder that EPP had no meaningful competitors: any competing platform would be unable to provide the key service customers sought—retrieval of medical records at scale—with respect to between 81-94% of all patients in the United States. That inability made any attempt at competition impossible.

71.     Epic was able to engage in this anticompetitive preemption (at least, at this early phase) by exploiting gaps in the prevailing regime for medical records exchange. Federal law requires EHR companies like Epic to make their records widely available for "treatment" purposes. For this and other reasons, a robust and standardized system has developed for exchanging records for "treatment" purposes, including exchange networks like Carequality. With the right tools, any platform can plug in to these networks to pull medical records for their users at scale, including from Epic's EHR system. For non-treatment purposes, however, no such centralized system with widespread buy-in exists, primarily because Epic has ensured that one does not emerge. Although Carequality allows participants to make non-treatment requests through it, Epic does not respond to them, making Carequality effectively useless for purposes other than treatment-related requests. The Carequality Steering Committee has repeatedly fielded proposals from members to require that participating EHR companies, including Epic, respond to queries for non-treatment purposes such as healthcare operations and research. In polls and surveys, such proposals have overwhelming support from Carequality membership, as they would increase the utility of

Carequality and the interoperability of medical records. Nonetheless, every time such a proposal goes to a vote of the Carequality Steering Committee, the Committee (over which Epic holds outsized power, as detailed below) miraculously rejects it, despite its constituency's overwhelming support for the proposal.

72.     Epic's efforts to stymie the creation of a centralized exchange regime for non-treatment requests previously blocked all competition in the payer platform market because payers have not traditionally been able to utilize the "treatment" use case due to the view that typical payer use cases for records—like processing claims—do not involve providing healthcare services to patients. Thus, payers fell through the cracks, allowing Epic to give them only two options: (1) obtain Epic records one-by-one through antiquated means like fax machines, or (2) use EPP.

73.     Particle first started in 2018 as a platform that healthcare organizations could use to retrieve records through exchange networks like Carequality, typically utilizing the "treatment" use case. For much of its existence, Particle only provided a record retrieval platform for traditional healthcare providers and health technology companies, and it did not cater to payers. In late 2023, however, by recognizing and responding to a key shift in the way certain payers conduct their business, Particle became the first company to introduce competition to the payer platform market.

74.     What Particle recognized is as follows. In recent years, many payers have begun to offer new, innovative treatment-related services to their members and members' doctors, such as creating personalized treatment plans for their members' doctors. This trend began with the Affordable Care Act's emphasis on value-based care and has led to a fundamental change in many payers' business model, with them providing or facilitating many services historically limited to providers. Particle realized in 2023 that this new frontier of "pay-vider" activity therefore allowed certain payers, under certain circumstances, to obtain records utilizing "treatment" queries. This

meant that payers could, for the first time, obtain records utilizing the centralized exchange networks like Carequality—which in turn meant they could, for the first time, use platforms like Particle to obtain records at scale, rather than having to rely solely on EPP. This shift in the services payers provide opened the door to competition in the payer platform market.

75.     In 2023, Particle began to work with these "pay-viders," providing them with medical records obtained through Carequality in order to facilitate the treatment-related services they provide to physicians. For some payers, Particle has entered into direct customer relationships for use of its payer platform as an independent piece of software. For others, Particle services them by contracting with separate software vendors to integrate Particle's payer platform capabilities into those vendors' software for specific payers, at the request of those payers. Under HIPAA, Carequality rules, and these payers' agreements with physicians, once the payers obtain and use the records through Particle to assist with physicians' treatment of patients, they can then also use those records for "secondary uses," which are any other lawful purpose (*e.g.* processing an insurance claim). In this way, Particle became the first (and, to date, only real) competitor to EPP in the payer platform market.[21]

76.     Under the system Particle pioneered, everyone benefits. Payers benefit because it breaks EPP's monopoly grip over the payer platform market and provides them with new and lower-cost options for retrieving records at scale. Patients benefit because it pushes their health plans to offer more robust treatment-related services to help them understand and improve their health—in addition to lowering prices for payers, which can translate to lower premiums.

---

[21]   Notably, Epic has never claimed that Particle's business model violates any law or Carequality rule. Nor could Epic make such an argument. The mechanism by which EPP pulls records for payers also relies on secondary use principles and is, at a high level, quite similar to Particle.

Healthcare providers benefit because the treatment-related services offered by payers under this system typically take the form of assistive services for doctors, and because patients are better able to pay for the treatment they offer. Competition benefits because companies like Particle are able to gain share in a rapidly-growing market that they would otherwise be unable to obtain due to Epic's anticompetitive conduct. The only party that does not benefit is Epic, because it must face actual competition.

77.      Epic first learned about Particle encroaching on its comfortable position atop the payer platform market in late 2023 and quickly began trying to thwart Particle's forays into that market. In late 2023, Epic discovered that Particle had contracted with a separate software vendor to integrate Particle's payer platform capabilities into software used by Blue Cross Blue Shield of Michigan, and that Blue Cross Blue Shield of Michigan was using Particle's payer platform capabilities to prepare "Gaps in Care" reports for doctors treating individual patients. Epic immediately (and predictably) took issue with Particle providing medical records to payers at scale, asking to meet with Particle and bombarding it with questions. When Particle explained how and why these activities fit the "treatment" use case and that secondary use was permitted, Epic indicated that it understood the model and did not dispute that Particle was correct. Instead, just a few weeks later, Epic began a comprehensive, multi-pronged campaign to destroy Particle by any means necessary.

## VII.     EPIC'S SCHEME TO MAINTAIN ITS MONOPOLY IN THE PAYER PLATFORM MARKET

78.      Epic's anticompetitive scheme involves a number of interrelated acts meant to disrupt Particle's current business and future prospects, and to secure a permanently-dominant position in the payer platform market. A key part of this scheme is that Epic is abusing its position as the dominant supplier of EHRs to harm Particle, and by extension payer platform competition.

However, that is not the only mechanism for its various anticompetitive acts (even if it is the backdrop for them). As described below, Epic's anticompetitive scheme generally involves (a) cutting off Particle customers' access to Epic-stored medical records unless they terminate their relationships with Particle, (b) obstructing and slow-walking the approval process for new Particle customers (and existing customers who wish to expand) to begin receiving Epic records, (c) using its broad reach and recognized dominance over EHRs to stoke baseless privacy and security fears among Particle's existing and potential customers, (d) attempting to overwhelm Particle and its systems by pushing its EHR software customers to bombard Particle with a large number of burdensome yet unfounded information requests, and (e) abusing and manipulating the Carequality dispute process to drain Particle's resources and cast further baseless doubt on its integrity. These acts serve to build on and amplify each other. At its core, however, the guiding principle of this scheme is simple: "death by a thousand cuts."

A.    **Epic Suddenly Cut Off Particle Customers' Access to EHRs, Based on Nothing But Pretext**

79.    In late March, 2024, Particle discovered that Epic had suddenly ceased responding to medical record requests from 34 separate Particle customers representing 119 different medical record end-points and collectively providing healthcare to over one million patients. Each of the cut-off customers received notice from Epic that they had been suspended from receiving medical records through Carequality queries to Epic. The Particle customers suddenly cut off by Epic— who were seemingly chosen at random—constituted roughly 20% of Particle's overall userbase. The majority of cut-off customers were Particle's traditional healthcare provider and health tech customers, who still provide most of Particle's revenue.

80.    In the early days after Epic suspended Particle's customers, its stated reasons for doing so repeatedly shifted. On an April 8, 2024 call, Epic first stated that the suspension of these

Particle connections was due to a "technical" issue. Then Epic changed its story and admitted that it *had* intended to suspend certain Particle connections, but only for two Particle customers. Finally, Epic revealed that it intentionally suspended all 119 of the Particle connections.

81.     The excuse Epic settled on for cutting off these customers is transparently pretextual. As it would later explain in the manufactured Carequality dispute it brought (discussed further below), Epic claims it cut off these dozens of Particle's customers because it allegedly discovered that *three* had labelled certain queries for "treatment purposes" when they should have been labeled for some other purpose. Notably, Epic's claim regarding improper treatment queries is *not* related to any claim that Particle's model for providing medical records to payers is impermissible. Indeed, only one of the three Particle customers accused of improperly using "treatment" queries is associated with a payer at all, and Epic has raised no issues with the records requests made by Particle's several other payer customers. Instead, Epic's pretextual justification revolves around a claim that these three customers had simply lied about their intended uses for the records.

82.     Despite cutting off EHR access to far, far more than three Particle customers, Epic did not make any allegations of mislabeling or other wrongdoing against any of those other Particle customers. Moreover, Epic's suspensions have been haphazard and seemingly random, often treating two Particle customers who provide identical services differently.

