**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S EMAIL ADDRESS
adamwolfson@quinnemanuel.com

October 18, 2024

VIA ECF

The Honorable Naomi Reice Buchwald
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   **Defendant's Pre-Motion Conference Request**
*Particle Health Inc. v. Epic Systems Corporation*, 1:24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

We represent Plaintiff Particle Health Inc. ("Particle") in this matter. We write in response to the letter Defendant Epic Systems Corporation ("Epic") filed on October 15, 2024, requesting a pre-motion conference regarding its forthcoming motion to dismiss. ECF 13 ("Letter").

Epic's letter begins by trying to portray Particle as a threat to patient privacy. Given Epic has repeatedly made this inaccurate insinuation in an effort to harm competition—indeed, similar statements underlie part of Particle's claims—we provide a brief response. Particle is a software company that helps healthcare organizations retrieve, store, and analyze medical records at scale. (Compl. ¶¶ 7–9.) This case is about Particle's payer platform, which, as the name implies, serves payers; *i.e.*, health insurers. It is undisputed that payers legally obtain and analyze medical records at scale as part of their day-to-day business. (*Id.* ¶¶ 5, 68.) Epic knows this. Its Epic Payer Platform ("EPP") is designed specifically to assist with that need, and Epic has never had a problem with providing medical records to payers in the same way Particle does—so long as they use Epic's own platform to retrieve, store, and analyze them. (*Id.* ¶¶ 5–6, 69–70.) Epic's letter spends much time discussing "treatment" and "non-treatment" use cases in an effort to further disparage Particle and confuse the issues. But what Epic omits is that those designations merely concern one mechanism by which payers obtain medical records—not *whether* they are allowed to obtain them. (*Id.* ¶¶ 8, 71–72.) There is no dispute they can, and regularly do. Further, the standard-setting organization Epic tried to coopt to harm Particle's business, Carequality, completely vindicated Particle in this respect, determining there was nothing wrong with Particle's platform.

With that addressed, Particle next notes that Epic's intended dismissal arguments are intensely factual, wrong on the law, and ignore Particle's actual allegations. If Epic believes it can truly raise legitimate "legal" challenges to Particle's Complaint, as it claims, then Particle will be ready to address them. However, what Epic identifies in its letter is anything but.

**The Relevant Market**. "[M]arket definition is a deeply fact-intensive inquiry and courts therefore hesitate to grant motions to dismiss for failure to plead a relevant market." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019) (quotation omitted). Although Particle strongly disagrees that the market it alleges is a "narrow" one, at the motion to dismiss stage, "it

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes." *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001). Particle's Complaint spends no fewer than fifteen pages setting forth detailed allegations as to the relevant markets under applicable antitrust standards. (Compl. ¶¶ 28–63.) Epic's letter ignores virtually all of them.

Epic first asserts that Particle's market definition is implausible because it "artificially narrows the market to a single category of customers. . . ." (Letter at 2). What the Complaint actually alleges is that payers have unique business needs and that payer platforms offer unique functionality, differentiating them as a product from other types of electronic platforms and more limited record retrieval services. (*E.g.*, Compl. ¶ 55.) That payer platforms have a distinct set of customers **increases** the plausibility of Particle's market definition, not lessens it. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (noting "distinct customers" is one "practical indicia" of a relevant market). Regardless, Epic ignores numerous cases—including the very decision it quotes out of context—holding that "a market may be limited to a particular group of consumers." *Planetarium Travel, Inc. v. Altour Int'l, Inc*, 97 F. Supp. 3d 424, 428 (S.D.N.Y. 2015).

Epic also claims that "Particle fails to address the dozens of other substitutable products that exist for payers to obtain these services" (Letter at 2), but that is a factual argument contrary to the well-pleaded allegations in the Complaint. To survive a motion to dismiss, a Complaint need only "offer[] . . . a 'plausible' reason why consumers would not respond to a 'slight increase' in the prices charged for products in the alleged product market by switching to products outside of it." *P & L Dev., LLC v. Gerber Prod. Co.*, 715 F. Supp. 3d 435, 458 (E.D.N.Y. 2024) (quotation omitted). The Complaint extensively discusses the lack of reasonable interchangeability between payer platforms and other products—including, in particular, the limited record retrieval service Kno2, the entity cited by Epic, provides. (*See, e.g.*, Compl. ¶¶ 52–57, 59, 62.)

**Anticompetitive Conduct**. On this point, Epic misstates the law and Particle's allegations. Anticompetitive conduct is that which "is likely to have the effect of . . . excluding competition. . . ." *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 379 (S.D.N.Y. 2022) (quotation omitted). Notably, Epic does not contend Particle implausibly alleges that Epic's conduct excluded competition. Instead, Epic argues it had legitimate business justifications for its actions. It also argues that only "uneconomic and irrational" acts show monopolization. (Letter at 2.) That is not the law.

