UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PARTICLE HEALTH INC.,

Plaintiff,

vs.

EPIC SYSTEMS CORPORATION,

Defendant.

Civil Action No. 1:24-cv-07174-NRB

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW
IN SUPPORT OF EPIC SYSTEMS CORPORATION'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ............................................................................................4

    A.    Electronic Health Records, HIPAA, and Carequality................................5

    B.    Epic Develops Concerns Regarding Potential Patient Privacy Violations. ............6

    C.    Epic Commences a Carequality Dispute Resolution Process................................7

    D.    Epic Notifies and Updates Its Customers About the Carequality Dispute and Potential Inappropriate Disclosures of Their Electronic Health Records.................................................................................................7

    E.    The Carequality Resolution Confirmed Certain Particle Customers Had Inappropriately Taken Records by Falsely Claiming Treatment Purposes............8

    F.    Following the Steering Committee Resolution, Particle Files the Present Baseless Lawsuit. ...............................................................................9

LEGAL STANDARD....................................................................................11

ARGUMENT...............................................................................................11

I.    PARTICLE'S ANTITRUST CLAIMS (COUNTS 1-5) SHOULD BE DISMISSED...............................................................................................11

    A.    Particle Fails to Plead a Plausible Antitrust Product Market. ...........................12

    B.    Particle Fails to Plausibly Allege Anticompetitive Conduct...............................17

        1.    Particle Fails to Plead Anticompetitive Conduct Under Section 2. ..........17

        2.    Particle Fails to Plead a Section 1 Agreement in Restraint of Trade. .......20

    C.    Particle Fails to Plausibly Allege Antitrust Injury...............................................24

II.    PARTICLE'S STATE LAW CLAIMS (COUNTS 6-9) SHOULD BE DISMISSED...............................................................................................24

    A.    Particle Fails to State a Claim for Tortious Interference with Contract...............25

    B.    Particle Fails to State a Claim for Tortious Interference with Prospective Business Relations. ..............................................................................26

C.    Particle Fails to State a Claim for Defamation. ....................................................28

    1.    Particle Fails to Plead Actual Malice. .....................................................29

    2.    The Allegedly Defamatory Statements Are Absolutely Privileged. .........30

    3.    Particle Fails to Plead False Statements of Fact.......................................31

    4.    Particle Fails to Plead Special Damages or Defamation Per Se...............33

D.    Particle Fails to State a Claim for Trade Libel. ....................................................34

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2238 Victory Corp. v. Fjallraven USA Retail, LLC*,
  2021 WL 76334 (S.D.N.Y. Jan. 8, 2021) ..............................................................25

*360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*,
  2020 WL 5259283 (S.D.N.Y. Sept. 3, 2020)........................................................27

*Adelson v. Harris*,
  973 F. Supp. 2d 467 (S.D.N.Y. 2013) ..................................................................29

*Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*,
  2024 WL 4628330 (S.D.N.Y. Mar. 26, 2024) ......................................................24

*Appel v. Schoeman Updike Kaufman Stern & Ascher L.L.P.*,
  2015 WL 13654007 (S.D.N.Y. Mar. 26, 2015) ....................................................28

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
  356 F. Supp. 3d 379 (S.D.N.Y. 2019) ..................................................................27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................11, 13

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
  813 F. Supp. 2d 569 (S.D.N.Y. 2011) ..............................................11, 12, 14, 15, 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................passim

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
  142 F. Supp. 2d 296 (E.D.N.Y. 2001) .................................................................15

*Biro v. Condé Nast*,
  807 F.3d 541 (2d Cir. 2015)..................................................................................30

*Biro v. Condé Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013) ..................................................................30

*Bruce Bzura, LLC v. Moss*,
  2018 WL 7858772 (S.D.N.Y. Oct. 25, 2018) ......................................................27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ..............................................................................................24

*Buckley v. Litman*,
  443 N.E.2d 469 (N.Y. 1982)..................................................................................30

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) ................................................................20

*BYD Co. v. VICE Media LLC*,
   531 F. Supp. 3d 810 (S.D.N.Y. 2021) ........................................30

*Camelot SI, LLC v. Three Sixty Brands Grp. LLC*,
   632 F. Supp. 3d 471 (S.D.N.Y. 2022) ........................................27

*Cap. Imaging Assocs. v. Mohawk Valley Med. Assocs.*,
   996 F.2d 537 (2d Cir. 1993)..................................................4, 24

*Carvel Corp. v. Noonan*,
   818 N.E.2d 1100 (N.Y. 2004) ..............................................27, 28

*CDC Newburgh Inc. v. STM Bags, LLC*,
   692 F. Supp. 3d 205 (S.D.N.Y. 2023) ........................................29

*Cenedella v. Metro. Museum of Art*,
   348 F. Supp. 3d 346 (S.D.N.Y. 2018) ............................21, 22, 23

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)................................................12, 13, 14

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014)...............................................31, 32

*Clean Coal Techs., Inc. v. Leidos, Inc.*,
   377 F. Supp. 3d 303 (S.D.N.Y. 2019) ........................................26

*Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*,
   166 F. Supp. 2d 891 (S.D.N.Y. 2001) ........................................15

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
   817 F.3d 46 (2d Cir. 2016)........................................................15

*Dentsply Int'l Inc. v. Dental Brands for Less LLC*,
   2016 WL 6310777 (S.D.N.Y. Oct. 27. 2016) .............................34

*Dfinity Found. v. N.Y. Times Co.*,
   702 F. Supp. 3d 167 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762 (2d Cir. July 29,
   2024)..........................................................................................4

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
   472 F.3d 23 (2d Cir. 2006)........................................................21

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
   612 F. Supp. 2d 330 (S.D.N.Y. 2009) ........................................16

iv

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) ................................................................34

*EQT Infrastructure Ltd. v. Smith*,
   861 F. Supp. 2d 220 (S.D.N.Y. 2012) ..................................................................4

*Fernandez v. Zoni Language Ctrs., Inc.*,
   2016 WL 2903274 (S.D.N.Y. May 18, 2016) ......................................................10

*Gargiulo v. Forster & Garbus Esqs.*,
   651 F. Supp. 2d 188 (S.D.N.Y. 2009) ..................................................................7

*Gross v. N.Y. Times Co.*,
   623 N.E. 2d 1163 (N.Y. 1993) .....................................................................31, 32

*H-Quotient, Inc. v. Knight Trading Grp., Inc.*,
   2005 WL 323750 (S.D.N.Y. Feb. 9, 2005) .........................................................11

*Harding v. Dorilton Cap. Advisors LLC*,
   635 F. Supp. 3d 286 (S.D.N.Y. 2022) ................................................................27

*Henneberry v. Sumitomo Corp. of Am.*,
   415 F. Supp. 2d 423 (S.D.N.Y. 2006) ................................................................34

*Honeywell Int'l Inc. v. Ecoer Inc.*,
   2024 WL 3521591 (S.D.N.Y. July 23, 2024) ......................................................27

*In re Adderall XR Antitrust Litig.*,
   754 F.3d 128 (2d Cir. 2014) .............................................................. 3, 17, 18, 20

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016) ...............................................................................24

*In re Google Digit. Advert. Antitrust Litig.*,
   627 F. Supp. 3d 346 (S.D.N.Y. 2022) .........................................................18, 20

*In re Platinum & Palladium Antitrust Litig.*,
   61 F.4th 242 (2d Cir. 2023) ................................................................................23

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011) ................................................................21

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ................................................................21

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021) ...............................................................................31

*Kirch v. Liberty Media Corp.*,
   449 F.3d 388 (2d Cir. 2006)................................................................25

*Liberman v. Gelstein*,
   605 N.E.2d 344 (N.Y. 1992)...............................................................29

*Loughlin v. Goord*,
   2022 WL 9575656 (2d Cir. Oct. 17, 2022)..........................................11

*Mann v. Abel*,
   885 N.E.2d 884 (N.Y. 2008)...............................................................31

*Mathias v. Daily News, L.P.*,
   152 F. Supp. 2d 465 (S.D.N.Y. 2001) ................................................15

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)...............................................................20

*McDougal v. Fox News Network, LLC*,
   489 F. Supp. 3d 174 (S.D.N.Y. 2020) ...........................................29, 31

*Medcalf v. Walsh*,
   938 F. Supp. 2d 478 (S.D.N.Y. 2013) ................................................33

*Mooney v. AXA Advisors, L.L.C.*,
   19 F. Supp. 3d 486 (S.D.N.Y. 2014) .............................................15, 16

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
   861 F. Supp. 2d 344 (S.D.N.Y. 2012) ................................................16

*Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*,
   485 F. Supp. 2d 387 (S.D.N.Y. 2007) ...........................................17, 18

*Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*,
   497 F. Supp. 2d 541 (S.D.N.Y. 2007) ................................................26

*Pasternack v. Lab'y Corp. of Am.*,
   2014 WL 4832299 (S.D.N.Y. Sept. 29, 2014).....................................35

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)...........................................................12, 17

*Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*,
   2024 WL 3524497 (S.D.N.Y. July 24, 2024).......................................26

*Planetarium Travel, Inc. v. Altour Int'l, Inc.*,
   97 F. Supp. 3d 424 (S.D.N.Y. 2015) ..............................................12, 13

*Port Dock & Stone Corp. v. Oldcastle N.E., Inc.*,
    507 F.3d 117 (2d Cir. 2007)................................................................18

*Prospect Funding Holdings, LLC v. Vinson*,
    256 F. Supp. 3d 318 (S.D.N.Y. 2017) ...............................................26

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
    96 F.4th 327 (2d Cir. 2024) ........................................................ 16, 17

*Riel v. Morgan Stanley*,
    2007 WL 541955 (S.D.N.Y. Feb. 16, 2007)........................................7

*RMS Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009) ...............................................25

