**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PARTICLE HEALTH INC., | |
| *Plaintiff*, | Case No.: 1:24-cv-07174 |
| v. | |
| EPIC SYSTEMS CORPORATION | **ORAL ARGUMENT REQUESTED** |
| *Defendant.* | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS ........................................................3

    A.    The Exchange Of Electronic Health Records .........................................3

    B.    Epic Dominates The EHR Market ..........................................................4

    C.    Epic Dominates The Payer Platform Market ..........................................4

    D.    The Emergence Of Payers Providing Treatment ....................................5

    E.    Particle Begins To Compete With Epic In The Payer Platform Market .................6

    F.    Epic's Multi-Pronged Anticompetitive Campaign ..................................8

        *1. Epic Completely Blocked Particle Customers' Access To Epic EHRs And Forced Them To Boycott Particle If They Wanted Access Again* ........................................................8

        *2. Epic Prevented Particle's New Customers From Accessing EHRs* ..........8

        *3. Epic Abused The Carequality Framework To Foment A Baseless Dispute* ........................................................9

        *4. Epic Made Repeated, Disparaging Statements To Destroy Trust In Particle* ........................................................11

        *5. Epic Flooded Particle's Systems With Baseless Inbound Inquiries* .................11

LEGAL STANDARD ...........................................................................................12

ARGUMENT ........................................................................................................12

I.    THE COMPLAINT ALLEGES A PLAUSIBLE PRODUCT MARKET .........12

    A.    The Complaint Does Not Improperly Restrict The Market By Customer ............13

    B.    The Complaint Addresses Reasonable Interchangeability And Cross-Elasticity of Demand In Detail, As Well As "Practical Indicia" ............................15

II.    THE COMPLAINT PLAUSIBLY ALLEGES ANTICOMPETITIVE CONDUCT ........18

    A.    Epic Misstates The Standard For Showing Anticompetitive Conduct ..................18

    B.    The Complaint Details Textbook Forms Of Anticompetitive Conduct ................20

    C.    The Complaint Plausibly Refutes Epic's Supposed "Privacy" Justifications ........21

III.    THE COMPLAINT ALLEGES AN AGREEMENT UNDER SECTION 1 ...................23

IV.    THE COMPLAINT PLAUSIBLY ALLEGES ANTITRUST INJURY ............................24

V.    PARTICLE'S STATE LAW CLAIMS ARE SOUND ........................................26

    A.    The Complaint Plausibly Alleges Tortious Interference with A Contract ............26

i

B.    The Complaint Plausibly Alleges Tortious Interference with Prospective Business Relations ........................................................................................28

C.    The Complaint Plausibly Alleges Defamation ........................................................30

*1. Particle's Defamation Claim Does Not Require A Showing Of Actual Malice* ........................................................................................................30

*2. Even If Actual Malice Were Required, Particle Has Sufficiently Pleaded It* ..............................................................................................................31

*3. The "Fair Report" Privilege Does Not Apply* ........................................32

*4. Particle Sufficiently Pleads Falsity* ........................................................33

*5. Particle Sufficiently Pleads Defamation Per Se* ....................................34

D.    The Complaint Plausibly Alleges Trade Libel ........................................................35

CONCLUSION ................................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*In re Actos End-Payor Antitrust Litig.*,
417 F. Supp. 3d 352 (S.D.N.Y. 2019) ........................................................................19

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014) ....................................................................................19

*Albert v. Loksen*,
239 F.3d 256 (2d Cir. 2001) ....................................................................................31

*Alternative Electrodes, LLC v. Empi, Inc.*,
597 F. Supp. 2d 322 (E.D.N.Y. 2009) .....................................................................20

*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) .........................................................................20

*Amaranth LLC v. J.P. Morgan Chase & Co.*,
71 A.D.3d 40 (1st Dept. 2009) ................................................................................29

*Atkins v. Bohrer*,
2011 WL 6779311 (S.D.N.Y. Dec. 23, 2011) ..........................................................34

*Bah v. Apple Inc.*,
2020 WL 614932 (S.D.N.Y. Feb. 10, 2020) .............................................................32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................23

*Bertuglia v. City of New York*,
839 F. Supp. 2d 703 (S.D.N.Y. 2012) ......................................................................28

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
142 F. Supp. 2d 296 (E.D.N.Y. 2001) .....................................................................17

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015) ....................................................................................31

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ................................................................................................24

*CA, Inc. v. Simple.com, Inc.*,
621 F. Supp. 2d 45 (E.D.N.Y. 2009) .......................................................................35

*CDC Newburgh Inc. v. STM Bags, LLC*,
  692 F. Supp. 3d 205 (S.D.N.Y. 2023) ................................................................. 30

*Celle v. Filipino Rep. Enterprises Inc.*,
  209 F.3d 163 (2d Cir. 2000) ................................................................................. 34

*Chandok v. Klessig*,
  632 F.3d 803 (2d Cir. 2011) ................................................................................. 31

*Chapdelaine Corp. Sec. & Co. v. Depository Tr. & Clearing Corp.*,
  2006 WL 2020950 (S.D.N.Y. July 13, 2006) ...................................................... 25

*Chapman v. New York State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008) ................................................................................. 15

*Chase Mfg., Inc. v. Johns Manville Corp.*,
  84 F.4th 1157 (10th Cir. 2023) ............................................................................ 20

*Clean Coal Techs., Inc. v. Leidos, Inc.*,
  377 F. Supp. 3d 303 (S.D.N.Y. 2019) .................................................................. 28

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010) ............................................................................... 21

*Concord Assocs., L.P. v. Ent. Properties Tr.*,
  817 F.3d 46 (2d Cir. 2016) ................................................................................... 12

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
  710 F.2d 752 (11th Cir. 1983) ............................................................................. 23

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
  788 F. App'x 37 (2d Cir. 2019) ............................................................................ 26

*Conti v. Doe*,
  2019 WL 952281 (S.D.N.Y. Feb. 27, 2019) ........................................................ 31

*Delmonte v. Citibank, N.A.*,
  2005 WL 8174293 (W.D.N.Y. Oct. 28, 2005) ..................................................... 35

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
  612 F. Supp. 2d 330 (S.D.N.Y. 2009) .................................................................. 16

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,
  194 F. Supp. 3d 263 (S.D.N.Y. 2016) .................................................................. 35

*Fed. Trade Comm'n v. Cardinal Health, Inc.*,
  12 F. Supp. 2d 34 (D.D.C. 1998) ......................................................................... 14

iv

*Fed. Trade Comm'n v. Tapestry, Inc.*,
  2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024) ................................................................ 14

*Fridman v. BuzzFeed, Inc.*,
  172 A.D.3d 441 (1st Dep't 2019) ................................................................................ 32

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ........................................................................................ 23

*In re Google Digit. Advert. Antitrust Litig.*,
  627 F. Supp. 3d 346 (S.D.N.Y. 2022) ........................................................................ 19

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
  206 F. Supp. 3d 869 (S.D.N.Y. 2016) ........................................................................ 29

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
  331 F. Supp. 3d 221 (S.D.N.Y. 2018) ........................................................................ 30

*Harwood Pharmacal Co. v. Nat'l Broad. Co.*,
  9 N.Y.2d 460 (1961) .................................................................................................... 34

*Hillel v. IQVIA, Inc.*,
  2022 WL 905852 (2d Cir. Mar. 29, 2022) .................................................................. 31

*Hogan v. Herald Co.*,
  84 A.D.2d 470 (4th Dep't 1982) .................................................................................. 32

*Huggins v. Moore*,
  94 N.Y.2d 296 (1999) .................................................................................................. 31

*Indian Head, Inc. v. Allied Tube & Conduit Corp.*,
  817 F.2d 938 (2d Cir. 1987) ................................................................................... 21, 24

*Jamsports & Ent., LLC. v. Paradama Prods., Inc.*,
  2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) .............................................................. 17

*Karedes v. Ackerley Grp., Inc.*,
  423 F.3d 107 (2d Cir. 2005) ........................................................................................ 32

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................................................ 20

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
  306 F. Supp. 3d 629 (S.D.N.Y. 2018) ........................................................................ 28

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951) .................................................................................................... 20

*Loughlin v. Goord*,
  558 F. Supp. 3d 126 (S.D.N.Y. 2021) ........................................................ 33

*McNamee v. Clemens*,
  762 F. Supp. 2d 584 (E.D.N.Y. 2011) ...................................................... 33

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ........................................................................................ 33

*Monsanto Co. v. Spray-Rite Svc. Corp.*,
  465 U.S. 752 (1984) .............................................................................. 23, 24

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ................................................................ 19

*Nunes v. NBCUniversal Media, LLC*,
  643 F. Supp. 3d 403 (S.D.N.Y. 2022) ...................................................... 32

*Orange Cnty. Choppers, Inc. v. Olaes Enterprises, Inc.*,
  497 F. Supp. 2d 541 (S.D.N.Y. 2007) ...................................................... 27

*P & L Dev., LLC v. Gerber Prods. Co.*,
  715 F. Supp. 3d 435 (E.D.N.Y. 2024) ............................................ 12, 14, 15

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019) ......................................................... 12, 31, 32

*Pearl River Union Free Sch. Dist. v. Duncan*,
  56 F. Supp. 3d 339 (S.D.N.Y. 2014) ........................................................ 35

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
  530 F. Supp. 3d 301 (S.D.N.Y. 2021) ...................................................... 14

*Planetarium Travel, Inc. v. Altour Int'l, Inc.*,
  97 F. Supp. 3d 424 (S.D.N.Y) .................................................................. 15

*Port Dock & Stone Corp. v. Oldcastle N.E., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ..................................................................... 19

*RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*,
  692 F. Supp. 3d 135 (S.D.N.Y. 2023) ...................................................... 29

*Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*,
  2014 WL 5861984 (S.D.N.Y. Nov. 10, 2014) ........................................... 26

*Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) ...................................................... 30

*Red Apple Media, Inc. v. Batchelor*,
  729 F. Supp. 3d 350 (S.D.N.Y. 2024) ..................................................................27, 28

