UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
PARTICLE HEALTH INC.,

                    Plaintiff,

              - against -

EPIC SYSTEMS CORP.,

                    Defendant.

------------------------------------X

**MEMORANDUM AND ORDER**

24 Civ. 7174 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


        Plaintiff Particle Health Inc. ("Particle") brings this

action against defendant Epic Systems Corporation ("Epic"),

alleging violations of Sections 1 and 2 of the Sherman Antitrust

Act, as well as various state law claims.  ECF No. 1 ("Compl.").

Epic has filed a motion seeking to dismiss Particle's complaint in

its entirety.  ECF Nos. 19-21.  For the reasons described herein,

Epic's motion is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

        Epic operates the most widely used software platform in the

United States for maintaining electronic health records ("EHRs")

---

[1]     Unless otherwise noted, the facts considered and recited are drawn from
plaintiff's complaint and documents incorporated by reference therein.  See
Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993).
Accordingly, the Court considers both plaintiff's complaint and the documents
attached to the Declaration submitted by Lauren Moskowitz, ECF No. 24, in
connection with defendant's motion to dismiss, each of which is incorporated by
reference in the complaint.  For purposes of the instant motion, all
nonconclusory factual allegations in the complaint are accepted as true, Matson
v. Bd. of Educ. Of City School Dist. Of N.Y., 631 F.3d 57, 63 (2d Cir. 2011),

and supplying those records to third parties, including healthcare researchers, analytics companies, health insurance providers, and patients.  Compl. ¶¶ 4, 35, 43.

Particle alleges that, in recent years, Epic has used its outsized influence in the EHR software market to expand into the growing market for "payer platforms[.]"  Id. ¶ 5.  Particle defines a payer platform as:

> [A] type of software platform that allows health insurance providers (also known as . . . "payers") to efficiently request and instantaneously retrieve large numbers of medical records directly from the EHR platforms that generate and store them.  In addition to obtaining the records at scale, payer platforms allow users to store the records, run analytics, and conduct other business-critical tasks within a self-contained system.

Id. ¶¶ 5, 7.  Epic released its Epic Payer Platform (the "EPP"), the first payer platform in the United States, in 2021.  Id. ¶ 6.

Approximately two years later, in 2023, Particle began to make its EHR software program, which combines record retrieval and storage with an analytics service, available to "pay-viders," or payers who also offer treatment-related services.  Id. ¶¶ 7, 9.[2] Particle's payer platform allows these payviders to request

---

and the Court draws all reasonable inferences in plaintiff's favor, Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

[2]    Before 2023, Particle did not cater to payers, instead operating its platform for traditional healthcare providers and health technology companies. Id. ¶ 8.

medical records at scale to assist in providing treatment-related services. Id. ¶¶ 9-10, 46, 75. This record exchange process relies upon standard-setting organizations, such as Carequality, which operate a centralized framework to facilitate the provision of EHRs. Id. ¶ 46. Particle works with payviders both directly, through direct customer relationships for use its platform as an independent piece of software, and indirectly, by contracting with other software vendors to integrate Particle's platform capabilities into external software developed for specific payers. Id. ¶¶ 10, 75.

Particle asserts that Epic first became aware that Particle had entered the payer platform market in late 2023, after it discovered that Particle had contracted with a software vendor to integrate Particle's payer platform capabilities into software used by Blue Cross Blue Shield of Michigan to assist in preparing "Gaps in Care" reports. Id. ¶¶ 11, 77. To assist with the reports, the vendor requested EHRs at scale through Carequality, and Epic objected to Particle's provision of patient EHRs for this purpose. Id. ¶ 77. Particle contends that the two companies discussed Epic's concerns and, after Particle explained its position, Epic "indicated that it understood the model and did not dispute that Particle was correct" in its position that the records had properly

been requested for "treatment" purposes and the secondary use of patient EHRs at issue was permitted.  Id.

However, on March 21, 2024, Epic filed a dispute against Particle under the Carequality Dispute Resolution Process,[3] alleging that Particle had violated Carequality's policies by: (i) allowing its customers to inappropriately label their EHR requests as being for treatment purposes; and (ii) building a Carequality gateway that improperly masked the identities of organizations requesting medical records.  ECF No. 24-1 at 2.  Epic subsequently confirmed that its concerns focused on three specific Particle customers.  Id.

Around the same time that Epic filed this dispute, beginning in late March 2024, it stopped responding to EHR retrieval requests from 34 Particle customers, constituting roughly 20% of Particle's overall userbase.  Id. ¶¶ 12, 79.  Most of these customers were traditional healthcare providers or health technology companies, and not payers or payviders.  Id.  Although Epic stated on an April 8, 2024 call that these Particle customers' connections had been

_____

[3]    Once a party has filed a dispute pursuant to the Dispute Resolution Process, a panel consisting of members from the Carequality community (the "Dispute Panel") is assembled and, after holding meetings with the parties, develops a recommendation for a resolution to the Steering Committee.  ECF No. 24-1 at 2.  The Steering Committee then reviews the panel's recommendation and all available evidence and either requests additional review by the dispute panel or issues a resolution.  Id.

suspended due to a "technical" issue, it later confirmed that it had intentionally stopped providing records to these customers due to its concern that the customers had mislabeled EHR requests as being for "treatment purposes" when they should have been labeled for another purpose.  Id. ¶¶ 80-81.  Without access to Epic-stored records, these Particle customers were unable to assess claims, underwrite risk, or provide any treatment-related services.  Id. ¶¶ 84-85.[4]  Particle alleges that Epic subsequently advised Particle's customers that it would restore their access to Epic-stored EHRs "if and only if" they stopped using Particle's platform.  Id. ¶ 12.

Particle cites XCures, a healthcare analytics company, as an example of a Particle client whose connection was suspended.  Id. ¶ 86.  Particle and XCures executed a contract on January 28, 2022, pursuant to which XCures purchased a one-year subscription to Particle's platform.  Id.  The parties amended their contract on December 20, 2023, renewing XCures' subscription for a one-year term beginning on January 1, 2024.  Id.  Epic suspended XCures' access to Epic-stored EHRs in approximately April 2024.  Id.  Two months later, Particle introduced XCures representatives to Epic

_____

[4]     Particle notes that Epic's actions also blocked Particle customers from sharing medical records with Epic customers, further increasing the impact on businesses that maintained relationships with Particle.  Compl. ¶ 92.

in an effort to resolve Epic's concerns regarding the company, and XCures' CEO informed Particle that Epic had promised to restore the company's access only if it ended its relationship with Particle.  Id.  On June 14, 2024, XCures sent Particle a letter stating that it had "transferred all of its Carequality connections from Particle Health to" another EHR software provider, which Particle asserts does not compete in the payer platform market. Id. ¶¶ 86-87.[5]  XCures stopped paying its monthly subscription fees to Particle, and Epic restored XCures' access to EHRs shortly thereafter.  Id. ¶ 87.  Particle contends, on information and belief, that Epic made similar representations to other Particle customers, causing at least ten unnamed "significant" customers to repudiate their contracts, threaten to do so, or demand that Particle make financial concessions to prevent them from doing so. Id. ¶ 88.  Notably, XCures is not a payer, and Particle does not specify whether the ten other unnamed customers were payers, payviders, or traditional healthcare companies.  See id.

    In April 2024, Epic also introduced a policy pursuant to which its Care Everywhere Governing Council, an executive committee

---

[5]    Particle asserts that this provider, Kno2, does not compete with Epic in the payer platform market because it only accesses EHRs for traditional healthcare companies, not payers, and "does not offer the centralization and suite of analytics services" offered by payer platforms.  Compl. ¶ 87.

affiliated with Epic, was required to approve each new Particle customer and any expansion of an existing Particle customer before the customer would be allowed to access EHRs maintained on Epic platforms. Id. ¶¶ 13, 96.[6] Particle asserts that this policy applies only to Particle customers and requires each new customer to provide in-depth information that is not required for non-Particle customers, including information about the customer's "business model, use of records, data maintenance processes and more." Id. ¶¶ 96-97. As a result of these changes, the approval process, which previously took less than two days, now takes "in many cases over a month" and, for one Particle customer, up to three months. Id. ¶¶ 13, 94-97.[7] Further, as part of this process, Epic requires Particle customers to acknowledge that Epic provides

---

[6] The Epic Care Everywhere Governing Council, which oversees Epic's record-sharing activities, is a committee consisting of fifteen volunteers from among Epic's software customers. Id. ¶ 96.

When Particle onboards a new customer, Epic must add the customer to its Carequality "directory" before Particle is permitted to retrieve Epic-stored EHRs on that customer's behalf. Compl. ¶ 13. The same process is required each time an existing customer expands, for example, by adding a new doctor's office to its network. Id. ¶¶ 13, 94.

[7] Specifically, Particle asserts that one unnamed customer first sought approval from Epic in June 2024, provided more information in July 2024, and did not receive full approval from Epic until September 3, 2024. Id. ¶ 98.

Particle asserts that Epic updated its policies specifically to allow for this slowed processing, editing their "Carequality Phonebook Support Policy" to allow for delayed processing of "entries who are the subject of a pending dispute under the Carequality dispute resolution process" until "the [d]ispute has been fully resolved." Id. ¶ 100.

alternative services and platforms for retrieving Epic-stored medical records.  Id. ¶ 99.

Around the same time that it instituted this new policy, on April 10, 2024, Epic released an "Issue Notification" to its customers regarding its dispute with Particle, with a sub-heading that read: "Third-Party and Privacy Risk."  Id. ¶ 102.  The document stated that Epic had filed a formal dispute with Carequality due to "serious concerns about security and privacy arising from" the activities of Particle Health, noting its concern that "Particle Health and its participant organizations might be inaccurately representing the purpose associated with their record retrievals[,]" and stating that any such misrepresentations created "the potential for HIPAA Privacy Rule violations" and allowed for "[p]otentially [i]nappropriate [d]isclosures of [p]rotected [h]ealth [i]nformation."  ECF No. 24-2 at 2-3; Compl. ¶¶ 14, 102-03.  Epic also stated its concerns regarding what it deemed Particle's "pattern of a lack of transparency, including obscuring provider-level details of connections through a generic gateway and declining to provide full information requested about their connections over the course of several months[.]"  ECF No. 24-2 at 3; see also Compl. ¶ 105.  Epic further asserted that, while the Carequality dispute was in progress and "the ongoing

potential for risks remain[ed] high," "Epic Carequality Administrators [had] suspended Particle Health's gateway connection to Epic community members[,]" although, as Particle notes, many Particle customers' connections remained active during this time. ECF No. 24-2 at 3; id. ¶ 108. News outlets subsequently published articles reporting on Epic's statements. Id. ¶ 102.[8]

Particle further asserts that, in the weeks following publication of this initial statement, Epic persuaded representatives of Carequality not to issue a planned joint press release regarding the parties' dispute, which would have clarified that Particle remained in good standing on Carequality and that

---

[8] Particle cites an April 12, 2024 article published on CNBC.com, which stated:

> Epic Systems, the largest provider of software for managing medical records, says a venture-backed startup called Particle Health is using patient data in unauthorized and unethical ways that have nothing to do with treatment.