83.     The inconsistencies in Epic's story reveal its supposed justification for the pretext it is: if Epic were concerned about three Particle customers mislabeling requests, it would have no reason to suspend dozens of other, completely unrelated Particle customers against whom it has made no allegations of wrongdoing. If Epic were concerned over those other parties' uses of Epic medical records, it would make no sense to treat such similarly-situated parties differently.  Over

the ensuing months, and in response to Particle filing a counter-dispute within Carequality, Epic has slowly restored EHR access to some Particle customers while continuing to add additional customers to the list of suspended Carequality connections. The result has been a morass of confusion, which is apparently intentional. These Particle customers do not know if or when they will be cut off again, and Epic has continued to pull additional Particle customers into the mix for no reason at all (beyond Epic's anticompetitive intent and the effects it knows this confusion causes).

84.     By cutting off Particle customers from accessing Epic medical records, Epic had an immediate and devastating effect on those businesses, and made continued association with Particle (and therefore Epic's only major competitor in the payer platform market) untenable for them. For payers, medical records are an essential part of their business—without medical records, a payer cannot assess claims, underwrite risk, or provide any of their treatment-related services to medical professionals. Medical records are also essential to Particle's traditional healthcare provider and health tech customers, who need medical records to onboard new patients and understand the care that existing patients have received from other providers. When Epic suspended Particle's customers from receiving Epic-stored medical records, it instantly shut off those customers from a substantial majority of all medical records in the United States, crippling their ability to function and provide healthcare (and healthcare coverage) to patients.

85.     *Epic-stored* medical records specifically are important for businesses like Particle's customers because medical records are not fungible; a Particle customer cannot simply replace an Epic-stored medical record with one stored by another EHR Software company—when onboarding a new patient, for example, a Particle customer needs *that patient's* (and only that patient's) medical records. If any portion of that patient's medical history is within Epic's control,

there is nothing the provider can substitute for them. Care for a substantial majority of patients is thereby brought to a standstill if a payer cannot obtain their full records, particularly when one considers that between 81-94% of patients in the U.S. have at least one medical record stored as an Epic EHR. That is what happened when Epic suspended Particle customers: over 40,000 medical record queries made to provide treatment to patients for medical care were blocked by Epic's suspension.

86.     Shortly after Epic suspended the 119 Particle connections discussed above, it fully revealed the anticompetitive nature of its scheme by informing those suspended businesses that it was preventing them from accessing medical records because of their association with Particle. For example, one (now former) Particle customer is a healthcare analytics company called XCures. On January 28, 2022, Particle and XCures executed a contract titled "Particle Platform Agreement" under which Particle agreed to provide XCures with the right to use Particle's platform in exchange for monthly fees. In an amendment to that contract dated December 20, 2023, Particle and XCures renewed XCures's subscription for a one year term beginning on January 1, 2024. On June 12, 2024, after its access to Epic records had been suspended for two months, Particle introduced representatives of XCures to Epic in the hopes they could resolve any issues Epic might have had with XCures. Following that meeting, XCures's CEO informed Particle that Epic told XCures its access to Epic data would be restored if it ended its relationship with Particle. Twelve days later, on June 24, 2024, XCures sent the following letter to Epic:



**xCures**

June 24, 2024

Attn: Epic Governing Council and other Carequality Implementers

To Whom It May Concern:

I am writing to confirm for you that xCures has transferred all of its Carequality connections from Particle Health to Kno2. Kno2 is now xCures' implementation partner for HIE and QHIN connectivity. We are working closely with the Kno2 team to create new directory listings leveraging their standard processes for oversight and validation.

Please feel free to reach out to me directly copying our company admin Sae Yamada at syamada@xcures.com should you have any questions about this transition.

Thank you,

Electronically signed by: Mika Newton
Reason: I am the author of this document.
Date: Jun 24, 2024 12:21 PDT

Mika Newton
CEO, xCures, Inc.
Mika@xcures.com

87.     Kno2, the company to which XCures switched its Carequality connections, is a close ally of Epic's. Notably, Kno2, unlike Particle, does *not* compete with Epic in the payer platform market. Although Kno2 offers a record retrieval service providing a platform to connect to Carequality, it only pulls records for traditional healthcare companies, *not payers*, and does not offer the centralization and suite of analytics services that make Particle a further threat to Epic's EPP. In addition, Particle now knows that Kno2 worked closely with Epic in the Carequality dispute Epic raised against Particle (discussed further below), including by providing Epic with evidence that Epic used to claim one Particle customer was making requests for non-treatment purposes. On information and belief, Kno2 collaborated with Epic in this way because it understood it would benefit from Epic sending business its way, if it helped eliminate EPP's only

37

real competitor to date. Thus, 12 days after Particle learned that Epic had offered to restore XCures's connections if it breached its contract with Particle, XCures informed Epic that it had succumbed to Epic's coercion and switched to a non-competing, Epic-friendly service. In doing so, XCures ceased paying its monthly subscription fees to Particle prior to the contract termination date of January 1, 2025, thereby breaching its contract with Particle. Shortly after XCures sent Epic the above letter, Epic restored virtually all of XCures's EHR access.

88.    On information and belief, Epic made similar representations to numerous other Particle customers, implicitly or explicitly, to coerce them into dropping Particle, and it has accomplished Epic's goal of harming Particle.  Even for those Particle customers who have not outright repudiated their contracts, Epic's conduct has soured their relationship with Particle and forced Particle to make dramatic concessions, including substantial refunds, to avoid losing their business. Since Epic began its campaign, at least ten significant Particle customers have either repudiated their contracts, threatened to do so, or demanded that Particle make material concessions to prevent them from doing so.

89.    In addition to sabotaging Particle's relationships with its existing customers, the threat of Epic cutting off their access to records if they associate with Particle has scared away numerous prospective customers, including many with whom Particle was in advanced talks. For example, on June 11, 2024—two months into Epic's campaign to sabotage customers that associated with Particle—the president and cofounder of one of Particle's prospective customers (with whom Particle had been in advanced talks) sent an email to the Particle account executive in charge of the relationship. In that email, he wrote the following (emphasis added):

> I wanted to let you know we will not be able to continue in our discussion of signing
> onto Particle. After due diligence on the HIE's [*i.e.* Health Information Exchanges]
> and Particle we decided ***the current dispute with Epic presents too much of a risk***
> as we begin our pilots with customers.

*We were invested in pursuing this agreement* having spent significant time with our legal team and *were nearly complete implementing the Particle API into our tech stack*. Unfortunately the noise around Particle is just too risky for us to commit to a commercial relationship.

While the team advising us on pursuing an HIE connection was bullish on our use case by being under the Particle umbrella *our advisors felt we would be under additional scrutiny*. *Our ability to be successful as a company is tied to our access to the HIE and Particles current dispute puts this connection at risk*.

Really appreciate all the support you've provided in walking us through the different options for using Particle.

*Happy to revisit the discussion if the current situation is resolved.*

90.    Thus, the president of this prospective customer made abundantly clear that, but for the risks presented by Epic's arbitrary and discriminatory shutoffs of Particle customers, it would have finalized the deal and entered into a commercial relationship with Particle. The email also demonstrates exactly how the healthcare community understood the arrangement Epic was offering: if you work with Particle, you will receive "additional scrutiny" and your access to critical healthcare information will be "put[] … at risk."

91.    The story of this customer mirrors those of numerous other prospective customers with whom Particle was in active talks prior to Epic's anticompetitive scheme. The prospective customers with whom Particle was in advanced talks prior to Epic's conduct, and who suddenly either abandoned a potential relationship with Particle or substantially postponed discussions for reasons related to Epic's conduct, include at least the following organizations: Beeline Rx, Power Life Sciences, Leafwell, and Medvise. On information and belief, the number of potential Particle customers deterred by Epic's conduct with whom Particle was *not* yet in contact is significantly higher still, as the number of new prospective customers expressing interest in Particle's platform has gone down significantly.

92.     In addition to blocking Particle's customers from receiving medical records generated by Epic customers, Epic has also blocked Particle customers from *sharing* medical records back with Epic customers. In order to retrieve records through Carequality, participants are also required to share data back with the network. Not only is this required, but many Particle customers rely on this functionality to share records back with other organizations to whom they are referring patients. By cutting off Particle customers' Carequality connections with Epic, Epic also prevents Particle customers from sharing records with Epic's EHR customers. This aspect of Epic's conduct both further increases the pain on businesses that choose to maintain a relationship with Particle and collaterally harms Epic's ***own customers***. For example, one adversely-affected Particle customer is a specialty cancer treatment network called OneOncology. OneOncology operates community oncology practices, and it needs to send medical records from those smaller practices (which do not use Epic's EHR Software) to large academic medical centers (which do) when its patients are escalated to that setting. Epic's suspension prevented them from doing so. As a result, not only was OneOncology unable to assist in the transition of its patients—leading it to threaten to breach its contract with Particle—Epic's own medical center customers became unable to onboard new cancer patients who came to them from OneOncology and were in dire need of medical care. Epic's suspension of OneOncology adversely impacted the treatment of over 2,900 patients. OneOncology's case shows just how far Epic is willing to go to harm Particle: it is willing to cut off its own customers from vital patient data, risking the lives of the most vulnerable patients in the process.