Epic's case citation, *Shak v. JPMorgan Chase & Co.*, notes "the 'willful' acquisition of monopoly power certainly requires proof of intent." 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016) (quotation omitted). But that intent is the "mere intent to do the act." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd*, 11 F.4th 118, 137 (2d Cir. 2021) (quotation omitted). "Simply put, benign intent does not shield anticompetitive conduct from liability in a monopolization claim." *Id*. (quotation omitted). Epic does not seriously contest that Particle alleges Epic intentionally committed the multiple categories of misconduct alleged in the Complaint because it cannot—that is the crux of Particle's claims. This should be the end of the anticompetitive conduct inquiry.

*Shak* does not change that conclusion. That case discusses a very specific type of exclusionary conduct: "an *intentionally* manipulative trading strategy to raise the prices of [futures] in order to profit from [defendants'] long positions." 156 F. Supp. 3d at 487 (brackets

and emphasis in original) (quotation omitted). An inference of intent for that very specific type of conduct only arises if it would be "uneconomic and irrational," but for the desire to obtain monopoly power. *Id.* But Particle does not allege Epic harmed competition through a trading strategy, which renders *Shak* inapposite. Epic is free to assert business justifications at the appropriate time, but that is a factual question on which **Epic** bears the burden. Particle is not obligated to address the ways Epic may try to explain away its conduct now. *See, e.g., In re Actos End-Payor Antitrust Litig.*, 417 F. Supp. 3d 352, 370 (S.D.N.Y. 2019) ("Nothing in the rule of reason suggests that a plaintiff must plead defendant's bad faith to meet its initial burden of establishing anti-competitive conduct.").

**Allegations of "Conspiracy."** Contrary to Epic's contentions, this is not a conspiracy case. Particle alleges vertical restraints Epic imposed on Particle's current and prospective customers; *i.e.*, agreements Epic obtained through coercion and improper use of market and monopoly power. (*E.g.*, Compl. ¶ 86.) The Complaint provides detailed allegations of both imposition of a condition on dealing and communication of acquiescence to that condition. (*Id.*) That is prototypical direct evidence of a vertical agreement sufficient to state a Section 1 claim *See, e.g.*, Areeda & Hovenkamp, *Antitrust Law*, ¶ 1447b2 ("A traditional vertical agreement is clearly present where assurances are requested and received."). This type of agreement, incidentally, is very similar to conduct that several of Epic's legal team members assert violated Section 1 in a series of cases by another Epic (Epic Games) against Apple and Google in the Northern District of California.

**Antitrust Standing.** Epic argues that Particle has not sufficiently alleged an antitrust injury because the Complaint identifies an injury "to Particle alone." (Letter at 3.) What Particle actually alleges is that it and Epic are currently the only two participants in the payer platform market, such that Epic's attempts to exclude Particle by coercing its customers, smearing its reputation, and destroying its business maintain and give Epic unfettered monopoly power. (Compl. ¶¶ 62, 140–146.) That is an entirely "conventional form of antitrust injury. . . ." *Valassis Communications, Inc. v. News Corp.*, 2019 WL 802093, at *11 (S.D.N.Y. Feb. 21, 2019) ("[E]xclusion from a market . . . is exactly the type of injury that antitrust laws were designed to prevent and flows from the competition-reducing aspect of defendant's conduct.") (quotation omitted).

**State Law Claims.** In the context of a tortious interference claim, "'[w]rongful means' include . . . misrepresentation, civil suits . . . and some degrees of economic pressure. . . ." *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 390 (S.D.N.Y. 2022) (quotation omitted). Particle alleges Epic did exactly that, including by engaging in "misrepresentation" by falsely painting Particle as a privacy threat to the healthcare community, (Compl. ¶¶ 102–14); instituting baseless proceedings akin to "civil suits" by bringing a manufactured dispute within a standard-setting body, (*id.* ¶¶ 119–24); and applying "economic pressure" by threatening to withhold vital records from customers that did business with Particle, (*id.* ¶¶ 79–93). Moreover, Particle's defamation and trade libel claims identify actionable statements by Epic. Contrary to Epic's arguments (Letter at 3), New York defamation law holds that "a statement of fact will not be transformed into a statement of opinion solely by use of language expressing uncertainty or qualification." *Loughlin v. Goord*, 558 F. Supp. 3d 126, 147 (S.D.N.Y. 2021) (quotation omitted); *see also Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 66 (S.D.N.Y. 2021).

* * * * *

For all these reasons, Particle respectfully believes Epic has not identified any legitimate bases to seek dismissal.

Respectfully submitted,

*/s/ Adam Wolfson*

Adam Wolfson