*Shak v. JPMorgan Chase & Co.*,
    156 F. Supp. 3d 462 (S.D.N.Y. 2016) ...............................................18

*Smith & Johnson, Inc v. Hedaya Home Fashions Inc.*,
    1996 WL 737194 (S.D.N.Y. Dec. 26, 1996) ................................ 15, 16

*Solent Freight Servs., Ltd. v. Alberty*,
    914 F. Supp. 2d 312 (E.D.N.Y. 2012)................................................22

*Soter Techs., LLC v. IP Video Corp.*,
    523 F. Supp. 3d 389 (S.D.N.Y. 2021) ...............................................33

*Taboola, Inc. v. Ezoic Inc.*,
    2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020)....................................25

*Tacopina v. Kerik*,
    2016 WL 1268268 (S.D.N.Y. Mar. 31, 2016) ...................................34

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
    603 F. Supp. 2d 584 (S.D.N.Y. 2009) ...............................................30

*Thai v. Cayre Grp., Ltd.*,
    726 F. Supp. 2d 323 (S.D.N.Y. 2010) ...............................................33

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)...............................................................20

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ...............................................13

*Wexler v. Allegion (UK) Ltd.*,
    374 F. Supp. 3d 302 (S.D.N.Y. 2019) ...............................................30

*Williams v. Vista on 5th*,
   2024 WL 3728074 (S.D.N.Y. Aug. 8, 2024)...................................................................4

*X.L.O. Concrete Corp. v. Rivergate Corp.*,
   634 N.E.2d 158 (N.Y. 1994)......................................................................................11

**Statutes & Rules**

28 U.S.C. § 1367.............................................................................................................24

42 U.S.C. § 1320d *et seq.*...............................................................................................1

42 U.S.C. § 1320d-5.......................................................................................................19

42 U.S.C. § 1320d-6.......................................................................................................19

N.Y. Gen. Bus. Law § 340 *et seq.*................................................................................11

N.Y. Civ. Rights Law § 74..............................................................................................30

N.Y. Civ. Rights Law § 76-a...........................................................................................29

Fed. R. Civ. P. 12(b)(1)..............................................................................................1, 24

Fed. R. Civ. P. 12(b)(6).......................................................................................1, 11, 25

Section 1 of the Sherman Act................................................................................passim

Section 2 of the Sherman Act................................................................................passim

**Other Authorities**

45 C.F.R. § 164.501......................................................................................................5, 9

45 C.F.R. § 164.502..............................................................................................1, 5, 9, 18

65 Fed. Reg. 82462 (Dec. 28, 2000)...........................................................................5, 9

Defendant Epic Systems Corporation ("Epic") respectfully submits this memorandum in support of its motion to dismiss Plaintiff Particle Health, Inc.'s ("Particle") Complaint[1] in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

## PRELIMINARY STATEMENT

This case is nothing more than a baseless retributive attack by Particle against Epic because Epic, together with its health care provider customers, revealed that Particle enabled some of Particle's customers to obtain confidential patient medical records under false pretenses.

The Health Insurance Portability and Accountability Act ("HIPAA") (42 U.S.C. § 1320d *et seq.*) and regulations promulgated thereunder exist to protect patient privacy and security and to ensure that sensitive patient information is provided only to authorized entities for a permitted purpose, and only the "minimum necessary" information for that purpose. 45 C.F.R. § 164.502. Particle unabashedly touts that its business model enables *payers* (health insurance companies) that purport to offer "treatment recommendations" to obtain patients' full medical records—far more than the "minimum necessary" information payers may legally obtain—and then use those records for "'secondary' purposes more typically associated with health insurance". (¶ 9.) This scheme enables Particle's payer customers to obtain even sensitive information about health care a patient may have paid for out-of-pocket specifically to maintain privacy, such as for an abortion or other reproductive health care.

Epic became concerned about Particle's behavior when it received reports of suspicious activity on the Carequality network. (¶ 77.) The non-profit Carequality network facilitates the electronic exchange of medical records between healthcare providers for treatment purposes.

---

[1] All citations to the Complaint are designated by "¶" and the relevant number(s). While Epic strongly disputes many of the facts in the Complaint, for the purpose of this motion, Epic assumes them to be true. Unless otherwise noted, all emphasis is added, and citations and internal quotations are omitted.

(¶ 6.) The network is built on trust that each participant is honest about the purpose for its requests made on the network.[2] (Ex. 2 at 2.) Particle acknowledges, as it must, that "privacy and security are paramount concerns" in the health care industry. (¶ 14.) Particle's suspicious activity led Epic and its customers, who are the custodians of their patients' records, to investigate and ultimately uncover evidence that Particle's customers were inappropriately obtaining patient records. (¶¶ 16, 77; Ex. 2.) At the direction of Epic's Care Everywhere Governing Council (the "Governing Council"), which comprises elected representatives of Epic's health care provider customers, Epic initiated a dispute against Particle, pursuant to the process established by the Carequality network, to understand what Particle and its customers were doing and repair the breakdown in trust they had caused. (¶¶ 16; 96; 103; Ex. 2 at 4.)

It is undisputed that two Particle customers were suspended as a result of the Carequality dispute process. (Ex. 1 §§ IV.1.b.i, IV.2.b.i.) Particle concedes that in response to Epic's concerns, it eventually revoked access for two customers. (¶ 104.) One was "Integritort", which sells medical records to lawyers for class action lawsuits, which Particle removed eight months after Epic raised the concerns. (¶ 110; Ex. 1 § IV.1.a; Ex. 2 at 4.) Notwithstanding Particle's assertion that it was "completely vindicated" by Carequality (¶ 123), it acknowledges that Carequality imposed a "corrective action plan" on Particle to "change its practices in certain ways" to protect patient privacy and protect against Particle allowing more bad actor customers, like those revealed by Epic, onto Carequality to improperly obtain patient records (¶ 125; *see* Ex. 1 § IV.4.b).

---

[2] These concerns, and the importance of trust, are magnified by the reality of modern communication, permitting the easy redistribution of medical records. Once a bad actor obtains patient medical records, they can easily pass those records on to other non-HIPAA covered entities (such as class action lawyers) and those entities can also distribute them even further.

Against this backdrop demonstrating the legitimacy of Epic's and its health care provider customers' concerns, and the months-long process they used to address those concerns, Particle nonetheless claims that Epic "baselessly" identified "security and privacy risks" and "manufactured" the Carequality dispute. (¶¶ 11-16.) Particle asserts that Epic's actions were designed to squash Particle because Particle claims to have the only product that can compete with Epic's Payer Platform, disregarding that Epic's Payer Platform and Particle's business model serve fundamentally different purposes and that Epic's Payer Platform is not even on the Carequality network. (¶¶ 7, 11, 14, 51, 62.) But Particle's invented claims are supported only by conclusory allegations and conjecture, and should be dismissed in their entirety with prejudice.

Particle's antitrust claims should be dismissed. *First*, Particle fails to allege a plausible relevant market. Particle alleges a gerrymandered market artificially restricted to a single set of customers—payers—while wishing away all the competing products that perform the same functions as Particle's product. (Section I.A.) *Second*, Particle fails to plausibly allege anticompetitive conduct. The gravamen of Particle's monopolization claims is that Epic (1) temporarily suspended certain Particle customers until Epic could confirm that each performed "treatment" as defined by HIPAA, (2) filed a dispute with Carequality based on the concern that Particle and its customers might be inaccurately representing the purpose of their record retrievals, and (3) notified its own customers of the Carequality dispute and its privacy concerns consistent with its normal course of business. (¶ 78.) Particle's allegations do not plausibly show that Epic engaged in "conduct without a legitimate business purpose that makes sense only because it eliminates competition". *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014). (Section I.B.1.) Particle's Section 1 claim also fails because no factual allegations suggest that an illegal agreement was made, a threshold pleading requirement. *See*

3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Particle's allegations amount to nothing

more than "labels and conclusions, and a formulaic recitation of the elements", which must be

ignored.  *Id.* at 555.  (Section I.B.2.)  *Third*, the antitrust claims should be dismissed for failure to

adequately allege antitrust injury.  Particle alleges harm only to *itself* as opposed to harm to

competition as a whole.  It would "trivializ[e] the [Sherman] Act" to allow "routine disputes

between business competitors [to] be elevated to the status of an antitrust action".  *Cap. Imaging*

*Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993).  (Section I.C.)

Particle's state law claims also should be dismissed.  Particle's tortious interference with

contract claim fails because Particle does not adequately plead Epic's knowledge of any contract,

actual breach, or that Epic intentionally procured a breach.  (Section II.A.)  Particle fails to plead

that Epic tortiously interfered with Particle's prospective customers because it does not plausibly

allege that it would have consummated any relationships but for Epic's conduct, that Epic was

aware of the alleged prospective relationships, or that Epic acted with malice.  (Section II.B.)

Finally, Particle's defamation and trade libel claims fail for several reasons, including because

Particle does not plead actual malice, Epic's statements are privileged and non-actionable, and

Particle does not allege special damages.  (Sections II.C and II.D.)

## **BACKGROUND**

The following facts are based on the Complaint, documents incorporated by reference

therein, and matters of public record, all of which can be considered on a motion to dismiss.[3]

---

[3] *See Dfinity Found. v. N.Y. Times Co.*, 702 F. Supp. 3d 167, 173 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024).  The Complaint "refers to and quotes from" several documents, "thus incorporating [them]". *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 224 n.2 (S.D.N.Y. 2012).  Accordingly, the Court can consider each of the following documents (referred to herein as "Ex.") attached to the Declaration of Lauren A. Moskowitz, dated December 19, 2024:  the version of the August 29, 2024 Carequality Steering Committee Resolution that Carequality publicly released as redacted on October 3, 2024 (Epic can provide an unredacted copy at the Court's request) (the "Resolution") (Ex. 1); the April 10, 2024 Issue Notification (the "Issue Notification") (Ex. 2); and the June 28, 2024 Email (Ex. 3).  (*E.g.*, ¶¶ 14, 17, 102, 110, 116, 124-25, 132, 206, 213.)  Public record includes statutes like HIPAA.  *See Williams v. Vista on 5th*, 2024 WL 3728074, at *1 (S.D.N.Y. Aug. 8, 2024).