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
  96 F.4th 327 (2d Cir. 2024) ................................................................... 15, 16, 17

*Rich v. Fox News Network, LLC*,
  939 F.3d 112 (2d Cir. 2019) .........................................................................27

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*,
  2016 WL 815205 (S.D.N.Y. Feb. 29, 2016) ..............................................34

*Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*,
  655 F. Supp. 3d 52 (D. Conn. 2023) ..........................................................14

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ................................................................. 19, 20, 22

*Shak v. JPMorgan Chase & Co.*,
  156 F. Supp. 3d 462 (S.D.N.Y. 2016) ........................................................20

*Sladkus v. Englese*,
  106 N.Y.S.3d 731 (N.Y. Sup. Ct. 2018) ....................................................33

*St. John's Univ., N.Y. v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010).......................................................26

*State St. Glob. Advisors Tr. Co. v. Visbal*,
  431 F. Supp. 3d 322 (S.D.N.Y. 2020).......................................................26

*Strapex Corp. v. Metaverpa N.V.*,
  607 F. Supp. 1047 (S.D.N.Y. 1985) ..........................................................30

*Taboola, Inc. v. Ezoic Inc.*,
  2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020) ..........................................27

*Teradata Corp. v. SAP SE*,
  --- F.4th ---, 2024 WL 5163082 (9th Cir. Dec. 19, 2024).........................23

*Thomas v. JPMorgan Chase & Co.*,
  811 F. Supp. 2d 781 (S.D.N.Y. 2011) ........................................................29

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ................................................................. 12, 13, 15

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health &*
  *Welfare Fund v. Takeda Pharm. Co. Ltd.*,
  11 F.4th 118 (2d Cir. 2021) ................................................................. 18, 19, 20, 22

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019)..................................................................13

*Valassis Commc'ns, Inc. v. News Corp.*,
   2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)......................................25

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)...........................................................................19

*Winter v. Pinkins*,
   2017 WL 5496278 (S.D.N.Y. Feb. 17, 2017)....................................33

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
   511 F. Supp. 2d 372 (S.D.N.Y. 2007).................................................25

*Zherka v. Amicone*,
   634 F.3d 642 (2d Cir. 2011)...............................................................34

## Statutes

Areeda & Hovenkamp, Antitrust Law, ¶ 1447b2 ............................................23

Health Insurance Portability and Accountability Act (42 U.S.C. § 1320d *et seq.*)........ 1, 6, 7,8, 10

N.Y. Civ. Rights Law § 74...........................................................................32, 33

N.Y. Civ. Rights Law § 76-a........................................................................30, 31

## Other Authorities

65 Fed. Reg. 82462, 82626-27 (Dec. 28, 2000).............................................7

Justice, *Anticompetitive Uses of Healthcare Data*,
   https://www.justice.gov/atr/HealthyCompetition (last visited Jan. 9, 2025)..........................7

Medicare & Medicaid Services, *The CMS Innovation Center's Strategy to Support High-quality Primary Care*, https://www.cms.gov/blog/cms-innovation-centers-strategy-support-high-quality-primary-care (last visited Jan. 9, 2025)...........................................................................6

## PRELIMINARY STATEMENT

This case is about Epic's unlawful and widespread campaign to eliminate competition in the payer-platform market. As alleged in the Complaint, Epic has targeted Particle—an innovative start-up improving accessibility and affordability in healthcare—because it has threatened Epic's chokehold over payer-platforms, which it was previously able to impose and maintain due its dominance over electronic health records ("EHRs"). Particle alleges Epic has done so through a variety of illegal means that continue to this day, including threatening Particle's customers unless they agree to stop working with Particle; instigating and then very publicly pursuing a baseless industry dispute in an attempt to spread fear, uncertainty, and doubt about Particle; and making repeated defamatory statements. Regarding the latter, one would think that, having been accused of such conduct, Epic would choose what it says with care. Instead, Epic brazenly doubles and triples down on knowingly false statements about Particle in its motion, which, if it were not itself a protected filing, would constitute further evidence in support of Particle's claims.

To reiterate Particle's allegations and the Carequality decision itself: Despite Epic's specific request that it do so, Carequality made no finding that Particle *ever* violated HIPAA, ***ever*** violated Carequality's rules, or ***ever*** put patient privacy at risk. Rather, Carequality found that Particle complied with all applicable laws, and employed a robust diligence process when onboarding customers. Carequality did find that two out of Particle's many ***customers*** made improper "treatment" requests through the Carequality network (contrary to their explicit representations to Particle), although, importantly, both customers possessed HIPAA-compliant authorizations for the EHRs they accessed. But, as Carequality itself found, Particle did nothing wrong. All that Particle did (and continues to do) is improve access to Epic EHRs, including for payers providing treatment ("pay-viders")—conduct that is not only legal and HIPAA compliant, but which ***the federal government has actively encouraged*** to support better health outcomes.

1

Apparently more interested in spinning its counternarrative, which seeks to frame Particle as the bad actor—a story Carequality explicitly considered and rejected—Epic ignores these well-pleaded facts. Of course, this is not appropriate at the pleading stage. As described herein, Particle respectfully submits that this Court reject Epic's request to ignore the vast majority of Particle's extensive allegations, those allegations' necessary inferences, and binding law of this Circuit.

First, Epic argues Particle's antitrust claims fail because there supposedly is no such thing as a payer-platform market. But Epic does not even assert that Particle provides an insufficient explanation of what is inside and outside of the alleged market; instead, it argues that a relevant market cannot be "restricted to a single set of customers" and that Particle supposedly does not define its market with respect to reasonable interchangeability and cross-elasticity of demand.

Both arguments are wrong. As an initial matter, courts regularly recognize that products can be designed for particular businesses and that, as both the Supreme Court and Second Circuit hold, this in fact is a "practical indicia" *supporting* market definition. Courts also recognize that products with unique combinations of features can constitute their own product market, even if they perform similar functions as other products. So it is here, on both counts. Further, regarding reasonable interchangeability, the Second Circuit recognizes a plaintiff may prove that through practical indicia, but also through evidence that a hypothetical monopolist could profitably impose a small but substantial non-transitory increase in price ("SSNIP") for the products in the market. Particle alleges that a payer-platform monopolist could do exactly that (and that Epic has).

Next, Epic argues that Particle does not plausibly allege anticompetitive conduct. For this argument, which ignores literally dozens of allegations regarding Epic's anticompetitive conduct, Epic essentially makes up a legal standard and suggests Particle must allege that Epic's conduct was "irrational." The case law on which Epic draws, however, is about the unilateral refusal to

deal doctrine, a narrow antitrust liability theory that clearly has no applicability here, as Epic does not contend the conduct that Particle alleges constitutes a unilateral refusal to deal. In any event, multiple courts from the Supreme Court on down have consistently recognized that the wrongful conduct Particle identifies is quintessentially anticompetitive.

Faced with this problem, Epic finally argues that Particle's antitrust claims do not identify an "agreement" sufficient for a Section 1 claim (which requires "concerted action") or plausibly allege antitrust injury. Regarding the former, Epic's argument once again ignores extensive precedent concluding that each of the types of agreement Particle identifies are actionable under Section 1—including coerced agreements with customers and agreements with industry bodies. Similarly, when arguing against antitrust injury, Epic ignores law that eliminating one competitor in a two-competitor market clearly harms competition.

Moving to Particle's state law claims, Epic ignores Particle's actual allegations and the reasonable inferences to be drawn therefrom. This deficiency applies to each of the claims for tortious interference, defamation, and trade libel, as discussed in detail below.

Particle's seventy-eight-page complaint provides a step-by-step description of how a monopolist desperate for control is willing to destroy an innovator with an objectively better product to put more dollars in its pockets. Epic can try to defend its actions at the appropriate time, but it identifies no basis to dismiss the Complaint now. The motion should be denied.

## SUMMARY OF RELEVANT ALLEGATIONS

### A.    The Exchange Of Electronic Health Records

An Electronic Health Record ("EHR") is an electronic record of a patient's medical history. Dkt. 1 ("Complaint") ¶ 29.[1] EHRs are created and maintained using EHR software, of which Epic

---

[1]  All citations to the Complaint are designated by "¶" and the relevant number(s). Unless otherwise noted, all emphasis is added, and brackets, citations, and internal quotations are omitted.

is the dominant provider. ¶¶ 1-2, 30. Access to EHRs is necessary for a wide variety of participants in today's healthcare industry, including patients, providers, health plans, and researchers. ¶ 43.

While there are many legal reasons to access EHRs, federal law *requires* EHR companies like Epic to make EHRs widely available for "treatment" purposes. ¶ 71. To do so efficiently, centralized exchange networks have been created through which EHRs are made available and exchanged. ¶ 8. Carequality is the nation's largest exchange network and operates "by allowing healthcare-related entities to join a voluntary contractual framework … [for] request[ing] or provid[ing]" EHRs. ¶¶ 16, 46, 71. Due to its position as the dominant provider of EHRs in the U.S., Epic is a "must have" connection for any exchange network, providing Epic with overwhelming leverage over Carequality. ¶¶ 51, 126.

### B.    Epic Dominates The EHR Market

Epic is a monopolist in the EHR market—"[n]early every large healthcare provider in the nation uses Epic's" software and "[o]ver three-quarters of the U.S. population have electronic health records within an Epic database." ¶¶ 2, 35-38, 48. Maintaining the software that stores the majority of EHRs in the US gives Epic control over the records themselves, as users of Epic's EHR platform must go through Epic to distribute those records to third parties. ¶¶ 4, 49-50. Moreover, because installation of Epic's EHR software necessitates significant upfront costs, once a provider has installed that software, it is often unable to switch EHR platforms. ¶¶ 3, 39-41.

### C.    Epic Dominates The Payer Platform Market

A payer platform is a relatively new type of software platform, designed specifically with the payer business model in mind, that allows payers to efficiently request, retrieve, and store medical records at scale, as well as "run analytics, and conduct other business-critical tasks within a self-contained system." ¶¶ 5, 53-57. The creation of payer platforms is revolutionary for payers

who, traditionally, could only obtain medical records "through a cumbersome, manual process" and had to manage their businesses through separate pieces of software. ¶¶ 5, 54-57, 68.