Id. ¶ 106 (citing https://www.cnbc.com/2024/04/12/epic-systems-boots-particle-health-for-unauthorized-sharing-of-data.html). The article also noted that Epic had "cut off data access to a startup called Particle Health." Id. ¶ 109.

Particle also cites: (1) an article by DMR News published on MSN.com, which stated that Epic "had taken action against Particle Health, a venture-backed startup, for allegedly misusing patient data[,]" id. ¶ 106, and "severed its data connection to Particle," id. ¶ 109 (citing https://www.msn.com/en-us/health/other/epic-systems-halts-data-sharing-with-particle-health-over-misuse-concerns/ar-BB11GFg4); and (2) an article in Modern Healthcare stating that "[o]n March 21, Epic stopped responding to data-sharing queries from customers of Particle Health on the Carequality national interoperability framework[,]" id. ¶ 109 (citing https://www.modernhealthcare.com/digital-health/epic-particle-health-dispute-data-sharing-carequality).

Epic continued to respond to queries from Particle connections. Id. ¶ 113.

Epic submitted a "Pre-Dispute Statement" on April 24, 2024 reiterating its claims. ECF No. 24-1 at 5. On May 3, 2024, Particle filed a Dispute Statement and Statement in Response, in which it asserted that Particle had not misrepresented the nature of its connections' treatment uses and the Particle gateway did not mask the identity of any of its connections. ECF No. 24-1 at 5-7. Particle also alleged that Epic had suspended Particle connections without identifying the bases for those suspensions, violated Carequality's anti-discrimination rules by suspending some Particle customers based on "arbitrary criteria that [we]re not universally applied" and refusing to timely onboard new Particle connections, and circumvented Carequality's dispute resolution process by "creating its own remedies for perceived wrongs" and making false and misleading public statements. Id. at 7.

Particle asserts that, during this period, the existence of the Carequality dispute and Epic's actions "scared away" other prospective customers, citing a June 11, 2024 email from the president and cofounder of an unnamed prospective Particle customer in which he wrote, inter alia, that the company would

"not be able to continue in [its] discussion of signing onto Particle" because "the current dispute with Epic presents too much of a risk[.]" Id. ¶ 89. [9] Particle contends that Epic's conduct caused at least four other prospective customers to "abandon[] a potential relationship with Particle or substantially postpone[] discussions[,]" and that the number of prospective customers expressing interest in Particle's platform has gone down significantly. Id. ¶ 91.[10]

On June 14, 2024, Particle notified the Carequality Dispute Panel that Particle had terminated its relationship with one of the three Particle customers at issue in the dispute, known as "Connection 2," after it confirmed that its queries were not for treatment purposes. ECF No. 24-1 at 9-10. Approximately two weeks later, on June 27, 2024, Particle notified the Dispute Panel that it had terminated its relationship with another customer at issue, known as "Connection 1," after determining that Customer 1 had also made queries for non-treatment purposes. ECF No. 24-1 at 8-9.

---

[9] Notably, Particle does not allege that this prospective customer was a payer. See Compl. ¶ 89.

[10] The four prospective customers who allegedly abandoned potential relationships with Particle were: Beeline Rx, Power Life Sciences, Leafwell, and Medvise. Compl. ¶ 91. Particle does not allege that any of these prospective customers were payers or payviders.

Particle alleges that Epic made additional statements about Particle to the healthcare community during this time, citing as an example a June 28, 2024 email in which Epic alerted its customers that a Particle customer "may have inappropriately taken patient records from [each customer's] system." ECF No. 24-3 at 2. Epic stated in this email that Particle had "recently acknowledged" that one of its customers had "accessed patient records inappropriately" by "request[ing] records falsely asserting they were providing treatment, but [then] us[ing] medical records to identify potential plaintiffs for class action lawsuits." Id. Epic further stated: "[W]e are pleased that after eight months of resistance [Particle] ha[s] now acknowledged wrongdoing." Id. Particle also notes that, in these statements, Epic directed its healthcare provider customers to request more information from Particle about its use of EHRs, see, e.g., ECF No. 24-2 at 6; ECF No. 24-3 at 2, which Particle alleges resulted in hundreds of inquiries being sent to Particle, "br[inging] Particle's operations nearly to a standstill" and "sapp[ing] employee morale[,]" id. ¶¶ 15, 115-16, 118.[11]

---

[11]   Particle's initial "Issue Notification" stated: "If, during your investigation, you have questions about any of the record retrievals made by Particle Health or one of its participant organizations, contact Particle Health[.]"  Id. ¶ 116.  Similarly, the June 28, 2024 email told customers to contact Particle with additional questions, asserting that "Particle has agreed

The Carequality dispute continued for approximately five months and involved counsel, hearings, and formal submissions. Id. ¶¶ 122-23.  The Dispute Panel met fourteen times and sent both parties questions and requests for supplemental information.  ECF No. 24-1 at 2-3.[12]  During that time, Particle approached Epic at least five times to ask whether it could implement measures to resolve the issues raised in the dispute, but Epic declined to engage in conversation.  Id. ¶ 122.

On August 14, 2024, the Dispute Panel provided their written recommendations to the Carequality Steering Committee.  ECF No. 24-1 at 3.  The Steering Committee adopted and accepted those recommendations on August 29, 2024.  Id.  On October 3, 2024, the Carequality Steering Committee issued a written decision finding,

---

to provide details on patients whose data was released to" the Particle customer at issue.  ECF No. 24-3 at 2.

[12]    The Dispute Panel met on May 21, May 22, May 31, June 6, and June 10, 2024, to discuss the parties' materials and formulate questions and requests for materials. ECF No. 24-1 at 3.  The Dispute Panel sent both parties questions and requests for supplemental information on June 6 and June 14.  Id.  Particle provided information in response to the Dispute Panel's requests on June 11 and June 19, and Epic provided information in response to the Dispute Panel's requests on June 12 and June 19.  Id.  The first Dispute Panel meeting occurred on June 20, 2024.  Id.  The Dispute Panel met again on June 28, July 10, and July 19, 2024, to review the materials received from the parties and confer with "privacy and technical [subject matter experts]."  Id.  The Dispute Panel sent additional questions and requests for information to both parties on July 18 and July 19, 2024, and both parties provided responses on July 26, 2024.  Id.  The Dispute Panel held a second meeting on July 23, 2024, after which it sent Particle Health follow-up questions and requests for supplemental information on August 1, 2024, to which Particle provided answers on August 6, 2024.  Id.  The Dispute Panel met again on July 26, July 31, August 7, and August 9 to continue its discussions.  Id.

inter alia, that: (i) Particle's Connections 1 and 2 improperly made requests for treatment purposes and would not be permitted to participate in Carequality for 12 months for any purpose, ECF No. 24-1 at 7-10; (ii) Connection 3 could appropriately make queries for treatment via Carequality after Particle obtained certain attestations and confirmations from that customer, id. at 10-14; (iii) Particle did not utilize a masking gateway to obstruct the source of its queries, id. at 14; and (iv) Particle "conducted diligence on each of the[] [connections at issue] although its diligence failed to reveal inaccurate information provided by each Connection[,]" id. at 14-18.

Although the Carequality Steering Committee stated that Particle's "current onboarding process . . . appears to be relatively robust[,]" it found that Particle should be subjected to a six-month corrective action plan "to confirm that Particle is thoroughly following its process." Id. at 15. This corrective action plan required Particle to, inter alia, submit to Carequality a list of all entries added to its Carequality directory in the last month, update its onboarding process to include additional checks on its customers, and immediately suspend any connection if an implementer or Carequality raised an objection and provided

objective evidence to substantiate that objection.  ECF No. 24-1 at 16-18.[13]

In sum, Particle asserts that Epic engaged in "a multi-pronged campaign to destroy Particle and actively snuff out competition" in the payer platform market, Compl. ¶ 11, by: (i) initiating a dispute against Particle through the dispute resolution process operated by Carequality, id. ¶¶ 119-33; (ii) preventing existing Particle customers from accessing EHRs stored on Epic-run systems, id. ¶¶ 79-93; (iii) slowing the onboarding process for new Particle customers to access EHRs stored on Epic-run systems, id. ¶¶ 94-101; and (iv) issuing statements to its customers that were intended to sow "[f]ear, [u]ncertainty, and [d]oubt" about Particle's payer platform product, id. ¶¶ 102-14, and to overload

---

[13]    Notably, the Steering Committee also issued findings with respect to Epic's actions, determining that Epic's decision not to load all Particle entries into its directory was "generally permissible[,]" but that Epic's policy lacked "clear and objective criteria to be used by Epic and the Care Everywhere Governing Council to determine whether" a customer was performing treatment. ECF No. 21-4 at 20-21.  The Steering Committee further stated that it "d[id] not believe that Epic [wa]s treating Particle differently than" other Carequality implementers.  Id. at 21.  The Carequality Steering Committee also implemented certain action items for Epic, including, inter alia, that: (i) Epic would update its policy to include "clear, objective criteria to be used by Epic and the Care Everywhere Governing Council to determine whether a [customer] is performing treatment"; and (ii) for six months following the Steering Committee's resolution, Epic would process any new Directory entry within 2 weeks and provide Carequality a report showing all new directory entries added to the directory during the last month, as well as how those entries were dispositioned.  ECF No. 24-1 at 21-22.

Particle's systems with requests for information from healthcare providers, id. ¶¶ 115-18.

Although Particle's market share had been growing before March 2024, its revenue growth dropped significantly in the months after Epic began to take the above-described actions, such that Particle was "barely able to meet one third of its previous projections, which up to that point it had regularly exceeded." Id. ¶ 18. Particle contends that this downward trend has continued due to Epic's allegedly anticompetitive behavior and that, if left unchecked, Epic will end any meaningful competition in the payer platform market. Id. ¶¶ 18-19.

## PROCEDURAL HISTORY

Particle filed suit on September 23, 2024, alleging the following causes of action: (1) monopolization, in violation of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2 (Claim One); (2) attempted monopolization, in violation of the Sherman Act, 15 U.S.C. § 2 (Claim Two); (3) monopoly leveraging, in violation of the Sherman Act, 15 U.S.C. § 2 (Claim Three); (4) violation of the Sherman Act, 15 U.S.C. § 1 (Claim Four); (5) violation of New York General Business Law § 340 ¶ 5, et seq. (Claim Five); (6) tortious interference with contractual relations (Claim Six); (7) tortious interference with prospective business

relations (Claim Seven); (8) defamation (Claim Eight); and (9) trade libel (Claim Nine). Compl. ¶¶ 148-220.