93.     Epic's decision to cut off Particle's customers from receiving and transmitting vital data has had its intended effect on Particle: since Epic began its campaign, Particle has been losing customers. That is no surprise. Given the essential nature of the input Epic provides for these

customers, Epic's suspension created an untenable situation for them. Some have found it in their interests to breach ongoing contracts and face the risks of doing so rather than continue to have their business ground to a halt by their inability to access Epic-stored medical records. Particle's prospective customers, too, have dried up, preferring to stay away for fear that a similar fate could befall them if they work with Epic's competitor.

**B.    Epic Began (and Continues) to Obstruct the Onboarding of New Particle Customers**

94.    Concurrent with its decision to suddenly cut off a substantial number of Particle customers, Epic put in place a new policy that significantly slows down the process for new Particle customers (and existing customers who wish to expand) to begin receiving medical records from Epic, and which applies *only* to Particle customers. With this policy, Epic created yet another hurdle to deter and/or punish any company that dealt with its competitor.

95.    When a new customer wishes to open up a connection with an EHR provider through the Carequality framework, the customer must be added to that EHR provider's "Carequality directory." The process is typically done automatically and, under normal circumstances, takes a maximum of two days. The only source of lag is a programmatic refreshing of the EHR provider's Carequality directory, which in Epic's case occurs every 24-48 hours. Thus, it has traditionally taken Particle one to two days to onboard new customers such that they can begin requesting Epic-stored medical records.

96.    Beginning in April 2024, Epic instituted a new, unprecedented policy that *every* new Particle connection—which included new customers and also expansions of existing customers, such as a new doctor's office being added to a network—had to be individually approved by Epic's "Care Everywhere Governing Council." The "Care Everywhere Governing Council" is a 15-member body made up of Epic-friendly volunteers from among Epic's EHR

software customers that oversees Epic's record-sharing activities at the highest level. Requiring every Connection to receive individualized approval through a single, executive-level body was a dramatic deviation from the standard practice for approval of new Connections. Unlike the typical automated and seamless process, Epic's new policy (on information and belief, intentionally) created a single chokepoint for new Particle customers—one that is slow-moving, deliberative, and opaque. This new across-the-board policy applies *only* to Particle customers, and it only began once Epic initiated its anticompetitive campaign against Particle in April 2024. *No* other group of connections is required to obtain approval directly from Epic's Care Everywhere Governing Council with any consistency, much less across the board. In fact, Particle is only aware of a few isolated instances in which *any* non-Particle customers were required to obtain manual approval *at all*. Epic's discriminatory policy against Particle customers has had its intended effect of dramatically increasing the duration and burden of the onboarding process for Particle's customers.

97.    In addition to requiring approval from a single, centralized council, Epic has further increased the duration and burden of the onboarding process by conducting a painstakingly slow and in-depth level of review for each new Particle customer—one that it does not apply to any other group of applicants. By this point, Epic's procedure when a new Particle customer seeks to onboard follows a familiar pattern. First, Epic will demand that the customer provide Epic with in-depth information about its business model, use of records, data maintenance processes, and more. Then, once the Particle customer provides that information, Epic will go silent for extended periods of time, only to appear again weeks later to ask for more information. And the cycle repeats. All in all, the onboarding process that typically takes *two days* has, since April 2024, taken new Particle customers far longer on average—in many cases over a *month*. For at least one Particle customer, the onboarding process took almost *three months*. This extended process creates friction

between Particle and its customers and sends a clear message to the customers: beware, because Epic is both watching you and will make your day-to-day business difficult.

98.    One Particle customer, which provides software for physicians that assists with patient care, provides an example of this process. This customer first sought approval to connect with Epic in June 2024. Epic requested extensive information from the customer shortly thereafter, which it quickly provided. But once the customer provided Epic with the information it requested, Epic went silent. On July 19—roughly a month after Particle's customer sent the requested information—Particle's CEO, on behalf of the customer, emailed Epic to check in on the status of the application. Four days after that, Epic finally responded to inform Particle and the customer that it had *more* questions. Again, Particle's customer answered those questions immediately. Two more weeks of silence followed, after which Epic reached out again, informing the customer that it had been approved to query Epic records for some of its software's users, but *again* requesting additional information for others. This Particle customer only received full approval to query Epic-stored medical records on *September 3*—almost *three months* after it had first requested to connect to Epic.

99.    Epic has also instituted a practice where, as part of the review process for instituting new connections or reinstating preexisting connections, it forces Particle customers to acknowledge that Epic provides alternative services and platforms for retrieving Epic-stored medical records. This practice sends a clear message to the Particle customer: if you drop Particle, you will have a much easier time obtaining EHRs directly from Epic. This contributes to the coercion Epic applies more broadly through actual or threatened suspensions and delays in approval.

43

100.    Epic's slow-walking of approval for Particle's customers (and only Particle's customers) is clearly discriminatory and in violation of Carequality's rules. Indeed, it was in violation of Epic's *own* protocols until shortly before it began its anticompetitive campaign. Epic maintains a "Carequality Phonebook Support Policy" which sets out its policy with regard to adding new entries to its Carequality Directory. Before February 2024, the policy had a section titled "Implementors not in good standing." An "Implementer" is the party, such as Particle, that helps the new entry connect to Carequality. The policy previously read: "For entries whose Carequality Implementor has an ongoing dispute or is deemed not in good standing by Epic or Carequality, Carequality administrators may delay processing the entry while the issue is under investigation." In February 2024, however—three weeks before Epic initiated its dispute against Particle—Epic revised the policy. The section titled "Implementers not in good standing" became "*Ongoing disputes and* implementers not in good standing. As relevant here, Epic revised the body of the section to expand its applicability to all "entries who are the subject of a pending dispute under the Carequality dispute resolution process." With regard to such entries, Epic further revised the policy such that, rather than merely allowing itself to "delay processing the entry while the issue is under investigation," Epic gave itself permission to "***delay processing the entry until the Dispute has been fully resolved***." Below is a redline showing the full set of revision Epic made to this provision of its policy in February 2024:

4.  ~~Implementors~~Ongoing disputes and implementors not in good standing

For entries who are the subject of a pending dispute under the Carequality dispute resolution process (Dispute), or whose Carequality Implementor has notified Epic of an ongoing dispute ~~or is deemed not in good standing by Epic or Carequality~~with regard to the entries' eligibility to participate in the Carequality network, or has been documented as not in good standing by Epic, Carequality, or another Carequality implementer, Carequality administrators may delay processing the entry ~~while the issue is under investigation~~until the Dispute has been fully resolved. For entries that are the subject to an ongoing dispute, Carequality administrators will

Carequality administrators may identify additional reasons not covered by the above sections that result in excluding the entry from the Phonebook. Some examples of situations where an Other reason include but are not limited to:

* Exclusion as a mitigation action in response to a Patient Safety Evaluation
  • Exclusion for Carequality entries that represent the same organization as an organization reviewed by the Epic Nexus Directory Support Policy.

As these edits show, Epic made this revision in the hope that it would provide Epic with cover to discriminate against Particle's customers after initiating a Carequality dispute, which it did three weeks after making this revision.

101.    Epic's discriminatory treatment of Particle customers in the Carequality onboarding process has further raised the cost and difficulty for healthcare companies who wish to associate with Particle, creating further incentive for them to abandon their relationships with Particle. At the same time, it has created additional fears among Particle's prospective customers that they will be targeted with discriminatory treatment by Epic if they associate with Particle, leading many to forego pursuing otherwise-profitable relationships with Particle in the first place.

**C.    Epic Began (and Continues to Pursue) a Fear, Uncertainty, and Doubt Campaign Against Particle**

102.    Around the same time that Epic began its suspension campaign of Particle's customers, it also began to actively cultivate a widespread and insidious misperception in the marketplace that (i) Particle had somehow acted unethically and introduced "security and privacy risks" for its customers, and (ii) *all* Particle connections had been shut off. On April 10, 2024, Epic released an "Issue Notification" regarding its dispute with Particle. The headline of the notification, in bold type at the top, read, "Third-Party Security and Privacy Risk." Though the statement was ostensibly intended for Epic customers including healthcare providers across the country (and in fact, was emailed directly to thousands) it was not marked confidential and, as Epic knew it would be (and, on information and belief, intended), was quickly picked up by the media. Within days, numerous news outlets had published articles repeating Epic's misleading statements about purported "security and privacy risks" introduced by Particle.

103.    The substance of the "Issue Notification" vaguely described Epic's supposed issues with Particle, painting a clearly false and misleading picture of Particle as a bad actor. The document stated that Epic had "serious concerns about security and privacy arising from activities of a third-party participant implementer in Carequality (Particle Health)." It stated that "Particle Health … might be inaccurately representing the purpose associated with [its] record retrievals." Beyond the ominous conclusions, however, Epic's statement provided nothing to substantiate any wrongdoing by Particle. The actual substance of Epic's dispute was an allegation that three Particle *customers* had wrongfully claimed a purpose of "treatment" when making record requests through Particle. Epic's statements did not explain what "activities of … Particle Health" led to its supposed "concerns about security and privacy," or how Particle itself—as opposed to a potential tiny subset of its customers—was "inaccurately representing" anything.