A.      **Electronic Health Records, HIPAA, and Carequality.**

An electronic health record is a "patient's medical history stored and maintained in electronic format". (¶ 29.)  Electronic health records are created using software that standardizes the user interface and "allows healthcare facilities to add, update, maintain, and delete patient" data. (¶¶ 30-31.)  Epic is one provider of electronic health record software. (¶ 1.)  Epic licenses its software to health care providers, such as large hospitals, that install the software and use it to document information about their patients. (¶¶ 22, 30.)

Given that a person's health record can contain some of the most sensitive information about them, regulations promulgated under HIPAA dictate what information can be shared with whom.  They identify permitted purposes to "use or disclose protected health information", 45 C.F.R. § 164.502(a)(1), such as "treatment, payment, or health care operations", *id.* § 164.502(a)(1)(ii).  Disclosure must be limited to the "minimum necessary to accomplish the intended purpose" unless, as is relevant here, the disclosure is for "treatment", *id.* § 164.502(b), defined as the "provision, coordination, or management of health care and related services by one or more health care providers", *id.* § 164.501.  The Department of Health & Human Services has unambiguously stated that payers do not provide treatment.  65 Fed. Reg. 82462, 82626-27 (Dec. 28, 2000) ("We do not consider the activities of third party pay[e]rs, including health plans, to be 'treatment.'  Only health care providers, not health plans, conduct 'treatment' for purposes of [45 C.F.R. § 164.501].")).  Thus, payers may obtain only the "minimum necessary" information to process and pay claims—*not*, for example, full and complete records regarding medical visits that are paid for out-of-pocket by the patient, such as reproductive health services.

Federal regulations require that electronic health records be made available in response to requests from providers for treatment purposes. (¶ 71.)  This requirement led to the creation of organizations such as Carequality that "facilitate the smooth flow and exchange of medical

records" among providers "for 'treatment' purposes". (¶¶ 8, 16.) Carequality "operate[s] by allowing healthcare-related entities to join a voluntary contractual framework that requires participants to abide by a uniform set of rules and request or provide medical records through a centralized system". (¶ 46.) Carequality "is made up of dozens of implementer organizations", including Epic and Particle, "that in turn onboard their participant organizations" (*i.e.*, "connections"), which then can exchange electronic health records with other connections for treatment purposes. (Ex. 2 at 3; ¶ 16.) All of Epic's health care provider customers in the U.S. use Carequality, with Epic as their implementer, to exchange records electronically with other health care providers that use different health record software.

**B.    Epic Develops Concerns Regarding Potential Patient Privacy Violations.**

In March 2024, "Epic Carequality administrators became aware of a significant increase in the volume of records sent from Epic organizations directly to the Particle Health gateway entry". (Ex. 2 at 4.) Epic became concerned that the uptick in volume could be associated with connections that were using Carequality to obtain records for non-treatment purposes. (*Id.* at 2-3; ¶ 81.) In light of its and its customers' "high sensitivity to (and legal requirements regarding) patient data-related issues" (¶ 112), Epic brought its concerns to the Governing Council (Ex. 2 at 3), which comprises fifteen (15) representatives each elected by Epic's health care provider customers (¶ 96). Based on its review, the Governing Council "determined that certain Particle Health [connections] may not be eligible to assert a [t]reatment" purpose. (Ex. 2 at 2.) The Governing Council therefore "directed Epic to file a formal dispute with Carequality as provided in the Carequality framework agreement, and to suspend Particle Health's gateway connection to Epic community members while the Carequality dispute is pending". (*Id.* at 4.)

C.    **Epic Commences a Carequality Dispute Resolution Process.**

In accordance with the Governing Council's directive, on March 21, 2024, "Epic filed a formal dispute with Carequality on the grounds that Particle Health might not be fulfilling its obligations as a Carequality implementer, and based on the concern that Particle Health and its participant organizations might be inaccurately representing the purpose associated with their record retrievals" (the "Dispute").  (*Id.* at 2; ¶ 119.)  Carequality's rules include a defined dispute resolution process to address conflicts between members.  (¶ 119; Ex. 1 § I.)  Formal disputes are decided by the Carequality Steering Committee (the "Steering Committee") (Ex. 1 § I; ¶ 124), which "is composed of representatives from major players in the healthcare industry" (¶ 127).  The Dispute consisted of a "full-blown arbitration proceeding, with experienced . . . counsel on both sides, multiple hearings, and formal submissions".  (¶ 123.)

D.    **Epic Notifies and Updates Its Customers About the Carequality Dispute and Potential Inappropriate Disclosures of Their Electronic Health Records.**

Shortly after filing the Dispute, on April 10, 2024, Epic sent its customers an "Issue Notification" outlining the "events that [] led Epic to file" the Dispute and identifying investigative steps its customers could take to determine whether they had shared records with Particle's connections.  (¶ 102; Ex. 2 at 2, 5.)[4]

On June 27, 2024, Particle notified Carequality that it "determined that [certain evidence] strongly indicates that, at least in certain instances, [a Particle customer] made queries for non-treatment purposes".  (Ex. 1 § IV.1.a.)  As a result, Particle informed Carequality that it had

_____

[4] The Complaint excerpts portions of several statements from the "Summary" section of the Issue Notification (¶¶ 206, 214; Ex. 2 at 2), but as shown in Appendices A.1 and A.2 and discussed below (*infra* Sections II.C and II.D), Particle has misquoted both the document and disregarded the surrounding context.  The Court can review the actual statements and full context in deciding a motion to dismiss.  *Riel v. Morgan Stanley*, 2007 WL 541955, at *4, *8-9 (S.D.N.Y. Feb. 16, 2007) (considering "long article" in the *Wall Street Journal* even when the complaint "single[d] out only small portions as constituting the alleged defamatory statements"); *see also Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 190 (S.D.N.Y. 2009) ("[The Court] may consider documents attached to the complaint or incorporated by reference, such as the affidavits containing the allegedly actionable statements".).

"terminated its contractual relationship with [that customer] and asked [it] to destroy any records queried on Carequality". (*Id.*) On June 28, 2024, Epic sent its customers an update to the Issue Notification, promptly informing them that "Particle Health recently acknowledged that one of Particle's customers . . . accessed patient records inappropriately through Carequality". (Ex. 3 at 1; ¶ 110.)[5] Epic noted that while it did "not agree with Particle's framing of the issue, [it was] pleased that after eight months of resistance they have now acknowledged wrongdoing and have provided a contact for assisting you in your investigation". (Ex. 3 at 1; ¶ 110.)

### E. The Carequality Resolution Confirmed Certain Particle Customers Had Inappropriately Taken Records by Falsely Claiming Treatment Purposes.

On August 29, 2024, the Carequality Steering Committee issued its findings and resolution of the Dispute (the "Resolution"). (¶ 124; *see* Ex. 1.) As relevant here, the Resolution suspended two Particle customers from participating in Carequality for twelve (12) months because they had inappropriately taken patient records by falsely claiming a treatment purpose. (Ex. 1 §§ IV.1.b.i, IV.2.b.i.) The Resolution further found that a third Particle customer's requests "may not have [all] been for treatment purposes" and ordered Particle to suspend requests from that customer unless and until certain information was provided. (*Id.* §§ IV.3.e.i, IV.3.j.i.) Moreover, because Particle's "diligence failed to reveal inaccurate information provided by" these three customers, the Resolution imposed a corrective action plan "subject[ing] [Particle] to additional oversight for six months to confirm that Particle is thoroughly following its process". (*Id.* § IV.4.a.iii.) Despite these findings, Particle claims the Resolution "completely vindicated" it (¶ 123) and "expressly [found] that Particle did absolutely nothing wrong" (¶ 17).

---

[5] Again, the Complaint also misquotes this notification, as shown in Appendix A.1.

**F.    Following the Steering Committee Resolution, Particle Files the Present Baseless Lawsuit.**

Less than a month after receiving the Steering Committee's proposed Resolution, Particle filed this lawsuit alleging that Epic's initiation of the Dispute and other related actions taken to address patient privacy concerns were all part of a scheme to restrict competition in a purported "payer platform market" in which only Epic and Particle allegedly compete.  (¶¶ 62, 78, 143.)

The Complaint defines "payer platforms" as "software platforms that allow payers to consolidate multiple aspects of their business on a single platform, including by providing them the ability to retrieve [electronic health records] at scale through smooth, automated processes, and then to store and analyze those records".  (¶ 53.)  Particle alleges that Epic competes in this alleged market with its Epic Payer Platform product, released in 2021, which allows payers to exchange information with Epic's provider customers for payer non-treatment use cases.  (*E.g.*, ¶¶ 69, 72.)  Because Epic Payer Platform facilitates exchanges for non-treatment purposes alone, only the "minimum necessary" information is exchanged.  45 C.F.R. § 164.502(b).

By definition, payers cannot request records for treatment purposes.  *See* 45 C.F.R. § 164.501; *see also* 65 Fed. Reg. at 82626-27; ¶ 72.  Records requested for non-treatment purposes like payment must be exchanged in a way that is consistent with the law and provides the "minimum necessary" information to the payer.  45 C.F.R. § 164.502(b).  Indeed, Epic's Payer Platform does not exchange records through Carequality.  (¶¶ 71-72.)  Contrary to the allegations in the Complaint, there are numerous ways for payers to request information from Epic provider customers for non-treatment purposes other than through "antiquated means like fax machines", Epic Payer Platform, and Particle.  (*E.g.*, ¶¶ 6, 72.)  For example, Datavant, Availity, and InterSystems, among a long list of other companies, offer non-treatment data

exchange services.[6]  Epic also facilitates connectivity for non-treatment uses by providing certain Application Programming Interfaces on open.epic.com that payers can use.  (*See* Ex. 2 at 3.)