Epic released its Epic Payer Platform in 2021 and it quickly became the largest payer platform in the nation. ¶¶ 5-6, 69. Because the majority of patients in the U.S. have at least one Epic-stored EHR, other payer platforms simply could not compete unless Epic allowed them to pull its EHRs at scale. ¶¶ 6, 60. While Epic provides Epic-stored EHRs at scale through Carequality for treatment purposes (as required by federal law), it largely refuses to provide them for non-treatment purposes, such as the "payment" needs of payers like health insurance companies. ¶¶ 51, 71-72. Epic has thus made it commercially impossible for any payer platform (other than its own) to access EHRs stored in its EHR software, effectively blocking potential competitors from entering the market—until recently. ¶¶ 6, 60-61, 69-71.

### D.    The Emergence Of Payers Providing Treatment

As the healthcare industry undergoes a revolution in its approach to patient care, pay-viders—entities that offer *both* treatment services traditionally offered only by providers *and* payment services traditionally offered by insurance companies—have recently emerged, with a broad swath of payers now offering varying treatments. ¶ 74. Specifically, many have turned from a fee-for-service model (*i.e.*, where payers reimburse providers for each service they deliver to a patient) to a value-based care model focusing on quality outcomes rather than the quantity of services. ¶¶ 9, 74. In a fee-for-service model, providers may be incentivized to provide costly services while payers may be incentivized to decline payment. By contrast, in a value-based care model, providers are reimbursed based on the quality of care, rather than the number of services performed, which incentivizes providers to focus on patient outcomes and care coordination,

leading to better patient outcomes and lower healthcare costs.[2] Pay-viders offer value-based care by acting more as a provider; *e.g.*, by "creating personalized treatment recommendations for their members' doctors." ¶ 9. Due to its significant benefits, the value-based care and pay-vider model are actively encouraged by regulators.[3] For instance, the Centers for Medicare & Medicaid Services ("CMS") has a publicly stated "goal of having 100% of Traditional Medicare beneficiaries and the vast majority of Medicaid beneficiaries in accountable care relationships by 2030."[4] To remain competitive and maintain access to approximately 40% of national healthcare expenditures tied to Medicare and Medicaid, payers must align with these mandates. That requires a more active role in the treatment of patients. Not only is there nothing illegal about payers providing treatment, it is necessary, and provides substantial benefits to patients across the nation. ¶ 76.

### E.    Particle Begins To Compete With Epic In The Payer Platform Market

Particle was able to enter the payer platform market and compete with Epic, despite Epic's best efforts to prevent competing payer platforms from doing so. ¶¶ 7, 62. Particle was the first to recognize that pay-viders legitimately offered, and assisted traditional providers like doctors with providing, *treatment*. ¶¶ 9-10, 73-76. Thus, pay-viders are legally entitled to EHRs where the purpose of obtaining the records is treatment. ¶¶ 9-10. And, contrary to Epic's insinuations otherwise, *both HIPAA and Carequality's rules allow payers to use EHRs acquired for treatment for certain "secondary uses," pursuant to strict agreements between payers and physicians that ensure no more information than is necessary is disclosed for non-treatment purposes*. ¶ 75. Particle recognized this and built software that allows pay-viders to utilize secure

---

[2]    *See* Centers for Medicare & Medicaid Services, *The CMS Innovation Center's Strategy to Support High-quality Primary Care*, https://www.cms.gov/blog/cms-innovation-centers-strategy-support-high-quality-primary-care (last visited Jan. 9, 2025).

[3]    *Id.*

[4]    *Id.*

exchange networks like Carequality to efficiently obtain EHRs at scale where there is a true treatment purpose. ¶¶ 9-10, 73-76. Particle's customers can use the payer platform to request and retrieve records from Epic at scale *when appropriate*, while enjoying the benefit of Particle's superior software features such as analytics. ¶¶ 73-76. As the only offerors of payer-platforms currently in the market, Epic and Particle directly compete.[5] ¶ 62.

To be clear, treatment requests from pay-viders threaten Epic's monopoly power in the payer-platform market because Epic can no longer block would-be competitors from obtaining EHRs for payers in all circumstances. *See* ¶¶ 8-11, 46, 65, 77. Epic thus resorts to falsely claiming that treatment requests from pay-viders violate the Health Insurance Portability and Accountability Act ("HIPAA") (42 U.S.C. § 1320d *et seq.*), based on a twenty-five-year-old statement from Department of Health and Human Services, before value-based healthcare and pay-viders even existed. *See* 65 Fed. Reg. 82462, 82626-27 (Dec. 28, 2000). But ***Carequality made no finding that Particle's pay-vider treatment requests failed to comply with HIPAA*** and, as described more fully below, Epic's alleged "HIPAA" and "privacy" concerns are merely another tool that Epic is using—including in this very motion—to destroy competition and maintain its monopoly in the payer-platform market. ¶¶ 65-67. As the Department of Justice has noted much more recently, "[a]cquisition and control of large amounts of data by a few companies can threaten healthy competition," and "may allow those companies to prevent other companies from entering the market," regardless of whether "such conduct is consistent with HIPAA."[6]

---

[5] That Epic claims not to use Carequality to provide EHRs to payers on its own platform is irrelevant—Epic has no need to do so because it effectively controls the majority of EHRs. ¶¶ 2, 34-38, 48; Dkt. 21 at 10 (citing ¶ 51). Nor is Epic's factual claim that it only serves "payers" relevant on a motion to dismiss. But even if it was, Particle's ability to offer payers EHRs at scale when such requests are legitimately for treatment purposes is a competitive differentiator demonstrating one reason why Particle's product is superior.

[6] Department of Justice, *Anticompetitive Uses of Healthcare Data*, https://www.justice.gov/atr/HealthyCompetition (last visited Jan. 9, 2025).

### F.    Epic's Multi-Pronged Anticompetitive Campaign

Epic's response to Particle's entrance into the payer-platform market was swift. ¶ 77. Immediately after Epic discovered that Particle was accessing Epic EHRs in connection with the treatment of patients in a program supported by Blue Cross Blue Shield of Michigan, Epic launched a multi-pronged and anticompetitive campaign to destroy Particle's business. *Id.* Epic did so during a time that establishing market share is absolutely critical, because the stickiness of these types of platforms essentially means that eliminating competition early on would allow Epic to lock itself into monopoly power. ¶ 11. Notably, Epic has not directed this campaign against any of the parties whom Epic claims have violated HIPAA. Dkt. 21 ("Mot.") at 2. Instead, Epic has focused its ire exclusively on Particle—its sole competitor. *See, e.g.*, ¶ 78.

#### 1. *Epic Completely Blocked Particle Customers' Access To Epic EHRs And Forced Them To Boycott Particle If They Wanted Access Again*

In March 2024, Epic began denying Particle's customers access to Epic EHRs. ¶¶ 12, 79, 84-88. Epic then told those Particle customers it would restore their access to these critical records *if and only if* they ended their relationship with Particle. *Id.* This broad-brush attack focused on Particle's payer *and* non-payer customers (who purchase different products from Particle). *Id.* One example was XCures, which swiftly ended its relationship with Particle after its CEO had such a conversation with Epic. ¶ 86. The same happened with prospective customers. ¶¶ 12, 89-91. As one put it: "While [we were] bullish on our use case by being under the Particle umbrella … [o]ur ability to be successful as a company is tied to our access to the [Health Information Exchange] and Particle's current dispute [with Epic] puts this connection at risk." ¶ 89.

#### 2. *Epic Prevented Particle's New Customers From Accessing EHRs*

When Particle onboards a new customer, that customer cannot obtain Epic-stored EHRs until Epic adds the customer to its "directory." ¶¶ 13, 95. Epic's approval process for adding a

new entity to its directory historically took no more than two days. *Id.* But, as part of its anticompetitive campaign, Epic reached an agreement with the Care Everywhere Governing Council (Epic's independent oversight body comprised of Epic-friendly industry participants) that every new Particle customer had to be manually approved by the Council before they could be added to Epic's directory. ¶¶ 13, 96. This new policy—which lasts to this day and applies only to Particle customers—has dramatically slowed Epic's approval process to, in some cases, up to one month. ¶¶ 13, 97. The reason Epic is creating such roadblocks for Particle customers is clear: it is trying to dissuade healthcare organizations from working with Particle. ¶¶ 13, 94-101.

### 3. Epic Abused The Carequality Framework To Foment A Baseless Dispute

Carequality is the nation's largest healthcare data-sharing network, and Epic's role as the dominant provider of EHRs renders it a "must have" connection for any network. ¶¶ 16, 126. Without Epic, Carequality cannot survive, which gives Epic significant leverage. ¶ 126.

Epic initiated a dispute against Particle using Carequality's framework in order to support and justify its other anticompetitive acts. The actual dispute focused on how three of Particle's ***customers*** allegedly applied incorrect designations to certain EHR requests made through Particle's platform (in breach of those customers' contracts with Particle). ¶¶ 104, 120-24. Epic nonetheless aimed its attack at ***Particle***, claiming that ***Particle*** inaccurately represented the purpose of these customers' record retrievals and "obscur[ed] provider-level details of connection through a generic gateway." ¶ 206. Epic did so even though there was no evidence showing that Particle was aware of, or complicit in, these customers' infractions, nor that Particle "obscured" anything. ¶ 122-124. Epic nonetheless insisted on an unprecedentedly lengthy and resource-intensive process, the first such action in Carequality's history. *Id.* Throughout the process, Epic refused to explain why Particle should be targeted instead of its three customers. ¶¶ 120-21. In reality, the

intent was clear: drain Particle's limited resources, and subject the company to fear and uncertainty in an industry that, by law and practice, must focus heavily on data privacy. ¶ 133.