On October 15, 2024, Epic filed a letter requesting a pre-motion conference regarding a proposed motion to dismiss the complaint. ECF No. 13. Particle filed a letter opposing the proposed motion on October 18, 2024, ECF No. 14, and the Court held a conference with the parties on November 25, 2024, during which the Court granted Epic permission to file its proposed motion.

On December 19, 2024, Epic moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim under the Sherman Act. ECF Nos. 19-24.[14] Epic attached to its motion an attorney declaration with supporting exhibits, ECF No. 24, including Carequality's Final Resolution in the parties' dispute, dated October 3, 2024, ECF No. 24-1, the Issue Notification released by Epic on April 10, 2024, ECF No. 24-2, and the email sent by Epic to certain of its customers on June 28, 2024, ECF No. 24-3.[15] Particle filed its opposition to the motion

---

[14]   Epic further asserts that, if the Court dismissed plaintiff's Sherman Act claims pursuant to Fed. R. Civ. P. 12(b)(6), it should dismiss plaintiff's remaining state law claims for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1). See ECF No. 21 ("Mot.") at 33-34.

[15]   Defendant also filed a motion to seal limited portions of Exhibit 3 to redact the names and email addresses of the individuals who sent and received the communication, ECF No. 22, which Particle has not opposed. Defendant's

on January 9, 2025, ECF Nos. 27-28, and Epic filed a reply on January 24, 2025, ECF No. 29.  Particle filed a sur-reply, with the permission of the Court, on February 5, 2025.  ECF No. 33.  On July 3, 2025, Particle filed a Notice of Supplemental Authority attaching two recent decisions issued in this District and the Ninth Circuit.  ECF No. 37.[16]  The Court held oral argument on August 12, 2025.[17]

## **LEGAL STANDARD**

To withstand a motion to dismiss under Rule 12(b)(6), a non-movant's pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim

---

motion to seal is granted.  In re SunEdison, Inc. Sec. Litig., Nos. 16 MDL 2742, 16 Civ. 7917 (PKC), 2019 WL 126069, at *2 (S.D.N.Y. Jan. 7, 2019) (allowing redactions where "[t]he public interest in the names of the specific senders and recipients in the[] e-mails is low"); see also Valassis Commc'ns, Inc. v. News Corp., No. 17 Civ. 7378 (PKC), 2019 WL 10984156, at *2 (S.D.N.Y. Mar. 11, 2019) (approving redactions to "names and addresses of third parties [that] were immaterial to [defendant's] motion for summary judgment").

[16]    Plaintiff attached opinions in: (1) United States v. Visa, Inc., No. 24 Civ. 7214 (JGK), 2025 WL 1740613 (S.D.N.Y. June 23, 2025); and (2) CoStar Grp., Inc. v. Com. Real Est. Exch., Inc., No. 23-55662, 2025 WL 1730270 (9th Cir. June 23, 2025).

[17]    Following oral argument, Particle filed a letter seeking additional briefing on questions raised by the Court regarding whether parties must share a "common goal" to enter into an agreement pursuant to Section 1.  ECF No. 38 (citing ECF No. 40 ("Oral Arg. Tr.") at 54:8-11, 57:1-5, 59:10-15).  However, the Court determined that additional briefing on the issue was not necessary. ECF No. 39.

has facial plausibility when the [pleaded] fact[s] . . . allow[] the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." Id. A court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor[.]" Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikon Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678). There is "no heightened pleading standard in antitrust cases." Concord Assocs., L.P. v. Ent. Properties Tr., 817 F.3d 46, 52 (2d Cir. 2016).

## DISCUSSION

Epic seeks to dismiss plaintiff's complaint in its entirety, contending that Particle has failed to state a claim under either the Sherman Act or New York state law. Mot. at 11-35. We begin by addressing Particle's antitrust claims.

### A.    Particle's Antitrust Claims (Claims One to Five)

Particle advances four federal antitrust claims under the Sherman Act, 15 U.S.C. §§ 1-2, including one claim pursuant to Section 1 and three claims pursuant to Section 2. Compl. ¶¶ 148-83. Particle further asserts a state law antitrust claim arising

under New York General Business Law § 340 ¶ 5, et seq. (the "Donnelly Act").  Compl. ¶¶ 184-91.[18]

Epic contends that Particle's antitrust claims must be dismissed because Particle has failed to plausibly allege: (i) the existence of a relevant antitrust product market; (ii) that Epic engaged in anticompetitive conduct; and (iii) antitrust injury. Mot. at 11-24.  We begin by addressing Particle's alleged product market.

### 1. Market Definition

"To state a claim under either [Section] 1 or [Section] 2 of the Sherman Act, a plaintiff must plausibly allege that the defendant['s] anticompetitive conduct restricted competition within a relevant market."  See Regeneron Pharms., Inc. v. Novartis Pharma AG, 96 F.4th 327, 338 (2d Cir. 2024).  "For antitrust purposes, . . . a market has two components: a product market and a geographic market."  Concord Assocs., 817 F.3d at 52 (citing Bayer Schering Pharma AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 574

---

[18]    Epic's arguments in support of dismissal of Particle's Sherman Act claims apply equally to Particle's claim under the Donnelly Act, which "is generally coextensive with the Sherman Act[.]"  See Cenedella v. Metropolitan Museum of Art, 348 F. Supp. 3d 346, 362-63 (S.D.N.Y. 2018) (citing Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 81 (2d Cir. 2013); see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012) ("The standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act.").  Accordingly, we do not separately address Particle's Donnelly Act claim.

(S.D.N.Y. 2011)).  Because neither party disputes that the appropriate geographic scope of the payer platform market is the United States, see Compl. ¶ 34, we will address only the relevant product market.

At the motion to dismiss stage, the "alleged product market must bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes[,]'" Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001) (quoting Gianna Enters. V. Miss World (Jersey) Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982)), and include a "plausible explanation as to why a market should be limited" to exclude possible substitutes, id.  In defining the boundaries of a market for antitrust purposes, courts generally perform an analysis of "'[t]he reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it[.]'" Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  "Products will be considered to be reasonably interchangeable if consumers treat them as acceptable substitutes[,]" PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation marks and citation omitted), because "'the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the

competitive level,'" <u>City of New York v. Grp. Health Inc.</u>, 649 F.3d 151, 155 (2d Cir. 2011) (quoting <u>Geneva Pharm. Tech. Corp. v. Barr Labs</u>, 386 F.3d 485, 496 (2d Cir. 2004)). "'Cross-elasticity' is related to interchangeability, and requires a consideration of the extent to which a change in the price of one product will alter demand for another product." <u>Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.</u>, 190 F. Supp. 2d 600, 610 (S.D.N.Y. 2002).

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." <u>Todd</u>, 275 F.3d at 199-200 (citations omitted). However, "'[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss must be granted[.]'" <u>Chapman</u>, 546 F.3d at 238 (quoting <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 436 (3d Cir. 1997)).

### i. The Alleged Product Market

Particle asserts that the relevant product market in this action is the payer platform market. Compl. ¶ 28. Particle claims

that payer platforms are unique products within the broader EHR software market because they contain features that are tailored to payer needs, which differentiate payer platforms from EHR software "platforms designed for and used by other types of businesses, like providers." Opp. at 14; see also Compl. ¶¶ 52-58, 68-69. These specific features are: (i) retrieval of EHRs "digitally, instantaneously, and at scale"; (ii) centralization and storage in an "organized[] and searchable/sortable database"; and (iii) various analytics services tailored to payer needs. Compl. ¶ 55 (emphasis in original).

Epic, however, asserts that Particle has impermissibly gerrymandered a market that is restricted to one sub-group of customers within the broader EHR software market. Mot. at 3, 12-17. As Epic notes, courts in the Second Circuit have previously dismissed claims based on product markets defined by a specific customer type when the complaint does not sufficiently allege facts showing that customer group to be unique, or showing that the same product is not sold to all customer types. Mot. at 12-13; see, e.g., Chapman, 546 F.3d at 238 (dismissing antitrust claims where plaintiff "failed to show how the market for restraint training services to child care providers [wa]s any different from the larger market for restraint training services to other businesses,

-23-

agencies, and organizations") (emphasis in original); <u>B.V.</u>
<u>Optische Industrie De Oude Delft v. Hologic, Inc.</u>, 909 F. Supp.
162, 172 (S.D.N.Y. 1995) (dismissing antitrust claims premised on
alleged product market of chest equalization radiography where "it
appears to the Court that [it] is not an independent product
market, but rather part of the overall X-ray market").

At this stage of the litigation, Particle has adequately
alleged that that both Epic's and Particle's payer platform
software contain features designed specifically to suit payer's
unique needs – in particular, their need to retrieve medical
records digitally, instantly, and at scale. <u>See</u> Compl. ¶¶ 55-56,
68-69. Particle further alleges that there are no reasonably
interchangeable substitutes for payer platforms, Compl. ¶ 56, and
that customers of payer platforms cannot turn to other types of
platform software or methods for retrieving medical records to
accomplish their purposes, <u>id.</u> ¶¶ 56, 62 ("To Particle's knowledge,
no other company has introduced a platform that allows payers to
automatically request and retrieve medical records at scale, and
that integrates the functions of requesting, receiving, storing,
and analyzing medical records, such that a payer would view it as
a commercially viable alternative to EPP.").

Moreover, despite Epic's claim that Particle sells the same software to its payer and non-payer customers, Particle has alleged that the product it sells to payers differs from the one sold to non-payers because it is customized with features tailored specifically to suit payer needs.  See Oral Arg. Tr. at 31:6-16 (explaining that Particle offers one product that "can be tailored to different businesses" and, "for payers, [the platform is] more specific to their business").  We note, however, that Particle's counsel also acknowledged at oral argument that these "payer-specific" features may not be utilized by all its payer customers. See, e.g., Oral Arg. Tr. at 34:1-4 ("Here, for the payer platform, it is conceivable, possibly even likely, that some of Particle's customers also utilize other analytics.  It might be their own bespoke ones.  It may be ones that they buy on top of payer platforms.").  However, at this stage of the litigation, Particle has sufficiently alleged that it does not sell the exact same product to its payer and non-payer customers.  Cf. Chapman, 546 F.3d at 238.

Epic further contends that Particle's complaint contains no analysis of the rule of reasonable interchangeability and cross-elasticity of demand, Mot. at 13-16, claiming that Particle has failed to allege facts sufficient to show that Epic's and

Particle's payer platform products are not interchangeable with other software products that exist to address payers' health record needs, id. at 13-14.