104.    Epic's statement to the public contained no substantiation of wrongdoing by Particle because there is none. Indeed, when Epic notified Particle weeks earlier about potentially inappropriate records requests by three of its customers, Particle immediately began to investigate and entered into an ongoing dialogue with Epic. By the time Epic released its public statement and cut off Particle's customers, Particle had *already removed* two of the alleged wrongdoers' connection to Carequality, as Epic obliquely acknowledged in its statement. The only reason Particle had not suspended the other one was because of a disagreement with Epic's unreasonably cramped definition of "treatment," over which the parties had been engaged in an active dialogue.[22] Nor could Epic fault Particle for any failures in its diligence or screening of these customers, whom it promptly removed when alerted to issues. When Particle onboarded these customers, it worked closely with Carequality administrators and performed independent and fulsome inquiries into their represented use cases, including by requiring them to submit legal memoranda attesting to their bases for asserting treatment use cases. Before onboarding them, Particle also required each customer to execute a contract promising that all queries would be directed toward a legitimate treatment use case.

105.    The closest Epic's "Issue Notification" came to making any actual accusations against *Particle*—rather than Particle's customers—was a vague and unexplained allegation that Particle was "obscuring provider-level details of connections through a generic gateway" when making requests for its customers. As Particle later demonstrated during the Carequality dispute related to these issues, Epic's allegation of a gateway that "obscur[es]" the details of the requesting

---

[22]    Particle was ultimately vindicated *vis-à-vis* this customer in the manufactured Carequality dispute Epic brought, with the Carequality Steering Committee finding that the customer *had* made its requests for "treatment" purposes. Epic's attempts to cabin the definition of "treatment" are unsurprising; as discussed above, "treatment" requests limit Epic's ability to direct the flow of the records it stores, and by extension its power to exclude competition.

organization is so unequivocally and demonstrably false that it is perplexing Epic even attempted

to assert it—a point with which Carequality itself agreed. Contrary to Epic's statements, *every*

*single request made using Particle's Carequality connection clearly states the name of the*

*requesting party exactly where a provider like Epic would expect to find it*. The sole substantive

accusation Epic made against Particle in its "Issue Notification" was made up from whole cloth.

106.    Viewed as a whole, Epic's statements within its "Issue Notification" conveyed two

clear misrepresentations to the public. The first was a general message that Particle was a bad

actor—that it was somehow responsible for a small handful of its customers allegedly misstating

the purpose of their requests, and that it had itself somehow engaged in dishonest behavior in order

to compromise patient privacy and security. The public got this message—which was contrary to

the actual substance of Epic's supposed dispute—loud and clear. For example, a CNBC article

published two days after Epic released its "Issue Statement" began by characterizing Epic's

statement as follows:

> Epic Systems, the largest provider of software for managing medical records, says
> a venture-backed startup called Particle Health is using patient data in unauthorized
> and unethical ways that have nothing to do with treatment.[23]

Likewise, the news outlet DMR News reported that Epic had "taken action against Particle Health,

a venture-backed startup, for allegedly misusing patient data."[24] The notion that Particle itself

"us[ed] patient data in unauthorized and unethical ways" or "misus[ed] patient data" is absolutely,

unequivocally false. Indeed, that allegation is not even related to the supposed issues Epic has

pressed when forced to clarify its positions, which, again, concern only whether a small handful

---

[23]   https://www.cnbc.com/2024/04/12/epic-systems-boots-particle-health-for-
unauthorized-sharing-of-data-.html

[24]   https://www.msn.com/en-us/health/other/epic-systems-halts-data-sharing-with-
particle-health-over-misuse-concerns/ar-BB1lGFg4

of Particle *customers* had properly utilized the "treatment" use case (as opposed to another permitted use case) for retrieving medical records through a connection to Carequality that Particle had facilitated. But by obfuscating the true nature of the dispute and blurring the lines between the actions of Particle and the actions of its customers, Epic successfully created the impression that *Particle itself* had illegally harvested patient data for some nefarious purpose.

107.    Another misrepresentation Epic made in this statement about Particle was a message intended for Particle's existing and potential customers—namely, that Particle is a data security risk. Particle's customers, in addition to using Particle to request records, use the platform to store substantial amounts of valuable data. Data security is paramount for those customers. By releasing a statement about Particle with the words "**Third-Party Security and Privacy Risk**" in large font at the top, and which stated that Epic had "serious concerns about security and privacy arising from activities of … Particle Health," Epic associated Particle with security issues and sowed doubt directly into Particle's customer-base about the integrity of Particle as a data storage platform. Epic chose the words "Security and Privacy" despite the actual supposed basis for its dispute having almost nothing to do with "Security" as that word is typically used. Indeed, the nature of Epic's "Issue Notification" statement was (on information and belief, intentionally) akin to the type of notice informing customers of a hack or data breach, in order to provide that misimpression as to Particle's business.

108.    In addition to statements that falsely painted Particle as a bad actor and a data security risk, Epic's "Issue Notification" also contained blatant falsehoods about Epic's own course of conduct that amplified the harm caused by its decision to cut off Particle customers. In describing its response to the supposed "Third-Party Security and Privacy Risk" introduced by Particle, Epic stated, "On March 21, Epic filed a formal dispute with Carequality, and ***Epic***

*Carequality Administrators suspended Particle Health's gateway connection to Epic community members*." This statement, of course, was not true: Epic had suspended a large swath of Particle customers from accessing Epic records through Carequality, but other customers' connections remained active.

109.    This lie, too, was immediately picked up by the media. In the same article discussed above, CNBC reported that Epic had "cut off data access to a startup called Particle Health," and that it "told customers in a notice on Thursday that it cut off its connection to Particle."[25] DMR News reported that Epic "announced in a notice last Thursday that it had severed its data connection with Particle Health."[26] Even after Particle attempted to clarify in a public statement a few days later that connectivity to Epic remained active for many Particle customers, news outlets continued to repeat Epic's lie that Particle had been totally disconnected from Epic. For example, the news outlet Modern Healthcare published an article on April 17, 2024—two days *after* Particle issued its clarifying statement—stating that, "On March 21, Epic stopped responding to data-sharing queries from customers of Particle Health on the Carequality national interoperability framework," and attributing that fact to Epic.[27]

110.    Over the ensuing months and to this day, Epic has continued to make hundreds of additional false and disparaging statements to the healthcare community regarding Particle. For example, on June 28, 2024, Epic sent out a follow-up email to hundreds of customers regarding supposed "Inappropriate Disclosures" of their patient's data "via Particle Health." While

---

[25]  https://www.cnbc.com/2024/04/12/epic-systems-boots-particle-health-for-unauthorized-sharing-of-data-.html

[26]  https://www.msn.com/en-us/health/other/epic-systems-halts-data-sharing-with-particle-health-over-misuse-concerns/ar-BB1lGFg4

[27]  https://www.modernhealthcare.com/digital-health/epic-particle-health-dispute-data-sharing-carequality

purporting to provide an update on the supposedly improper requests made by one Particle customer—which Particle had removed from its system months earlier after Epic raised issues— Epic told the healthcare community, "we are pleased that after eight months of resistance [Particle] ha[s] now acknowledged wrongdoing and have provided a contact for assisting you in your investigation." Particle had not and has not in any way "acknowledged wrongdoing" or anything remotely close. This aspect of Epic's statement was, again, made up from whole cloth.

111.    Epic's falsehoods about Particle are material to Particle's ability to compete. Reputation and credibility are vitally important in the healthcare industry, particularly among actors who are responsible for handling sensitive patient information. Even the mere specter that an organization might be vulnerable to a security breach or prone to misusing patient data is enough to tank its ability to compete for business from the healthcare providers and payers who Particle relies on to survive. Epic's representations regarding the status of its connections to Particle are also material: by telling the world that it had "suspended Particle Health's gateway connection to Epic community members," Epic sent Particle's existing and potential customers the clear message that they would be unable to access Epic records as long as they used Particle as their Carequality connection. For many customers, of course, that was true. But by conveying that message to *all* Particle customers, whether existing or potential, Epic greatly amplified the fear and uncertainty faced by those customers and gave them additional incentive to abandon their relationships with Particle.

112.    Epic's falsehoods about Particle were also likely to induce reasonable reliance. As the dominant EHR company, Epic is a familiar name to healthcare organizations across the country, whereas Particle is a relative newcomer. By virtue of Epic's position as the source of the vast majority of medical records in the United States, its statements on health data issues have

weight and credibility. That is why, for example, Epic's mere decision to release a statement regarding Particle sparked a flurry of media coverage across the country—when Epic speaks, healthcare organizations listen to what it has to say. Healthcare organizations' high sensitivity to (and legal requirements regarding) patient data-related issues also makes them especially likely to rely on statements, like Epic's, that alert them to potential issues of patient privacy. The caution and sensitivity that sparks that reliance is reasonable, given obligations healthcare organizations must meet with respect to patient privacy. In addition, Epic's statements on patient privacy and security have baseline credibility because Epic is bound by a web of laws and regulations that lead recipients to believe that any data security or similar concerns it raises are motivated by its own interest in ensuring compliance with those laws. Here, the problem is that Epic has used those typical indicia of trustworthiness to spread falsehoods to hundreds in a way that they are likely to believe. Epic's statements regarding its own connections to Particle were also likely to—and did— induce reasonable reliance, as healthcare organizations have no reason to suspect Epic of lying about its own course of conduct.