Particle uses Carequality to facilitate its customers' record exchanges by classifying their health record requests as "for treatment".  (¶ 73.)  Particle claims that its product also provides storage and analytics.  (¶ 55.)  While Particle alleges that it initially marketed its software to only traditional providers able to request records for treatment purposes (¶ 8), it expanded its reach by marketing its product to "pay-viders" (¶ 9).  Particle uses the term "pay-viders" to refer to payers who purport to offer some form of "treatment-related services" to classify their requests as "for treatment" to obtain access to far more data than the "minimum necessary" for payment.  (¶¶ 9-10.)  By contrast, Epic's Payer Platform is used by payers for non-treatment purposes, and therefore does not go through Carequality.  (¶ 51.)  Particle nonetheless alleges that its product "competes with" Epic's Payer Platform in the alleged "payer platform market".  (¶ 62.)

Particle also asserts tortious interference claims alleging that Epic is to blame for its loss of customers.  (*E.g.*, ¶¶ 86-91.)  Particle does not allege that Epic poached those customers, but instead that one merely ended an existing relationship with Particle (in the case of XCures, which switched to another platform, Kno2 (¶¶ 86-87))[7], and that certain other potential customers failed

---

[6] *See* Datavant, *Health Plans*, https://www.datavant.com/who-we-serve/health-plans (last visited Dec. 19, 2024); Availity, *How a Health Plan Closed Care Gaps and Increased Provider Engagement with Electronic Clinical Quality Validation*, https://www.availity.com/case-studies/how-a-health-plan-closed-care-gaps-and-increased-providerengagement-with-electronic-clinical-quality-validation/ (last visited Dec. 19, 2024); InterSystems, *InterSystems Payer Services*, https://www.intersystems.com/products/healthshare/payer-services/ (last visited Dec. 19, 2024).  "Courts may also take judicial notice of information contained on websites where the authenticity of the site has not been questioned".  *Fernandez v. Zoni Language Ctrs., Inc.*, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016).  Particle's refusal to recognize or address the existence of these companies, among others, is discussed below.  (*See infra* Section I.A.)

[7] Despite alleging that XCures switched its service provider from Particle to Kno2, Particle alleges that Kno2 is not a competitor in the payer platform market.  (¶ 87.)

to consummate relationships with Particle (Beeline Rx, Power Life Sciences, Leafwell, and Medvise (¶ 91)). Particle also alleges defamation and trade libel claims based on Epic's communications to customers concerning the Dispute. (¶¶ 204-220.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where alleged facts are "merely consistent with" alleged wrongdoing, the complaint "stops short of the line between possibility and plausibility" and should be dismissed. *Twombly*, 550 U.S. at 557. A court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations". *Loughlin v. Goord*, 2022 WL 9575656, at *1 (2d Cir. Oct. 17, 2022). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice". *Iqbal*, 556 U.S. at 678.

## ARGUMENT

## I.    PARTICLE'S ANTITRUST CLAIMS (COUNTS 1-5) SHOULD BE DISMISSED.[8]

Particle fails to state an antitrust claim. *First*, Particle fails to plausibly allege the existence of a relevant antitrust product market. (Section I.A.) *Second*, Particle fails to plausibly allege that Epic engaged in anticompetitive conduct in the purported product market. (Section I.B.) *Third*, Particle fails to plausibly allege antitrust injury. (Section I.C.)

---

[8] Particle's fifth cause of action arises under the Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*, which was modeled after the Sherman Act and thus, "should generally be construed in light of Federal precedent". *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994). All the arguments in support of dismissal of Particle's Sherman Act claims apply to and require dismissal of Particle's Donnelly Act claim. Moreover, the Donnelly Act is preempted by the Sherman Act where "'the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce,'" *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, 2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005), which is the case here (¶ 147).

### A.     Particle Fails to Plead a Plausible Antitrust Product Market.

"In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant . . . product market". *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011).  The alleged product market "must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible". *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008).

Particle defines the alleged relevant "payer platform market" as "software platforms that allow payers to consolidate multiple aspects of their business on a single platform, including by providing them the ability to retrieve [electronic health records] at scale through smooth, automated processes, and then to store and analyze those records".  (¶¶ 52-53.)  But this alleged market and the allegations in support thereof bear no relation to the established methodology courts have prescribed to define a market in antitrust cases.  Instead, Particle has gerrymandered an alleged market restricted to only one sub-group of customers (payers) and, even within that sub-group, to only Epic's and Particle's products, thereby alleging that Epic's market share exceeds 90 percent.  (¶ 62.)  Courts are particularly wary where a plaintiff, like Particle, "attempt[s] to define the elements of the relevant market to suit its desire for high [defendant] market share".  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 106 (2d Cir. 2002).

*First*, Particle attempts, without support, to restrict the relevant market to software sold to a particular customer type—payers (¶ 53)—a prime example of how plaintiffs inappropriately attempt to restrict a market to increase the defendant's market share.  *PepsiCo*, 315 F.3d at 106.  Courts dismiss claims based on product markets defined by a specific customer type where the complaint does not plausibly allege facts to show that customer group to be unique.  *See, e.g.*, *Chapman*, 546 F.3d at 238 ("[Plaintiff] has failed to show how the market for restraint training

services *to child care providers* is any different from the larger market for restraint training services to other businesses, agencies, and organizations." (emphasis in original)); *Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 428 (S.D.N.Y. 2015) (rejecting "division of the market by customer [as] too narrow . . . and unsupported").

Here, Particle does not allege (nor could it) that only payers seek software to retrieve, store, and analyze electronic health records.  Particle does not allege any facts to establish that payers differ from other customers in any way with respect to their desire for such software.  The conclusory allegation that "payer platforms offer various analytics services tailored to payer needs" (¶ 55) need not be credited.  *See Iqbal*, 556 U.S. at 686.  Moreover, even that conclusory allegation is contradicted by Particle's other allegations.  Particle alleges that it developed its software for health care *providers* (¶ 8) and later started to sell that same software to *payers* to be used in the same way, by asserting a treatment purpose for the medical record retrieval (¶ 9). The Second Circuit has expressly rejected subdivision of an antitrust market by customer type where, as here, the same product is sold to all customers.[9]  *Chapman*, 546 F.3d at 238 ("Handle With Care is marketed to and utilized by various [customers] that are not child care providers.").

*Second*, the Complaint contains no analysis of the rule of reasonable interchangeability or cross-elasticity of demand to support its claim that the market should be limited solely to Epic and Particle's products.  "[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products

---

[9] Even today, Particle markets the very same "Snapshot" and "Signal" products to payers and providers. *Compare* Particle Health, *Payers*, https://www.particlehealth.com/payers (last visited Dec. 19, 2024) *with* Particle Health, *Value-Based Care*, https://www.particlehealth.com/value-based-care (last visited Dec. 19, 2024).  The Court may take judicial notice of the contents of these websites in deciding this motion to dismiss.  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015).

even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." *Chapman*, 546 F.3d at 238; *Bayer*, 813 F. Supp. 2d at 577 ("[Plaintiff] must allege sufficient facts about other [products] to make its proposed product market plausible.").

Particle does not allege that its and Epic's software are the only electronic health record products sold to payers. Nor could it. Myriad software products exist to address payers' health record needs that appear to compete with Particle's and Epic's products. One such product, offered by Datavant, allows payers to "capture and analyze health data" by "[a]cquir[ing] complete member histories".[10] Yet another, InterSystems's HealthShare product, provides "provider to payer data exchange" such as "downloading health records" and "performance and strategic planning analytics requirements".[11] Availity markets its software as having helped a "large national health plan" to "capture medical records electronically" and thereby "identify and close potential quality care gaps".[12] These are just examples; as there are others. Particle offers no facts as to why these software products and the many others of their ilk would not be substitutes. Instead, Particle ignores them and pretends that the only competitor is manual retrieval of patient records over email or fax. (¶¶ 5, 51, 54-55, 57, 72.) Moreover, despite specifically acknowledging that a real-life customer *actually substituted* Particle's product with that of a competitor, Kno2 (¶ 87), Particle then entirely ignores that fact in alleging the relevant market (¶ 62). Particle does not engage in any analysis of how such real-life substitution could occur while Kno2 is supposedly outside the relevant market. Particle cannot avoid dismissal by

---

[10] *See* Datavant, *Health Plans*, https://www.datavant.com/who-we-serve/health-plans (last visited Dec. 19, 2024). (*See supra* note 6.)

[11] *See* InterSystems, *InterSystems Payer Services*, https://www.intersystems.com/products/healthshare/payer-services/ (last visited Dec. 19, 2024).

[12] *See* Availity, *How a Health Plan Closed Care Caps and Increased Provider Engagement with Electronic Clinical Quality Validation*, https://www.availity.com/case-studies/how-a-health-plan-closed-care-gaps-and-increased-providerengagement-with-electronic-clinical-quality-validation/ (last visited Dec. 19, 2024).

ignoring market realities and potential substitutes; it must engage with them and perform an economic analysis of interchangeability. *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016) ("[A]n antitrust complaint must explain why the market it alleges is the relevant, economically significant product market."). Particle has not even attempted to do so.