Carequality's determination following this lengthy dispute further reflects the baselessness of Epic's complaints. After extensive fact-finding, the Carequality Steering Committee made no finding that Particle acted in anything but full compliance with HIPAA and Carequality's rules and found that Epic's allegation that Particle masked its queries lacked any factual basis. ¶ 124. The two Particle customers that made improper treatment requests, in violation of their express representations to Particle, circumvented Particle's robust diligence process with no fault attributable to Particle. *Id.* Nonetheless, both had HIPAA-compliant authorizations for the EHRs they accessed. PX-1 at 7-8. Despite this clear vindication, Epic was still able to coerce the Carequality Steering Committee into imposing a "corrective action plan" on Particle. ¶ 125. And while the Steering Committee prescribed remedial measures for Epic, the Committee chose not to brand Epic with the scarlet letter of a "corrective action plan." PX-1 at 19-21.

This contradictory outcome reflects Epic's immense influence over Carequality. ¶ 126. As the dominant supplier of EHRs within the Carequality framework, Epic's participation is crucial to Carequality's survival. *Id.* Over the years, Epic has leveraged this position by repeatedly threatening to withdraw from Carequality to secure favorable concessions. *Id.* Here, Epic's coercion led to a resolution that competitively burdened Particle, despite the lack of evidence supporting Epic's claims. ¶¶ 125-126. Then, when Carequality planned to notify the press that Particle remained a member in good standing and that the vast majority of Particle customers could still access Epic EHRs, Epic intervened through backchannels to kill the press release. ¶¶ 130-131. This outcome not only hindered Particle's ability to compete but also exemplifies the anticompetitive strategies Epic allegedly employs to maintain its dominance.

10

### 4. Epic Made Repeated, Disparaging Statements To Destroy Trust In Particle

Epic "embarked on a market wide campaign to destroy trust in Particle" by defaming Particle's integrity and operations to other market participants. ¶¶ 14-15, 102-14. In April 2024, Epic directed thousands of statements to its customers cultivating a widespread and insidious misperception that (i) Particle had somehow acted unethically and introduced "security and privacy risks" for its customers, and (ii) all Particle connections had been shut off. ¶ 102. On April 10, 2024, Epic released an "Issue Notification" regarding its dispute with Particle under the heading "Third-Party Security and Privacy Risk" that was riddled with falsities, including that Particle "might be inaccurately representing the purpose associated with [its] record retrievals" and was "obscuring provider-level details." ¶¶ 102-05. Epic's masking claims are demonstrably false, as evinced by Carequality's findings. ¶ 124. Moreover, Epic's false statements are inconsistent with the explanations Epic itself has given for its actions. ¶¶ 80, 103-14. These lies were nonetheless immediately picked up by the media (as was Epic's intention), further destroying Particle's credibility and ability to compete. ¶ 109. Epic's falsehoods continue to this day, ¶ 113, including in recent correspondence to its customers repeating the lie that Particle somehow masked its gateway connections to the Carequality network. Those same falsehoods are repeated in its current motion. By making these false statements, Epic destroyed public trust in its only meaningful competitor, in an industry where security and privacy are paramount concerns. ¶ 14.

### 5. Epic Flooded Particle's Systems With Baseless Inbound Inquiries

Epic has attempted to overwhelm Particle's systems and thus prevent it from competing by flooding Particle's systems. ¶¶ 15, 115-18. When Epic made the above defamatory statements, it further told its customers to request more information from *Particle*, even though Epic knew that the "issues" were isolated to actions of three of Particle's *customers* and that Particle played no role in initiating the inquiries for their EHR requests. *Id.* Epic successfully directed hundreds of

near-simultaneous, baseless inbound inquiries to Particle's systems, much akin to the method by which hackers shut down a website through floods of simultaneous requests that overwhelm the website's systems. *Id.* Because Particle remains a small company with limited resources, these targeted attacks further impeded Particle's ability to operate and to compete with Epic in the payer-platform market, because Particle needed to devote substantial resources to responding rather than running and expanding its day-to-day business. *Id.*

## LEGAL STANDARD

On a motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). There is "no heightened pleading standard in antitrust cases." *Concord Assocs., L.P. v. Ent. Properties Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).

## ARGUMENT

## I.    THE COMPLAINT ALLEGES A PLAUSIBLE PRODUCT MARKET

Epic's market definition arguments are intensely factual, ignore well-pleaded allegations, and bear no relationship to the standard for pleading a relevant market. "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp*., 275 F.3d 191, 199-200 (2d Cir. 2001). Courts define the boundaries of a relevant market around "products that have reasonable interchangeability *for the purposes for which they are produced*—price, use and qualities considered." *P & L Dev., LLC v. Gerber Prods. Co*., 715 F. Supp. 3d 435, 458 (E.D.N.Y. 2024). In assessing a 12(b)(6) motion, courts simply look to whether a plaintiff's proposed market definition "bear[s] a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes.'" *Todd*, 275 F.3d at 200. The Complaint more than meets this modest standard.

12

The relevant market is the market for the sale of payer platforms, software platforms specifically designed for the payer business model that "allow payers to … retrieve [EHRs] at scale through smooth, automated processes, and then to store and analyze those records." ¶¶ 52-53. In the five pages the Complaint spends on explaining the contours of the payer platform market, it explains how they are different from both (a) platforms that perform superficially similar functions for other businesses but are not available to payers and/or do not cater to payers' specific business needs; and (b) other medical record services that are available to payers but have more limited functionality and efficiency—and which are not integrated into a single platform. ¶¶ 51-57, 63, 68-73, 87. Epic's motion ignores nearly all of this discussion. *See* Mot.

### A.      The Complaint Does Not Improperly Restrict The Market By Customer

Epic argues that the Complaint should be dismissed because "Particle attempts, without support, to restrict the relevant market to software sold to a particular customer type—payers." Mot. at 12. This argument both misreads Particle's allegations and misconstrues the law.

*First*, Particle does not, as Epic asserts, allege a "product market[] defined by a specific customer type." *Id.* Rather, Particle alleges payer platforms are ***designed for payers***, with specific combinations of functionality and features that make them a unique product. *See* ¶¶ 53-57, 87. As the Supreme Court and Second Circuit have each observed, "peculiar characteristics and uses," "industry or public recognition," and "distinct customers" are each "practical indicia" of a distinct product market. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019). Courts thus routinely recognize that products specifically designed for a certain type of business, such as a specific type of platform, are a plausible, relevant market. *See*, *e.g.*, *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 348 (S.D.N.Y. 2021) (finding plausible market for online platforms for pharmacies).

Contrary to Epic's (unsupported) representation that Particle sells the "same software" to payers and providers, Mot. at 13, the Complaint alleges in detail the unique combination of features that differentiate payer platforms from platforms designed for and used by other types of businesses, like providers. *See* ¶¶ 5, 51-57, 63, 68-73. Indeed, Epic itself designed its Epic Payer Platform specifically for payers, *see* ¶¶ 5-6, 69, which shows Epic itself recognizes that its product is distinct from other platforms for non-payers. *See Fed. Trade Comm'n v. Tapestry, Inc*., 2024 WL 4647809, at *20 (S.D.N.Y. Nov. 1, 2024) ("[W]hen determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business.").

*Second*, even if, as Epic contends, Particle alleged a "product market[] defined by a specific customer type," Mot. at 12, courts recognize that "[a] product market can be limited to a particular category of buyers." *P & L Dev.*, 715 F. Supp. 3d at 459; *Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp*., 655 F. Supp. 3d 52, 84 (D. Conn. 2023) (similar). Such a limitation is appropriate where "different classes of customers have varied ability to substitute" different products—that is, where they have narrower ranges of alternatives available to them. *Fed. Trade Comm'n v. Cardinal Health, Inc*., 12 F. Supp. 2d 34, 49 (D.D.C. 1998).

Epic does not mention or address this law. It does, however, concede that a market definition based on a specific customer group is plausible if the complaint alleges that group is "unique." Mot. at 12. Notably, Epic does not dispute that payers **are** a unique group in the healthcare industry with unique business needs.[7] *See* ¶¶ 54-57, 68. Moreover, Particle alleges that payers are uniquely limited in their ability to substitute products available to other groups, such as Kno2, largely because Epic has made it impractical for comparable platforms to service payers,

---

[7] In fact, the motion argues, *see* Mot. at 9-10, that payers cannot access "full" EHR records precisely **because** they are a unique group, relative to patients and traditional providers.

*see* ¶¶ 62, 68-73, 87, meaning payers have fewer alternatives than other groups. These allegations are more than sufficient at the pleading stage to define a product market around a particular category of buyers. *See, e.g.*, *P & L Dev.*, 715 F. Supp. 3d at 458-59 (finding plausibly alleged market for "sale of Store-Brand infant formula to Retailers" where certain substitutes available to other groups "d[id] not serve the same purposes for retailers").[8]

**B.** **The Complaint Addresses Reasonable Interchangeability And Cross-Elasticity of Demand In Detail, As Well As "Practical Indicia"**

Epic next argues that the Complaint should be dismissed because Particle "ignores" other products that, in Epic's opinion, "appear to compete with Particle's and Epic's products" for payers' business. Mot. at 14. It therefore contends that Particle does not define the payer platform market with respect to reasonable interchangeability or cross-elasticity of demand; *i.e.*, the hallmarks of substitutability that define a relevant market's outer bounds. Mot. at 13-17. As an initial matter, Epic's "deeply fact-intensive" arguments about other products supposedly available to payers reach far beyond the Complaint and have no place in a motion to dismiss. *See Todd*, 275 F.3d at 200. Regardless, they are premised on ignoring Particle's allegations and the law.

"Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand—that is, where consumers would respond to a slight increase in the price of one product by switching to another product." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024). As the Second Circuit further explained, interchangeability can be evaluated by "imagining that a hypothetical monopolist has imposed a small but significant non-transitory

---

[8] Epic's citations are not to the contrary, as each involved a plaintiff who did ***not*** plausibly allege a unique customer group. Mot. at 12-13; *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (plaintiff failed to offer any allegations "to show how the market for … child care providers is any different from the larger market"); *Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 429 (S.D.N.Y) (rejecting plaintiff's customer limitation to "the Amex Network and Amex Cardholders" in the market for "discounted airline tickets" where there were no allegations that such customers were "constrained from purchasing airline tickets from [different entities].").

increase in price ('SSNIP') within the proposed market," and if the hypothetical monopolist can do so "without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market." *Id.* "Courts also often look to 'practical indicia' of market boundaries to identify whether two products are economic substitutes." *Id.*

As noted above, the practical indicia here demonstrate payer platforms are a relevant product market. *See supra* at 13-14. However, Particle also specifically explains how a hypothetical monopolist of payer platforms could profitably impose a SSNIP, just as the Second Circuit instructs. Specifically, Particle explains in detail why "traditional services that assist with medical records" (which include the companies Epic identifies in its motion) are not adequate substitutes for payer platforms. *See* ¶¶ 56-57, 69. Most importantly, these services do not "integrate[] the functions of requesting, receiving, storing, and analyzing medical records"; *i.e.*, are not a complete, integrated platform like a payer platform, but are instead an amalgamation of different services.[9] ¶¶ 56-57, 62. Further, these other services cannot "retrieve medical records ***instantaneously*** and ***at scale***"—one of a payer platform's defining features. ¶ 56. For these reasons, the alternative set of services Epic invokes "cost much [more] on a per-record basis" than payer platforms, ¶ 57, and the latter have "quickly displac[ed] [these] older services and technologies" since their introduction, ¶ 69. It is also why, in response to a SSNIP by a hypothetical monopolist of all payer platforms, "payer platform users would not switch

_____

[9] Epic argues that payer platforms' distinct combination of features is irrelevant, citing *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 354 (S.D.N.Y. 2009). Mot. at 16. But that case—decided at summary judgment—dealt with the distinct concept of a "cluster market," where a plaintiff attempts to group multiple non-interchangeable ***products*** into a single market. *Id.* Here, the relevant market consists of only a single product which provides distinct functionality in part due to a unique combination of features. ¶ 56. Much as smartphones combine calling, internet browsing, photography, and more to create a new product, payer platforms combine retrieval, storage, and analysis to "substantially reduce payers' costs and eliminate the friction associated with juggling multiple applications and vendors." *See id.*

to … traditional services that assist with medical records[] in sufficient numbers to make the increase unprofitable." ¶ 57.

The Second Circuit is clear that such allegations plausibly establish a relevant market. For example, in *Regeneron*, the Second Circuit had no trouble finding a product market plausible based on allegations that (1) "physicians ha[d] a 'strong preference'" for products in the proposed market over older alternatives; (2) "a small, but significant, price increase in the [market products] would not cause physicians to substitute" to the older products; and (3) large numbers of physicians had "transitioned" to products in the proposed market "due to their superiority." 96 F.4th at 341. As set out above, the Complaint here alleges virtually identical facts. *See* ¶¶ 55-57, 59, 62, 69.[10] Indeed, the Complaint here goes ***further,*** setting out additional practical indicia that differentiate payer platforms from other services. *See id.*

Epic takes issue with the fact that the Complaint does not specifically identify the offerors of these traditional services—like Datavant, InterSystems, and Availity—and differentiate their specific offerings from payer platforms. Mot. at 14-15. But an antitrust plaintiff "is not required to anticipate and refute in its complaint all possible market substitutes" a defendant might invoke. *Jamsports & Ent., LLC. v. Paradama Prods., Inc*., 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15, 2003). And none of Epic's cited cases stand for such a proposition. At most, they show that courts look for some discussion of alternative product ***types***—not specific companies. *See, e.g., Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303-04 (E.D.N.Y. 2001) (dismissing complaint that "does not explain … ***if*** there are other, substitute products available"). Particle discusses potential alternatives at length. *See* ¶¶ 55-57, 59, 62, 69.

---

[10] Epic asks the Court to ignore Particle's allegation about users' response to a price increase, calling it a "bare legal conclusion." Mot. at 16 (citing ¶ 57). But the Second Circuit in *Regeneron* relied on a substantively ***identical*** allegation in finding a relevant market plausibly pleaded, noting that "[t]he district court did not properly credit" that allegation. 96 F.4th at 341.

Finally, Epic's arguments about Kno2 are a red herring. Particle provides products in multiple markets, catering to both payers and non-payers. ¶ 73. The crux of Particle's claims is that Epic is trying to destroy its *entire* business, to keep Particle out of the payer platform market. *See* ¶¶ 11-12, 77-78. Kno2 is not an alternative to a payer platform. Indeed, Particle alleges the exact opposite. ¶ 87 ("Kno2 … does *not* compete … in the payer platform market."). Instead, Kno2 is relevant because it is a more limited *non-payer* service to which one of Particle's *non-payer* customers switched when Epic cut off access to EHRs in its broad attempt to force Particle out of business. ¶¶ 86-87. This demonstrates the wide-ranging effects Epic's conduct has had on Particle's ability to stay in business, and says nothing about the substitutability of Kno2 with Epic's and Particle's *payer platform* offerings.

## II. THE COMPLAINT PLAUSIBLY ALLEGES ANTICOMPETITIVE CONDUCT

The Complaint spends over forty pages detailing Epic's multi-pronged effort to destroy Particle, its only competitor in the payer-platform market. Epic attempts to sidestep these allegations by arguing that an antitrust plaintiff must preemptively explain away all possible justifications a defendant might raise for its conduct. That is not the law, and Epic's reliance on cases addressing discrete antitrust doctrines irrelevant to this case is misplaced. Contrary to Epic's assertion, Particle alleges prototypical anticompetitive conduct. And regardless, the Complaint more than plausibly dismantles Epic's (irrelevant) attempts at "privacy" justifications.

### A. Epic Misstates The Standard For Showing Anticompetitive Conduct

Under Section 2, a plaintiff must allege that "the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd*., 11 F.4th 118, 137 (2d Cir. 2021). Conduct is "improper" if it tends to result in "exclusion not the result of superior efficiency." *Id.* Therefore, conduct need not be "willfully

18

improper" or even "unreasonable," as "benign intent does not shield anticompetitive conduct from liability." *Id.* So long as a plaintiff pleads conduct which tends to "impede[] competition through means other than competition on the merits," *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015), it need not exclude a defendant's purported business justifications in its complaint. *See United Food*, 11 F.4th at 137; *see also In re Actos End-Payor Antitrust Litig.*, 417 F. Supp. 3d 352, 370-72 (S.D.N.Y. 2019) (rejecting "justification" arguments on this basis). If a defendant wishes to advance procompetitive or other justifications for its conduct, it must do so as an ***affirmative defense***, for which it bears the burden. *In re Actos*, 417 F. Supp. 3d at 371-72.

Epic's attempts to construct a contrary standard are unavailing. Epic relies almost exclusively on "unilateral refusal to deal" cases discussing the special standard applicable to that liability theory. *See* Mot. at 18 (*citing Port Dock & Stone Corp. v. Oldcastle N.E., Inc.*, 507 F.3d 117, 125 (2d Cir. 2007); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014); *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022)). Because courts place a "high value … on the right to refuse to deal" with competitors, *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-10 (2004), they have fashioned a special rule that refusing to deal with a competitor violates Section 2 only if, *inter alia*, the refusal is "irrational but for its anticompetitive effects." *Google Digital Advert.*, 627 F. Supp. 3d at 383 (*citing Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013)). But this rule "targets only a discrete category of [S]ection 2 cases," and does not apply when "a monopolist[] more direct[ly] interfere[s] with rivals." *Novell*, 731 F.3d at 1076. Epic does not attempt to argue that Particle alleges a unilateral refusal to deal. Nor could it, as Particle's ***customers*** (not Particle) were the ones Epic cut off. *See, e.g.*, *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023)

(finding court "erred in choosing the refusal-to-deal-with-rivals framework" to analyze claim premised on cutting off competitor's customers). Epic's supposed "standard" is therefore inapt.[11]

## B.    The Complaint Details Textbook Forms Of Anticompetitive Conduct

Because this is not a refusal to deal case, the relevant question is whether Epic's conduct had a tendency to result in "exclusion not the result of superior efficiency," *United Food*, 11 F.4th at 137, or to "impede[] competition through means other than competition on the merits," *Schneiderman*, 787 F.3d at 652. Courts have long deemed conduct like Epic's anticompetitive.

The first prong of Epic's scheme was to cut off Particle customers' access to Epic EHRs unless they agreed not to do business with Particle. ¶¶ 12, 79-101. This is the exact type of conduct the Supreme Court found anticompetitive in *Lorain Journal Co. v. United States*, 342 U.S. 143, 148-149 (1951). Courts regularly rely on *Lorain Journal* to condemn exclusionary conduct that closely parallels Epic's. *See, e.g.*, *Chase*, 84 F.4th at 1172-73 (finding decision to "cut off any distributors buying" rival's product was anticompetitive conduct under *Lorain Journal*); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 226-27 (D.D.C. 2022) (similar).

Another aspect of Epic's scheme was a "market-wide disparagement and disinformation campaign" against Particle. ¶¶ 102-114. "[C]ourts recognize that false and misleading statements may provide a basis for antitrust claims." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 240 (S.D.N.Y. 2019). "At the motion to dismiss stage," allegations (like Particle's) that a monopolist's statements about a rival were "false and misleading in certain respects" are "sufficient to go forward with the discovery process." *Alternative*

---

[11]    The only other case Epic cites on this point, *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 490 (S.D.N.Y. 2016), involved "a very specific type of exclusionary conduct" not applicable here. *See* Dkt. 14. Moreover, the language Epic quotes relied on a premise that anticompetitive conduct must be "anticompetitive in purpose," 156 F. Supp. 3d at 486, but that premise was directly abrogated by *United Food*, 11 F.4th at 137.

*Electrodes, LLC v. Empi, Inc*., 597 F. Supp. 2d 322, 332-33 (E.D.N.Y. 2009) (denying motion to dismiss Section 2 claim on this basis).