## ii. The Rule of Reasonable Interchangeability

Particle has alleged that no reasonably interchangeable products exist outside of the payer platform market that offer the same combination of features, permitting payers to, _inter alia_, obtain EHRs instantaneously and at scale, process claims, and perform analytics within a single platform, citing as substitutes only "traditional" methods of retrieval such as fax and email. See Compl. ¶¶ 54-56.

Although Epic asserts that Particle ignores other software platforms that could perform individual functions identified as features of payer platforms, Reply at 4, Particle alleges that such products do not exist, contending in particular that no other type of product or service exists that offers the same specific combination of features, allowing payers to retrieve EHRs instantaneously and at scale, and to store and analyze those records, Compl. ¶¶ 54-57.[19] Particle further contends that health

---

[19]    As noted above, Particle admitted at oral argument that its clients are "able to choose certain services that are built in to the platform," id. at 31:11-16, stating that it "is conceivable, possibly even likely, that some of Particle's [payer platform] customers also utilize other analytics" services, including their own "bespoke" analytics products, id. at 33:10-34:19.  This concession suggests that Particle's payer platform product may not always

insurance companies that do not use EPP "typically have not yet begun to use a payer platform at all, and still obtain their medical records through fax and other manual processes."  Id. ¶ 59.

At the pleading stage, we are required to "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in favor of" Particle.  Acticon AG, 692 F.3d at 37. Accordingly, Particle has plausibly alleged that payers could not turn to other products in the broader EHR product market to fulfill the specific needs met by payer platform software.

### iii. Cross-Elasticity of Demand

We next turn to Particle's allegation that, because "payer platforms cost much less on a per-record basis than traditional, manual services that assist with medical records . . . , a hypothetical monopolist of payer platforms can profitably implement a [small but significant and nontransitory increase in price, or "SSNIP"], because payer platform users would not switch to other types of products (e.g., traditional services that assist

_____

contain all three of the characteristics it contends are uniquely designed to suit payer needs (i.e., retrieval of records instantaneously and at scale, storage, and analytics).  Even if we were to disregard the analytics component of the platform, Particle asserts that customers of payer platforms would not be able to use other types of EHR software or methods to retrieve and store medical records in a way that would be sufficient to support payer needs. Compl. ¶¶ 54-57.

with medical records) in sufficient numbers to make the increase unprofitable." Compl. ¶ 57.

Although Particle has provided little evidence to support this assertion, Particle's allegation is sufficient at this stage of the litigation, given its position that the only alternative to payer platform software is the use of manual retrieval services. Id. Particle has plausibly alleged that, given their need to retrieve medical records instantaneously and at scale, payers would be unable to "switch away from the products in the proposed market in sufficiently high numbers to render the SSNIP unprofitable." U.S. v. Am. Express Co., 838 F.3d 179, 199 (2d Cir. 2016), aff'd sub nom. Ohio v. Am. Express Co., 585 U.S. 529; see also Regeneron, 96 F.4th at 339 (analysis of proposed product market should "focus[] on . . . [whether products are] economic substitutes" under the hypothetical monopolist test) (emphasis in original). Accordingly, Particle has plausibly alleged cross-elasticity of demand and, as a result, the existence of a payer platform market.[20]

_____

[20]   As Epic notes in its motion, Mot. at 17 n.14, the complaint also alleges the existence of two other markets, for EHR Software and EHR Provision Services, Compl. ¶¶ 29-34, 43-47, but Particle specifically states that "[t]he relevant market in which Epic and Particle compete is the payer platform market," Compl. ¶ 28, and did not address either alternative market in its briefing or at oral argument. Accordingly, given our determination that Particle has sufficiently alleged the existence of a payer platform market, we do not address those markets in this opinion.

However, we note that important factual questions were raised in the parties' briefing and at oral argument regarding the suitability and scope of this alleged product market. Although Particle asserts that there are only two competitors in its proposed product market, Epic and Particle, Compl. ¶ 75, it is not clear to this Court whether the parties' products are truly in competition with one another.

As an initial matter, it appears that Epic sells its EPP product only to payers. See, e.g., Oral Arg. Tr. at 24:4-25:21. By contrast, Particle readily admits that it sells its software product to both payers and non-payers, although it contends that the product it sells to payers differs because it is customized with features that are tailored specifically to payer needs, specifically retrieval, storage, and analytics. Oral Arg. Tr. at 31:6-16. However, as noted supra p. 25, the importance of at least one of these payer-specific features, i.e., analytics, becomes less persuasive upon closer examination. Specifically, Particle admitted at oral argument that its clients are "able to choose certain services that are built in to the platform," id. at 31:11-16, stating that it "is conceivable, possibly even likely, that some of Particle's [payer platform] customers also utilize other

analytics" services, including their own "bespoke" analytics products, id. at 33:10-34:19.

Moreover, it has become clear that the parties disagree about what kind of retrieval functions their products offer. Epic asserted at oral argument that its EPP does not permit the retrieval of records at scale for treatment purposes. Id. at 19:23-22:9; 25:25-26:13. Particle disputes this assertion, stating that Epic "do[es] provide records at scale . . . for treatment purposes," id. at 55:20-56:7, and "one of the reasons that EPP . . . became so popular . . . is exactly because it provided this very quick, very large scale transition of records[,]" id. at 35:5-21, 39:21-24 (citing Compl. ¶ 69).

This disagreement regarding one of the foundational facts in this case — whether the parties' products perform the same basic functions — is frustrating. However, at the motion to dismiss stage, this Court must "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in favor of" plaintiff. Acticon, 692 F.3d at 37. Accordingly, Epic's motion to dismiss Particle's antitrust claims due to its failure to plead a relevant product market is denied.

Focused discovery should shed light on these issues and provide more clarity regarding the services provided by the parties

to their customers. The issues described above would be best informed by limited discovery addressing: (i) the definitions of "payer" and "payvider," and whether either or both of the parties' payer platform products have payers and/or payviders as customers; (ii) the exact functions offered by the parties' payer platform products, and specifically the unique characteristics identified by Particle (_i.e._, retrieval at scale, storage, and analytics); and (iii) the existence of alternative products available to suit payer needs. After the parties engage on these narrow subjects, the Court may re-evaluate Particle's claims with the benefit of a fuller record.

## 2. Section 1 Claim

We next address Particle's claim under Section 1 of the Sherman Act. See Compl. ¶¶ 172-83. Epic asserts that this claim must be dismissed because Particle has failed to sufficiently allege the existence of one or more agreements in restraint of trade. Mot. at 20-23. We agree.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy[] in restraint of trade or commerce[.]" 15 U.S.C. § 1. To prove a Section 1 violation, a plaintiff must allege facts sufficient to show: (i) "'a combination or some form of concerted action between at least two legally

distinct economic entities'" that (ii) "'unreasonably restrains trade.'" Am. Express Co., 838 F.3d at 193 (quoting Geneva Pharms., 386 F.3d at 506)).

"'The crucial question in a Section 1 case is . . . whether the challenged conduct stems from independent decision or from an agreement, tacit or express.'" Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 135 (2d Cir. 2014) (quoting Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation omitted)). "Agreements that fall within the scope of Section 1 are characterized as either 'horizontal' or 'vertical.'" In re Zinc Antitrust Litig., 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) (citations omitted). "A horizontal agreement is an 'agreement between competitors at the same level of the market structure,' while a vertical agreement is a 'combination[] of persons at different levels of the market structure.'" Id. (quoting U.S. v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972)). Each alleged agreement must have been made "among 'separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking[.]'" In re Platinum and Palladium Commodities Litig., 828 F. Supp. 2d 588, 596 (S.D.N.Y. 2011) (quoting Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 195 (2010)

(internal quotation marks and citations omitted)). No matter the type of agreement alleged, "[a] plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." Citigroup, 709 F.3d at 136.

"Once the participants and agreement are identified, a court must ask whether the plaintiff has alleged facts that render it plausible that the participants shared a conscious commitment to the agreement." P&L Dev., LLC v. Gerber Prods. Co., 715 F. Supp. 3d 435, 461 (E.D.N.Y. 2024) (internal quotation marks and citations omitted). "Those facts can constitute either 'direct evidence that the defendants entered into an agreement' or 'circumstantial facts supporting the inference that a conspiracy existed.'" Id. (quoting Relevant Sports, LLC v. United States Soccer Federation, Inc., 61 F.4th 299, 306 (2d Cir. 2023) (quoting United States v. Apple, Inc., 791 F.3d 290, 315 (2d Cir. 2015))). However, "a conclusory allegation of agreement at some unidentified point" does not suffice. Twombly, 550 U.S. at 557. Moreover, conduct that is equally consistent with lawful behavior as it is with an agreement is insufficient to "nudge[] [the] claims across the line from conceivable to plausible." Id. at 570.

Here, Particle asserts the existence of agreements between Epic and: (1) the Epic Care Everywhere Governing Council; (2) Particle's customers and prospective customers; and (3) Carequality and Carequality Steering Committee members. Compl. ¶¶ 174-77.[21]

### i. Agreement between Epic and the Care Everywhere Governing Council

We begin by examining the alleged agreement between Epic and the Epic Care Everywhere Governing Council, a fifteen-member body consisting of volunteers from Epic's customers. Compl. ¶ 96.

Particle alleged at oral argument that the Care Everywhere Governing Council is legally distinct from Epic. Oral Arg. Tr. At 65:18-66:18. However, whether the council is legally distinct or not is immaterial to the Court's analysis, as even "conduct by legally related entities can violate [Section] 1 when it stems from an agreement among 'separate economic actors pursuing separate economic interests, such that the agreement deprive[d] the marketplace of independent centers of decisionmaking[.]'" In re Platinum, 828 F. Supp. 2d at 596 (quoting Am. Needle, Inc., 560 U.S. at 195 (quotations and citations omitted)).

---

[21] Particle also states, on information and belief, that Epic also consummated agreements "with others that will be revealed by discovery[.]" Compl. ¶ 176. For purposes of this motion, we address only the three alleged agreements identified in the complaint.

The complaint does not contain any facts demonstrating that the Epic Care Everywhere Governing Council is a "separate economic actor[] pursuing separate economic interests[.]"  Id.  Rather, Particle alleges that the council is directly involved in Epic's business, "oversee[ing] Epic's record-sharing activities at the highest level."  Compl. ¶ 96.  Accordingly, Particle's allegations cannot "support a reasonable inference that [Epic and the council] have 'separate corporate consciousnesses.'"  In re Term Commodities Cotton Futures Lit., No. 12 Civ. 5126 (ALC), 2014 WL 5014235, at *7 (S.D.N.Y. Sept. 30, 2014) (dismissing Section 1 claim where plaintiff failed to allege an agreement among parties that could not "reasonably be perceived as separate economic actors pursuing separate economic interests" (citation omitted)).  This alone is sufficient to dismiss Particle's Section 1 claim premised on an alleged agreement between Epic and the Care Everywhere Governing Council.