113.   Epic's falsehoods about Particle have continued for a prolonged period of time. Long after releasing its "Issue Statement," Epic has continued to double down on its allegations falsely accusing Particle of wrongdoing. Between its initial statement and its June 28 email repeating its lies and stating that Particle had "acknowledged wrongdoing" with respect to its customers, over two months passed during which it regularly repeated such statements to members of the healthcare community. Epic's intention to double down on its lies was apparent since it began making them: in the weeks following Epic's initial statement, representatives of Carequality proposed that Epic, Carequality and Particle issue a joint press release correcting the record and explaining that (i) Particle remains in good standing on Carequality; and (ii) Epic is actively

responding to queries by Particle Connections. Epic refused to agree to submit a joint press release
and (through back channel communications with Carequality that it kept from Particle), persuaded
Carequality not to issue a statement. It thus ensured that the public's false perceptions would
remain uncorrected.

114.    Epic's falsehoods are not readily susceptible of neutralization by Particle. As stated
above, Epic is a far more established player in the healthcare industry with a much broader reach
than Particle. Given Epic's role in the healthcare system, if it takes issue with Particle, there is a
reasonable and widespread belief among healthcare industry participants that Particle *must* have
done something wrong. Particle's inability to neutralize Epic's statements is borne out by the fact,
also stated above, that media outlets continued to report that Particle customers had been totally
disconnected from Epic's health records even after Particle put out a statement attempting to
correct the record. Further preventing Particle from neutralizing Epic's falsehoods is the fact that
the reality of the situation is complex. Understanding Particle's side of the story requires a
relatively sophisticated knowledge of health information exchange and interoperability. By
contrast, Epic's version of events ("Third-Party Security and Privacy Risk") is impactful and, at a
surface level, easy to understand (even if it is incorrect). Thus, the only effective way for Particle
to correct an organization's misunderstanding is to engage with that organization directly to
provide the truthful (and complex) sequence of events. For the relatively few organizations with
which Particle has been able to engage directly (not for lack of trying), it has had some success in
clearing the misunderstandings Epic cultivated. But Particle cannot possibly hope to correct a
market-wide disparagement and disinformation campaign through individualized conversations
with hundreds of providers. Nor can Particle devote the resources necessary to combat the

prolonged smear campaign without jeopardizing the quality of its current operations and relationships.  But of course, that is Epic's very goal.

**D.     Epic Repeatedly Tried to Overload Particle's Systems With Avalanches of Healthcare Provider Requests**

115.    In addition to destroying public trust in Particle, Epic's disparagement campaign had another purpose and effect: directing thousands of healthcare providers to contact Particle regarding the use of their health records and thereby overwhelming Particle's systems and resources. Each of Epic's issue notifications and subsequent statements to its EHR customers proceeded in the same way: first, stoking baseless fears about Particle's use of their patient's records, as described above; second, suggesting to those customers that it is important for them to "investigate" the issue; then third, providing them with Particle's contact information and directing its customers to reach out to them.

116.    For example, Epic's initial "Issue Notification" states on the last page, "All electronic health records your organization might have disclosed to Particle Health through its gateway and to its participants were requested under a Treatment Permitted Purpose. There is no programmatic way to determine whether those requests were appropriately made under a Treatment Permitted Purpose." Epic then spends much of the rest of the page providing directions "To help you prioritize your investigation," before stating, "If, during your investigation, you have questions about any of the record retrievals made by Particle Health or one of its participant organizations, contact Particle Health at support@particlehealth.com." Similarly, in Epic's June 28 email to customers where it stated that Particle had "acknowledged wrongdoing," Epic also stated that Particle "ha[s] provided a contact for assisting you in your investigation" before providing Particle's contact information.

117.    These messages naturally raised concerns about patient privacy and regulatory compliance for Epic's thousands of healthcare provider customers and, immediately after doing so, guided them to direct those concerns toward Particle. As a result, concerned healthcare providers immediately began bombarding Particle with calls and emails seeking to investigate what they had been led to believe was a major data breach for which Particle was responsible. Healthcare providers, of course, have every right to know where their patients' data is going and how it is being used, so Particle has had no choice but to locate the information requested by each and every provider and otherwise assist in each and every investigation. The process for locating and investigating such information for even a single provider is complex and in-depth and can involve weeks of back-and-forth. Particle has continued to receive a barrage of requests from providers since April 2024 up through the filing of this complaint.

118.    Particle is a small company with few employees and limited resources. It does not have the capacity to both properly conduct its business and assist with investigations and information requests from hundreds of separate providers. Epic knows this. By informing thousands of healthcare providers that their patients' data may be at risk, then directing them to look to Particle for answers, Epic has brought Particle's operations nearly to a standstill. Employees who would otherwise be tasked with developing the business, courting new customers, or improving Particle's software have instead been distracted with demonstrating to hundreds of healthcare providers exactly how and why their patients' data has been retrieved. At the same time, these distractions have sapped employee morale by forcing Particle's employees to engage in tedious data collection rather than the roles they were hired to perform.

E.    **Epic Abused the Carequality Dispute Process to Harm Particle's Growth**

119.    Carequality maintains a private dispute resolution process that allows members to resolve issues regarding Carequality's rules. Around the same time that Epic began making its

disparaging and defamatory public statements about Particle, it also initiated a manufactured and pretextual dispute within Carequality.

120.    Particle's dispute had no basis and no purpose other than to distract Particle, drain its resources, legitimize Epic's anticompetitive conduct, and subject Particle to public scrutiny. On April 24, 2024—roughly a *month* after first filing its dispute—Epic finally submitted a "Pre-Dispute Statement," which purported to lay out the bases for its dispute. As with its public statements, Epic's dispute statement was heavy on innuendo and light on detail. In it, Epic discussed its supposed concerns about non-treatment use cases for three Particle customers, then stated—with no substantiation or explanation whatsoever—that Epic was "concerned the problem may be much broader than these three organizations." As to why Particle should be held responsible for alleged improper requests by three individual customers, Epic offered nothing other than its "serious doubts" about Particle's integrity.

121.    Similar to Epic's "Issue Notification" to its customers, the closest Epic's pre-dispute statement came to making any actual accusations against *Particle* to justify a dispute against *Particle*—rather than a tiny subset of Particle's customers—was an allegation that Particle "masks some of its customers' identities when they request medical records" through a "gateway designed to mask the identity of groups requesting data." As Particle quickly showed in its counterstatement, that accusation was just as wholly divorced from reality in the context of the Carequality dispute as it was when Epic made it in the "Issue Notification" to its customers. Again: ***every single request made using Particle's Carequality connection clearly states the name of the requesting party exactly where a provider like Epic would expect to find it***. Without its completely fact-free "masking" claim, Epic not only lacked any specific allegations of wrongdoing by Particle, but also its supposed "concerns" about Particle's integrity became facially absurd

because *Epic itself had previously responded to requests from those three customers*. In light of

the fact that Epic could see exactly who was making each request, Epic offered no explanation for

why it was somehow wrong for Particle to *allow* the requests, but not wrong for Epic to *respond*

to them. As discussed below, Carequality itself agreed Epic had no basis to make its masking

complaint.

122.    Despite Epic's frivolous dispute having no basis in fact or Carequality's rules, Epic

resisted all efforts to end the dispute. During the course of the dispute, which lasted for five months,

Particle approached Epic at least five separate times to inquire whether there were any mechanisms

Particle could put in place to resolve the issues raised in the dispute. Epic refused to even engage

in such conversations. Instead, it continued to press forward with its claims of wrongdoing by

Particle. As the dispute dragged on, Epic made no effort to substantiate its "concern[] [that] the

problem may be much broader than these three organizations," confirm its "serious doubts" about

Particle's integrity, or prove that Particle operates a "gateway designed to mask the identity of

groups requesting data." Instead, it shifted focus to harping on the supposed wrongdoing of the

three Particle customers, with no attempts at connecting any wrongdoing to *Particle itself*. Even

as it failed to advance any theory for how Particle violated Carequality's rules, however, Epic

obstructed and drew out the Carequality process to make its dispute as burdensome as possible for

Particle. For example, for much of the dispute, Epic refused to provide Particle with the chief piece

of evidence it claimed supported its allegation that one Particle customer was not making requests

for treatment purposes.

123.    Historically, disputes between Carequality members have been informal and

inexpensive, almost always facilitating settlements among members within a few weeks. But, this

particular dispute dragged on for over five months due to Epic's behavior, with Epic repeatedly

brushing aside all attempts at reconciliation. Meanwhile, Epic insisted on expanding the traditionally informal process into a full-blown arbitration proceeding, with experienced (and expensive) counsel on both sides, multiple hearings, and formal submissions. It demanded extensive information from Particle, while at the same time refusing to provide such information itself. Indeed, this was **the first time in the history of Carequality** that a dispute reached the point of a formal hearing and submissions to the panel. And, at least in the substance of the panel's findings, it completely vindicated Particle.