Particle offers only the bare assertion that "[t]o Particle's knowledge, no other company has introduced a platform that allows payers to automatically request and retrieve medical records at scale, and that integrates the functions of requesting, receiving, storing, and analyzing medical records, such that a payer would view it as a commercially viable alternative to [Epic Payer Platform]". (¶ 62.) But "merely asserting that a commodity is in some way unique is insufficient to plead a relevant market". *Concord Assocs.*, 817 F.3d at 54. Courts routinely grant motions to dismiss complaints that lack specific and concrete factual allegations demonstrating that potential alternative products are not reasonably interchangeable with those included in the proposed product market. *See, e.g.*, *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481-82 (S.D.N.Y. 2001) ("There is no discussion of other products in the market that potentially compete with the Daily News, of arguably competing products that should not be included the market, or of the factors that make the Daily News a unique market. This failure to reference the rule of interchangeability is alone grounds for dismissal."); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001) ("[M]any district courts have dismissed antitrust complaints for failure to identify substitute products and failure to distinguish among apparently comparable products or to allege other pertinent facts related to cross-elasticity of demand.").[13]

---

[13] *See also, e.g.*, *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 499 (S.D.N.Y. 2014) ("There is no discussion about the insurance agent labor supply, the existence of other insurance agents that are not affiliated with AXA, potential barriers to entry into the insurance agent market, or systemic barriers that might prevent an agent from changing insurance employers. This is a critical deficiency of the complaint."); *Bayer*, 813 F. Supp. 2d at 577 ("Sandoz does not address non-SSRI anti-depressants and non-steroidal anti-inflammatory drugs, such as ibuprofen and aspirin, that are widely used for PMS."); *Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) ("Plaintiffs' pleadings did not refer to any reasonably interchangeable alternatives . . . .");

Particle's allegations as to cross-elasticity of demand are entirely conclusory.  (*E.g.*, ¶ 57.)  Particle alleges no facts to show that a change in the price of payer platforms would not cause customers to substitute other products, such as facts concerning whether customers of one product in fact do switch to others.  *Cf. Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340-41 (2d Cir. 2024) (holding product market adequately pleaded given, among other things, a factual allegation quantifying the rate of customer switching between potentially substitutable products).  Instead, the Complaint contains only the bare legal conclusion that a small but significant and non-transitory increase in price would not lead to substantial customer switching.  (¶ 57.)  But a complaint must "*demonstrate* the cross-elasticity of demand", not merely assert it.  *Mooney*, 19 F. Supp. 3d at 500; *see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 372 (S.D.N.Y. 2012) (requiring plaintiff to "*allege facts regarding* interchangeability of products and cross-elasticity of demand").

*Third*, Particle tries to avoid the above flaws by alleging that only its and Epic's software perform all three functions—retrieval, storage, and analytics—and that this combination "provides distinct value to customers".  (¶ 55.)  Courts have specifically rejected proposed antitrust markets for products combining multiple functions if "buyers could and would respond to a price increase by a full line seller by shifting all or part of their business to partial line or single product sellers".  *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 354 (S.D.N.Y. 2009); *see also Bayer*, 813 F. Supp. 2d at 577 (requiring allegations that "demonstrate that there is no combination of drugs that can serve as a functional substitute").  Here, no allegations establish the economic significance of combining these three

---

*Smith & Johnson, Inc v. Hedaya Home Fashions Inc.*, 1996 WL 737194, at *6 (S.D.N.Y. Dec. 26, 1996) ("Nowhere in the complaint does plaintiff explain why afghans are not interchangeable with other similar products, *e.g.*, quilts, spreads, blankets and comforters[.]").

functions together.  Particle's conclusory assertion that combining the functions "substantially reduces payers' costs and eliminates the friction associated with juggling multiple applications and vendors" (¶ 56) does not suffice to plausibly allege that customers are prevented from substituting a combination of other products without all three functions for Particle's product.

Moreover, the allegation that the combination of functions possesses economic significance is directly contradicted by other allegations in the Complaint.  The Complaint explains that XCures switched from Particle's software to Kno2's (¶ 86), which allegedly does not perform all three of the functions Particle's performs (¶ 87), thus establishing substitutability between software performing all three functions and software performing only some.

For all these reasons, Particle's alleged market is legally deficient.[14]  As such, all of Particle's antitrust claims, each of which depends on this flawed market, should be dismissed.[15]

> **B.    Particle Fails to Plausibly Allege Anticompetitive Conduct.**
>
> **1.    Particle Fails to Plead Anticompetitive Conduct Under Section 2.**

Particle must identify "an element of anticompetitive conduct" to plead a monopolization claim.  *In re Adderall*, 754 F.3d at 133.  It must also do so to plead attempted monopolization, *Regeneron Pharms.*, 96 F.4th at 342, and monopoly leveraging, *Olde Monmouth Stock Transfer*

---

[14] Particle alleges two other supposed markets, one for "EHR Software" (¶¶ 29-30) and another for "EHR Provision Services" (¶ 43), but expressly disclaims reliance on either as relevant markets for its antitrust claims (¶ 28 ("Particle's claims do not depend on whether these other [purported businesses] are defined as relevant antitrust markets")).  As such, Epic does not address them in detail in this motion because the failure of the alleged payer platform market is dispositive for all antitrust claims.  Notwithstanding Particle's disclaimer, its monopoly leveraging claim (Count 3) does rely on allegations of Epic's monopoly power in those other two alleged markets (¶ 167) in addition to the alleged payer platform market.  There are various patent deficiencies in Particle's allegations of monopoly power for those two supposed markets, which constitute an independent basis to dismiss that claim.  For example, Particle relies on calculations that divide the total number of U.S. patients who have an electronic health record using Epic software by the total U.S. population.  (¶¶ 35, 47-48.)  But patients can and do have electronic health records with multiple vendors' software.  Under Particle's approach, the market shares of all competitors in these markets would sum to more than 100 percent, an illogical outcome.

[15] Particle relies on Epic's alleged share of the invented payer platform market to plead monopoly power or a dangerous probability of achieving it (¶¶ 59, 62), asserting only bare legal conclusions as to direct power to control prices (¶ 61).  *Cf. PepsiCo*, 315 F.3d at 108 (monopoly power may be alleged directly or using market share as a proxy).  The failure of the alleged market therefore defeats all its monopolization-related claims (Counts 1-3).

*Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 395 (S.D.N.Y. 2007).

Anticompetitive conduct is defined as "conduct without a legitimate business purpose that makes

sense only because it eliminates competition." *In re Adderall*, 754 F.3d at 133.  Pleading that the

conduct lacked a legitimate business purpose and made sense only because it eliminates

competition is plaintiff's obligation, not an affirmative defense to be litigated down the road.

*Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 490 (S.D.N.Y. 2016) (dismissing

complaint because "plaintiffs here have not made concrete allegations plausibly suggesting

uneconomic behavior intended to acquire or maintain monopoly power, or satisfactorily

distinguished [defendant's] conduct from that of a rational, hard-nosed market actor"); *see also*

*In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 383 (S.D.N.Y. 2022) (partially

dismissing complaint for lack of allegations "to show that Google's decision to change course

was irrational but for its anticompetitive effect, as opposed to an immediately profitable business

strategy that also presented the perception or reality of enhanced consumer privacy.").  Dismissal

is appropriate where the conduct is "equally consistent with the idea that the [alleged]

monopolist" acted "for a valid business reason, rather than for an anticompetitive one".  *Port*

*Dock & Stone Corp. v. Oldcastle N.E., Inc.*, 507 F.3d 117, 125 (2d Cir. 2007).

     The conduct about which Particle complains and on which it bases its Section 2 claims is

a far cry from conduct that can be plausibly alleged to lack a legitimate business purpose.  The

privacy and security of patient health records is "paramount" (¶ 14) to health care organizations

"given obligations [they] must meet with respect to patient privacy" (¶ 112).  Such organizations,

including Epic's own customers, have a "high sensitivity to" and are under "legal requirements

regarding[] patient data-related issues".  (¶ 112.)  It is illegal to disclose patient health records

except for certain purposes specified by law, *see* 45 C.F.R. § 164.502(a), and violations can carry

civil or even criminal liability, *see* 42 U.S.C. §§ 1320d-5 to -6.  Companies that handle patient

health records, including Epic, its customers, and Particle, have legitimate business reasons to

protect the privacy and security of that data.  It is undisputed that at least two Particle customers

retrieved health records in violation of Carequality rules by claiming a treatment purpose that

was patently invalid.  (Ex. 1 §§ IV.1.a, IV.2.a.)  As Particle's customer-onboarding diligence had

failed to identify that those customers lacked a valid treatment purpose (*id.* § IV.4.a.iii), Epic

conducted its own diligence before responding to further requests from some Particle customers

(*e.g.*, ¶ 77; Ex. 2 at 4).  As Particle acknowledges, these restrictions were temporary (¶ 83), as

Epic restored access once it could verify that each customer performed treatment.  For similar

reasons, Epic conducted its own diligence on new Particle customers before they could retrieve

records through Carequality.  (¶ 94; Ex. 2 at 4.)  Epic informed and continued to update its

customers—who are legitimately concerned with the security and privacy of their data—that

they may have disclosed information in response to a Particle query asserting an invalid

treatment purpose.  (¶¶ 102, 110; Ex. 2; Ex. 3.)  Those communications provided information in

Epic's possession (*see* Ex. 2 at 5), and explained how to contact Particle directly to obtain further

information Epic did not possess about how that sensitive information had been used (*id.*; ¶ 116).

Lastly, Epic raised its concerns with Carequality so that the additional diligence it was

temporarily performing could eventually be replaced by Particle's own improved diligence,

subject to Carequality's supervision.  (¶ 119; *see also* Ex. 1 § II, at 5 (seeking to "[e]stablish a

process with appropriate oversight that Particle Health can follow to return to good standing as a

Carequality Implementer and re-onboard their current customers").)  Particle's conclusory

allegations that these concerns were mere "pretext" are not only entirely unsupported (*see, e.g.*,

¶¶ 81, 134-37), but are undermined by documents referenced in the Complaint showing that Epic

acted at the behest of its health care provider customers (*see* Ex. 2 at 4). As these actions were undertaken for the "legitimate business purpose" of protecting the privacy and security of patient data, they cannot be anticompetitive conduct. *In re Adderall*, 754 F.3d at 133.