The Complaint also alleges that Epic "initiated a manufactured and pretextual dispute within Carequality," and "used its power and influence … to manipulate Carequality and bias the resolution in Epic's favor." ¶¶ 119-33. Coercing an industry group to harm competition is clearly actionable. *See*, *e.g.*, *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc*., 611 F.3d 495, 506-07 (9th Cir. 2010); *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 946-47 (2d Cir. 1987) (finding defendant's cultivation of "disproportionate voice" in standard-setting body and use of influence to harm competitor was anticompetitive). Again, Epic does not challenge the sufficiency of the Complaint's allegations that Epic improperly "manipulated" Carequality to obtain a result in its favor. ¶¶ 125-33. It merely argues that it was justified in bringing a dispute. *See* Mot. at 18-19. But that fact-intensive argument is irrelevant, as manipulating a body like Carequality to harm a competitor is anticompetitive conduct even if the defendant's position is "supported by objective scientific evidence." *Indian Head*, 817 F.2d at 947 ("The 'objective validity' of a restraint has never been a defense to an antitrust charge.").

Finally, Epic argues the alleged conduct did not affect the payer-platform market because some of the affected customers were not payers. Mot. at 20. That self-serving framing ignores Particle's central allegation: that Epic, to close competition in the payer platform market, engaged in a campaign to destroy Particle's **entire business**. *See*, *e.g.*, ¶¶ 11-12, 77-78. By eliminating Particle the company, Epic's conduct necessarily tended to eliminate Particle the competitor. Thus, it worked to starve Particle of **both** payer and non-payer customers and prospects. *See id.*

## C.    The Complaint Plausibly Refutes Epic's Supposed "Privacy" Justifications

Although Particle need not refute Epic's supposed business justifications to plead a monopolization claim, "desire to harm competition" **is** an element of Particle's separate claim for

*attempted* monopolization. *United Food*, 11 F.4th at 137 n.18. Further, to the extent the Court construes Epic's arguments about privacy as raising an affirmative business justification defense, that defense is inapplicable to "pretextual" justifications like Epic's. *See Schneiderman*, 787 F.3d at 658. The Complaint more than plausibly alleges that Epic's true motivations are anticompetitive.

*First*, the context of Epic's anticompetitive campaign shows a desire to stifle competition. Particle alleges that Epic "stymie[d] the creation of a centralized exchange regime for non-treatment [medical records] requests" for years by arbitrarily refusing to respond to such requests, which had the effect of "block[ing] all competition in the payer platform market." ¶¶ 70-72. After discovering that Particle had managed to enter the market despite these anticompetitive barriers, Epic immediately began targeting Particle. ¶¶ 73-77.

*Second*, Epic's claim that it was motivated by patient privacy concerns is riddled with inconsistencies. Particle describes how Epic's explanations for cutting off Particle customers "repeatedly shifted," with Epic first claiming it was due to a technical issue. ¶ 80. In fact, it appears Epic reflexively moved to crush Particle after perceiving it as a threat in the payer-platform market, then scrambled to construct a pretext for its actions by investigating each of Particle's Carequality connections. The reason Epic eventually settled upon—supposed concerns over the activities of *three* Particle customers—fails to explain why Epic cut off EHR access to dozens of other innocent Particle customers in a "haphazard and seemingly random" fashion, "often treating two Particle customers who provide identical services differently." ¶¶ 81-83. Epic's "justification" also does not explain why it targeted new Particle customers for extreme and inexplicable delays in onboarding, in some cases increasing the time it takes to begin retrieving records from two days to over three months. ¶ 97. And it certainly does not explain why Epic offered to restore suspended customers' EHR access *on the condition that they end their relationships with Particle*. ¶¶ 86-88.

These allegations, taken together, more than amply show that anticompetitive animus motivated Epic, rather than its claimed concerns over privacy. At the very least, they are sufficient to "nudge[]" Epic's anticompetitive motivation "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.    THE COMPLAINT ALLEGES AN AGREEMENT UNDER SECTION 1

Section 1 of the Sherman Act applies where two or more entities engage in "concerted action" that unreasonably restrains competition. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). This includes agreements that are "horizontal, vertical, or both." *Id.* An "agreement" does not require an express contract-like understanding, but can occur where a customer acquiesces to an announced condition. *See Monsanto Co. v. Spray-Rite Svc. Corp.*, 465 U.S. 752 (1984). At the pleading stage, "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). Epic's arguments fail under this law.

*First*, where a supplier pressures a customer not to do business with a rival, that is an "agreement" sufficient to establish a Section 1 claim. *See, e.g.*, Areeda & Hovenkamp, Antitrust Law, ¶ 1447b2; *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 779-780 (11th Cir. 1983). Particle alleges exactly that sort of coercive agreement between Epic and Particle's current and prospective customers. In particular, it provides one notable example, *see* ¶ 86, and alleges that it understands this is a widespread practice. ¶ 88. These well-pleaded allegations demonstrate just one facet of Epic's attempts to cripple Particle as a competitor and is a sufficient example at the pleading stage that allows the Court to infer competitive harm regardless of whether XCures is a payer. *See, e.g. , Teradata Corp. v. SAP SE*, --- F.4th ---, 2024 WL 5163082, at *9 (9th Cir. Dec. 19, 2024); *see supra* at 15.

*Second*, manipulating or improperly influencing a standard-setting body (or other industry group) in order to harm competition through that body's mechanisms also constitutes an "agreement" for purposes of a Section 1 claim. *See Allied Tube*, 486 U.S. 492; *Indian Head*, 817 F.2d at 946-47. Particle alleges Epic did exactly that with Carequality, as well as members of Carequality's Steering Committee. ¶¶ 125-27.

*Third*, Particle alleges that Epic and the Care Everywhere Governing Council agreed to impose an anticompetitive policy that every new Particle connection be approved individually by the Governing Council. ¶ 96. Particle specifically alleges that the Governing Council is an independent oversight body comprised of **other industry participants** and "oversees Epic's record-sharing activities," but that its independence is compromised because it has fifteen "Epic-friendly volunteers from among Epic's EHR software customers." *Id.* Epic argues it could not "agree" with the Governing Council because it supposedly is not a separate entity, but Epic itself characterizes the Governing Council as an independent body in its Motion, describing it as "comprise[d] [of] elected representatives of Epic's health care provider customers" with the power to "direct[]" Epic to take certain actions. Mot. at 2, 6. Particle's allegations that Epic and the Governing Council cooperated to apply an anticompetitive policy to oust Particle from the payer-platform market is sufficient to suggest agreement at the pleading stage. *See, e.g.*, *Monsanto*, 465 U.S. at 764.

For the same reasons described in *supra* Section I.B and *infra* Section IV, Particle also adequately pleads that Epic's agreements to restrain trade, that have the effect of destroying its only competitor in the payer-platform market, has an anticompetitive effect on that market.

## IV.    THE COMPLAINT PLAUSIBLY ALLEGES ANTITRUST INJURY

Antitrust injury is injury "of the type the antitrust laws were intended to prevent" and should "be the type of loss that the claimed violations would be likely to cause." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Exclusion from a market is a conventional

form of antitrust injury because it is exactly the type of injury that antitrust laws were designed to prevent." *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *11 (S.D.N.Y. Feb. 21, 2019); *see also, e.g.*, *Chapdelaine Corp. Sec. & Co. v. Depository Tr. & Clearing Corp.*, 2006 WL 2020950, at *4 (S.D.N.Y. July 13, 2006) (rejecting argument that complaint alleged "harm to a single competitor" because plaintiff's exclusion "decreases the number of alternatives available"). This is "especially" true where the plaintiff is the "only competing provider" in the market. *Valassis*, 2019 WL 802093, at *12; *see also, e.g.*, *Xerox Corp. v. Media Scis. Int'l, Inc.,* 511 F. Supp. 2d 372, 381 n.4 (S.D.N.Y. 2007) ("[T]he threat of exclusion of one of two competitors from the marketplace … is clearly an injury of the type the antitrust laws were designed to prevent.").

Epic does not seriously contest that Particle provides a detailed account of Epic's unfair and monopolistic conduct. *See* ¶¶ 79-101 (interference with Particle customers); ¶¶ 102-114 (campaign to malign Particle); ¶¶115-118 (efforts to overwhelm Particle's client support services); ¶¶ 119-133 (abuse of the Carequality dispute process). Nor does Epic seriously contest that Particle explains in detail how Epic's conduct towards Particle—***the only viable competitor in the payer-platform market***—has stifled competition in that market. ¶¶ 140-146. This clearly identifies antitrust injury. *Valassis*, 2019 WL 802093, at *11-12. Epic's sole argument is that Particle has not alleged harm because the Court should define the relevant market more broadly than payer platforms. *See* Mot. at 24. But in doing so, Epic concedes that its antitrust injury argument fails if Particle has plausibly alleged a relevant market. *See id.* That is precisely the case here. *See* ¶¶ 52-63; *supra* Section I. Particle has pleaded harm to the payer-platform market resulting from Epic's attempts to destroy Particle, and thus plausibly states antitrust injury.

## V.    PARTICLE'S STATE LAW CLAIMS ARE SOUND

### A.    The Complaint Plausibly Alleges Tortious Interference with A Contract

Tortious interference requires a valid contract, defendant's knowledge of the contract and procurement of a breach, and damages. *Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 41 (2d Cir. 2019). Particle has plausibly alleged facts sufficient to satisfy each element.

*First*, Particle has adequately alleged Epic's knowledge of Particle's contract with XCures. Under New York law, a plaintiff is not required to prove that the defendant had "perfect or precise knowledge of the terms and conditions of the contract[] in issue." *Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, 2014 WL 5861984, at *10 (S.D.N.Y. Nov. 10, 2014). Rather, the defendant need only have "some knowledge" of the relevant contract. *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 348 (S.D.N.Y. 2020). "[I]t is sufficient … to allege facts from which the court might reasonably infer that [a defendant] had such knowledge." *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 172-73 (E.D.N.Y. 2010).