However, we also note that, although Particle contends in its opposition brief that Epic cooperated with this council to "apply an anticompetitive policy to oust Particle from the payer-platform market" by slowing the approval process for Particle's customers to access Epic-stored EHRs, Opp. at 24, the allegations contained in Particle's complaint are more indicative of unilateral conduct.

Specifically, the complaint states only that "Epic instituted a new, unprecedented policy" requiring every new Particle connection to be "approved by Epic's 'Care Everywhere Governing Council.'" Compl. ¶ 96 (emphasis added).[22] The complaint further alleges that "Epic has . . . conduct[ed] a painstakingly slow and in-depth level of review for each new Particle customer[,]" including by requesting in-depth information and then "go[ing] silent for extended periods of time[,]" id. ¶ 97 (emphasis added); see also Compl. ¶ 100 (referring to "Epic's slow-walking of approval for Particle's customers") (emphasis added). The complaint does not further address the council's role in the alleged agreement, nor does it identify any specific communications between Epic and the council prior to the implementation of this policy. Particle "essentially pleads that the manipulative conduct was born of a single source[,]" In re Platinum, 828 F. Supp. 2d at 597, i.e., Epic, which is insufficient to support an inference that the parties entered into "an agreement . . . [which] joined together

_____

[22]     Although Particle cites Monsanto Co. v. Spray-Rite Service Corp. in its opposition, Opp. at 24 (citing Monsanto, 465 U.S. 752, 764 (1984)), it is not clear why the cited portion is specifically relevant to the alleged agreement between Epic and the Care Everywhere Governing Council. In fact, the cited portion supports the notion that Particle has not adequately alleged an agreement between the two parties under Section 1, as it states that "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Id. (citations omitted). Particle has presented neither.

independent decisionmaking centers," id.  Accordingly, Particle has failed to sufficiently allege an agreement pursuant to Section 1 between Epic and the Epic Care Everywhere Governing Council.

### ii. Agreement between Epic and Particle's Customers and Prospective Customers

Next, we turn to the alleged agreement between Epic and Particle's former customers and former prospective customers. Compl. ¶ 175.  Particle alleges that these customers and prospective customers consummated agreements with Epic by "acquiescing to Epic's conditions on dealing and communicating their acquiescence to Epic." Id.  However, the complaint contains no further details regarding any specific agreement between Epic and one of Particle's prospective or former payer customers.

Particle asserts that, where a supplier pressures a customer not to do business with a rival, that is an "agreement" sufficient to establish a Section 1 claim, citing an 11th Circuit case and Areeda & Hovenkamp's treatise on Antitrust Law. Opp. at 23 (citing Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc., 710 F.2d 752, 779-80 (11th Cir. 1983) (alleging conspiracy in which company discouraged existing customer from purchasing stone from a competitor); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1447b2 (discussing cases in which manufacturers refused to sell to

dealers absent assurances that they would adhere to specified prices).

However, as Epic correctly notes, the case law cited by Particle addresses agreements between suppliers and their existing customers. Reply at 8. Particle does not allege that Epic had an existing supplier-customer relationship with Particle's customers in the payer platform market, or that all of the customers that Epic allegedly pressured switched to Epic's payer platform. Indeed, the only specific example that Particle cites in support of these alleged Section 1 agreements is an incident in which Epic allegedly pressured a Particle customer, non-payer XCures, to stop using Particle's platform. Compl. ¶¶ 86-87. XCures subsequently switched to using the services of another competitor in the broader EHR software market, Kno2. Compl. ¶¶ 86-87.[23]

Moreover, Particle has wholly failed to "allege[] facts that render it plausible that [Epic and any former Particle customer or

---

[23] Moreover, Particle does not plausibly allege the existence of an agreement between Epic and XCures. The complaint states only that "Epic told XCures its access to Epic data would be restored if it ended its relationship with Particle," Compl. ¶ 86, and XCures subsequently switched its services to Kno2, id., an entity that is not legally affiliated with Epic. These allegations do not constitute direct or circumstantial evidence sufficient to support a plausible inference that a conspiracy between Epic and XCures actually existed. Bilinski v. Keith Haring Foundation, Inc., 96 F. Supp. 3d 35, 43 (S.D.N.Y. 2015) (dismissing Section 1 claim where plaintiffs "failed to allege . . . sufficient facts that would support the inference of interdependent, rather than independent, conduct by the alleged conspirators"). Further, as noted supra p. 6, Particle does not allege that XCures is a payer or used its payer platform product.

prospective customer] shared a 'conscious commitment' to [an] agreement." P&L Dev., LLC, 715 F. Supp. 3d at 461 (citations omitted). "[A] conclusory allegation of agreement at some unidentified point" does not suffice to "plausibly suggest[]" an illegal agreement. Twombly, 550 U.S. at 557. Because Particle has failed to sufficiently allege any such agreement, its Section 1 claim predicated on an agreement between Epic and Particle's customers and prospective customers must be dismissed. See Cinema Village Cinemart, Inc. v. Regal Entertainment Group, No. 15 Civ. 5488 (RJS), 2016 WL 5719790, at *3 (S.D.N.Y. Sept. 29, 2016) (dismissing Section 1 claim where the complaint did not "plausibly suggest[] the existence of [any] agreements").

### iii. Epic and the Carequality Steering Committee

Finally, Particle alleges the existence of an agreement between Epic and Carequality and the Carequality Steering Committee, contending that Epic brought a dispute against it via Carequality's dispute resolution process and used its influence over Carequality to pressure the Steering Committee into imposing a corrective action plan on Particle. Compl. ¶¶ 16-17, 176.

Specifically, Particle has alleged, without providing any specifics or examples, that Epic "has wielded [its] power to threaten Carequality's very existence by repeatedly raising the

specter of it leaving the organization, including during the pendency of the Particle dispute[,]" and that, as a result, the Steering Committee was incentivized "to provide at least some concessions to appease Epic, even if it could not justify finding for them on the merits." Compl. ¶ 126; see also Compl. ¶¶ 130-32.

In support of its claims, Epic cites Indian Head, Inc. v. Allied Tube & Conduit Corp., 486 U.S. 492 (1988), and Indian Head, Inc. v. Allied Tube & Conduit Corp., 817 F.2d 938, 946-47 (2d Cir. 1987). Opp. at 24. Both cases concern a fact pattern in which members of the steel industry packed an annual meeting of the National Fire Protection Association with new members solely to vote against a new type of electrical conduit, Allied Tube, 486 U.S. at 492, in an effort to "bias the [private standard-setting process] by . . . stacking the private standard-setting body with decisionmakers sharing their economic interest in restraining competition[,]" id. at 511. The Supreme Court ultimately held that, where "an economically interested party exercises decision-making authority in formulating a product standard for a private association that comprises market participants, that party enjoys no [Noerr-Pennnington] immunity from any antitrust liability

flowing from the effect the standard has of its own force in the marketplace."  Id. at 509-10.

The situation alleged by Particle is markedly different.  As an initial matter, Particle has provided no direct evidence of an agreement or any communications between Epic and Carequality or the Carequality Steering Committee regarding the parties' dispute, making only the conclusory allegation that Epic threatened to leave Carequality "during the pendency of the Particle dispute."  Compl. ¶ 126.  Moreover, because Particle asserts that Epic's representative on the Steering Committee recused himself during the pendency of the parties' dispute, Epic did not "exercise[]" any formal "decision-making authority" in formulating the Steering Committee's resolution.  Id. ¶ 127.

Nor has Particle alleged indirect evidence supporting the plausible inference of an agreement between Epic and Carequality. Particle alleges that Epic's allegations were "frivolous" and "ha[d] no basis in fact[,]" see, e.g., id. ¶ 122, but it then asserts that the Carequality Steering Committee "completely vindicated Particle[,]" id. ¶ 123, and "found [it] did nothing wrong[,]" id. ¶ 124 (emphasis in original).  And, although Particle characterizes the imposition of a six-month corrective action plan following the dispute as indirect evidence of an agreement between

Epic and Carequality, id. ¶ 125, the imposition of this plan, by itself, cannot plausibly viewed as evidence of an agreement with or bias towards Epic. Rather, the imposition of the corrective action plan was entirely reasonable, given the nature of the dispute and Carequality's valid concern in ensuring that its implementers continued to abide by its rules.

In this regard, it must be remembered that Particle voluntarily terminated its relationships with two of the three customers that were the subject of the dispute after it determined that those customers had mislabeled requests for records made through Carequality. See ECF No. 24-1 at 8-10. Moreover, the Carequality Steering Committee found that Particle's onboarding procedures were "relatively robust," but determined that, because two of Particle's connections engaged in apparent misconduct despite Particle's procedures, the company "should be subjected to additional oversight for six months to confirm that [it] is thoroughly following its process." Id. at 15-18. In the absence of any additional evidence, the imposition of this narrowly targeted and time-limited monitoring and oversight plan, given the Steering Committee's findings and its role in facilitating the exchange of sensitive medical records, simply does not suffice to "support the inference that a conspiracy actually existed."

<u>Citigroup</u>, 709 F.3d at 136.  Even viewed in the light most favorable to Particle, the complaint's allegations fall far short of establishing that Epic and Carequality entered into an agreement to unreasonably restrain trade in the payer platform market.

                    *    *    *

In light of the above, Particle has failed to state a claim under Section 1 of the Sherman Act.[24]

### 3. Section 2 Claims

Next, we address Particle's claims for monopolization, attempted monopolization, and monopoly leveraging under Section 2 of the Sherman Act.  Epic contends that each claim must be dismissed because the complaint fails to plausibly allege that Epic engaged in anticompetitive conduct.  Mot. at 26-29.