124.    In a decision dated August 29, 2024, the Carequality Steering Committee found Particle did **nothing wrong**. No improper masking, no violations of HIPAA or other statutes, no knowledge by Particle of improper practices by any customers, no improper practices at all by the only accused customer who Particle kept on its system after the dispute began, no shortcomings in its screening processes, no violations of Carequality rules, nothing. With regard to Epic's "masking" claim, the decision stated, "**the Steering Committee does not believe that Particle utilized a 'masking gateway.'**" With regard to Particle's responsibility for the three customers' alleged mislabeling, it stated, "it does appear that **Particle conducted diligence** on each of these Connections," and, "**Particle's current onboarding process … appears to be relatively robust**." The decision contained no finding that Particle had violated any Carequality rules. In short, Carequality found Epic's dispute was as baseless as Particle contended from the very start of the process.

125.    However, Carequality's vindication of Particle on the merits was not the end of the story. While Epic pushed forward its baseless dispute to burden and distract Particle, it also used its power and influence over Carequality and/or worked behind the scenes to manipulate Carequality and bias the resolution in Epic's favor, regardless of the dispute's merits. As a result

of this manipulation, despite being unable to find that Particle did anything wrong or violated any Carequality rules, the Steering Committee nonetheless miraculously imposed a six-month "corrective action plan" on Particle; *i.e.*, require Particle to change its practices in certain ways untethered to Carequality's rules or Particle's behavior. While this result was far less than Epic had asked for, it nonetheless imposed further burdens on Particle's ability to compete and was instituted, on information and belief, solely to appease Epic.

126.    Epic obtained this result through a variety of illicit means. First, as by far the largest provider of records through the Carequality framework, Epic holds outsized power over the organization and has wielded that power to threaten Carequality's very existence by repeatedly raising the specter of it leaving the organization, including during the pendency of the Particle dispute. Without Epic, Carequality is irrelevant, because an organization focused on facilitating the exchange of EHRs has no real purpose if an EHR provider controlling the full medical history of between 81-94% of U.S. patients will not allow third parties to request its records using that organization's network. These repeated threats therefore hang over Carequality like a Damocles sword and infected how it assessed the end result of the Particle dispute. Because of these threats, the Carequality Steering Committee had overwhelming incentive to provide at least some concessions to appease Epic, even if it could not justify finding for them on the merits. That is what occurred here.

127.    Another source of power Epic wields over Carequality arises from the makeup of the Carequality Steering Committee. That Committee is composed of representatives from major players in the healthcare industry, each of which have business interests in remaining on friendly terms with Epic. The votes of those members are visible, and the threat of a Steering Committee member disrupting his or her organization's relationship with Epic by voting for a resolution Epic

disfavors is very real and, given Epic's broad dominance, very scary. In many cases, those relationships are personal. Indeed, one of the businesses represented on the Carequality Steering Committee **is Epic itself**. And although Epic's representative purported to recuse himself for the purposes of this dispute, he remains closely connected to his peers on the Steering Committee who were active decisionmakers in the end result.

128.    On information and belief, Epic has leveraged its power over Carequality to obtain results that favored it for as long as it has been a participant in the network. For example, as discussed above, the Carequality Steering Committee has repeatedly voted upon measures advanced by members to require that participants respond to requests for non-treatment purposes, like operations. Epic has disfavored these measures because they would disrupt its scheme to preempt or limit competition in the payer platform market and other markets. Thus, despite their overwhelming popularity with the Carequality membership base, these initiatives have mysteriously been voted down each time they are brought. There is no explanation for the rejection of these proposals other than Epic's undue influence. Requiring companies like Epic to respond to EHR requests for operations purposes would serve only to increase efficiencies and lower costs for healthcare industry participants, and enhance competition in markets such as the payer platform market. Thus, on information and belief, Carequality's continuing limitation to "treatment" requests is one example of Epic flexing its power over the Carequality Steering Committee to anticompetitive ends.

129.    With these varied sources of leverage as the backdrop, on information and belief, Epic also worked behind the scenes in its dispute with Particle to coerce and/or obtain the Steering Committee's agreement to impose a remedy on Particle despite the clear finding that Particle did

not violate the law or Carequality's rules. Evidence of Epic's behind-the-scenes communications emerged at various points during the dispute.

130.    For example, as discussed briefly above, Carequality planned early on to issue a press release to confirm that Particle remained a Carequality member in good standing and that Epic records were still available to many Particle customers. Carequality proposed that press release in an April 17 email to Particle and Epic, which contained a draft statement. In that email, Carequality wrote, "We believe it is in everyone's best interest to issue a joint statement setting forth the basic facts regarding the dispute and those involved," and, "we plan to post by end of day today." The statement Carequality intended to publish clarified that the parties were working to "help minimize disruptions to data exchange between Epic and all of Particle Health's other connections, which are not involved in the dispute," and that "Carequality has not been presented with any definitive evidence that supports a broader suspension of … Particle Health." Particle responded with minor proposed edits in the main email chain, which Carequality accepted. Epic did not respond to the email chain.

131.    At 5:00 PM that day, however, Carequality did not publish the statement as it said it would. Instead, a few hours later that evening, Particle's CEO received a call from the Executive Director of Carequality, who informed him that Carequality would not be publishing a statement like the one it had circulated earlier. When asked why, Carequality's Executive Director revealed that Epic had conveyed—through back-channel communications in which Particle was not included and of which it was unaware—that Epic did not want such a statement published. At 7:00 PM that evening, Carequality emailed the parties again, this time to inform them that it would not publish any statement on the dispute at all. On information and belief, this was not the only time Epic conveyed its preferences to Carequality through back-channel communications, and Epic

used similar tactics to ensure that the ultimate resolution put out by Carequality would harm Particle and benefit Epic, even if the Steering Committee could not find any wrongdoing by Particle.

132.    Carequality's resolution itself is further evidence of Epic's undue influence, as the remedy it imposed benefits Epic despite findings that Particle was always in the right and that, as Particle noted throughout the process, Epic's dispute was meritless. The "corrective action plan" imposes a variety of requirements on Particle that allow Epic and its proxies to stop the flow of record requests from Particle's platform with essentially no notice and no due process (including whenever Epic decides to change its own rules, without any input from Carequality). The resolution also ordered Particle to produce certain information that only Epic had ever previously, privately demanded of Particle—and then only well after the hearing had concluded. These results indicate Epic's back-channel communications and influence, because the Steering Committee was clear that Particle did not violate any Carequality rules or any applicable laws or regulations.

133.    In total, Epic's frivolous dispute had the effect of draining Particle's resources—forcing it to spend hundreds of thousands of dollars in legal fees to defend against a claim the Steering Committee itself found has no basis in fact or Carequality rules, and which, on information and belief, Epic never intended to have merit. All the while, the pendency of a publicly-known dispute brought by Epic against Particle maintained the cloud over Particle's reputation that Epic's public statements placed, allowing it to become cemented in the public's mind. Finally, the remedy Epic coerced the Steering Committee into imposing ***after finding in favor of Particle on the merits*** only compounds those problems and provides Epic further means to interfere with Particle's business and customer relationships. These effects, individually and in

combination, have further materially dampened Particle's ability to compete in the payer platform market.

**F.    Epic's Conduct Lacks Any Non-Pretextual, Procompetitive Justification**

134.    Given the above facts, Epic's gameplan is clear: block meaningful competition for payer platforms by preventing Particle's customers from obtaining the medical records critical for their use of Particle's platform while also creating substantial fear, uncertainty, and doubt about Particle's continued viability and erecting as many roadblocks as possible to prevent it from focusing on and investing in its business. That is blatantly anticompetitive, and Epic's scheme is designed to let it dominate and control the payer platform market as an extension of its EHR monopoly.

135.    Epic's explanation to date has been that it is acting to protect patient privacy. But Epic has presented no credible evidence or other support substantiating its claims. Epic has identified nothing about Particle's conduct that poses any threat to patient privacy. Even if, as Epic claims, the three accused Particle customers requested records for purposes other than treatment, that does not mean they accessed those records in violation of patient privacy—both HIPAA and the Carequality framework provide numerous permissible bases for accessing medical records other than treatment. In any event, the activities of three of Particle's customers do not explain the way Epic has acted with respect to *other*, unaccused Particle customers and Particle *itself*.

136.    Moreover, the way Epic has acted upon its supposed concerns for patient privacy flatly contradicts any claim to be acting in the interests of patients. First, Epic repeatedly rebuffed Particle's attempts to engage with it on patient privacy issues amidst the Carequality dispute. Second, Epic's decision to cut off records access to 119 Particle Connections blocked over 40,000 records requests that were made to facilitate the treatment of patients. Third, Epic's decision to prevent Particle customers from *sharing* records with Epic EHR users harmed and will continue

to harm Epic's **own customers**. For example, Epic's actions have already compromised the care of severely ill cancer patients, among others. In reality, for these reasons and many more, Epic's complaints are pure pretext and do not actually present any legitimate business or procompetitive justifications.