Moreover, the Complaint does not plausibly allege that the conduct it describes "makes sense only because it eliminates competition". *Id.* The alleged conduct here did not actually operate to eliminate competition in the market that Particle alleges; in fact, the conduct did not affect competition in that supposed market at all. The majority of customers allegedly affected by Epic's actions to protect patient data were providers (¶ 79)—who are not even participants in Particle's defined market. Particle does not allege that it lost a single payer customer due to Epic's actions or that Epic gained a single such customer. (¶¶ 86-87, 91.) Because the "allegations do not plausibly allege harm to competition in the [proposed product] market", the claim should be dismissed. *In re Google*, 627 F. Supp. 3d at 393.

### 2.    Particle Fails to Plead a Section 1 Agreement in Restraint of Trade.

To state a Section 1 claim, the alleged facts must be sufficient to plausibly suggest a "combination or some form of concerted action between at least two legally distinct economic entities". *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016). While a horizontal agreement might qualify as a per se violation of antitrust law, the rule of reason applies to vertical agreements like those alleged here. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988). An agreement may be shown through direct evidence, such as a "recorded phone call in which two competitors agreed to fix prices", or "circumstantial facts supporting the inference that a conspiracy existed". *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). "[A] conclusory allegation of agreement at some unidentified point" does not suffice absent a "further circumstance pointing toward a meeting of the minds". *Twombly*, 550 U.S. at 557. Conduct that is equally consistent with lawful behavior

as it is with an agreement is insufficient to "nudge[] [the] claims across the line from conceivable to plausible." *Id.* at 570.

Additionally, the agreement must have "an actual adverse effect on competition *in the relevant market*". *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018).[16] Allegations may be direct, "showing increased prices, reduced quality, or reduced outputs", or indirect, "pleading that a defendant had market power plus some other ground for believing that the challenged behavior could harm competition in the market". *Id.* at 362.

Particle alleges that Epic consummated vertical agreements to restrain trade with three groups: (1) the Epic Care Everywhere Governing Council, (2) Particle's customers and prospective customers, and (3) Carequality and Carequality Steering Committee members. (¶¶ 175-76.) None of the allegations is sufficient to plausibly allege any such agreements.

<u>Epic Care Everywhere Governing Council</u>.  Particle fails to allege an agreement at all.  It instead alleges that "*Epic* instituted a new, unprecedented policy that every new Particle connection . . . had to be individually approved by Epic's 'Care Everywhere Governing Council.'" (¶ 96.) That is unilateral conduct that does not violate Section 1.  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 365 (S.D.N.Y. 2016) ("A unilateral business decision by a single entity . . . is not a violation of Section 1.").  Moreover, even if it alleged an agreement (it does not), Particle fails to allege any facts establishing the Governing Council's independence, as it must for a Section 1 claim.  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 596-97 (S.D.N.Y. 2011).  Indeed, each time the Complaint references the Governing Council, it is alleged to be affiliated with Epic—not independent.  (¶¶ 13, 96.)  Particle also fails

---

[16] The requirement to show anticompetitive effects also applies to any attempt to incorrectly characterize Epic's alleged conduct as tying.  (¶ 177.)  *See E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (requiring "anticompetitive effects in the tied market").

to plausibly allege any anticompetitive effect on the payer platform market.  *See Cenedella*, 348 F. Supp. 3d at 362.

    <u>Former Particle Customers and Prospective Customers</u>.  The Complaint alleges that Particle's customers "consummated agreements to restrain competition by acquiescing to Epic's conditions on dealing and communicating their acquiescence to Epic".  (¶ 175.)  Apart from XCures, Particle does not identify any customer that allegedly formed an agreement with Epic, much less allege facts to show any such agreements.  (¶ 88.)  "[A] conclusory allegation of agreement at some unidentified point" does not suffice.  *Twombly*, 550 U.S. at 557.

    With respect to XCures, the Complaint provides no direct or circumstantial evidence of an agreement.  Instead, it alleges only that "Epic told XCures its access to Epic data would be restored if it ended its relationship with Particle", and then XCures told Epic of its switch to Kno2.  (¶ 86.)  But that is not indicative of any agreement.

    Moreover, even if Particle had plausibly alleged that Epic and XCures entered into an agreement (it did not), Particle fails to allege an actual adverse effect on the purported payer platform market.  *See, e.g.*, *Cenedella*, 348 F. Supp. 3d at 362; *Solent Freight Servs., Ltd. v. Alberty*, 914 F. Supp. 2d 312, 322 (E.D.N.Y. 2012) (holding that "[defendant's] inducement to prevent dealings with one of its competitors" would "not establish that [its] conduct is anticompetitive in purpose or effect").  Particle advances no direct allegations of anticompetitive effect:  it does not mention "increased prices, reduced quality, or reduced outputs".  *Cenedella*, 348 F. Supp. 3d at 362; (*see* ¶ 88).  As to indirect allegations, Particle provides no "ground for believing that the challenged behavior could harm competition in the [payer platform] market".  *Id.*  Because XCures is not a payer (¶ 86), neither the software it purchased from Particle nor the replacement software it purchased from Kno2 forms part of the purported payer platform market

as Particle defines it (*see* ¶ 87).  And the Complaint advances no allegations that show how an agreement by a non-payer (not a participant in the alleged market) to switch to another product (alleged not to compete in that market) could have any effect on the purported payer platform market at all.

Carequality or Steering Committee Members.  The Complaint does not even identify what supposed agreement existed between Epic and Carequality, instead vaguely insinuating that "Epic conveyed its preferences to Carequality" and that Carequality's decisions constitute "evidence of Epic's undue influence" (¶¶ 131-32), then tacking on a conclusory allegation of agreement (¶ 176).  But "a conclusory allegation of agreement at some unidentified point" does not suffice.  *Twombly*, 550 U.S. at 557.  Indeed, the Complaint does not even identify the behavior that Epic allegedly agreed to perform pursuant to its supposed agreement with Carequality.  *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 277 (2d Cir. 2023) (affirming dismissal where the plaintiffs failed to "allege[] any behavior on the part of [the defendant] at all").  Particle concedes that Epic's own representative on the Steering Committee recused himself (¶ 127) and claims that Carequality "completely vindicated" Particle (¶ 123).  These allegations are inconsistent with any agreement.

Even had Particle plausibly alleged the existence of an agreement with Carequality, it fails to plausibly allege any anticompetitive effect on the payer platform market.  *See Cenedella*, 348 F. Supp. 3d at 362.  Though the Resolution did impose a corrective action plan on Particle, "proving harm to the plaintiff as an individual competitor is not enough".  *Id.*  And the Complaint provides no "other ground for believing that" any agreement to impose that corrective action plan "has harmed the market rather than harmed [Particle] as an individual".  *Id.*

#### C.    Particle Fails to Plausibly Allege Antitrust Injury.

Particle's antitrust claims also fail as a matter of law because Particle does not and cannot allege a cognizable antitrust injury.  It is fundamental that "[t]he antitrust laws . . . were enacted for the protection of competition not competitors".  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)).  "[H]arm[] [to] an individual competitor will not suffice".  *Cap. Imaging*, 996 F.2d at 543.  Therefore, to establish standing under the antitrust laws, a plaintiff must allege an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful".  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016).  As discussed above, Particle has not plausibly alleged that Epic's conduct adversely affected competition in the payer platform market.  (*See supra* Section I.B.)

Recognizing this fatal deficiency in its allegations, Particle attempts to allege an antitrust injury by conclusorily alleging that Particle represents "an entire mode of competition" because it is Epic's only competitor in the payer platform market.  (¶¶ 14, 143.)  This argument relies on the flawed payer platform market definition, which includes only Epic's and Particle's products.  (*See supra* Section I.A.)  Once that implausibly narrow definition is disregarded, Particle is left with a Complaint that "attempts to describe a narrow vendetta carried out by" Epic against Particle.  *Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*, 2024 WL 4628330, at *8 (S.D.N.Y. Mar. 26, 2024).  Elevating this "routine dispute[] between business competitors . . . to the status of an antitrust action", as Particle seeks to do here, would "trivializ[e] the [Sherman] Act".  *Cap. Imaging*, 996 F.2d at 543.

### II.    PARTICLE'S STATE LAW CLAIMS (COUNTS 6-9) SHOULD BE DISMISSED.

As a threshold matter, because Particle inadequately pleads its federal claims, its state law claims should be dismissed under Rule 12(b)(1).  While courts may exercise supplemental jurisdiction over state law claims under 28 U.S.C. § 1367, they routinely decline to do so where

the federal claims are dismissed before trial, particularly where, as here, no pre-trial proceedings have taken place. *See, e.g.*, *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, 2021 WL 76334, at *6 (S.D.N.Y. Jan. 8, 2021). No further analysis of Particle's state law claims is required. Despite this, if the Court elects to consider them, each should be dismissed under Rule 12(b)(6).

### A.    Particle Fails to State a Claim for Tortious Interference with Contract.

"Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom". *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006). Particle's claim that Epic tortiously interfered with its alleged contract with XCures fails.

*First*, Particle fails to allege Epic's knowledge of the XCures contract. Particle "must plead facts showing . . . that [the defendant] had actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached". *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *9 (S.D.N.Y. Apr. 17, 2020). The bare legal conclusion that Epic "was aware of the [XCures] contract and its importance to Particle" (¶ 194) falls far short. Particle fails to provide a "concrete factual foundation" to show that any contractual term was communicated to Epic, let alone the (unspecified) term allegedly breached. *Taboola*, 2020 WL 1900496, at *10.