Here, Particle alleges facts showing that Epic was intimately aware of the contractual, client relationship between Particle and XCures. Not only did Particle access records on XCures' behalf (which it could not do without a contractual relationship) and introduce representatives of XCures to Epic to negotiate and resolve XCures' access, but Epic also suspended XCures' access to medical records ***because of*** its contractual relationship with Particle, even going so far as to tell XCures' CEO that "its access to Epic data would be restored if it ended its relationship with Particle." ¶ 86. Such allegations go far beyond the minimum required to plausibly establish knowledge on Epic's part. *See, e.g.*, *State St. Glob. Advisors*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020) (knowledge adequately alleged where defendant "had some knowledge of the terms" of the interfered-with contract but "lacked detailed knowledge about that agreement").

*Second*, Particle alleges XCures breached. Contrary to Epic's assertion, Particle directly identifies "the specific contractual term that was breached," Mot. at 25, stating that "XCures ***ceased paying its monthly subscription fees to Particle prior to the contract termination date … thereby breaching its contract*** with Particle." ¶ 87. The Complaint thus makes clear that Particle's contract was ***not*** terminable at will—had the contract been terminable at will, XCures' cessation of payments would not have constituted a breach.[12] Moreover, Epic's citation to *Orange Cnty. Choppers, Inc. v. Olaes Enterprises, Inc.*, 497 F. Supp. 2d 541 (S.D.N.Y. 2007), only highlights the sufficiency of Particle's pleadings. Mot. at 26. There, the complaint was "[c]onspicuously missing" an allegation that the counterparty "actually breached the contract." *Id.* at 562. It was only that "conspicuous omission" that "[left] open the possibility that [the counterparty] lawfully terminated the contract or that the contract was terminable at will." *Id.* In contrast, Particle expressly alleges breach. ¶ 87.

*Third*, Particle alleges that Epic intentionally procured XCures's breach. A plaintiff adequately alleges an intent to induce a breach where, "taken together, the[] pleadings constitute a sufficient allegation that [the defendant] knew that the interference was certain or substantially certain to occur as a result of [its] action." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019). Allegations of intent need not be "the most detailed … to satisfy the minimal notice pleading standard of Rule 8(a)." *Red Apple Media, Inc. v. Batchelor*, 729 F. Supp. 3d 350, 376 (S.D.N.Y. 2024). Particle alleges Epic intentionally caused XCures' breach, *see, e.g.*, ¶ 196, and alleges facts to support its claim. These include that Epic suspended XCures' connection to Epic

---

[12] Moreover, contrary to Epic's assertions, it can be held liable for tortious interfering with an at-will contract when the defendant utilizes wrongful means. *See Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *8 (S.D.N.Y. Apr. 17, 2020) ("Where the means employed to induce the breach are 'wrongful,' however, the valid contract prong of a tortious interference claim may be satisfied by an at-will contract."). Thus, even if Particle's contract with XCures was terminable at will (it was not), Epic's use of wrongful means, ¶¶ 78-133, still subjects it to liability.

EHRs because XCures utilized the Particle platform and, after Particle introduced XCures to Epic in an effort to restore XCures' access, "Epic told XCures its access to Epic data would be restored if it ended its relationship with Particle." ¶ 86. XCures breached its contract with Particle days later. *Id.* Few inducements could be more obvious, and Particle's allegations are "plainly sufficient to support intentional inducement at the pleadings stage." *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 729 (S.D.N.Y. 2012) (finding intent adequately pleaded where defendant told plaintiff's clients that plaintiff may be stealing from them).[13]

### B.    The Complaint Plausibly Alleges Tortious Interference with Prospective Business Relations

To plead tortious interference with prospective economic relations a plaintiff must allege "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 643 (S.D.N.Y. 2018). Particle alleges each element.

*First*, Particle alleges numerous facts demonstrating that it had a "reasonable probability of entering into a business relationship" with multiple third parties. Mot. at 27. The complaint provides excerpts from an email sent by the CEO of one such prospective customer stating that it was "invested in pursuing [an] agreement" with Particle and "nearly completed implementing the Particle API into our tech stack," but then reneged on this nearly consummated deal because "the current dispute with Epic present[ed] too much of a risk." *Id.* Thus, the "prospective customer made abundantly clear that, but for the risks presented by Epic's arbitrary and discriminatory

---

[13]    Epic cites *Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 319 (S.D.N.Y. 2019), but the allegations in that case bear no resemblance to Particle's detailed allegations. There, the complaint contained "no allegation" that the breach "was done at [defendant's] instruction … or that [defendant] even suggested that" the counterparty should breach. *Id.*

shutoffs of Particle customers, it would have finalized the deal and entered into a commercial relationship with Particle." ¶ 90. The Complaint then identifies four potential customers—Beeline Rx, Power Life Sciences, Leafwell, and Medvise—Epic targeted. It asserts that each customer abandoned advanced negotiations with Particle under circumstances that mirror those detailed in the excerpted email. ¶ 90. Particle is not required to repeat its detailed allegations verbatim for each customer when it is evident that the same allegations apply to all of them. *See, e.g.*, *Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 801 n.137 (S.D.N.Y. 2011) ("[T]he court will not dismiss the claim simply because plaintiffs incorporate by reference facts stated elsewhere.").

*Second*, Particle properly alleges Epic's knowledge of Particle's prospective business relationships and details Epic's conduct toward Particle's prospective counterparties. The Complaint alleges that Epic had knowledge of Particle's rapid expansion, and responded with a multi-pronged campaign directed at Particle, its customers, and its potential customers, including Beeline Rx, Power Life Sciences, Leafwell, and Medvise. ¶¶ 78-133. Epic's conduct can only be explained if Epic knew its actions would disrupt Particle's business relationships—had Epic not known of the prospective parties, it would not have directed conduct toward them. *See, e.g.*, *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 911 (S.D.N.Y. 2016) (claim sufficiently pled where defendant allegedly knew about and directed conduct generally toward entire category of prospective customers).

*Third*, Particle plausibly alleges that Epic acted with the required level of culpability. To sustain a claim for tortious interference with prospective business relations, a plaintiff must plead that the defendant acted with "wrongful purpose or used improper means." *RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, 692 F. Supp. 3d 135, 149 (S.D.N.Y. 2023). A plaintiff satisfies this standard if it alleges the defendant's conduct was unlawful. *Id.* Economic pressure may also constitute

"wrongful means" if it is "extreme and unfair." *Id.* Moreover, both defamation and violations of the antitrust law similarly constitute wrongful means. *See Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 47 (1st Dept. 2009); *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003). Because Particle plausibly alleges Epic's violations of antitrust law and state common law, it satisfies the pleading standard for wrongful conduct.

*Fourth*, Particle properly alleges that it would have consummated a transaction but for Epic's interference. "Interference … can be found if the plaintiff had a reasonable expectancy of a contract with the third party, which can result from mere negotiations." *Strapex Corp. v. Metaverpa N.V.*, 607 F. Supp. 1047, 1050 (S.D.N.Y. 1985); *see also Gym Door Repairs*, 331 F. Supp. 3d at 239 (plaintiffs need only demonstrate "a reasonable probability of entering into a business relationship."). Particle's allegations make clear it had such a reasonable expectancy— its prospective customers articulated that they were "invested in pursuing [an] agreement," "bullish on our use case by being under the Particle umbrella," and "nearly complete implementing the Particle API into [their] tech stack." ¶ 89. These customers cited a single cause for abandoning discussions: "the current dispute with Epic." *Id.* Thus, the Complaint easily satisfies Rule 8's liberal notice pleading requirements.

### C.    The Complaint Plausibly Alleges Defamation

To state a claim for defamation under New York law, a plaintiff must allege: (1) a false statement of fact, (2) published to a third party, (3) made with the applicable level of fault, (4) and special damages or defamation per se. *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 220 (S.D.N.Y. 2023). None of Epic's argument for dismissal withstand scrutiny.

#### 1. Particle's Defamation Claim Does Not Require A Showing Of Actual Malice

Although a plaintiff must plead actual malice when certain qualified privileges apply, Epic is not protected by either of the qualified privileges it identifies. Under New York Civil Rights

Law Section 76-a, a plaintiff must plead actual malice in any "action involving public petition and participation." N.Y. Civ. Rights Law § 76-a(2). However, "publications directed only to a limited, private audience" are not matters of public interest subject to the privilege. *See Huggins v. Moore*, 94 N.Y.2d 296, 302-03 (1999); *Albert v. Loksen*, 239 F.3d 256, 270 (2d Cir. 2001). Here, Particle alleges that Epic published its defamatory statements privately to a limited audience—its customers. ¶ 102. Thus, Epic's defamatory statements are not privileged under Section 76-a.

Neither does the qualified common interest privilege apply at the motion to dismiss stage. New York courts recognize a qualified "common interest privilege" for communications "by one person to another upon a subject in which both have an interest." *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011). But the common interest privilege is not appropriately resolved on a motion to dismiss. *See, e.g.*, *Conti v. Doe*, 2019 WL 952281, at *9 (S.D.N.Y. Feb. 27, 2019) ("[T]he Second Circuit has cautioned district courts against dismissing defamation claims based on the common interest privilege."). Indeed, where a ***plaintiff*** does not allege a common interest, it is error to apply the privilege on a motion to dismiss. *See Hillel v. IQVIA, Inc.*, 2022 WL 905852, at *2 (2d Cir. Mar. 29, 2022) (finding error where complaint alleged that statements sought to "undermin[e] [plaintiff's] ability to compete" and "[the parties to the communication] shared no common interest" in that). Similarly, Particle alleges that the purpose of Epic's defamatory statements was to destroy Particle's business reputation and exclude it from the market. ¶¶ 102-14. Nothing in Particle's Complaint suggests that Epic and its clients had a common interest in that stated purpose and thus, dismissal is unavailable. *Hillel*, 2022 WL 905852, at *2.