### i. Monopolization

Section 2 of the Sherman Act makes it unlawful for a person to "monopolize" or "attempt to monopolize" interstate trade or

---

[24]    As stated above, <u>supra</u> n.18, "[t]he standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act[.]" <u>Nat'l Gear & Pison, Inc.</u>, 861 F. Supp. 2d at 370-71.  Accordingly, in order to survive a motion to dismiss, a "Donnelly Act claim must 'include specific, factual allegations as to the identities of the co-conspirators, the nature of their conspiracy, how the participants attempted to accomplish their objectives, and what overt acts they performed[.]'" <u>Id.</u> at 371 (citations omitted).  For the reasons stated in this section, plaintiff has not sufficiently alleged these facts in its complaint.  Because plaintiff has failed to state a claim under Section 1 of the Sherman Act, plaintiff's claim under the Donnelly Act is also dismissed.  <u>See</u> <u>Cendella</u>, 348 F. Supp. 3d at 363.

commerce.  15 U.S.C. § 2.  To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must allege: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." PepsiCo, Inc., 315 F.3d at 105 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

Monopoly power is "the power to control prices or exclude competition[.]"  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).  "It can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market."  Geneva Pharm. Tech. Corp. v. Barr Laboratories, Inc., 386 F.3d 485, 500 (2d Cir. 2004).  Particle alleges that Epic has over 90% market share in the payer platform market. Compl. ¶ 62.  "At the motion to dismiss stage, an allegation of such a high market share, even without consideration of other market characteristics, suffices to raise an inference of monopoly power."  P & L Dev., LLC v. Gerber Prods. Co., 715 F. Supp. 3d 435, 464 (E.D.N.Y. 2024) (finding monopoly power where plaintiff alleged defendants had 100% share of the market); see also In re

<u>Keurig Green Mountain Single-Serve Coffee Antitrust Litig.</u>, 383 F. Supp. 3d 187, 227 (S.D.N.Y. 2019) (finding monopoly power where plaintiffs alleged defendants had between 88-93% market share).

In establishing the second element of a Section 2 violation, an antitrust plaintiff must "establish that 'the defendant has "engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition.'" <u>United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd.</u>, 11 F. 4th 118, 137 (2d Cir. 2021) (quoting <u>PepsiCo, Inc.</u>, 315 F.3d at 108). Conduct is "improper" if it tends to result in "exclusion not the result of superior efficiency." <u>Id.</u> (internal quotation marks and citation omitted). Accordingly, a plaintiff must plead conduct which tends to "impede[] competition through means other than competition on the merits." <u>New York ex rel. Schneiderman v. Actavis PLC</u>, 787 F.3d 638, 652 (2d Cir. 2015) (citing <u>Trans Sport, Inc. v. Starter Sportswear, Inc.</u>, 964 F.2d 186, 188-89 (2d Cir. 1992) (quoting <u>U.S. Football League v. Nat'l Football League</u>, 842 F.2d 1335, 1359 (2d Cir. 1988))).

Particle alleges that Epic has willfully maintained its monopoly power by: (1) cutting off Particle customers' access to Epic-stored EHRs unless they agreed not to do business with

Particle, Compl. ¶¶ 12, 79-93; (2) prolonging the approval process for new Particle customers to access Epic-stored EHRs, id. ¶¶ 79-93; (3) launching a "market-wide disparagement campaign" against Particle, id. ¶¶ 102-14; and (4) initiating an allegedly manufactured dispute within Carequality and manipulating its outcome, id. ¶¶ 199-233.

Epic contends that the purportedly anticompetitive conduct identified by Particle is not conduct that can be plausibly alleged to have lacked a legitimate business purpose. Mot. at 17-20. Rather, it asserts that Epic had legitimate reasons to be concerned about the privacy and security of patient health records that were being requested using the Particle platform, noting that health care organizations have a "high sensitivity to" privacy and security issues. Id. at 18 (quoting Compl. ¶ 112).

While Epic has advanced a highly persuasive explanation for its actions, "[i]n determining whether a complaint states a claim[] that is plausible, the court is required to proceed 'on the assumption that all the [factual] allegations in the complaint are true.'" In re Crude Oil Commodity Futures Lit., 913 F. Supp. 2d 41, 56 (S.D.N.Y. 2012) (quoting Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (quoting Twombly, 550 U.S. at 555)). Moreover, "[t]he choice between two plausible inferences

that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion[.]" <u>Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 185 (2d Cir. 2012).

The complaint, taken as a whole, alleges Epic's willful intent to acquire monopoly power in the payer platform market via anticompetitive conduct. Particle has adequately alleged that the payer platform market consists of only two players, Epic and Particle, and that Epic's conduct was sufficiently anticompetitive, and intended to exclude Particle from that market. <u>See Chapdelaine Corp. Secs. & Co. v. Depository Trust & Clearing Corp.</u>, No. 05 Civ. 10711 (SAS), 2006 WL 2020950, at *4 (S.D.N.Y. July 13, 2006) (defendant engaged in allegedly anticompetitive conduct where such conduct "intentionally foreclosed [plaintiff] from entering into prospective business relationships[,]" thereby "precluding [plaintiff] from competing in the market").

It remains to be seen whether Particle will be able to establish willful acquisition of market power in discovery. However, at this stage of the litigation, Particle has identified conduct sufficient to raise a non-speculative inference that Epic's actions were uneconomic and inconsistent with the rational behavior of a legitimate competitor. <u>See, e.g.</u>, <u>Wacker v. JP</u>

Morgan Chase & Co., 678 F. App'x 27, 30 (2d Cir. 2017) (summary order) (reversing dismissal of plaintiffs' Section 2 claims where plaintiffs adequately pled "willful acquisition or maintenance of monopoly power").

### ii. Attempted Monopolization

Similarly, to state a claim for attempted monopolization under Section 2 of the Sherman Act, a plaintiff must show that the defendant: "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 456 (1993). "Proof of the first element of an attempted monopolization claim, anticompetitive or exclusionary conduct, may be used to infer the second element, specific intent to monopolize; and when coupled with proof of monopoly power, evidence of anticompetitive conduct may demonstrate a dangerous probability of success." Volvo N. America Corp. v. Men's Intern. Professional Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988) (citing Nat'l Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerts Laboratories, 850 F.2d 904, 915 (2d Cir. 1988) (citing Northeastern Tel. Co. v. Am. Tel. & Tel. Co., 651 F.2d 76, 85 (2d Cir. 1981), cert. denied, 455 U.S. 943 (1982))).

For the reasons stated above, plaintiff has adequately pled the first and third elements of an attempted monopolization claim. Because specific intent can be "reasonably infer[red]" from the existence of uneconomic conduct, plaintiff has pleaded facts sufficient to survive a motion to dismiss with respect to the intent element of an attempted monopolization claim. Id.[25]

---

[25]     Particle also brings a claim for monopoly leveraging. A claim of monopoly leveraging requires that "defendant (1) possessed monopoly power in one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct." A.I.B. Express, Inc. v. FedEx Corp., 358 F. Supp. 2d 239, 246-47 (S.D.N.Y. 2004) (citing Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 415 n.4 (2004)). Epic addresses Particle's monopoly leveraging claim in a footnote, contending that "[t]here are various patent deficiencies in Particle's allegations of monopoly power for" the EHR Software and EHR Provision Services markets, Mot. at 17 n.14, the two other markets in which Particle alleges Epic also possessed monopoly power, Compl. ¶¶ 29-30, 43. Specifically, the complaint alleges that approximately 81% of the total population of the United States has at least one EHR stored by Epic's EHR Software, Compl. ¶ 35, but Epic asserts that this percentage does not accurately represent its market value because patients may have EHRs that are stored within multiple vendors' software, Mot. at 17 n.14.

However, Particle has also alleged that, between 2017 and 2022, Epic "added almost 100,000 new hospital beds to its EHR network, while not a single competitor made a net gain of beds during that same period[,]" Compl. ¶ 36, and that Epic's EHR software entails "overwhelming lock-in effects" that discourage customers from switching software providers by charging "massive nine- . . . [and] ten-figure investments, with over two-thirds of that cost coming in the form of upfront fees[,]" id. ¶ 39. These allegations are sufficient, at this stage of the proceeding, to establish that Epic possessed monopoly power in the broader EHR Software and Provision Services markets, creating a probability that it could use that power to monopolize the payer platform market and exclude Particle from participating in that market. See, e.g., Yankees Ent. and Sports Network, LLC v. Cablevision Systems Corp., et al., 224 F. Supp. 2d 657, 672 (S.D.N.Y. 2002) (holding plaintiff adequately alleged defendant leveraged its monopoly in the regional sports programming market in the secondary markets of broadcast rights and advertising).

### 4. Antitrust Standing

Finally, we address Epic's argument that Particle has failed to establish standing under the Sherman Act by failing to plausibly allege antitrust injury.  Mot. at 24.

"To satisfy antitrust standing at the pleading stage a plaintiff must plausibly allege . . . : (1) that it suffered a special kind of antitrust injury, and (2) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws.'"  IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 62 (2d Cir. 2019) (internal quotation marks and citations omitted).

An antitrust injury is an injury "'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  The Second Circuit employs a three-step process to determine whether a plaintiff has adequately alleged antitrust injury, pursuant to which the Court: (i) "identif[ies] the practice complained of and the reasons such a practice is or might be anticompetitive"; (ii) "identif[ies] the actual injury the plaintiff alleges . . . [which] requires [it] to look to the ways in which the plaintiff claims it is in a 'worse

position' as a consequence of the defendant's conduct"; and (iii) "compare[s] the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." IQ Dental Supply, Inc., 924 F.3d at 62-63 (internal quotation marks and citations omitted).

Here, as detailed above, Particle has alleged that Epic has engaged in various forms of anticompetitive conduct that have stifled competition in the payer platform market, including cutting off existing Particle customers' access to EHRs and promising to restore access only if they ended their contracts with Particle and slowing the approval process for new Particle customers. Compl. ¶¶ 79-114. Particle contends that such practices have resulted in customers ending their contracts with the company and discouraged new customers from purchasing their software, resulting in the near-exclusion of Particle, Epic's only competing provider in the payer platform market, from that market. Id. Particle further alleges that Epic initiated a dispute within Carequality, thereby interfering with Particle's ability to compete in the market. Id. ¶¶ 119-33.

If proven, such allegations are sufficient to establish antitrust standing. A competitor's "'[e]xclusion from a market is a conventional form of antitrust injury' because it is 'exactly

the type of injury that antitrust laws were designed to prevent and flows from the competition-reducing aspect of [defendant's] conduct.'" Valassis Commc'ns, Inc. v. News Corp., No. 17 Civ. 7378 (PKC), 2019 WL 802093, at *11 (S.D.N.Y. Feb. 21, 2019) (quoting Higgins v. New York Stock Exch., 755 F. Supp. 113, 116 (S.D.N.Y.), aff'd sub nom. Higgins v. New York Stock Exch., Inc, 942 F.2d 829 (2d Cir. 1991) (citation omitted)); see also Chapdelaine Corp. Secs. & Co. v. Depository Trust & Clearing Corp., No. 05 Civ. 10711 (SAS), 2006 WL 2020950, at *4 (S.D.N.Y. July 13, 2006) (exclusion from the market amounts to antitrust injury when defendant's allegedly anticompetitive conduct "decreases the number of alternatives available to consumers of [plaintiff's] products"). Particle has alleged that it has lost both customers and revenue as a result of Epic's conduct, and that this conduct has harmed competition in the payer platform market as a whole. Compl. ¶¶ 145-46.[26]

---

[26] Epic contends that a competitor may only adequately allege antitrust injury resulting from exclusionary conduct if that conduct "caused the plaintiff's 'exit from the market.'" Reply at 9. However, we agree with plaintiff that the law does not require a party's actual exit from the market. See ECF No. 33 at 1. Rather, it requires a plaintiff to allege that the defendant engaged in conduct that "tends to exclude competitors from the market[,]" Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp., 224 F. Supp. 2d 657, 669-70 (S.D.N.Y. 2002). Particle "need not wait to make [its] claim until it is 'actually . . . driven from the market and competition is thereby lessened.'" Xerox Corp v. Media Sciences Intern., Inc., 511 F. Supp. 2d 372, 381 (quoting Brunswick Corp., 429 U.S. at 489 n.14).