137.    Instead, the true purpose of Epic's outrageous accusations and conduct has been to block competition. The timing of Epic's conduct gives this away: it was immediately after learning that Particle had, through one of its customers, helped provide EHRs to Blue Cross Blue Shield of Michigan and that Particle was expanding into the payer market that Epic began its campaign of anticompetitive conduct. Further, the conduct itself has little to no connection to any goal other than eliminating competition from the payer platform market. For example, if the primary motivator underlying Epic's conduct was a concern that three Particle customers had made treatment requests for non-treatment purposes, it would have no reason to shut off records access for dozens of *other* Particle customers that had no connection to those three. Nor would it have a reason to make restored access to Epic records for those other parties contingent on ending their relationship with Particle, as it did for XCures. Nor would it have a reason to subject *new* Particle customers to a burdensome, drawn-out onboarding process that it does not apply to any other parties. Nor would it have reason to continually paint Particle *itself*—as opposed to the accused Particle customers—as a bad actor to the healthcare community, despite lacking any basis for Particle's culpability in any wrongdoing. Nor would it insist on pushing forward with a costly Carequality dispute despite utterly lacking any basis in fact or Carequality's rules, even amidst Particle's repeated attempts to reach an amicable conclusion.

138.    Epic's conduct is also irrational but for its anticompetitive effects. When clients use Particle's payer platform, the value of Epic's underlying EHR System is increased because payers

use and request more EHRs from the EHR System. This rationally allows Epic to charge more money for its EHR System and therefore make additional profit. In other words, Epic's conduct is irrational but for its anticompetitive effect because it makes Epic's own primary product—its EHR software—less interoperable and less attractive to customers. Consistent with these economic facts, Epic has put together what it calls an App Orchard, or a set of applications that are able to integrate with Epic's EHR Software. This is economic evidence that Epic realizes expanded access to and demand for records from its EHR Software is rational as it increases the value of its EHR Software for healthcare providers. By disabling Particle's customers' access to Epic EHR, Epic's EHR Software becomes less valuable and thus less profitable. It is only if Epic successfully eliminates competition in the payer platform market that Epic's strategy vis-à-vis Particle makes economic sense, as it could then charge supracompetitive prices for Epic's own alternative EPP while also expanding use of its EHR Software.

139.    Furthermore, there are substantially less restrictive alternatives to Epic's conduct, such as: permitting payers to access EHRs unfettered by the artificial limitations Epic has tried and is trying to place on them; not utilizing Carequality and its processes in a way meant to harm competition; not disparaging a rival in order to scare away its current and prospective customers, because that rival is the only major competitive threat that has yet arisen in the payer platform market; and so on. To meet its supposed concern of ensuring that parties seeking records for non-treatment purposes do not receive Epic records on the Carequality system, an obvious less restrictive alternative is to shut off records access to the parties that actually engage in such conduct, rather than shutting off records access to dozens of other parties with no connection to such conduct—all of whom are customers of a competitor.

## VIII.   HARM TO COMPETITION

140.    Epic's anticompetitive behavior means that payers have no meaningful choice in the payer platform market aside from Epic, regardless of price or quality. This is bad for payers, patients, healthcare workers, and competition.

141.    The only entity that will benefit from that outcome is Epic itself. Rather than compete on the merits, Epic will win customers in the payer platform market simply by existing and denying other market participants access to their platform or data. And given its track record of cementing a competitive moat around its EHR offering, Epic is sure to similarly lock in hospitals and other healthcare organizations to its proprietary software once its market power is established.

142.    These problems are broadly recognized in the EHR market, and will extend to the payer platform market if Epic is allowed to continue its anticompetitive campaign. As described by a CEO of a major healthcare system in Minnesota:[28]

> I will submit that one of the biggest impediments to innovation in health care is Epic, because the way that Epic thinks about their [intellectual property] and the IP of others that develop on that platform. There are literally billions of dollars in the Silicon Valley chasing innovation in health care. And yet Epic has architected an organization that has its belief that all good ideas are from Madison, Wisconsin. And on the off chance that one of us think of a good idea, it's still owned by Madison, Wisconsin.

143.    Nor is Epic's conduct limited to Particle. As the first company to figure out a way to overcome Epic's restraints on competition in the payer platform market, Particle represents not just a single competitor to Epic, but an entire mode of competition. Epic knows that if Particle succeeds in competing with it in the payer platform market, Particle will not be the last company to challenge Epic's monopoly. That is why it is so important for Epic to utterly destroy Particle: it

---

[28] *Interoperability Battle Lines: Data Freedom Fighters vs. Entrenched Data Blockers*, 4sighthealth, https://www.4sighthealth.com/interoperability-battle-lines-data-freedom-fighters-vs-entrenched-data-blockers/

must not only destroy a fledgling competitor, but show the whole industry that there will be no circumventing the moat Epic tries to place around its monopoly. There is therefore a substantial risk that Epic's conduct will result in the elimination of all meaningful competition in the payer platform market, leaving Epic as the only real competitor left standing and leading to the same sort of lock-in effects that characterize its ever-growing stranglehold on EHR Software and/or EHR Provision Services. That is not only harm to competition; it is elimination of competition.

144.     Epic's conduct will also substantially harm payers, patients and healthcare providers. As previously noted, Particle's innovations substantially benefit all. Payers benefit because it breaks EPP's monopoly grip over the payer platform market and provides them with new and lower-cost options for retrieving records at scale. Patients benefit because it pushes their health plans to offer more robust treatment-related services to help them understand and improve their health—in addition to lowering prices for payers, which can translate to lower premiums. Healthcare providers benefit because patients have a wider variety of treatments available to them, as well as better ability to pay for treatments from the healthcare providers. Competition benefits because companies like Particle are able to gain share in a rapidly-growing market that they would otherwise be unable to obtain due to Epic's anticompetitive conduct.

## IX.     ANTITRUST INJURY

145.     Epic's conduct has caused, and will continue to cause substantial antitrust injury to Particle in the form of lost customers and revenue. If Particle's customers cannot receive the EHR data stored and maintained in Epic's systems, and cannot remain confident that Epic will provide them with EHRs in accordance with the law and its standard practices, Particle will not be able to sell its products in the payer platform market and lose payer customers that have any substantial number of insureds with records in Epic's EHR System.

146.    Particle's injury is of the type the antitrust laws were intended to prevent. Epic's conduct is harming competition as a whole, with widespread and substantial effects in the payer platform market and the dangerous probability that competition will be eliminated in the payer platform market to the benefit of Epic and no one else.

## X.    INTERSTATE TRADE AND COMMERCE

147.    Epic's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

(a)    Epic provides EPP throughout the United States;

(b)    Epic has used instrumentalities of interstate commerce to provide EPP throughout the United States;

(c)    In furtherance of the anticompetitive scheme alleged herein, Epic employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

(d)    The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Epic has inflicted antitrust injury by artificially excluding Particle and other competitors and causing the other antitrust injuries described herein.

## XI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)
### MONOPOLIZATION

148.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

149.    Epic has a market share of over 90% in the payer platform market, which is a market with high barriers to new entry, as described herein.

150.    Epic has monopoly power in the payer platform market, which is the relevant market in which Epic and Particle compete.

151.    Epic has willfully acquired and maintained monopoly power in the payer platform relevant market, by means of predatory, exclusionary, and anticompetitive conduct, as alleged herein.

152.    Epic's conduct has no legitimate business purpose or procompetitive effect.

153.    There are less restrictive alternatives to the restraints Epic has imposed.

154.    Epic's conduct has had a substantial effect on interstate commerce.

155.    Particle has suffered antitrust injury as a result of Epic's anticompetitive conduct in the form of current and future lost customers and revenue. Epic's conduct has harmed competition overall in the payer platform relevant market.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)**
**ATTEMPTED MONOPOLIZATION**

156.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

157.    Epic has a market share of over 90% in the payer platform market.

158.    Epic specifically intended to monopolize the payer platform market by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

159.    Epic attempted to monopolize the payer platform market by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

160.    There is a dangerous probability Epic will achieve monopoly power in the payer platform market due to Epic's anticompetitive conduct. Specifically, by taking all meaningful competitive options off the table other than EPP, Epic's own payer platform, Epic will achieve an unassailable, dominant position in the payer platform market.

69

161.    Epic's conduct has no legitimate business purpose or procompetitive effect.

162.    There are less restrictive alternatives to the restraints Epic has imposed.

163.    Epic's conduct has had a substantial effect on interstate commerce.

164.    Particle has suffered and will continue to suffer antitrust injury as a result of Epic's anticompetitive conduct in the form of current and future lost customers and revenue. Epic's conduct has harmed competition overall, and, if left unchecked, will permanently harm competition in the payer platform relevant market.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)
### MONOPOLY LEVERAGING

165.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

166.    Epic has monopoly power in the EHR Software and/or EHR Provision Services market(s), as alleged herein.

167.    Epic has used its monopoly power in the EHR Software and/or EHR Provision Services market(s) in an exclusionary and anticompetitive manner to foreclose competition, gain a competitive advantage, and/or destroy a competitor in the payer platform relevant market, as described herein.