*Second*, Particle fails to allege XCures's actual breach. "The Second Circuit has adopted a formalistic approach to determining whether a plaintiff has properly alleged breach of a contract in a tortious interference claim". *RMS Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 409 (S.D.N.Y. 2009). Under this approach, a complaint must allege the specific contractual term that was breached. *Id.* Particle fails to do so. While the Complaint alleges that XCures subscribed to Particle's platform through January 1, 2025 (¶ 193), it fails to allege any facts

25

related to how the contract could or could not be terminated.  On its own, then, the Complaint is "deficient as a matter of law because [it] leave[s] open the possibility . . . that the contract was terminable at will".  *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 562 (S.D.N.Y. 2007).

*Third*, Particle fails to plausibly allege that Epic intentionally procured XCures's breach. Particle "must allege facts showing that the defendant's *objective* was to procure such a breach". *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 327-28 (S.D.N.Y. 2017). "[M]erely acting with knowledge that a third party may breach" does not suffice.  *Id.*  Particle must plead that Epic "direct[ed] or set[] in motion the alleged breach" rather than XCures's "independent decision" to breach "for its own economic benefit".  *Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 319-20 (S.D.N.Y. 2019).  Epic's alleged statement that XCures could restore its ability to retrieve health records by switching to a different provider did not direct XCures to breach its contract; instead, the Complaint makes clear that XCures independently decided to switch for its own business reasons.  (¶ 86.)  Based on Particle's own allegations, Epic's communications served the lawful purpose of assisting XCures, *at Particle's own request* (¶ 86), to regain its access to health records.

### B.    Particle Fails to State a Claim for Tortious Interference with Prospective Business Relations.

To plead tortious interference with prospective business relations, a plaintiff must allege: "[1] it had a business relationship with a third party; [2] the defendant knew of that relationship and intentionally interfered with it; [3] the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and [4] the defendant's interference caused injury to the relationship".  *Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*, 2024 WL 3524497, at *7 (S.D.N.Y. July 24, 2024).  This tort "is a difficult one to sustain, with requirements more

demanding than those for interference with performance of an existing contract". *Id.* The Complaint fails as to each element.

*First*, the Complaint is devoid of facts demonstrating Particle's "reasonable probability of entering into a business relationship" with any third party. *Harding v. Dorilton Cap. Advisors LLC*, 635 F. Supp. 3d 286, 305 (S.D.N.Y. 2022). Particle merely asserts that it was "in advanced talks" with four identified companies without any substantiating factual allegations (¶ 91), which is insufficient. *See Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 405 (S.D.N.Y. 2019) (rejecting conclusory allegation that plaintiff had "an opportunity and expectation of entering an agreement").

*Second*, Particle fails to allege that Epic even had knowledge of Particle's prospective business relationships, let alone intentionally interfered with them.[17] *See, e.g., 360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*, 2020 WL 5259283, at *7 (S.D.N.Y. Sept. 3, 2020) (dismissing claim where plaintiff failed to allege the defendant knew about the specific prospective business relationships identified in the complaint). Indeed, Particle fails to allege any conduct whatsoever by Epic directed towards those third parties. *Bruce Bzura, LLC v. Moss*, 2018 WL 7858772, at *3 (S.D.N.Y. Oct. 25, 2018) ("[T]he defendant must target some activities toward the third party and convince them not to enter into a continuing business relationship with the plaintiff.").

*Third*, Particle fails to plausibly allege that Epic acted with the required level of culpability. "'[A]s a general rule', to succeed on a tortious interference claim the 'defendant's conduct must amount to a crime or an independent tort'". *Camelot SI, LLC v. Three Sixty Brands Grp. LLC*, 632 F. Supp. 3d 471, 483 (S.D.N.Y. 2022) (quoting *Carvel Corp. v. Noonan*,

---

[17] As to the third parties that are not named in the Complaint (*e.g.*, ¶¶ 89-91), the claim is even weaker. *See, e.g., Honeywell Int'l Inc. v. Ecoer Inc.*, 2024 WL 3521591, at *6 (S.D.N.Y. July 23, 2024) ("Defendants' failure to identify the *specific* business entities Honeywell supposedly influenced is fatal to their claim.").

818 N.E.2d 1100, 1103 (N.Y. 2004)).  Particle makes no such allegation.  Nor does it plead that

Epic acted solely out of malice or otherwise "not for 'normal economic self-interest'", *id.*

(quoting *Carvel*, 818 N.E.2d at 1103), as required in the absence of a crime or independent tort.

To the contrary, Particle concedes Epic acted out of economic self-interest.  (*E.g.*, ¶ 11.)

　　　　*Fourth*, Particle fails to allege that it would have consummated any transaction but for

Epic's alleged interference.  While it quotes an unnamed customer stating they "were invested in

pursuing this agreement", it provides no further facts about the customer, their negotiations, or

their likelihood of consummating an agreement, aside from a conclusory assertion that the

customer "would have finalized the deal and entered into a commercial relationship with

Particle".  (¶¶ 89-90.)  And it pleads only that supposed "advanced talks" with other customers

ended or stalled.  (¶ 91.)  These conclusory allegations are insufficient.  *See Appel v. Schoeman*

*Updike Kaufman Stern & Ascher L.L.P.*, 2015 WL 13654007, at *9 (S.D.N.Y. Mar. 26, 2015)

(dismissing in part based on plaintiff's failure to "allege any non-conclusory facts to support an

allegation that, but for the [defendant's] actions, she would have secured employment").

## C.　　Particle Fails to State a Claim for Defamation.

　　　　In attempting to manufacture a defamation claim, Particle blatantly misrepresents Epic's

statements.  As just one example, Particle alleges that Epic "published the following" statement:

"Particle Health has not 'fulfill[ed] its obligations as a Carequality implementer.'"  (¶ 206(iii))

(alteration in Complaint).)  Epic's actual statement was:  "Epic filed a formal dispute with

Carequality on the grounds that Particle Health *might not be fulfilling* its obligations as a

Carequality implementer".  (Ex. 2 at 2 (emphasis added).)  In other words, Particle not only

ignores the context—Epic's fair and true reports of the Carequality Dispute—but also masks

(and actually changes) Epic's language identifying the concern that Particle "*might not be*

*fulfilling*" its obligations.  Appendix A.1 shows, side-by-side, the stark differences between the

28

five allegedly defamatory statements in the Complaint and Epic's actual statements. *See*

*McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 181 (S.D.N.Y. 2020) (explaining

that "courts considering defamation claims [must] review the context of the whole publication

when analyzing potentially defamatory speech").

"To state a claim for defamation under New York law, a plaintiff must allege: (i) a false

statement of fact of and concerning the plaintiff, (ii) published to a third party without

authorization or privilege, (iii) made with the applicable level of fault . . . on the part of the

publisher, (iv) that either caused special harm or constitutes defamation *per se*." *CDC Newburgh*

*Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 220 (S.D.N.Y. 2023). Particle fails to allege each

element as to all of the alleged statements. Disposition of defamation claims on the pleadings is

favored to avoid chilling speech. *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013).

### 1.    Particle Fails to Plead Actual Malice.

Particle's defamation claim fails because Particle has not plausibly alleged that Epic

acted with actual malice. New York requires proof of actual malice to recover damages in any

"action involving public petition and participation". N.Y. Civ. Rights Law § 76-a(2). Such

actions include "a claim based upon: . . . any other lawful conduct in furtherance of the exercise

of the constitutional right of free speech in connection with an issue of public interest". *Id.* § 76-

a(1)(a). The privacy and security of health records is an "issue of public interest". The

Complaint describes the "paramount" importance of these issues to the industry (¶ 14), and it

acknowledges that the privacy and security of health records is subject to extensive public

regulation (¶ 112). Actual malice is also required for "a communication made by one person to

another upon a subject in which both have an interest" to be actionable. *Liberman v. Gelstein*,

605 N.E.2d 344, 349 (N.Y. 1992). Here, Epic's allegedly defamatory statements were

"published to Epic customers" (¶ 207), health care providers that have a shared interest in patient

privacy.  That shared interest triggers this qualified privilege, thereby requiring actual malice.

*See, e.g.*, *Buckley v. Litman*, 443 N.E.2d 469, 470-41 (N.Y. 1982).

Actual malice is "a difficult standard to meet", and "Rule 12(b)(6) should play a

particularly important role in testing the plausibility of a plaintiff's defamation claim".  *Biro v.*

*Condé Nast*, 963 F. Supp. 2d 255, 277, 279 (S.D.N.Y. 2013).  A complaint must plead the

"objective facts" from which "a court typically will infer actual malice".  *Biro v. Condé Nast*,

807 F.3d 541, 545 (2d Cir. 2015).  The bare conclusion that "Epic knew its statements were false

when published or published them with a reckless disregard" (¶ 208)—which also fails to

identify "individuals at [Epic] to whom such knowledge could be imputed"—"does not conform

to the plausibility standard that applies to pleading actual malice", *BYD Co. v. VICE Media LLC*,

531 F. Supp. 3d 810, 823 (S.D.N.Y. 2021).  This claim should be dismissed.

### 2.    The Allegedly Defamatory Statements Are Absolutely Privileged.

Particle's defamation claim also fails because Epic's statements are inactionable fair

reports of the Carequality Dispute.  Under the fair report privilege, "[a] civil action cannot be

maintained . . . for the publication of a fair and true report of any judicial proceeding . . . or other

official proceeding".  N.Y. Civ. Rights Law § 74.  "New York courts have broadly construed the

meaning of an official proceeding", *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603

F. Supp. 2d 584, 588 (S.D.N.Y. 2009) to allow the privilege to encourage the free availability of

information about proceedings that bear on the public interest, *Wexler v. Allegion (UK) Ltd.*, 374

F. Supp. 3d 302, 311 (S.D.N.Y. 2019).  An obvious public interest exists in proceedings like the

Carequality Dispute here that relate to security and privacy of sensitive patient medical data.