### 2. Even If Actual Malice Were Required, Particle Has Sufficiently Pleaded It

Even if these privileges did apply (the law is clear they do not), Particle's defamation claim would still not be subject to dismissal because it adequately pleads actual malice. A statement "made with knowledge that it was false or with reckless disregard of whether it was false or not"

is made with actual malice. *Palin v. New York Times Co.*, 940 F.3d at 815-16. Although actual malice is fact-specific, *see Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015), allegations that a defendant harbored bias and had direct knowledge of contradictory facts are typically sufficient. *See, e.g.*, *Palin*, 940 F.3d at 814-15 (noting defendant's bias and knowledge of contradictory information); *Bah v. Apple Inc.*, 2020 WL 614932, at *12 (S.D.N.Y. Feb. 10, 2020) (noting defendants' "own records" reflected contradictory information).

Here, Particle pleads numerous facts permitting an inference of actual malice. Particle alleges that Epic had actual knowledge that contradicted its statements, including that Epic (1) knew only three Particle customers were the subject of the Carequality dispute when it falsely stated that **Particle** misrepresented treatment requests for a "broad" set of customers (¶ 120); and (2) possessed Particle's record requests clearly identifying the requesting parties, such that it knew Particle did not "obscure" customer identities (¶ 105). Epic's knowledge of falsity is also demonstrated by its failure to keep track of its lies, ultimately providing inconsistent explanations for its statements. ¶¶ 14, 80, 83. These well-pleaded allegations, in combination with Epic's anticompetitive motive to keep Particle from competing, are more than sufficient at this stage.[14]

### 3. The "Fair Report" Privilege Does Not Apply

The "fair report" privilege is inapplicable to Epic because the private, Carequality dispute was a non-governmental process. N.Y. Civ. Rights Law § 74. Section 74 of the Civil Rights Law, which codified the common-law rule of fair report, "permits the privileged publication of … the **public proceedings of governmental bodies**" and "**does not extend to non-governmental**

---

[14] To the extent Epic attempts to suggest that it did not publish the statements in question with actual malice because it was motivated by "privacy issues," this self-serving narrative is irrelevant at the pleading stage. *See Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 420-21 (S.D.N.Y. 2022) ("A court does not weigh competing, plausible theories of actual malice on a motion to dismiss."); *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (noting that the "resolution of … actual malice … typically requires discovery.").

*proceedings*." *Hogan v. Herald Co.*, 84 A.D.2d 470, 477-78 (4th Dep't 1982); *Fridman v. BuzzFeed, Inc.*, 172 A.D.3d 441, 442 (1st Dep't 2019) (noting privilege applies when statements concern "official government activity"). Epic does not identify, and Particle has not been able to locate, a single case applying Section 74 to non-governmental activities. *See, e.g.*, *Sladkus v. Englese*, 106 N.Y.S.3d 731, at *4 (N.Y. Sup. Ct. 2018) (rejecting application of the privilege to "a nonbinding mediation … conducted outside a courtroom … without the benefit of a judge").

### 4. Particle Sufficiently Pleads Falsity

Contrary to Epic's arguments, Particle adequately alleges false statements of fact. "[A] statement of fact will not be transformed into a statement of opinion solely by use of language expressing uncertainty or qualification." *Loughlin v. Goord*, 558 F. Supp. 3d 126, 147 (S.D.N.Y. 2021). Although "truth is a defense to defamation claims … Defendant may not resort to evidence outside the pleadings in a motion to dismiss pursuant to Rule 12(b)(6)." *Winter v. Pinkins*, 2017 WL 5496278, at *2 (S.D.N.Y. Feb. 17, 2017); *see also, e.g.*, *McNamee v. Clemens*, 762 F. Supp. 2d 584, 604 (E.D.N.Y. 2011) (denying dismissal where truth was not "supported by evidence attached to the complaint"). Epic first claims that its statements were mere opinions because it used words like "might," but this argument is unavailing. *See* Mot. at 32; *see also Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19-21 (1990) ("'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'"). Next, Epic asks the Court to credit its version of events and determine that its statements were substantially true based on allegations and documents outside of the pleadings. *See* Mot. at 32-33. These requests are inappropriate and should be rejected out of hand. *See, e.g.*, *Winter*, 2017 WL 5496278, at *2; *McNamee*, 762 F. Supp. 2d at 604.[15]

---

[15] Even if Epic's inappropriate evidence on a motion to dismiss is considered, the documents it references easily corroborate Particle's allegations as to the falsity of Epic's defamatory statements. For instance, Epic stated that Particle misrepresented the purposes of record retrievals and obscured provider-level details of connections through a

### 5. *Particle Sufficiently Pleads Defamation Per Se*

Epic is wrong that Particle does not plead sufficient damages because Epic's statements amount to defamation per se. When statements "fall within established categories of per se defamation, the law presumes that damages will result, and they need not be alleged or proven." *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011). Statements that "tend to injure another in his or her trade, business or profession" constitute defamation per se. *Atkins v. Bohrer*, 2011 WL 6779311 (S.D.N.Y. Dec. 23, 2011); *see also, e.g.*, *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 179-180, 185, 187 (2d Cir. 2000) (finding statements were defamation per se that plaintiff was "negligent" and "alarmed by dwindling listeners"); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2016 WL 815205, at *9 (S.D.N.Y. Feb. 29, 2016) (finding "false reviews" that tended to "impute incompetence, incapacity or unfitness to [plaintiff] and its business services" established defamation per se).

Particle identifies statements Epic made that undoubtedly tend to disparage Particle in its businesses of facilitating the exchange of sensitive medical data, including that Particle failed to maintain "patient security and privacy," "inaccurately represent[ed] the purpose associated with [its] record retrievals," and "obscur[ed] provider-level details." ¶ 206. These statements—suggesting that Particle was dishonest, incompetent, and possibly in violation of patient privacy laws—were directly targeted at Particle itself and not the quality of its products, as Epic claims. Mot. at 33-34; *Harwood Pharmacal Co. v. Nat'l Broad. Co.*, 9 N.Y.2d 460, 463-64 (1961) (noting while "[m]ere disparagement of the quality, design and performance" of a product is not defamation per se, statements that suggest deceit do). Epic's statements were defamation per se.

---

generic gateway. ¶ 206. But Carequality concluded that Particle's **client** "made queries for non-treatment purposes in violation of [its] contractual obligations to Particle," that Particle did not utilize a "masking gateway," and that Particle conducted diligence in a manner that was "relatively robust." Dkt. 24-1 at 7, 13-14. Indeed, Carequality found no wrongdoing on Particle's part.

### D.    The Complaint Plausibly Alleges Trade Libel

Contrary to Epic's conclusory claims, Particle sufficiently identifies statements that criticized Particle's platform and sufficiently alleges actual malice. *See* Mot. at 34-35. To state a claim for trade libel, a plaintiff must adequately plead (1) falsity, (2) publication, (3) malice, and (4) special damages. *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016). For one, Epic stated that it had "suspended Particle Health's … gateway connection," which necessarily implied that "Particle's platform was unable to retrieve Epic-stored medical records." ¶ 214. This is a statement about the non-functionality of Particle's platform; the cause of that alleged non-functionality is irrelevant. *Id.*; Mot. at 35.  Furthermore, Epic's false statements about Particle under the titles "Third-Party Security and Privacy Risk" and "Potentially Inappropriate Disclosures of Protected Health Information" necessarily implied that Particle's platform posed security and privacy risks. ¶¶ 214-15; Mot. at 34-35. As to, actual malice, for the same reasons stated *supra* at Section V.C.2, Particle has pleaded numerous objective facts from which actual malice can be inferred. For instance, Epic was obviously aware based on its own operations that Particle was still able to retrieve Epic-stored medical records. ¶ 216.[16]

### CONCLUSION

For the reasons stated above, Epic respectfully requests that the Court deny Epic's motion to dismiss.

---

[16] Epic's one-sentence argument that Particle fails to allege special damages is insufficient to meet its burden on a motion to dismiss and need not be considered. *See, e.g.*, *Pearl River Union Free Sch. Dist. v. Duncan*, 56 F. Supp. 3d 339, 351 (S.D.N.Y. 2014) (noting burden on movant).  But even if considered, naming specific lost customers is sufficient to allege special damages at the pleading stage, which Particle has done.  ¶¶ 86-88, 91; *see also, e.g.*, *Delmonte v. Citibank, N.A.*, 2005 WL 8174293, at *6 (W.D.N.Y. Oct. 28, 2005) (finding allegations sufficient based on Court of Appeals holding that "special damages are sufficiently alleged because of the specific naming of the customers lost"); *CA, Inc. v. Simple.com, Inc.*, 621 F. Supp. 2d 45, 54 (E.D.N.Y. 2009) (explaining that "a loss of business … satisfies the requirement for special damages").

Dated: January 9, 2025                    Respectfully Submitted,

                                          **QUINN EMANUEL URQUHART &**
                                          **SULLIVAN, LLP**

                                   By:    */s/ Adam B. Wolfson*
                                          _____

                                          Adam B. Wolfson
                                          865 S. Figueroa Street, 10th Floor
                                          Los Angeles, California 90017
                                          Telephone: (213) 443-3000
                                          Facsimile: (213) 443-3101
                                          adamwolfson@quinnemanuel.com

                                          Kathryn Bonacorsi
                                          Lauren Beck
                                          295 Fifth Avenue
                                          New York, New York 10016
                                          Telephone: (212) 849-7000
                                          Facsimile: (212) 849-7100
                                          kathrynbonacorsi@quinnemanuel.com
                                          laurenbeck@quinnemanuel.com

                                          *Attorneys for Plaintiff Particle Health Inc.*

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, Adam B. Wolfson,  an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Civil Rule 7.1(c) that annexed Memorandum of Law was prepared using Microsoft Word and the document contains 11,794 words as calculated by the application's word-counting function, excluding the parts of the Affirmation exempted by Local Civil Rule 7.1(c). I further certify that the annexed Memorandum of Law is within thirty-five pages, as stipulated to by the parties and endorsed by the Court.  *See* Dkt. 18.

I certify under the penalty of perjury the forgoing statements are true and correct. Executed on this 9th day of January, 2025 in New York, New York.

*   /s/  Adam B. Wolfson*      
Adam B. Wolfson