Although, as stated above, it remains to be seen whether Particle's allegations will be borne out in discovery, Particle has sufficiently alleged antitrust injury resulting from Epic's conduct at this stage of the litigation.

## B. Particle's State Law Claims

We next turn to Particle's state law claims, namely: (i) tortious interference with contractual relations; (ii) tortious interference with prospective business relations; (iii) defamation; and (iv) trade libel. Compl. ¶¶ 192-220. Epic contends that each state law claim must be dismissed under Rule 12(b)(1) or, in the alternative, under Rule 12(b)(6). Mot. at 24-35.

Given our determination that Particle has plausibly alleged claims under Section 2 of the Sherman Act, we need not address Epic's motion to dismiss Particle's state law claims on jurisdictional grounds pursuant to Rule 12(b)(1). Accordingly, we address each state law claim below under a Rule 12(b)(6) standard.

### 1. Tortious Interference with Contract (Claim Six)

"Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of

the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)).

Particle alleges that Epic tortiously interfered with its contract with XCures, claiming that Epic knew of its contract, intentionally procured a breach of that contract by demanding that XCures cut ties with Particle, that XCures breached the contract when it ceased paying monthly fees to Particle in June 2024, and that Particle suffered monetary and reputational harm as a result. Compl. ¶¶ 192-98. Epic, however, contends that Particle has failed to state a claim for tortious interference because the complaint fails to sufficiently allege Epic's knowledge of Particle's contract with XCures, that XCures actually breached its contract with Particle, or that Epic intentionally procured XCures' breach. Mot. at 25-26.

To plead a claim for tortious interference with contract, a plaintiff must plausibly allege that the defendant had "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached." Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC, 14 Civ. 7529 (RJS), 2016 WL

5414979, at *4 (Mar. 18, 2016) (citing Medtech Products Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008); Reach Music Pub., Inc. v. Warner/Chappell Music, Inc., No. 09 Civ. 5580 (KBF), 2014 WL 5861984, at *10 (S.D.N.Y. Nov. 10, 2014)). However, a plaintiff need not plead that the "'defendant had perfect or precise knowledge of the terms and conditions of the contract[] in issue.'" State Street Global Advisors Trust Company v. Visbal, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020)(quoting Don King Prods., Inc. v. Douglas, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) (citation omitted)).

Here, plaintiff has sufficiently alleged that Epic was aware of the basic terms and conditions of the contract between XCures and Particle — i.e., that XCures paid certain fees to Particle in order to continue their business relationship — and that Epic endeavored to interfere with this basic contractual arrangement when it informed XCures that its access to Epic data would be restored if it ended its relationship with Particle. Compl. ¶¶ 86, 193-96.

A complaint must also allege that the other contracting party actually breached the parties' contract and violated its terms. Kirch v. Liberty Media Corp., 449 F.3d 388, 402 (2d Cir. 2006) Plaintiff has alleged that XCures and Particle had entered into an

amended contract pursuant to which XCures would pay monthly fees for a one-year term, beginning on January 1, 2024. Compl. ¶ 86. Because the complaint states that XCures stopped paying these monthly fees prior to the contract termination date of January 1, 2025, Particle has sufficiently alleged that XCures breached a specific contractual term of the parties' contract – i.e., the obligation to pay monthly fees for a one-year term beginning on January 1, 2024. Id. ¶ 87.

Finally, Particle must also show that Epic intentionally procured XCures' breach of the contract without justification. First, Particle must demonstrate that "the target of [Epic's] conduct was [XCures'] contractual arrangement[] with [Particle]." G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 767-68 (2d Cir. 1995). Particle alleged that Epic intentionally procured XCures' breach, alleging that "XCures' CEO informed Particle that Epic told XCures its access to Epic data would be restored if it ended its relationship with Particle." Compl. ¶ 86. The question of "whether the actions of one party . . . were improper or justified" is fact-intensive and "ought not be decided at" the motion to dismiss stage. Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC, No. 07 Civ. 7998 (HB), 2008 WL 1710910, at *5 (S.D.N.Y. Apr. 10, 2008) (citing Mina Inv. Holdings, 184 F.R.D. 245, 251 (S.D.N.Y.

1999) (noting that the issue of when interference with contracts will be deemed "improper" is a "factually sensitive issue")). However, at this stage of the litigation, Particle has plausibly alleged that Epic procured XCures' breach improperly and without justification. Accordingly, at this stage of the litigation, Epic's motion to dismiss Particle's claim for tortious interference with contract is denied.[27]

### 2. Tortious Interference with Prospective Business Relations (Claim Seven)

Next, Epic contends that Particle has failed to state a claim for tortious interference with prospective business relations with any third party. Mot. at 26-28.

To plead tortious interference with prospective business relations, a plaintiff must allege that: "'[1] it had a business relationship with a third party; [2] the defendant knew of that relationship and intentionally interfered with it; [3] the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and [4] the defendant's interference caused injury to the relationship.'" Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC, No. 22 Civ. 4094 (KPF), 2024 WL 3524497, at *7 (S.D.N.Y. July 24, 2024) (quoting Kirch, 449 F.3d at 400

---

[27] We note that this claim is not relevant to Particle's antitrust action, as XCures is neither a payer nor a payvider. See supra p. 6.

(quoting <u>Carvel Corp. v. Noonan</u>, 350 F.3d 6, 17 (2d Cir. 2003))).
"'[A] plaintiff must also establish causation by demonstrating
'that [it] would have entered into an economic relationship but
for the defendant's wrongful conduct.'" <u>Id.</u> (quoting <u>Nat'l Air</u>
<u>Cargo Grp., Inc. v. Maersk Line Ltd.</u>, No. 17 Civ. 8659 (KPF), 2019
WL 4735426, at *9 (S.D.N.Y. Sept. 27, 2019) (quoting <u>Tucker v.</u>
<u>Wyckoff Heights Med. Ctr.</u>, 52 F. Supp. 3d 583, 598 (S.D.N.Y.
2014))).

Epic asserts that the complaint is devoid of facts sufficient
to satisfy any of the necessary elements of this claim, including
facts sufficient to show that Particle had a reasonable probability
of entering into a business relationship with any third party,
that Epic knew of Particle's prospective business relationships
and acted with the requisite level of culpability, or that Particle
would have consummated a transaction but for Epic's interference.
Mot. at 26-28.

We agree. As Epic notes, the complaint fails to allege that
Epic had any knowledge of Particle's prospective business
relationships with the four third parties named in the complaint.[28]
Rather, the complaint states only that Epic knew that Particle was

---

[28]   These four prospective customers are: Beeline Rx, Power Life Sciences,
Leafwell, and Medvise.  Compl. ¶ 91.

"encroaching on its comfortable position atop the payer platform market[.]" Compl. ¶ 77. This general awareness of a competitor's success is insufficient to establish a claim for tortious interference with business relations. See 360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC, No. 19 Civ. 8760 (LGS), 2020 WL 5259283, at *7 (S.D.N.Y. Sept. 3, 2020) (dismissing claim where plaintiff failed to allege defendant's knowledge of specific prospective business relationships identified in the complaint).

### 3. Defamation (Claim Eight)

"To state a claim for defamation under New York law, a plaintiff must allege: (i) a false statement of fact of and concerning the plaintiff, (ii) published to a third party without authorization or privilege, (iii) made with the applicable level of fault . . . on the part of the publisher, (iv) that either caused special harm or constitutes defamation per se." CDC Newburgh Inc. v. STM Bags, LLC, 692 F. Supp. 3d 205, 220 (S.D.N.Y. 2023) (citations omitted).

Particle's defamation claim is based on five statements made by Epic concerning Particle's record retrieval activities. See Compl. ¶ 206(i)-(v).[29] Notably, Epic contends that Particle

---

[29] In its complaint, Particle identified the following statements as containing falsehoods:

misrepresented the statements it identifies as allegedly defamatory, attaching to its motion an Appendix comparing the statements identified in the complaint against the full statements made by Epic in the relevant publications. See Mot., Appendix A.1. Epic also submitted a declaration attaching the original publications cited in Particle's complaint as exhibits. ECF No. 24. Particle does not dispute that the statements and documents identified by Epic are genuine. Accordingly, we will refer to the original documents in reviewing Particle's defamation claim. See Idema v. Wager, 29 F. App'x 676, 678 (2d Cir. 2002) (when reviewing an allegedly defamatory statement, "the court must read the offending words in the context of the whole article") (quoting Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 177 (2d Cir. 2000)); see also Gargiulo v. Forster & Garbus Esqs., 651 F. Supp. 2d 188, 190 (S.D.N.Y. 2009) ("[The Court] may consider documents attached to the complaint or incorporated by reference,

---

(i)   "Activities of . . . Particle Health" are responsible for "serious concerns about security and privacy" of patient medical records.
(ii)  Particle Health has "inaccurately represent[ed] the purpose associated with its record retrievals."
(iii) Particle Health has not "fulfill[ed] its obligations as a Carequality implementer."
(iv)  Particle Health has "obscure[d] provider-level details of connections through a generic gateway."
(v)   Particle Health has "admitted wrongdoing" in connection with its customers' retrieval of medical records.