168.    Epic's conduct has no legitimate business purpose or procompetitive effect.

169.    There are less restrictive alternatives to the restraints Epic has imposed.

170.    Epic's conduct has had a substantial effect on interstate commerce.

171.    Particle has suffered and will continue to suffer antitrust injury as a result of Epic's anticompetitive conduct in the form of current and future lost customers and revenue. Epic's conduct has harmed competition overall, and, if left unchecked, will permanently harm competition in the payer platform relevant market.

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1)

172.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

173.    As alleged above, Epic has entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power in the relevant market for payer platforms.

174.    As alleged above, Epic has conditioned the provision of EHR Provision Services on the boycotting of Particle's competing platform.

175.    As alleged above, Particle's former customers have consummated agreements to restrain competition by acquiescing to Epic's conditions on dealing and communicating their acquiescence to Epic. Particle's former customers and former prospective customers who have abandoned their relationships with Particle have engaged in individualized dealings with Epic.

176.    As alleged above, Epic has also consummated agreements to restrain competition with Carequality, members of the Carequality Steering Committee, the Epic Care Everywhere Governing Council and, on information and belief, still others that will be revealed by discovery.

177.    These contracts, combinations, or conspiracies include but are not limited to tying arrangements and vertically-arranged boycotts.

178.    Epic's conduct has had an anticompetitive effect in the relevant market for payer platforms.

179.    Epic's conduct has no legitimate business purpose or procompetitive effect.

180.    There are less restrictive alternatives to the restraints Epic imposed on the relevant market for payer platforms.

181.    Epic's conduct has had a substantial effect on interstate commerce.

182.    Particle has been or will be injured in its property as a result of Epic's conduct.

183.    Particle has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Particle has been and will be injured by the harm to competition as a result of Epic's conduct.

## FIFTH CAUSE OF ACTION
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 340 ¶5, ET SEQ.

184.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

185.    As alleged above, Epic has entered into one or more contracts, combinations, conspiracies, or arrangements to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power in the relevant market for payer platforms.

186.    These contracts, combinations, conspiracies, or arrangements include but are not limited to tying arrangements and vertically-arranged boycotts.

187.    Epic's conduct has had an anticompetitive effect in the relevant market for payment platforms.

188.    Epic's conduct has no legitimate business purpose or procompetitive effect.

189.    There are less restrictive alternatives to the restraints Epic imposed on the relevant market for payment platforms.

190.    Particle has been or will be injured in their property as a result of Epic's conduct.

191.    Particle has suffered and will suffer injury of the type that the New York antitrust laws were intended to prevent.  Particle has been and will be injured by the harm to competition as a result of Epic's conduct.

## SIXTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

192.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

193.    Particle and XCures entered into a "Particle Platform Agreement" on January 28, 2022, and an amendment to that agreement on December 20, 2023. The Agreement was at all relevant times a valid, binding, and enforceable contract. Under that contract, XCures agreed to pay monthly fees to Particle until January 1, 2025 in exchange for the right to use Particle's product.

194.    At all relevant times, Epic was aware of the contract and its importance to Particle.

195.    XCures has breached its valid and enforceable contract with Particle. XCures ceased paying its monthly fees to Particle in June 2024, prior to the termination date of January 1, 2025.

196.    Epic intentionally procured XCures' breach without justification, with the purpose of harming Particle, as well as unfairly restraining competition in the EHR software market, EHR Provision Services market, and payer platform market. Epic's conduct was improper, conducted with malice, and is without privilege or justification.

197.    The breach of the contract would not have occurred but for Epic's conduct.

198.    Because of Epic's conduct, Particle has suffered, and continues to suffer, damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

199.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

200.    As alleged above, Epic knowingly interfered with Particle's concrete prospective business relationship with numerous prospective customers, including at least: Beeline Rx, Power Life Sciences, Leafwell, and Medvise.

201.    Epic acted in bad faith and used wrongful and oppressive means and tactics, for wrongful motives, in interfering with Particle's prospective advantageous business relations with its prospective customers, including at least Beeline Rx, Power Life Sciences, Leafwell, and Medvise, through the conduct described herein.

202.    The loss or material degradation of these business relationships with at least Beeline Rx, Power Life Sciences, Leafwell, and Medvise, would not have occurred but for Epic's activities, as these prospective customers' decisions not to pursue or to postpone relationships with Particle either expressly cited Epic's conduct, or occurred, without warning and in a sudden break from the course of prior dealing, immediately after Epic began its conduct.

203.    Because of Epic's conduct, Particle has suffered, and continues to suffer, damages in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**DEFAMATION**

204.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

205.    Beginning in April 2024 Epic has published numerous false and defamatory statements about Particle, including an April 10, 2024 "Issue Notification" regarding Epic's dispute with Particle. The Issue Notification falsely characterized Particle as a bad actor and data security risk.

206.    Through its Issue Notification and subsequent statements, Epic has, directly or by intentional implication, published at least the following falsehoods concerning Particle:

       (i)     "Activities of … Particle Health" are responsible for "serious concerns about security and privacy" of patient medical records

74

(ii)   Particle Health has "inaccurately represent[ed] the purpose associated with [its] record retrievals."

(iii)  Particle Health has not "fulfill[ed] its obligations as a Carequality implementer."

(iv)   Particle Health has "obscur[ed] provider-level details of connections through a generic gateway."

(v)    Particle Health has "admitted wrongdoing" in connection with its customers' retrieval of medical records.

207.    The statements were initially published to Epic customers and quickly picked up by the media. Within days, Epic's statements were in the public view, as numerous news outlets published articles repeating Epic's false statements about purported "security and privacy risks" introduced by Particle.

208.    Epic knew its statements were false when published or published them with a reckless disregard for the truth. Epic is uniquely well-positioned to know that Particle poses no security risks, works diligently to address any third-party security concerns, has not obscured the identity of its connections, and has upheld its obligations as a Carequality implementer.

209.    Epic's false statements are defamatory because they call into question Particle's basic integrity regarding the security of EHRs in a business in which security is a paramount concern. Epic's statements are defamatory per se because they injure the Particle business.

210.    Epic's statements are not privileged.

211.    Because of Epic's statements, Particle has suffered, and continues to suffer, damages in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
### TRADE LIBEL

212.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

213.    Beginning in April 2024 Epic has published numerous false and defamatory statements about Particle's products and services, including an April 10, 2024 "Issue Notification" regarding Epic's dispute with Particle. The Issue Notification falsely indicated that Particle introduced data security and privacy risks to its customers, and that Particle customers were unable to access Epic-stored EHRs through the Particle platform.

214.    Through its Issue Notification and subsequent statements, Epic has, directly or by intentional implication, published at least the following falsehoods concerning Particle's services and products:

(i)    Particle's platform poses a "security and privacy risk."

(ii)    Particle's platform was unable to retrieve Epic-stored medical records for any customers because Epic had "suspended Particle Health's … gateway connection."

215.    The statements were initially published to Epic customers and quickly picked up by the media. Within days, Epic's statements were in the public view, as numerous news outlets published articles repeating Epic's false statements about purported "security and privacy risks" introduced by Particle.

216.    Epic knew its statements were false when published or published them with a reckless disregard for the truth. Epic is uniquely well-positioned to know that Particle poses no security risks, works diligently to address any third-party security concerns, and that Particle maintained continuing access to Epic EHRs.

217.    Epic's false statements constitute trade libel because they denigrate the quality of Particle's goods or services.

218.    Epic's libelous statements have injured Particle's business by causing existing and/or prospective customers to lose trust in Particle's goods or services and abandon or decline to pursue business relationships with Particle.

219.    Epic's statements are not privileged.

220.    Because of Epic's statements, Particle has suffered, and continues to suffer, damages in an amount to be determined at trial.

## JURY TRIAL DEMANDED

221.    Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Particle prays for judgment against Defendant Epic as follows:

A.    Adjudication that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

B.    Adjudication that the acts alleged herein constitute attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

C.    Adjudication that the acts alleged herein constitute monopoly leveraging in violation of the Sherman Act, 15 U.S.C. § 2;

D.    Adjudication that the acts alleged herein violate the state laws alleged herein;

E.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the federal statutes, state statutes, and state common law cited herein;

F.    Pre-judgment and post-judgment interest on such monetary relief;

G.    Equitable relief in the form of enjoining Epic from engaging in the anticompetitive and tortious conduct alleged herein;

H.    Equitable relief as may be required to restore competition and to prevent the recurrence of future antitrust and tort violations alleged herein;

I.    The costs of bringing this suit, including reasonable attorneys' fees; and

J.    All other relief as the Court deems just and proper.

Dated: September 23, 2024

Respectfully Submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:   */s/ Adam B. Wolfson*

Adam B. Wolfson
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
E-Mail: adamwolfson@quinnemanuel.com

Kathryn Bonacorsi
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
E-Mail: kathrynbonacorsi@quinnemanuel.com

*Attorneys for Plaintiff Particle Health Inc.*