Each of the allegedly defamatory statements constitute "fair and true reports" of the

Carequality Dispute.  The fair report privilege "confers an absolute immunity" on statements

made "by parties or their counsel", *Wexler*, 374 F. Supp. 3d at 311, and it applies if "the ordinary

viewer or reader can determine from the publication itself that the publication is reporting on [an official] proceeding". *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 179 (2d Cir. 2021). As the allegedly defamatory statements are contained in notices that expressly refer to the Carequality Dispute, an ordinary reader could determine that each constituted a report on it. (*See generally* Ex. 2; Ex. 3.) Particle acknowledges that the concerns summarized in the Issue Notification (Statements 1-4) are those that Epic advanced in the Carequality Dispute; as such, it constitutes fair reporting. (*See* ¶¶ 120-21.) And Statement 5 was an accurate recitation of a development from that proceeding and specifically references the Carequality Dispute. (Ex. 3.) Accordingly, all the alleged statements constitute fair reporting and are privileged.

### 3. Particle Fails to Plead False Statements of Fact.

Particle's defamation claim also fails because when the statements are accurately quoted and in context, as they must be, *McDougal*, 489 F. Supp. 3d at 181, it is beyond cavil that each is an inactionable expression of opinion and/or is substantially true.

"Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action". *Gross v. N.Y. Times Co.*, 623 N.E. 2d 1163, 1167 (N.Y. 1993). "Expressions of opinion, as opposed to assertions of fact . . . cannot be the subject of an action for defamation". *Mann v. Abel*, 885 N.E.2d 884, 886 (N.Y. 2008). Statements are opinion when context indicates that they convey the speaker's *subjective assessments* rather than purporting to objectively describe reality. *See, e.g.*, *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014).

Here, the Court must consider the overall context of the full Issue Notification, which explicitly "outlines events that have led Epic to file a formal dispute with Carequality". (*See* Ex. 2 at 2.) Particle instead quotes it misleadingly and selectively, omitting language to hide the opinion-based nature of Epic's statements: "Epic filed a formal dispute with Carequality on the

31

grounds that Particle Health *might not be* fulfilling its obligations as a Carequality implementer, and based on the *concern* that Particle Health and its participant organizations *might be inaccurately representing* the purpose associated with their record retrievals." (*See* Ex. 2 at 2; App'x A.1.)  A notification of Epic's decision to file the Carequality Dispute and its concerns that led to that decision are naturally understood as a description of Epic's subjective opinions. Indeed, the statements explicitly assert Epic's hypothesis as to what "might" have happened (though Particle purposefully omits the "might" in its quotations), rather than a statement of fact. *See, e.g.*, *Chau*, 771 F.3d at 129.  Further, by explicitly listing the actions that formed the basis for its concern, the Issue Notification conveyed that it presented Epic's own conjecture.  *See Gross*, 623 N.E.2d at 1168 ("[A] proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture").[18]

Even if any of the statements could be understood as assertions of fact, Particle's claim still must be dismissed on the ground that the statements are not plausibly alleged to be false. *Chau*, 771 F.3d at 129.  If "the overall gist or substance of the challenged statement is true", it is not actionable as defamation.  *Id.*  Statements 1-4 express Epic's concerns that formed the basis for initiating the Carequality Dispute (*see* Ex. 2 at 2), which are undeniably true, as the Steering Committee determined that two of Particle's customers had inappropriately sought records under a treatment use case and imposed a corrective action plan against Particle for failing to detect those privacy violations.  (Ex. 1 §§ IV.1-.2, .4.)[19]  Statement 5 is also true.  Epic explained that

---

[18] Alternatively, the Court can conclude that Statements 1-4 are non-actionable opinion based on the allegation that the Issue Notification containing Statements 1-4 is "vague" (¶¶ 14, 103, 105) and thus incapable of being proven true or false as it lacks "a precise meaning which is readily understood".  *Gross*, 623 N.E.2d at 1167.

[19] Particle alleges that the Resolution found Statement 4 to be false (¶¶ 105, 124).  That is wrong.  Statement 4 asserted that Particle "obscur[ed] provider-level details of connections through a generic gateway".  (Ex. 2 at 2.) The Resolution found only that Particle's approach was consistent with Carequality rules under "current [industry] specifications" given "Particle's architecture".  (Ex. 1 § IV.5.)  Whether Particle's gateway was permitted from a

Particle had "*acknowledged* that one of Particle's customers, Integritort", had engaged in wrongdoing and that Epic was pleased that after eight months of resistance "they have now *acknowledged* wrongdoing". (Ex. 3 at 1; App'x A.1.) As the Resolution notes, the day prior, Particle notified Epic it had terminated its contractual relationship with a customer for making at least some "queries for non-treatment purposes". (Ex. 1 § IV.1.a.) In other words, Particle had acknowledged the wrongdoing of a customer, just as the statement accurately reports.

### 4. Particle Fails to Plead Special Damages or Defamation Per Se.

To state a defamation claim, Particle must also plead either that it suffered special damages (*i.e.*, actual economic harm) resulting from the allegedly defamatory statements or that the statements were defamatory per se. *See Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487 (S.D.N.Y. 2013). To plead special damages losses must be itemized. *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 336 n.110 (S.D.N.Y. 2010). Particle, by contrast, does not even plead "round figures or a general . . . dollar amount", *id.*, instead merely alleging that it "has suffered, and continues to suffer, damages in an amount to be determined at trial" (¶ 211). Furthermore, to plead lost sales as special damages, a plaintiff must both name the customers lost and plausibly allege that their loss was the "natural and immediate consequence" of the alleged defamation. *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 410 (S.D.N.Y. 2021). Particle cannot satisfy these requirements as it does not allege that any of the lost customers named in the Complaint were among the audience for Epic's allegedly defamatory statements. *See id.*

Particle also fails to plead defamation per se. In the commercial context, as here, only statements that "impugn[] the basic integrity or creditworthiness of a business" itself (as opposed

---

technical standpoint does not address the question of whether it obscured the identity of its ultimate customer or was "generic". Particle thus fails to plausibly allege that Statement 4 was false.

to the business's goods or services specifically) may constitute defamation. *See, e.g.*, *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, 2016 WL 6310777, at *6 (S.D.N.Y. Oct. 27. 2016). Examples of defamation per se include calling a physician a "butcher", or a lawyer a "shyster". *Tacopina v. Kerik*, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016). Here, none of the statements comes close to the standard for defamation per se, and Particle does not attempt to plead otherwise.

### D.    Particle Fails to State a Claim for Trade Libel.

Particle's trade libel claim as to Statements 6 and 7 fares no better.[20]  To state a claim for trade libel, "a plaintiff must adequately plead (1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) special damages". *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016).  Unlike defamation, "trade libel is based on statements confined to denigrating the quality of a business'[s] *services* [*or products*]". *Id.* (second alteration in original).  Particle's trade libel claim fails for at least three reasons.

*First*, Statements 6 and 7 do not "speak to the quality of [Particle's] goods or services" and dismissal is appropriate on that basis alone. *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 472 (S.D.N.Y. 2006).  Particle flatly misrepresents Statement 6, alleging Epic stated that "Particle's platform poses a 'security and privacy risk'".  (¶ 214(i).)  But the actual statement was the subtitle under "Issue Notification", namely "Third-Party Security and Privacy Risk" (*see* Ex. 2 at 1; App'x A.2).  The text of the Issue Notification is clear that the risks related to Particle's "activities", including its "representations of a Treatment Permitted Use"—and did

---

[20] Indeed, just as with Particle's defamation claim (*see supra* Section II.C), Particle misrepresents Epic's actual statements, as identified in Appendix A.2.

not suggest that Particle's platform itself posed a security risk such as containing bugs or being vulnerable to hacking or the like.  (Ex. 2 at 2.)  *See Pasternack v. Lab'y Corp. of Am.*, 2014 WL 4832299, at *20 (S.D.N.Y. Sept. 29, 2014) (dismissing trade libel claim based on statements describing the defendant's behavior, not the quality of goods or services provided).  As to Statement 7, Epic's description of its own actions in suspending Particle's gateway is not a statement about Particle's products at all.  (Ex. 2 at 2, 4; App'x A.2.)  Thus, it fails to denigrate (or even address) the quality of those products, as is required for trade libel.

Moreover, Particle alleges no false statement of fact.  It has not plausibly alleged the falsity of a "third-party security and privacy risk".  (Ex. 2 at 1.)  Indeed, it is undisputed that health records were retrieved in violation of Carequality rules (*see* Ex. 1 §§ IV.1.a, IV.2.a), and no allegations establish that these violations presented no "risk" to the "security and privacy" of patient data.  Similarly, that "Epic had suspended a large swath of Particle customers from accessing Epic records through Carequality, but other customers' connections remained active" (¶ 108) does not establish falsity.  That statement does not assert that Epic suspended all Particle customers but only that it "suspended Particle Health's generic gateway connection".  (Ex. 2 at 2; App'x A.2.)  And the Complaint fails to plead any facts to show that the suspension of the gateway connection would entail the suspension of all Particle customers, rather than only some.

*Second*, Particle fails to adequately plead actual malice, relying on the same conclusory and deficient allegation it proffered for its defamation claim (¶ 216).  (*See supra* Section II.C.1.)

*Third*, Particle does not even attempt to plead special damages, relying again on the same deficient allegation as it does for its defamation claim (¶ 220).  (*See supra* Section II.C.4.)

## <u>CONCLUSION</u>

For the foregoing reasons, Epic respectfully requests that the Court grant its motion to dismiss Particle's Complaint in its entirety with prejudice.

Dated:  December 19, 2024

Respectfully Submitted,

*/s/ Lauren A. Moskowitz*
Lauren A. Moskowitz
Margaret T. Segall
Lauren M. Rosenberg
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10011
Telephone:  (212) 474-1000
lmoskowitz@cravath.com
msegall@cravath.com
lrosenberg@cravath.com

*Attorneys for Defendant Epic Systems Corporation*