Compl. ¶ 206(i)-(v).

such as the affidavits containing the allegedly actionable statements[.]") (citing Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

The allegedly defamatory statements identified in the complaint are listed below, next to the relevant excerpts from the statements issued by Epic:

| Allegedly Defamatory Statement Identified by Particle | Actual Statement by Epic |
| --- | --- |
| "Activities of . . . Particle Health" are responsible for "serious concerns about security and privacy" of patient medical records. Compl. ¶ 206(i). | "This Third-Party Security and Privacy Risk Notification outlines events that have led Epic to file a formal dispute with Carequality over serious concerns about security and privacy arising from activities of a third-party participant implementer in Carequality (Particle Health)[.]" ECF No. 24-2 at 3. |
| Particle Health has "inaccurately represent[ed] the purpose associated with [its] record retrievals." Compl. ¶ 206(ii). | "At the Care Everywhere Governing Council's recommendation, due to the significant security and privacy concerns, on March 21, 2024, Epic filed a formal dispute with Carequality on the grounds that Particle Health might not be fulfilling its obligations as a Carequality implementer, and based on the concern that Particle Health and its participant organizations might be inaccurately representing the purpose associated with their record retrievals." ECF No. 24-2 at 3. |
| Particle Health has not "fulfill[ed] its | "At the Care Everywhere Governing Council's recommendation, due to |

| | |
|---|---|
| obligations as a Carequality implementer." Compl. ¶ 206(iii). | the significant security and privacy concerns, on March 21, 2024, Epic filed a formal dispute with Carequality on the grounds that Particle Health might not be fulfilling its obligations as a Carequality implementer, and based on the concern that Particle Health and its participant organizations might be inaccurately representing the purpose associated with their record retrievals." ECF No. 24-2 at 3. |
| Particle Health has "obscure[ed] provider-level details of connections through a generic gateway." Compl. ¶ 206(iv). | "This Third-Party Security and Privacy Risk Notification outlines events that have led Epic to file a formal dispute with Carequality over serious concerns about security and privacy arising from activities of a third-party participant implementer in Carequality (Particle Health), including . . . demonstrating a pattern of a lack of transparency, including obscuring provider-level details of connections through a generic gateway and declining to provide full information requested about their connections over the course of several months[.]" ECF No. 24-2 at 3. |
| Particle Health has "admitted wrongdoing" in connection with its customers' retrieval of medical records. Compl. ¶ 206(v). | "Particle Health recently acknowledged that one of Particle's customers . . . accessed patient records inappropriately through Carequality. [The customer] requested records falsely asserting they were providing treatment, but it uses medical records to identify potential plaintiffs for class action lawsuits. While we do not agree with Particle's framing of |

|  | the issue, we are pleased that after eight months of resistance they have now acknowledged wrongdoing and have provided a contact for assisting you in your investigation." ECF No. 24-3 at 2. |
| --- | --- |

Epic contends that Particle has failed to sufficiently state a claim for defamation with respect to any of these statements. Mot. at 28-34. As an initial matter, Epic argues that Particle was required to plead actual malice, and that Particle's conclusion that "Epic knew its statements were false when published or published them with reckless disregard" for the truth fails to meet the actual malice standard. Mot. at 29-30 (quoting Compl. ¶ 208). We agree.

New York requires proof of actual malice to recover damages in any "action involving public petition and participation[,]" Coleman v. Grand, 523 F. Supp. 3d 244, 257 (E.D.N.Y. 2012) (quoting N.Y. Civ. Rights Law § 76-a(2)), and "New York courts have long held that, if a defendant's allegedly defamatory statements involve a matter 'arguably within the sphere of legitimate public concern,' the plaintiff bears the burden of showing" actual malice, id. (quoting Konikoff v. Prudential Ins. Co. of America, 234 F.3d 92, 101 (2d Cir. 2000) (quotation omitted)).

We agree with Epic that "[t]he privacy and security of health records is an 'issue of public interest[.]'" Mot. at 29 (citing

N.Y. Civ. Rights Law § 76-a(2)).  Further, although Particle asserts that actual malice is not required because Epic published its statements privately to its customers, directing those statements to a limited and private audience, Opp. at 30-31, the complaint explicitly states that Epic's April 10, 2024 statement "was not marked confidential and, as Epic knew it would be (and, on information and belief, intended), was quickly picked up by the media[.]" Compl. ¶ 102.[30]  Accordingly, Particle's argument is unpersuasive.

Actual malice requires that the defamatory statements at issue were "'made with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.'"  Palin v. New York Times Co., 940 F.3d 804, 816 (2d Cir. 2019) (quoting Church of Scientology Int'l v. Behar, 238 F.3d 168, 174 (2d Cir. 2001) (quotation omitted)).  "The reckless conduct needed to show actual malice 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing,' . . . but by whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained

---

[30]    As noted supra n.8, the complaint also cites articles from three news outlets that reported on Epic's statement.  Compl. ¶¶ 106-09.

serious doubts as to the truth of his publication.'" Behar, 238
F.3d at 174.

While Particle contends that it has pled "numerous facts
permitting an inference of actual malice[,]" Opp. at 32, the Court
is not persuaded. Rather, the complaint clearly states that Epic
expressed its concern about mislabeled requests submitted by three
of Particle's customers and initiated a dispute against Epic
through the Carequality dispute resolution process. While the
complaint alleges that this dispute resolution process resulted in
a finding that Particle had not committed any wrongdoing, it does
not contend that Epic issued its allegedly defamatory statements
in April and June 2024 with actual knowledge of their falsity or
with reckless disregard as to their falsity.[31] Accordingly, Epic's
motion to dismiss Particle's defamation claim is granted.[32]

### 4. Trade Libel (Claim Nine)

Finally, Particle asserts a claim for trade libel, contending
that, beginning in April 2024, Epic, either directly or by

---

[31] In fact, as previously noted, by June 2024, Particle had notified
Carequality and Epic that it had terminated its relationships with two of the
three customers at issue in the parties' dispute after it determined that those
customers had, in fact, mislabeled their record requests. ECF No. 24-1 at 8-
10.

[32] Epic also asserts that its allegedly defamatory statements were mere
opinions and substantially true, and that Particle has failed to plead special
damages or defamation per se. Mot. at 30-34. However, given our holding with
respect to actual malice, we need not address these arguments.

intentional implication, published falsehoods concerning Particle's services and products to Epic's customers. Compl. ¶¶ 212-220.[33] Particle contends that these statements were "quickly picked up by the media" and in the public view "within days[.]" Id. ¶ 215.

A claim for trade libel arises when a party has made one or more statements "'denigrating the quality of a business' services [or products].'" Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) (quoting Ehrenkranz

---

[33]    Specifically, Particle contends that Epic published the following statements:

(i)      Particle's platform poses a "security and privacy risk."
(ii)     Particle's platform was unable to retrieve Epic-stored medical records for any customers because Epic had "suspended Particle Health's . . . gateway connection."

Compl. ¶ 214.

As with the statements identified in connection with Particle's defamation claim, Epic has provided an Appendix sharing the full context for these statements, as well. See Mot. at Appendix A.2. Each statement is also included in one of the exhibits attached to the declaration submitted by Epic's counsel, as described below:
a. Compl. ¶ 214(i): "Issue Notification: Third-Party Security and Privacy Risk[.]"  ECF No. 24-2 at 1.
b. Compl. ¶ 214(ii): "While the Carequality dispute is in progress and the ongoing potential for risks remains high, . . . Epic Carequality Administrators suspended Particle Health's generic gateway connection on March 21[.]"  ECF No. 24-2 at 2.
    a. This statement may also refer to the following: "After consideration of the information known at the time, the Care Everywhere Governing Council directed Epic to file a formal dispute with Carequality as provided in the Carequality framework agreement, and to suspend Particle Health's gateway connection to Epic community members[.] . . . On March 21, Epic filed a formal dispute with Carequality, and Epic Carequality Administrators suspended Particle Health's gateway connection to Epic community members."  ECF No. 24-2 at 4.

v. 58 MHR, LLC, 18 N.Y.S.3d 578 (Sup. Ct. Suffolk Cty. 2015) (emphasis added)).  To state a claim for trade libel, a plaintiff must adequately plead: "(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) special damages."  Id. (internal quotation marks and citations omitted).

Epic asserts that Particle's trade libel claim fails because the statements identified by Particle do not address the quality of Particle's goods or services.  Mot. at 34-35.  However, even when the relevant statements are read within their broader context, this argument is unconvincing.  The relevant statements clearly state that Particle's platform posed security and privacy risks to Particle customers, thereby calling into question the quality of the company's services.

However, Epic correctly contends that the complaint does not adequately plead special damages.  "Language which merely disparages a product is not actionable unless special damages are pleaded and it appears that such damage is a natural and immediate consequence of the disparaging statements."  Angio-Med. Corp. v. Eli-Lilly & Co., 720 F. Supp. 269, 274 (S.D.N.Y. 1989) (citations omitted).  Special damages are "limited to losses having pecuniary or economic value, and must be 'fully and accurately stated,'"

<u>Kirby v. Wildenstein</u>, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992) (quoting <u>Drug Research Corp. v. Curtis Pub. Co.</u>, 7 N.Y.2d 435, 440 (1960)), "'with sufficient particularity to identify actual losses[,]'" <u>id.</u> (quoting <u>Matherson v. Marchello</u>, 473 N.Y.S. 2d 998, 1001 (2d Dep't 1984)). In addition, "special damages must be the 'natural and immediate consequence of the disparaging statements' to be recoverable." <u>Id.</u> (quoting <u>Angi-Med.</u>, 720 F. Supp. at 274). "Courts considering product disparagement claims have . . . applied this [special damages] requirement strictly, granting motions to dismiss . . . for failure to allege special damages with the requisite specificity." <u>Id.</u> (citations omitted).

The complaint alleges only that Epic's statements "caus[ed] existing and/or prospective customers to lose trust in Particle's goods or services and abandon or decline to pursue business relationships with Particle," and that Particle "has suffered, and continues to suffer, damages in an amount to be determined at trial." Compl. ¶¶ 218, 220. Although Particle names certain customers who ceased their relationships with Particle, it does not specifically allege that these customers abandoned their relationships with Particle based on the two allegedly libelous statements identified in the Complaint. <u>See</u> Compl. ¶ 214. Given the pleading requirement of special damages, these allegations are

too generalized to survive dismissal. Accordingly, plaintiff's claim for trade libel must be dismissed.

### CONCLUSION

In sum, Epic's motion to dismiss is granted in part and denied in part. Specifically, we grant Epic's motion to dismiss plaintiff's claim under Section 1 of the Sherman Act (Claim Four) and the Donnelly Act (Claim Five), as well as plaintiff's claims for tortious interference with business relations (Claim Seven), defamation (Claim Eight), and trade libel (Claim Nine). However, Epic's motion to dismiss plaintiff's claims under Section 2 of the Sherman Act (Claims One, Two, and Three), as well as plaintiff's claim for tortious interference with contract (Claim Six), is denied. The parties should confer and submit an expeditious schedule to complete the discovery described in Section A.1.

The Clerk of the Court is respectfully directed to terminate the motions pending at ECF Nos. 20 and 22.

Dated:   September 5, 2025
         New York, New York

                          _____
                          NAOMI REICE BUCHWALD
                          UNITED STATES DISTRICT JUDGE