UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PARTICLE HEALTH INC.,

Plaintiff,

v.

EPIC SYSTEMS CORPORATION,

Defendant.

Civil Action No. 1:24-cv-07174-NRB

---

**EPIC SYSTEMS CORPORATION'S ANSWER AND DEFENSES TO
PARTICLE HEALTH INC.'S COMPLAINT**

Defendant Epic Systems Corporation ("Epic"), by and through its undersigned counsel, hereby answers Particle Health Inc.'s ("Particle") Complaint, filed on September 23, 2024 (Dkt. No. 1), and asserts its affirmative and other defenses.

## PRELIMINARY STATEMENT

Epic unequivocally denies Particle's claims. For the reasons set forth here and in the numbered paragraphs that follow, Particle's claims are baseless. Particle facilitated the theft of patient health data; Epic uncovered that scheme and sought to protect its healthcare provider customers and their patients' most sensitive health records. Particle has decided that the best defense to getting caught is an invented offense and has lodged a series of meritless claims against Epic.

Epic was founded nearly fifty years ago with the guiding goal of developing software with the patient at the heart. It has spent the last five decades developing electronic health record software ("EHR software"), which allows hospitals, healthcare providers, and others to create, store and exchange patient health records electronically. Epic's EHR software also facilitates patients' access to their own data and helps patients get well, stay well, and be healthier.

Epic is a pioneer of healthcare interoperability. Interoperability includes the exchange of electronic health records between healthcare providers to ensure that medical care is fully informed by a patient's medical history, allowing healthcare providers to coordinate care and improve patient outcomes. Interoperability saves lives, and Epic paved the way for it to be possible. Epic has proven itself a leader by being the first to develop software to interoperate safely and to ensure the protection of patient privacy, which was and remains critical to convincing health systems to participate and make interoperability a reality. Today, every single customer of Epic's EHR software in the United States is interoperable.

Epic was one of the very first EHR software companies to have its customers live on the Trusted Exchange Framework and Common Agreement ("TEFCA"), the next-generation, government-sponsored interoperability framework developed pursuant to the 21st Century Cures Act.  As of November 3, 2025, more than 1,700 hospitals and 40,900 clinics with Epic's EHR software are set up to exchange records through TEFCA.  Before TEFCA, Epic was a founding member of Carequality, an interoperability framework through which patient health records are exchanged.

The data exchanged through these frameworks cannot be regarded simply as the binary 1s and 0s of programming code but rather are among the most sensitive information that exists for a person—individual patient health information.  These sensitive data and the electronic health records that contain them are governed in the United States by a stringent federal regulatory regime promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 (together with its implementing regulations, "HIPAA") as well as a number of other state and federal regulations.  HIPAA allows information that is necessary for a patient's treatment to flow freely between healthcare providers, and requires that only the "minimum necessary" information from a patient's records is shared for most non-treatment purposes, such as payer-related (*i.e.*, health insurance) purposes.  The U.S. Department of Health and Human Services ("HHS") has unambiguously stated that payers do not provide treatment.  65 Fed. Reg. 82462, 82626-27 (Dec. 28, 2000) ("We do not consider the activities of third party pay[e]rs, including health plans, to be 'treatment.'  Only health care providers, not health plans, conduct 'treatment' for purposes of [45 C.F.R. § 164.501].")).  Therefore, unless and until there is a change in the law, payers cannot request a patient's full health records under the pretense of providing treatment and cannot bypass HIPAA's "minimum necessary" standard.

In addition, HIPAA requires healthcare providers to comply with a patient's request to withhold information from payers regarding healthcare services for which a patient (or someone acting on their behalf) paid in full. If a patient wishes to keep information about sensitive healthcare services private from their insurance company, companies like Particle have no right to ignore the patient's wishes and provide complete medical records to an insurer anyway—and doing so violates HIPAA. Further, some states have more stringent laws that require healthcare providers to obtain explicit patient consent before sharing sensitive patient information for purposes other than treatment, such as information about mental health care, certain reproductive healthcare services, HIV status, and treatment for substance use disorders.

As the custodians of their patients' records, healthcare providers control those records and bear ultimate responsibility under HIPAA and applicable state laws for how those records are used or disclosed. Contrary to Particle's assertions, Epic itself does not control access to medical records; thus, medical records are not requested from Epic, whether by a patient, a healthcare provider, a payer, or any other type of organization. Instead, it is Epic customers that are entrusted with the custody of those records and thus receive requests for health records and must decide whether and how to respond to those requests.

Interoperability frameworks like TEFCA and Carequality rely on mutual trust among participants to protect patient records. Healthcare providers who share records through interoperability frameworks make promises to their patients that they will protect their sensitive medical information. Patients trust their healthcare providers to make good on those promises, and the law requires providers to do so. Interoperability frameworks, therefore, cannot succeed unless healthcare providers can trust that other participants in those frameworks are legally allowed to request and receive patient records, for without that trust, healthcare providers are not

at liberty to share their patients' records without fear that they will be misused or disclosed in violation of both law and their promises to patients.

For the Carequality framework specifically, this trust is memorialized in the Carequality Framework Policies, a set of rules that govern record exchange via Carequality. These rules, which all members of Carequality's framework work jointly to uphold, concern which third parties can get a patient's data and under what circumstances. Implementer organizations like Epic, whose role is to enable their customers to access Carequality and exchange records through its framework, are required to sign the Carequality Connected Agreement, which makes implementers responsible for ensuring that they and their participating customers (called connections) follow these rules. Carequality maintains a directory of connections authorized to connect to its framework to exchange patient records. Implementers are responsible for vetting all of their connections to ensure that they can be trusted to comply with HIPAA and with Carequality's rules. The stakes are high. Once a connection has been added to the Carequality directory, that connection can access any patient records it wants by asserting a treatment purpose; the healthcare provider receiving the request automatically provides the records based on their trust in the Carequality framework and as the Carequality rules require. For that reason, before Epic's customers will begin automatically providing records in response to queries made through Carequality, Epic, on behalf of those customers, performs additional diligence when new connections are added by Carequality implementers. At Epic, this step is not and has never been automated. Epic does not generate profit through putting in this additional work; Epic is doing its part to protect both its healthcare provider customers' patient records and the integrity and security of the nationwide Carequality framework.

Mutual trust in interoperability frameworks is essential to the fast and efficient exchange of health information that is critical to patient care and serves as the entire foundation of the way interoperability is designed.  This design is presently under attack.  Businesses and individuals have begun exploiting national health data exchange networks to obtain complete patient medical records under the false pretense of providing treatment.  These entities then profit by improperly using those records, not for treatment purposes, but instead for things like recruiting participants for class action lawsuits, selling Medicare Advantage leads, and marketing other services.  Particle is one of these companies.  Particle co-founder and then-CEO Troy Bannister bluntly admitted to the public that Particle views itself as a data broker freely dealing sensitive personal health information to any buyer willing to pay.  Particle, he explained, needs only an individual's basic demographic information to "go find all your medical records"—up to "95 records per patient per search" for "over 300 million people's medical records".  (StartUp Health, *At Particle Health, Troy Bannister Is on a Mission to Change Lives with Access to Vital Medical Data* at 4:46, YouTube (Apr. 13, 2022), https://www.youtube.com/watch?v=n3GkgkNyCqY.)  And once Particle obtains those records, "we sell to like everyone.  Like everybody in healthcare wants access to this data, which is awesome from like a total addressable market standpoint." (*Id.* at 13:55.)

The crisis of confidence that is resulting from wolves in sheep's clothing entering the health record exchange frameworks risks ruining interoperability for the very patients whose lives depend on their physicians' access to their whole medical record.  When records are made available in violation of the rules governing patient data exchange, patients' health records are exposed and healthcare providers and patients may lose their trust in the integrity of data exchange frameworks, threatening the significant progress made by the healthcare industry with

respect to interoperability.  Indeed, certain Epic customers have voiced that they have contemplated limiting their participation in the Carequality framework or withdrawing from it entirely.  Further breaches of trust between participants in these frameworks risk exacerbating the trend, potentially undermining patient care by depriving doctors and other healthcare providers of information about a patient's medical history that may be necessary to guide appropriate treatment in the future.

In 2023 and 2024, Particle got caught betraying the mutual trust upon which Carequality depends.  Particle provided access to the Carequality framework to entities that do not perform treatment and facilitated the improper retrieval of confidential health records under false pretenses.  By falsely asserting a treatment use case, Particle customers exploited the trust of other Carequality participants—including Epic's healthcare provider customers—in order to improperly obtain a patient's full health record and use it downstream for any purpose they see fit.  This misconduct undermines HIPAA's entire framework, which prescribes specific use cases for the exchange of patient health information.  It also puts the HIPAA-covered entities that inadvertently provided that information to the wrong hands at risk of serious penalties under HIPAA, and a loss of trust among their patients whose data was stolen.

Particle's entire Complaint paints Particle itself as the victim.  But the real victims here are the patients.  The perpetrators are Particle and its bad actor customers.  That was made crystal clear by the work that was done by Epic and its customers to get to the bottom of the issues that culminated in Epic's invocation of the Carequality Dispute Resolution Process against Particle (the "Carequality Dispute").  The Carequality Dispute resulted in a Resolution adopted by Carequality through its Steering Committee (the "Resolution").  In the Resolution, Carequality confirmed that Particle had allowed three of its customers to request and obtain full patient

records through Carequality despite not being entitled to do so.  As a result, hundreds of thousands of confidential patient records were inappropriately obtained from Epic's healthcare provider customers through Carequality.

While each of these three Particle customers asserted a treatment purpose for its requests, none of them actually provides medical treatment.  Instead, they sell patient data to tort lawyers, pharmaceutical companies, and health insurance companies.  That was the fate of the hundreds of thousands of confidential patient records that were taken before Particle's customers were caught and the spigot was turned off.  Particle is the common denominator of how these customers were able to circumvent the rules.  Particle asserts that it is an innocent bystander of this behavior and that it was duped by its own customers just like the rest of the Carequality community.  That is false.  Even a cursory exercise in due diligence would have revealed that these organizations lack a valid treatment purpose.  Particle allowed its customers to misuse the Carequality framework precisely because this is how Particle makes its money.  Particle's business model is to allow its customers to exploit the trust on which the Carequality framework depends to misappropriate patients' most sensitive health records.  Epic highlights below some Particle customers that it learned of in the course of its investigation, all of whom obtained records pursuant to a falsely asserted treatment purpose that would have been uncovered by basic diligence—or, for some customers, by basic common sense.

Integritort.  Integritort is one of the customers that Particle enabled.  Particle pretends that it could not have known what Integritort was up to.  But the name itself is an obvious clue that Integri**tort** was not a healthcare provider.  And even beyond that, basic due diligence would have revealed what Integritort is.  Either absent that diligence or ignoring it, in October 2023, Particle sought to add Integritort to the Carequality directory.  Epic then performed its independent step

of reviewing that new directory entry as it does all new connections.  Epic's review of publicly

available information about Integritort made clear that Integritort did not provide medical

treatment.  Indeed, a video available on Integritort's own website describes it as "bring[ing]

transparency and efficiency to the mass tort business" and "seamlessly integrating real-time

medical records into the mass tort process".  (*Integritort 1080p 230827* at 0:03, Integritort (Aug.

27, 2023), https://integritort.com/.)  Epic shared this information in November 2023 with its Care

Everywhere Governing Council (the "Governing Council")—an elected subset of representatives

from the Epic healthcare provider customer community—which concluded that Integritort's use

case was not consistent with treatment.  As a result, the Governing Council directed Epic to

decline to add Integritort as a connection in the Carequality directory to exchange electronic

health records with Epic customers.  Epic expressly informed Particle of this decision.

Undeterred, as was later uncovered, Particle found a workaround—Particle allowed Integritort to

connect to Epic's customers and take records from them using a non-descript directory entry.

 Subsequently, a third party provided Epic with a video recording of an Integritort sales

and marketing conference call containing unequivocal evidence of Integritort's wrongdoing.  In

that video, Integritort's leadership (including at least one individual who has been criminally

prosecuted and banned from the U.S. securities industry for fraud) bragged that Integritort can

quickly evaluate whether any given individual in the United States is a potential plaintiff for a

mass tort lawsuit by retrieving his or her complete medical record using only simple

demographic data (such as name, address, and telephone number).  In the video, Integritort

demonstrated this capacity with a live example of retrieving an audience member's medical

record through Carequality.  There was absolutely no treatment being provided, but the private

medical record was retrieved and displayed via the Carequality framework based on an assertion

that it was being requested for a treatment purpose.  Epic understands that Troy Bannister (Particle's co-founder and former CEO) was presented with this video in or around February 2024—well before it was shared with Epic—but Particle still took no action against Integritort.  And Particle refused to inform Epic of which records Integritort had wrongfully accessed from Epic's customers, as is required to allow those customers to inform their affected patients that their privacy had been breached.  It was not until March 22, 2024, the day after Epic filed the Carequality Dispute, that Integritort's entry in the Carequality directory was finally disabled from retrieving records by either Particle or Integritort itself.

      <u>Novellia.</u>  Another Particle customer, Novellia, was also discovered to be retrieving records under false pretenses.  Novellia is not a healthcare provider and does not provide treatment.  It publicly describes itself as a "free personal health tool" designed to provide individuals with access to their own medical records, while selling patient data to life-sciences researchers.  (*Novellia*, Facebook (last visited Nov. 3, 2025), https://www.facebook.com/people/ Novellia/61568430788742/; *Life Sciences*, Novellia (last visited Nov. 3, 2025), https://life sciences.novellia.com/.)  The invalidity of Novellia's asserted treatment purpose would be immediately apparent from basic customer diligence.  Epic understands that Particle had represented to Novellia that it could request records through Carequality for treatment purposes even after learning of Novellia's intended non-treatment use for those records.  As a result, Novellia began pulling complete patient records via Carequality in reliance on Particle's statements.  Particle never informed Novellia that its use of Carequality was improper.  Indeed, Epic understands that it was Novellia itself that decided to stop using Carequality to retrieve health records when others informed Novellia that its activities were not treatment and that its retrievals violated Carequality's terms, thereby putting patient privacy at risk.  Not only did

Particle mislead Novellia from the start, but Epic also further understands that Particle actively contacted Novellia to encourage it to restart its record retrievals even after Novellia had determined them to be improper and ceased retrieving records through Carequality.  And as with Integritort, Particle refused to disclose which records Novellia had accessed from Epic customers.

Reveleer.  A third Particle customer, Reveleer, also requested and retrieved full and complete patient records through Carequality purportedly for the purpose of treatment, even though Reveleer does not provide medical treatment.  To the contrary, it was revealed that Reveleer was assisting health insurance companies with various payment-related functions—which do not constitute treatment—by retrieving records under false pretenses.  Particle assisted Reveleer in requesting and retrieving records by falsely asserting a relationship between Reveleer and thousands of individual clinicians—including many employed by Epic's healthcare provider customers.  Reveleer then turned around and purported to request records on behalf of a clinician from the very same health system at which that clinician works.  In other words, the way Reveleer accessed this data was by purporting to request data on behalf of a clinician from that clinician's own health system and disguising that request to make it look like a request from the outside.  Unsurprisingly, when Epic inquired with its impacted customers as to whether the record retrievals—purportedly on their behalf—were authorized, every single provider that responded disavowed the relationship that Reveleer asserted.  And, to date, Epic has not seen any documentation demonstrating that Reveleer had been authorized by any provider to make these requests on its behalf for treatment purposes.  In reality, Epic understands that Reveleer was requesting these records for its own health plan customer, for that health plan's own non-treatment purposes.  This was yet another innovative way a bad actor could break the rules and

breach trust.  Once again, basic diligence by a Carequality implementer would have uncovered this breach of trust if it was actually trying to find the truth about what its connections were up to.  As with Integritort and Novellia, Particle refused to disclose which records Reveleer had retrieved from Epic customers.

After Epic conducted its own investigation into Particle's facilitation of improper record retrievals, and in the face of Particle's refusal to cooperate, the Governing Council directed Epic to initiate the Carequality Dispute against Particle in order to repair the critical breakdown in the trust on which Carequality is built and to protect the privacy and security of patient records.  On August 29, 2024, Carequality issued the Resolution confirming that Epic and its customers had taken appropriate action to protect patient privacy.  The Resolution confirmed that Particle customers had inappropriately accessed individuals' medical records by falsely claiming to be treating them as healthcare providers.  (Resolution §§ IV.1.a, IV.2.a.)  This was not news to anyone by this time; Particle had finally conceded as much before the Resolution was issued by admitting to Carequality that certain of its customers did not validly perform treatment. (Compl. ¶ 104; Resolution §§ IV.1.a, IV.2.a.)  Carequality recognized that these Particle customers had breached Carequality's rules, imposing a variety of sanctions, including requiring them to delete the patient records they had improperly obtained and suspending certain violators from future participation in Carequality for a period of one year.

In addition, far from exonerating Particle for its part in this breach of trust, as Particle here claims, the Resolution imposed a corrective action plan on Particle itself.  As the Resolution explicitly noted, the purported customer diligence Particle conducted into those of its customers that falsely asserted a treatment purpose was plainly unsuccessful given that it "failed to reveal inaccurate information provided by each Connection".  (Resolution § IV.4.a.iii.)  Because of

these repeated failures of customer diligence, Carequality found "that Particle should be subjected to additional oversight for six months to confirm that Particle is thoroughly following its process". (*Id.*)  Specifically, Carequality imposed numerous obligations on Particle, including a requirement to submit detailed information about new connections to Carequality so that Carequality itself could oversee Particle's customer diligence and verify that Particle had not onboarded any customers that cannot validly request records for treatment purposes. (*Id.* § IV.4.b.)  The clear message to Particle from the Resolution was that Particle itself needs to take affirmative steps to stop adding customers that do not provide medical treatment to retrieve records through Carequality under false pretenses.

The Resolution also expressly rejected accusations advanced by Particle in the Carequality Dispute that Epic had discriminated against Particle by applying a more stringent standard to Particle connections than to other implementers' connections in assessing whether they legitimately perform medical treatment.  Carequality investigated Particle's contention that Epic had singled it out and handled its connections unfairly, and Carequality concluded that it was not true.  Carequality reviewed comprehensive data on Epic's processing of all Carequality directory entries added during the first half of 2024, which confirmed that Epic processed Particle connections consistently with how it processed connections added to the Carequality directory by other implementers. (*Id.* § IV.6.c.)  Contrary to Particle's accusation, Epic and its customers remain vigilant against attempts to improperly acquire patient health records and exploit them for commercial gain, and Carequality concluded that the actions Epic took upon discovering Particle customers' improper record retrievals were no different than the actions it would have taken in response to any suspected breach of Carequality's rules.

13

Although Particle had the right to appeal the Resolution, it chose not to do so and instead accepted it, thereby obligating itself to act in accordance with the Resolution's conclusions. But that is not what Particle has done. Instead, Particle unfortunately has doubled down on its conduct, and Particle's own Complaint in this case brazenly touts that its business model is to deliver patient records beyond what is legally permissible. Particle recognizes, consistent with HHS's express determination, *see* 65 Fed. Reg. at 82626-27, that "traditional payer use cases for medical records have not been considered 'treatment'" (Compl. ¶ 9). But Particle then boasts that it nonetheless enables and encourages payers to "utilize the centralized exchange networks" like Carequality "to obtain medical records through the most efficient means currently available" (*id.*) containing far more than the "minimum necessary" information that they are entitled to receive under HIPAA. Further, when Particle's payer customers automatically receive full, unredacted medical records by falsely asserting a treatment purpose, the organizations that are the custodians of those records are unable to honor any patient requests to withhold information relating to services paid for in full by the patient. The custodians of those records are also deprived of the opportunity to determine whether they need to redact certain information to comply with any additional state law requirements, or whether to obtain explicit patient consent before sharing the records for non-treatment purposes.

Rather than accept that its business model of facilitating improper access to full patient health records was exposed and change its conduct, Particle filed this case, claiming that Epic was wrong to take the steps it took to protect patient data.

It is undisputed that Particle facilitated its customers' wrongful record retrievals pursuant to misrepresentations of a treatment purpose. According to Particle, Epic's actions to bring that to light and stop the bleeding of additional patient records getting taken were not actually done to

protect the privacy and security of Epic customers' patient data.  Instead, Particle concocts a theory that all of that was a charade to hobble Particle so that it could not effectively compete with Epic's Payer Platform product that it offers to health insurance companies.  That makes absolutely no sense for many reasons.

As an initial matter, Epic's Payer Platform product helps payers discharge various non-treatment, insurance-related functions and to do so in careful compliance with all of the various regulations that govern and restrict what payers are able to see from a patient record.  Indeed, because Carequality is not set up to ensure that those restrictions can be implemented and followed, Payer Platform does not request or exchange any health records through Carequality at all.

Particle's so-called "payer platform market" bears no relation to reality and has been artificially gerrymandered solely for purposes of this litigation and Particle's accompanying public relations campaign.  Particle's purported market definition is a contrived market of two: Epic Payer Platform and Particle.  If Particle were to be believed, before Epic's Payer Platform and Particle came along within the past few years, it was only the fax machine for payers to request and receive records.  That does not even pass the straight face test.  Payers are among the most sophisticated data-driven entities that exist in the healthcare industry.  They have been efficiently obtaining health information electronically for decades.  For example, clearinghouses have existed for decades to facilitate electronic exchange of health information.  The methods for electronic data retrieval have only grown from there.  And countless companies offer analytics tools for payers, not to mention the fact that many payers have developed these tools themselves. Particle simply wishes away the myriad other products that exist today that do the same things Particle says its product does (data retrieval, storage, and analytics), either individually or in

combination.  For example, Datavant, Availity, InterSystems HealthShare, among a long list of other companies, offer non-treatment electronic data exchange services.  Epic's Payer Platform product was not the first and is not the only of its kind.  Epic looks forward to being able to present such facts and answer the Court's questions as part of the limited first phase that the Court instructed the parties to conduct.

In sum, Particle's fabricated antitrust allegations represent a feeble attempt to distract public attention from Particle's role in the misappropriation and sale of highly confidential patient data, which gravely undermines the trust on which Carequality's framework depends. Epic is confident that Particle's remaining claims will be dismissed.  For that reason, Epic is not filing any claims against Particle at this time so as not to breathe any additional oxygen into this misguided lawsuit; Epic instead will focus on continuing to help healthcare providers administer the best care for patients by protecting the security of patient data and the requisite trust in the nation's frameworks for exchanging that most sensitive data.

## ANSWER

Except as otherwise expressly set forth below, Epic denies each and every allegation contained in the Complaint, including, without limitation, headings, sub-headings, and footnotes contained in the Complaint.  With respect to the footnotes, Epic denies the allegations contained in each, and, for those containing citations, refers to the content of the citations.  Epic expressly reserves the right to amend and/or supplement its answer and defenses, including to raise any additional defenses, counterclaims, and third-party claims not asserted herein of which it becomes aware through discovery or other investigation.  Subject to the foregoing, as and for its Answer to Particle's Complaint, Epic pleads as follows:

1.      Epic Systems Corporation ("Epic") is a behemoth in the provision of software to healthcare providers across the country.  Its primary product is a system for maintaining electronic health records ("EHR"), which have come to almost entirely replace the paper patient files long used by medical professionals.

**ANSWER:**  Epic denies the allegations in Paragraph 1, except admits that it is a

provider of electronic health record software.

2.      As its name implies, Epic is massive—it is a monopolist in the EHR software market.  Nearly every large healthcare provider in the nation uses Epic's EHR platform and software.  Over three-quarters of the U.S. population have electronic health records within an Epic database.  An ever-growing problem in today's healthcare system, however, is that Epic obtained that position by promising efficiencies, streamlined processes, and, most importantly, cost-savings.  But, that proved to be a Faustian bargain for healthcare providers nationwide, because Epic has used its position of dominance to worm its way to the core of the U.S. healthcare system and stamp out competition in a wide variety of interrelated markets, thereby generating billions of dollars for itself.

**ANSWER:**  Epic denies the allegations in Paragraph 2, except states that certain

allegations in Paragraph 2 purport to state a legal conclusion to which no response is required.

To the extent that a further response is required, Epic denies the allegations of the paragraph.

3.      Epic's EHR platform is hugely expensive, often involving upfront installation costs of hundreds of millions of dollars.  After incurring such large costs of entry, very few healthcare providers are willing or able to switch EHR platforms.  This is a broad source of power for Epic.  As one commentator put it, "[w]ithin a few years, any significant discussion of healthcare strategy in the U.S. will require the active participation and support of Judith Faulkner, the founder and CEO of Epic, and her executive team."

**ANSWER:**  Epic denies the allegations in Paragraph 3, except states that (i) it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 3, and therefore denies them, and

(ii) Particle purports to quote a commentator and Epic refers to any such quote for its contents.

4.      By providing the software that stores the majority of American medical records, Epic gains control over a crucial resource:  the medical records themselves.  When a healthcare provider uses an EHR platform to collect, store, and organize medical records, the EHR company typically gains control over the distribution of those records to third parties, such as other healthcare providers or health insurance providers.  In the U.S., somewhere between 81-94% of patients have at least one medical record stored in an Epic EHR.  Epic is thus by far the dominant supplier of electronic medical records to third parties.

**ANSWER:**  Epic denies the allegations in Paragraph 4.

5.     The problem this lawsuit addresses is that Epic is now attempting to use its power over EHRs to expand its dominance into the fledgling market for "payer platforms."  A payer platform is a relatively new type of software platform that allows health insurance providers (also known as "health plans" or "payers") to efficiently request and instantaneously retrieve large numbers of medical records directly from the EHR platforms that generate and store them.  In addition to obtaining the records at scale, payer platforms allow users to store the records, run analytics, and conduct other business-critical tasks within a self-contained system.  Until recently, payers obtained medical records—which are a critical part of their business—through a cumbersome, manual process.  Payer platforms digitize and automate this process, helping health plans drastically improve their performance by reducing error-driven denials, providing better health-enhancing services to members, and generating more complete pictures of their members' health and risk.  The Epic Payer Platform ("EPP") is by far the largest payer platform in the nation.

**ANSWER:**  Epic denies the allegations in Paragraph 5.

6.     Epic released EPP in 2021, and, as the first payer platform, quickly gained customers.  But, although the new market was growing rapidly, no competitors emerged to challenge EPP during the first few years of its existence.  That was because of a calculated move by Epic to stifle competition.  No competitors could challenge EPP because Epic made it commercially impossible for any payer platform other than EPP to access records stored in Epic's EHR software.  Without the ability to pull Epic-stored records—which constitute a substantial majority of all medical records in the United States—and provide those records to payers at scale, any hypothetical competing payer platform was dead on arrival.

**ANSWER:**  Epic denies the allegations in Paragraph 6.

7.     Plaintiff Particle Health Inc. ("Particle"), however, solved this problem and is the only competitor in the payer platform market ever to pose a meaningful threat to EPP's market share.  Founded in 2018, Particle began offering its services a few years later.  Particle's platform, like EPP, provides both a record retrieval service, which allows users to interface with EHR companies like Epic to smoothly request medical records at scale, and an analytics service, which allows users to efficiently store and monitor trends in the medical records they request.

**ANSWER:**  Epic denies the allegations in Paragraph 7, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons, products, or entities other than Epic in Paragraph 7, and therefore denies

them.

8.     For most of its existence, Particle did not cater to payers, instead offering a platform for traditional healthcare providers and health tech companies to use to retrieve medical records automatically and at scale.  Epic has historically allowed platforms like Particle

to retrieve Epic-stored medical records for traditional healthcare providers.  Federal regulations require that EHR companies like Epic make their records widely available for "treatment" purposes, which has led to a system of centralized exchange networks through which EHR companies make their records available in response to "treatment" requests.  One aspect of these exchange networks is that they allow platforms like Particle to plug in and pull records at scale.  Epic, for its part, has generally been content to allow platforms like Particle to retrieve its records for traditional healthcare providers because that activity does not threaten Epic's dominion over payers.

**ANSWER:**  Epic denies the allegations in Paragraph 8, except (i) refers to the

federal regulations referenced therein for their contents, and (ii) states that it is without

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

persons or entities other than Epic in Paragraph 8, and therefore denies them.

9.      In 2023, Particle became the first competitor to figure out how to compete with EPP by being the first to recognize and respond to a seismic shift in how payers operate.  Historically, payers have been unable to utilize the exchange networks to obtain and retrieve medical records because traditional payer use cases for medical records have not been considered "treatment."  In recent years, however, increasing numbers of payers have begun to offer certain treatment-related services to their members and members' doctors, as more organizations have come to realize the value of innovative value-based care arrangements.  The services offered by these so-called "pay-viders" include, for example, creating personalized treatment recommendations for their members' doctors.  Particle was the first to realize that payers offering these services legitimately needed records to assist physicians with providing "treatment," and could therefore, under certain circumstances, utilize the centralized exchange networks to obtain medical records through the most efficient means currently available.  Under HIPAA and the rules of those networks, those same payers can then rightfully use the records for "secondary" purposes more typically associated with health insurance, like population health analytics or processing claims.

**ANSWER:**  Epic denies the allegations in Paragraph 9, except (i) refers to

HIPAA, the rules referenced therein, and guidance from the Department of Health & Human

Services (65 Fed. Reg. 82462, 82626-27 (Dec. 28, 2020)) for their contents, and (ii) states that it

is without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 9, and therefore denies them.

10.      The pay-vider trend opened the door to competition in the payer platform market, because that new class of payer had every right to access medical records through the centralized exchange networks and therefore could utilize platforms other than EPP, like Particle.  That increased competition also substantially benefited ordinary consumers, because it

encouraged their payers to offer broader treatment-related services as part of their health plan coverage, and it allowed payers to save on costs due to the existence of a competing payer platform (which translates into better health plan coverage, for less). Particle quickly began to assist payers who offer innovative "pay-vider" services with obtaining medical records, both directly (through customer relationships with certain payers) and indirectly (through contracts with other payer software vendors to integrate Particle's payer platform capabilities into their software for specific payers). The payers who Particle has assisted, either directly or indirectly, include major companies like Blue Cross Blue Shield of Michigan and Blue Shield of California, as well as up-and-coming payers like Curative and Clover Health. As the first company to introduce viable competition to the payer platform market, Particle was on a meteoric growth path.

      **ANSWER:** Epic denies the allegations in Paragraph 10, except (i) refers to

HIPAA and guidance from the Department of Health & Human Services (65 Fed. Reg. 82462,

82626-27 (Dec. 28, 2020)) for their contents, and (ii) states that it is without knowledge or

information sufficient to form a belief as to the truth of the allegations concerning persons or

entities other than Epic in Paragraph 10, and therefore denies them.

      11. Epic first became aware of Particle's entry into the payer platform market in late 2023, when it learned that a Particle customer was utilizing the Particle platform to provide EHRs to Blue Cross Blue Shield of Michigan. Epic immediately began to raise baseless complaints with Particle to intimidate it into exiting the market, each to no avail. A few months later, in March 2024, with the rising threat that Particle posed to its dominant EPP product, Epic decided that it had had enough of fair competition. Why? Because the payer platform market is one where early entry is key, and where early dominance essentially means the winner takes all. As Epic's dominance in EHRs shows, early entrants to these markets enjoy substantial lock-in effects and inertia. Knowing that from personal experience, Epic therefore set out to eliminate any whiff of competition in this relatively new market, so it could continue to extend its dominance and erect an impregnable moat around payer platforms. Epic accordingly began a multi-pronged campaign to destroy Particle and actively snuff out competition, which only meaningfully showed up once Particle began its recent, swift growth.

      **ANSWER:** Epic denies the allegations in Paragraph 11.

      12. *First*, Epic has leveraged its chokehold over EHRs to coerce Particle's customers—both its newer payer customers and its older healthcare provider customers—into ending their relationships with Particle. Because Epic is the dominant supplier of EHRs to third parties, nearly every one of Particle's customers using its platform must request EHRs from Epic. For Particle's customers, those records are an essential part of their business. Keenly aware of its EHR dominance and the power that provides over Particle's customers, Epic began in March 2024 to suddenly and arbitrarily deny Particle customers (including Particle's traditional healthcare provider customers) access to Epic-stored records. Though it has since offered a shifting series of pretextual justifications for its behavior, Epic's desire to crush Particle has

remained clear beneath it all: after cutting off their access to essential medical records, Epic informed Particle customers that it would resume supplying them with those records ***if and only if*** they stopped using Particle's competing platform. Faced with catastrophic business losses, some have done just that, while many others have threatened to do so, requiring Particle to provide them with substantial monetary concessions. The threat of losing access to Epic records has also scared off prospective customers. As one (now lost) prospective Particle customer put it: "***While [we were] bullish on our use case by being under the Particle umbrella our advisors felt we would be under additional scrutiny. Our ability to be successful as a company is tied to our access to the [Health Information Exchange] and Particles current dispute [with Epic] puts this connection at risk***."

        **ANSWER:** Epic denies the allegations in Paragraph 12, except refers to the communication that Particle purports to quote therein for its contents.

        13.     *Second*, at the same time Epic began coercing Particle's existing customers to end their relationships with Particle, it began to obstruct Particle's onboarding of new customers and expansion of its relationships with existing customers, further stifling Particle's ability to compete. When Particle onboards a new customer or adds a new record endpoint for an existing customer (such as a new doctor's office in an existing customer's network), Epic must add that customer to its "directory" in order for Particle to begin retrieving Epic-stored medical records on its behalf. This approval process typically occurs automatically, and was never a problem before Particle entered the payer platform market. Approval consistently took no more than two days. As soon as Epic commenced its anticompetitive campaign, however, it began to drastically slow-walk the approval process for new Particle customers, including traditional healthcare provider customers. Epic instituted a new policy that ***every*** new Particle customer had to be individually approved by a single, arcane executive committee affiliated with Epic that has treated every new customer with extreme skepticism. That new policy, which lasts to this day, applies ***only*** to Particle customers; no other group of organizations is required to consistently obtain manual approval from Epic. Indeed, aside from a few isolated instances, Particle is not aware of any non-Particle customers that have had to obtain manual approval ***at all***. Epic's new policy has made an onboarding process that previously took a maximum of ***two days*** now often take over ***a month***—and, in the case of at least one Particle customer, almost ***three months***. By adopting this policy, Epic has dramatically and transparently increased the risks for healthcare organizations to associate with Particle, by unapologetically putting a target on their backs and making sure they know that fact.

        **ANSWER:** Epic denies the allegations in Paragraph 13.

        14.     *Third*, at the same time Epic began coercing Particle's customers to end their relationships with Particle, it embarked on a market wide campaign to destroy trust in Particle. Beginning in April 2024, Epic directed thousands of statements to the healthcare community that baselessly (and vaguely) claimed that Epic had cut off Particle customers because Particle introduced "security and privacy risks," and allowed "potentially inappropriate disclosures of protected health information." Those claims were (and are) not only false; they are inconsistent with the pretextual explanations Epic itself has given for its actions when forced to explain its reasons in detail. Epic repeated these claims multiple times to thousands of

healthcare providers, including eventually claiming—with absolutely no basis—that Particle had "admitted wrongdoing." The actual substance of Epic's supposed reasons for cutting off Particle customers has nothing to do with any alleged "security and privacy risks" they face or "wrongdoing" by Particle, despite what its statements insinuated. But, by repeatedly issuing (and doubling down on) vague and ominous statements alluding to such risks, Epic destroyed public trust in its only meaningful competitor in an industry where privacy and security are paramount concerns. These tactics have so far paid off: as soon as Epic began its campaign, Particle began to struggle to obtain new business and keep the old, in contrast with the rapid expansion in market share it saw before.

> **ANSWER:** Epic denies the allegations in Paragraph 14, except (i) refers to the communications purportedly quoted therein for their contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 14, and therefore denies them.

15.    *Fourth,* Epic has repeatedly tried to overwhelm Particle and thereby prevent it from operating on a competitive basis by directing its statements about supposed "security and privacy" risks to hundreds of Epic's own healthcare provider customers, and then telling those providers to request more information from Particle about what Epic knew were non-issues. These efforts were meant to inundate Particle with hundreds of inbound inquiries from healthcare providers, much the same as hackers shut down websites through distributed denial-of-service (DDoS) attacks that overwhelm a website with supposedly benign but, in reality, malicious traffic. Because Particle remains a small company, it simply does not have the resources to both run its operations as normal and assist hundreds of healthcare organizations with investigations into what they have been misled to believe are real issues. As a result, Epic's tactic of weaponizing concerns over privacy obligations to overwhelm Particle with information requests has drained Particle's resources and severely disrupted its operations, further hindering its ability to compete.

> **ANSWER:** Epic denies the allegations in Paragraph 15, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic and concerning methods hackers allegedly use to overwhelm websites in Paragraph 15, and therefore denies them.

16.    *Fifth*, Epic has bogged Particle down and further smeared its name by bringing a manufactured dispute against it within a standard-setting organization called Carequality, and by using its outsized influence over that organization to improperly obtain a result that favors Epic, regardless of the merits. Carequality is, in its own words, "the nation's largest healthcare data sharing platform." It is a private non-profit body that oversees and administers a contractual framework that healthcare organizations, including Epic and Particle, join to facilitate the smooth flow and exchange of medical records between them for "treatment"

purposes, and to ensure interoperability.  At the same time that Epic cut off records access to Particle's customers and began its smear campaign against Particle, Epic also initiated a dispute against Particle within Carequality's private dispute resolution process.  Epic's claims hinged on an allegation that three Particle *customers* (not Particle itself) applied an incorrect designation to certain medical record requests they made through Particle's platform.  However, Epic did not identify—and to this day still has not identified—anything indicating that Particle was or should have been aware that any customers misused its platform, such as deficiencies in Particle's onboarding or screening processes.  Although disputes between Carequality members have traditionally been informal and relied on negotiated resolutions, Epic insisted on filing a formal dispute (the first in Carequality history) and drew it out, forcing an unprecedentedly slow and formal process while rebuffing five separate efforts by Particle to reach a negotiated resolution. All of this had the purpose and effect of further draining Particle's resources and subjecting it to sustained scrutiny in the public eye.

**ANSWER:**  Epic denies the allegations in Paragraph 16, except (i) admits that Carequality is a non-profit, quasi-government organization that is intended to facilitate the electronic exchange of medical records, and Epic initiated a dispute against Particle pursuant to the Carequality Dispute Resolution Process, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 16, and therefore denies them.

17.     After receiving comprehensive written submissions and evidence and holding a full hearing, the Carequality Steering Committee ***fully agreed*** with Particle's arguments, expressly finding that Particle did absolutely nothing wrong, that Epic's allegations against Particle had no basis in fact, and that Particle acted within the law and Carequality rules. And yet, in a clear indication of Epic's strong influence over that body, the Steering Committee nevertheless imposed a "corrective action plan" on Particle that gave Epic much of what it wanted ***while expressly disclaiming*** any finding of wrongdoing by Particle.  That unprecedented result can be explained only by the outsized power and influence over Carequality that Epic has purposefully cultivated.  As by far the largest supplier of medical records to the Carequality framework, Epic knows that Carequality could not exist (and is, in fact, entirely irrelevant) without its voluntary participation.  Throughout the years, Epic has repeatedly extracted concessions from Carequality by threatening to leave the organization, and it hangs this threat over Carequality's head like a Damocles sword, improperly manipulating the organization.  On information and belief, Epic's improper coercion of Carequality allowed it to obtain a resolution to the dispute that further burdened Particle, even though the Steering Committee was expressly unable to find any merit in Epic's allegations of wrongdoing.  This result further hinders Particle's ability to compete and is yet another example of Epic's anticompetitive tactics.

**ANSWER:** Epic denies the allegations in Paragraph 17, except (i) admits that the Carequality Steering Committee imposed a corrective action plan on Particle, and (ii) refers to the Carequality Steering Committee Resolution referenced therein for its contents.

18. The impact on Particle of Epic's anticompetitive conduct has been severe and threatens its very existence. Particle's market share and revenue had been growing exponentially prior to Epic's exclusionary campaign. Just a few months after Epic began its conduct, however, Particle's revenue growth dropped so sharply and so dramatically that it was barely able to meet *one third* of its previous projections, which up to that point it had regularly exceeded. And, unfortunately, that downward trend is continuing, all because of Epic's anticompetitive campaign.

**ANSWER:** Epic denies the allegations in Paragraph 18, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 18, and therefore denies them.

19. If left unfettered, Epic's conduct will snuff out meaningful competition in the still-fledgling payer platform market, relegating yet another market to Epic's monopoly control. That outcome would not only harm the customers of payer platforms (health plans), but also the patients, doctors, and hospitals affected by prices and plans that payer platforms establish for their health care reimbursements. Even putting that aside, Epic's increasingly obstructive efforts to box out Particle also create inefficiencies and delays in the treatments actual patients need and receive, thereby harming the very constituents Epic purports to help. Without meaningful competition, Epic will be allowed to provide a worse product for higher price, which will in turn have cascading effects on the scope and price of plans that payers provide. Only the antitrust and other claims in this Complaint, and the injunctive relief sought herein, can preserve robust competition in the payer platform market, and remedy the extensive harm Epic has already caused.

**ANSWER:** Epic denies the allegations in Paragraph 19, except states that certain allegations in Paragraph 19 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

20. Plaintiff Particle Health Inc. ("Particle") is a privately-held corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 104 W 27th St, New York, New York 10001.

**ANSWER:** Epic states that it is without knowledge or information sufficient to

form a belief as to the truth of the allegations concerning persons or entities other than Epic in

Paragraph 20, and therefore denies them.

21. Defendant Epic Systems Corporation ("Epic") is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 1979 Milky Way, Verona, Wisconsin 53593.

**ANSWER:** Epic admits the allegations in Paragraph 21.

22. Epic is the largest provider of health information technology in the United States, and its products and services are used primarily by large U.S. hospitals and health systems to access, organize, store, and share electronic medical records. As discussed in further detail below, a substantial majority of large hospital systems use Epic's electronic health records systems software and the vast majority of patients in the United States have electronic health information stored in Epic's software products. Epic operates across the United States, including in the Southern District of New York, where it transacts substantial business.

**ANSWER:** Epic denies the allegations in Paragraph 22, except admits that Epic

is a provider of electronic health record software; Epic licenses its electronic health record

software to healthcare providers, including large hospitals; and Epic has customers in New York.

23. Epic also offers a variety of other healthcare software to various entities within the healthcare system, including but not limited to payer platforms.

**ANSWER:** Epic denies the allegations in Paragraph 23, except admits that it

licenses software to various types of entities in the healthcare industry.

24. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question jurisdiction), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Clayton Antitrust Act, 15 U.S.C. § 15(a).

**ANSWER:** Epic states that the allegations in Paragraph 24 purport to state a

legal conclusion to which no response is required. To the extent a response is required, Epic

denies the allegations in Paragraph 24, except states that Particle purports to invoke the

jurisdiction of this Court.

25.     This Court has supplemental jurisdiction to adjudicate the related state law claims under 28 U.S.C. § 1367 because these claims are so related to the claims arising under Title 15 that they form part of the same case or controversy.

**ANSWER:**  Epic states that the allegations in Paragraph 25 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations in Paragraph 25, except states that Particle purports to invoke the jurisdiction of this Court.

26.     This Court has personal jurisdiction over Epic pursuant to Federal Rule of Civil Procedure 4(h)(1)(A) and the New York long-arm statute because (a) Epic transacts substantial business in this District; and (b) Epic directed the tortious and otherwise illegal conduct from which these claims arise toward this district, where Particle resides.

**ANSWER:**  Epic states that the allegations in Paragraph 26 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations in Paragraph 26, except states that Particle purports to invoke the jurisdiction of this Court.

27.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Epic, as an entity subject to this Court's jurisdiction, resides in this District and because a substantial part of the events or omissions giving rise to the claims and affecting interstate commerce occurred in this judicial District.

**ANSWER:**  Epic states that the allegations in Paragraph 27 purport to state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations in Paragraph 27, except states that Particle purports to invoke the jurisdiction of this Court.

28.     The relevant market in which Epic and Particle compete is the payer platform market.  There are, however, other aspects of Epic's business that inform how and why it has the power to foreclose competition in the payer platform market.  Although Particle's claims do not depend on whether these other aspects of Epic's wide-ranging business are defined as relevant antitrust markets, it nevertheless notes that they may be considered in that way and, as noted herein, therefore contribute to certain types of antitrust and other liability.  Those other aspects of Epic's business are its dominance over EHR Software and the provision of EHRs.

**ANSWER:**  Epic denies the allegations in Paragraph 28, except states that certain allegations in Paragraph 28 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

29.    The first type of product (and, in the alternative, relevant market) at issue in this case is Electronic Health Records Software.  An Electronic Health Record ("EHR") is a patient's medical history stored and maintained in electronic format.  An EHR often contains critical patient information such as a patient's medical history, diagnoses, medications, treatment plans, immunization dates, allergies, radiology images, and laboratory and test results.  Due to their electronic form, EHRs have substantial, unique benefits over paper records, including that a patient's medical history can be more easily stored in one central location, sent between medical care providers, accessed immediately, and physically take up less space.  Using EHRs also enhances accuracy, given that they involve electronic data entry and a number of checks to ensure accuracy.

**ANSWER:**  Epic denies the allegations in Paragraph 29, except (i) admits that an Electronic Health Record ("EHR") is a patient's medical history stored and maintained in electronic format; often contains critical patient information such as a patient's medical history, diagnoses, medications, treatment plans, immunization dates, allergies, radiology images, and laboratory and test results; can be exchanged between medical care providers, accessed immediately, and physically take up less space; and involves electronic data entry and a number of checks to ensure accuracy, and (ii) states that certain allegations in Paragraph 29 purport to state a legal conclusion to which no response is required.  To the extent that a further response is required, Epic denies the allegations of the paragraph.

30.    Electronic Health Records are maintained in Electronic Health Record Software ("EHR Software").  EHR Software allows healthcare facilities to add, update, maintain, and delete patient EHR data, along with user interfaces that allow medical professionals and patients to use and interact with the EHR data.  For example, here is a snapshot of Epic's EHR interface (with all patient information redacted):



**ANSWER:** Epic denies the allegations in Paragraph 30, except (i) admits that electronic health records software allows end users to add, update, and maintain patient data often through a multitude of user interfaces, and (ii) refers to Epic's electronic healthcare software interface referred to therein for its contents.

31.    Hospitals deploy EHR Software to streamline their operations and avoid the use and maintenance of unreliable paper records.  EHR Software also allows for increased interconnectivity between and among healthcare practitioners and facilities so that all healthcare professionals have a single, accurate view of the patient's medical history and profile.

**ANSWER:** Epic denies the allegations in Paragraph 31, except admits that Epic's electronic health record software is used by healthcare providers to document information about their patients, and Epic's electronic health record software makes it possible for healthcare organizations to have a single, comprehensive patient medical record that informs and is informed by the patient's health experiences.

32.    From a practical perspective, there are no reasonably interchangeable substitutes for EHR Software.  The entire purpose and use of the software is as a centralized location for a uniform type of EHRs, which are in turn specifically designed and used for medical care purposes.  Other types of electronic record software do not have that same use case or application, and are therefore not the types of product to which customers would turn for the same essential purpose.

**ANSWER:** Epic denies the allegations in Paragraph 32.

33.    Customers of EHR Software recognize that it constitutes a unique type of product and that other types of software are not reasonably interchangeable with EHR Software. Furthermore, EHR Software has unique pricing and price-demand curves vis-à-vis other types of software, including software in the healthcare industry.  Because of these facts, a hypothetical monopolist of EHR Software (or actual monopolist, like Epic) can profitably implement a small but substantial, non-transitory increase in price ("SSNIP"), because EHR Software users would not switch to other types of products in sufficient numbers to make the increase unprofitable.

**ANSWER:**  Epic denies the allegations in Paragraph 33, except states that (i) it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 33, and therefore denies them, and (ii) certain allegations in Paragraph 33 purport to state a legal conclusion to which no response is required.  To the extent that a further response is required, Epic denies the allegations of the paragraph.

34.    The geographic scope of the EHR Software Market is the United States. There are few, if any, groups of healthcare facilities that span across multiple countries. Moreover, the United States has a unique regulatory regime that controls how EHR Software is designed and implemented in the United States.

**ANSWER:**  Epic denies the allegations in Paragraph 34, except states that (i) it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 34, and therefore denies them, and (ii) certain allegations in Paragraph 34 purport to state a legal conclusion to which no response is required.  To the extent that a further response is required, Epic denies the allegations of the paragraph.

35.    Epic is a monopolist in the EHR Software Market.  Epic's Software contains at least one electronic health record from more than **280 million** patients in the United States, and generates **$4.6 billion** in annual revenue.[1]  Its market share measured by the percentage of patients with at least one electronic record is approximately 81%, as the total population of the United States is approximately 345 million.[2]

**ANSWER:**  Epic denies the allegations in Paragraph 35 and accompanying

footnotes, except (i) refers to the Forbes and CNBC articles cited therein for their contents, and

denies them, (ii) refers to Epic's website cited therein for its contents, and (iii) states that certain

allegations in Paragraph 35 purport to state a legal conclusion to which no response is required.

To the extent that a further response is required, Epic denies the allegations of the paragraph.

36.    Epic's dominant market position has put the company in a monopolistic position—one that's thwarting industry competition, stifling innovation, and exerting an undue amount of control over the employees, partners and customers with whom Epic works.  As a result, Epic has grown while competitors have stagnated:  between 2017 to 2022, Epic added almost 100,000 new hospital beds to its EHR network, while not a single competitor made a net gain of beds during that same period.  As one healthcare network CEO put it, Epic's system "has tentacles that go out through amazing networks."[3]  Moreover, Epic is well-positioned to perpetuate its market dominance, as "[m]ore than 90% of medical students and residents now train on Epic."[4]

**ANSWER:**  Epic denies the allegations in Paragraph 36 and accompanying

footnotes, except (i) refers to the Forbes and Becker's articles cited therein for their contents, and

denies them, (ii) states that it is without knowledge or information sufficient to form a belief as

---

[1] https://www.forbes.com/companies/epic-systems/?sh=3caf699ca11b; https://www.cnbc.com/2024/08/16/epic-systems-customers-will-use-tefca-to-exchange-health-records-.html.

[2] On its website, Epic indicates that it has at least one EHR for more than 325 million patients. https://www.epic.com/about/. If that is a reference to United States patients, that is approximately 94%.

[3] *The Billionaire Who Controls Your Medical Records*, Katie Jennings, Fortune, https://www.forbes.com/sites/katiejennings/2021/04/08/billionaire-judy-faulkner-epic-systems/?sh=489c3fe7575a.

[4] *How Epic won over academic medical centers*, Giles Bruce, Becker's Healthcare, https://www.beckershospitalreview.com/ehrs/how-epic-won-over-academic-medical-centers.html.

to the truth of the allegations concerning persons or entities other than Epic in Paragraph 36, and therefore denies them, and (iii) states that certain allegations in Paragraph 36 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

37.    While harmful to doctors and patients, Epic's monopoly has been lucrative for its secretive private owners. "Epic Systems founder Judy Faulkner built an empire pioneering—and later dominating—electronic medical records."[5] Ms. Faulkner's 47% stake in Epic has been estimated to be worth $7.4 billion.[6]

**ANSWER:** Epic denies the allegations in Paragraph 37 and accompanying footnotes, except (i) refers to the Forbes and Becker's articles cited therein for their contents, and denies them, and (ii) states that certain allegations in Paragraph 37 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

38.    Unsurprisingly, there is widespread recognition that Epic is a monopolist. For example, one doctor has written:[7]

> EPIC cornered the market with an awful product and a virtual monopoly. It's not just rules/regulations - it's an actual POS software we're forced to use. EHRs could actually be helpful if they were engineered correctly. But not while EPIC is the only option . . . .

Almost 10 years ago, academic commentators recognized that "Epic is creating an emerging monopoly in the USA."[8] Since then, Epic's dominance has only grown—and dramatically so.

---

[5] *The Billionaire Who Controls Your Medical Records*, Katie Jennings, Fortune, https://www.forbes.com/sites/katiejennings/2021/04/08/billionaire-judy-faulkner-epic-systems/?sh=489c3fe7575a.

[6] *Judy Faulkner's wealth climbs to $7.4B*, Naoimi Diaz, Becker's Healthcare, https://www.beckershospitalreview.com/ehrs/judy-faulkners-net-worth-sees-increase.html.

[7] https://x.com/drkevinknopf/status/1151990148587872256?s=46.

[8] *Implications of an emerging EHR monoculture for hospitals and healthcare systems*, Ross Koppel and Christoph Lehmann, Journal of the American Medical Informatics Association Vol. 22, Issue 2 (March 2015), https://academic.oup.com/jamia/article/22/2/465/695841.

**ANSWER:** Epic denies the allegations in Paragraph 38 and accompanying footnotes, except refers to the X post and Journal of the American Medical Informatics Association article cited therein for their contents, and denies them.

39.    This market power is enforced by the overwhelming lock-in effects of Epic's Software.  Installing Epic involves massive nine- (and, in some instances) ten-figure investments, with over two-thirds of that cost coming in the form of upfront fees.[9]  For example, when Partners HealthCare adopted Epic software, it incurred $1.6 billion in expenses.[10]

**ANSWER:** Epic denies the allegations in Paragraph 39 and accompanying footnotes, except (i) refers to the Journal of the American Medical Informatics Association and New Yorker articles cited therein for their contents, and denies them, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 39, and therefore denies them.

40.    Among EHR vendors, Epic has a notorious reputation for lock-in effects that make it prohibitive for healthcare organizations to switch EHR vendors after installing Epic. As put succinctly by one source, "Epic knows switching costs are too high to move to another vendor, as there are large-scale losses in productivity, time spent, and resources in changing behavior and moving to a computerized EHR system in the first place."[11]  Epic has been described as "a collective organism that acquires knowledge and technology from external sources and then forcibly assimilates their clients into its drone army."[12]

**ANSWER:** Epic denies the allegations in Paragraph 40 and accompanying footnotes, except refers to the Harvard Business School comment and 4sight Health article cited therein for their contents, and denies them.

---

[9] *Id.*

[10] *Why Doctors Hate Their Computers*, Atul Gawande, https://www.newyorker.com/magazine/2018/11/12/why-doctors-hate-their-computers.

[11] *Epic EHR Systems: The Role of Network Effects*, Harvard Business School, https://digital.hbs.edu/platform-digit/submission/epic-ehr-systems-the-role-of-network-effects/.

[12] *Healthcare's Epic Problem & the Audacity of Liberating Patient Data*, 4sightHealth, https://www.4sighthealth.com/healthcares-epic-problem-the-audacity-of-liberating-patient-data/.

41.    These facts indicate that as an economic matter, clients that have selected Epic Systems as their EHR Software have little choice but to continue using Epic Systems and are beholden to Epic Systems.  Very few large healthcare organizations have switched away from Epic after installing Epic's EHR Software.

**ANSWER:**  Epic denies the allegations in Paragraph 41, except admits that Epic is invested in maintaining long-term relationships with its customers and thus very few large healthcare organizations have terminated their relationships with Epic.

42.    In addition to the Epic-specific switching costs and lock-in effects its EHR customers face, new entrants to the EHR Software market also face substantial barriers to new entry.  For one, there are incredibly high hard costs, time requirements, and expertise required to develop EHR Software in the first place.  Further, putting aside Epic itself, there are substantial lock-in effects and switching costs from selecting and then implementing EHR Software.  There are also substantial network effects once an EHR Software provider achieves any sort of scale.  As Epic's own case demonstrates, those network effects build on each other over time, making it extremely difficult for new entrants to participate in the market.  EHR Software providers must also comply with significant and varied regulatory schemes.

**ANSWER:**  Epic denies the allegations in Paragraph 42, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 42, and therefore denies them.

43.    The second type of product—or, in this case, service—at issue in this dispute is the provision of medical records to third parties ("EHR Provision Services").  This type of service (or, in the alternative, relevant market) is related to, but distinct from, EHR Software.  Whereas EHR Software generates and stores medical records, EHR Provision Services, as the name implies, involve the provision of the records *themselves* to users other than the parties who generate them.  Whereas the customer base for EHR Software includes only hospitals and other healthcare providers who have need to generate medical records, the customer base for EHR Provision Services includes healthcare researchers, analytics companies, health plans, and patients in addition to other healthcare providers—in short, any party who needs to obtain existing medical records generated by a third party.  The same companies that supply EHR Software also supply records as part of their EHR Provision Services.

**ANSWER:**  Epic denies the allegations in Paragraph 43, except states that certain allegations in Paragraph 43 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

44.     EHR Provision Services are a unique type of service with no reasonable substitutes.  When an individual or organization needs to access the information contained within a patient's electronic medical records—whether for treatment, research, or insurance claims processing—nothing other than medical records will serve the user's purposes.  Furthermore, consumers of EHR Provision Services recognize that they constitute a unique type of service and that other types of service are not reasonably interchangeable with them.  Furthermore, EHR Provision Services have unique pricing and price-demand curves vis-à-vis other types of service, including services in the healthcare industry.  Thus, a hypothetical monopolist of EHR Provision Services can profitably implement a SSNIP, because users with need to obtain medical records would not switch to other types of service providers in sufficient numbers to make the increase unprofitable.

**ANSWER:**  Epic denies the allegations in Paragraph 44, except states that certain allegations in Paragraph 44 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

45.     The geographic scope for EHR Provision Services is the United States. The existing networks that facilitate the exchange of EHRs, such as Carequality (discussed further below), generally operate at a national level.  Far fewer, if any, systems exist to facilitate the exchange of medical records across international borders.  In addition, the exchange of health records via EHR Provision Services is governed by domestic private standards and public regulations, including laws like the 21st Century Cures Act, that are unique to the United States.

**ANSWER:**  Epic denies the allegations in Paragraph 45, except (i) refers to the referenced regulations for their contents, (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 45, and therefore denies them, and (iii) states that certain allegations in Paragraph 45 purport to state a legal conclusion to which no response is required.  To the extent that a further response is required, Epic denies the allegations of the paragraph.

46.     Standard-setting organizations, such as Carequality, play an important role for EHR Provision Services.  The process of medical records exchange poses substantial practical challenges, including ensuring uniformity and consistency in the process for requesting records, ensuring that parties with control over records make them available to EHR Provision Service providers, and ensuring that the records themselves are interoperable in format.  When they function as they should, such organizations can help overcome these difficulties by providing uniform standards and processes, and by ensuring that participants abide by them. These organizations, including Carequality, operate by allowing healthcare-related entities to join a voluntary contractual framework that requires participants to abide by a uniform set of rules and request or provide medical records through a centralized system.  The result is that a party

who wishes to request a medical record maintained, for example, by Epic, need not go to Epic directly in some cases. Instead, that party can request a record through a centralized framework, and Epic will receive that request and provide the record pursuant to its contractual obligations under the EHR exchange organization's agreement. Critically, the centralized system created by networks like Carequality allows third-party platforms, such as Particle, to plug in using APIs and retrieve medical records for their users *at scale*.

   **ANSWER:** Epic denies the allegations in Paragraph 46, except admits that

Carequality is an interoperability framework that requires participants to abide by a uniform set

of rules and enables the exchange of electronic health records, and through Carequality, Epic

provider customers can exchange electronic health records for treatment purposes with other

providers who are not Epic customers.

   47. EHR Provision Services and EHR Software are closely intertwined, and the market share of EHR Software providers generally mirror those same companies' share of EHR Provision Services. This is because, by providing the software that healthcare providers use to store the medical records they generate, companies like Epic gain control over the records themselves and, as a result, become the suppliers of those records when providing EHR Provision Services. Thus, a company that supplies its EHR Software to more hospitals will control more medical records and, accordingly, a larger share of EHR Provision Services.

   **ANSWER:** Epic denies the allegations in Paragraph 47.

   48. To this point, Epic's dominance over the EHR Software market translates to dominance and monopoly power over EHR Provision Services. Because Epic provides the software that stores a substantial (and growing) majority of medical records in the United States, it also supplies a substantial and growing majority of the records provided with EHR Provision Services. Indeed, Epic's share of EHR Provision Services is even *larger* than its share of EHR Software—between 81-94% of patients in the U.S. have at least one Epic EHR in their file, which is a much higher percentage than any other EHR Software provider. Because 81-94% of patients have at least one Epic-stored EHR, Epic effectively holds the keys to the medical history for 81-94% of patients, allowing it to substantially control the output for the country's EHR Provision Services as a whole.

   **ANSWER:** Epic denies the allegations in Paragraph 48, except states that certain

allegations in Paragraph 48 purport to state a legal conclusion to which no response is required.

To the extent that a further response is required, Epic denies the allegations of the paragraph.

49.    As with Epic's dominant market share in EHR Software, Epic's even more dominant share EHR Provision Services lends Epic the power to control output in that market. This power is borne out by direct evidence: by threatening to withhold its supply of medical records, Epic has been able to coerce users of medical records to abandon otherwise profitable relationships with Particle (among others). This power is further borne out by the fact that, due to the nature of EHR Provision Services, rivals' ability to expand is sharply limited: the number of records rivals can supply via EHR Provision Services is directly tied to the number of healthcare providers that use their EHR Software. Rival EHR Provision Service providers cannot expand their record output to counteract an output limitation by Epic unless they can gain additional users of their EHR Software, but Epic's monopolistic entrenchment over EHR Software prevents them from doing so. Moreover, barriers to new entry for EHR Provision Services are extremely high, because all potential entrants must, as a prerequisite to even consider market entry, establish themselves and gain a customer base in the completely separate EHR Software market, which itself has high barriers to entry. Finally, the market demand elasticity for EHR Provision Services is low: parties that obtain medical records via EHR Provision Services almost invariably have some specific, pressing need for those records—whether for intaking new patients or processing insurance claims. Users of EHR Provision Services are exceedingly unlikely to respond to an increase in price or reduction in the quality, convenience, or availability of the services by exiting the market entirely. All of these factors, alone and combined, mean that Epic has an extremely high degree of control over the output of EHR Provision Services: if it decides to restrict output, there is little that customers or competitors can do about it.

**ANSWER:** Epic denies the allegations in Paragraph 49, except states that (i) it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 49, and therefore denies them, and (ii) certain allegations in Paragraph 49 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

50.    Because between 81-94% of patients in the U.S. have *at least* one Epic EHR in their medical file, any party requesting medical records will, by necessity, need to request at least one record from Epic between 81-94% of the time, or else not obtain a patient's full medical record history. This independently gives Epic substantial power over entities in need of EHR Provision Services, regardless of the price of those services, because it essentially makes Epic a "must have" option for any requesting party that wants to ensure it has access to a complete medical picture for more than 6-19% of U.S. patients (*i.e.*, essentially any and all of the parties requesting such records).

**ANSWER:** Epic denies the allegations in Paragraph 50.

51.    In addition, although networks like Carequality allow the exchange of medical records for all legal purposes, including healthcare operations and research, Epic has chosen to only provide records through the Carequality framework for "treatment" purposes—the bare minimum to meet its legal requirements.  Due to Epic's decision, Carequality's only effective use is for "treatment" requests.  For parties seeking to obtain EHR provision services from Epic for *other* purposes, Epic severely restricts the options.  Those parties must typically request records directly from the healthcare providers that use Epic's EHR software using manual processes, or purchase Epic's Payer Platform for extremely high prices.  Critically, the methods by which Epic makes records available for non-treatment purposes is a closed system and does *not* allow third-party platforms, like Particle, to plug in and retrieve Epic-stored records at scale for non-Epic customers.

**ANSWER:**  Epic denies the allegations in Paragraph 51.

52.    The core relevant market at issue in this case is the payer platform market. This is the market in which Epic and Particle compete.

**ANSWER:**  Epic states that the allegations in Paragraph 52 purport to state a

legal conclusion to which no response is required.  To the extent a response is required, Epic

denies the allegations in Paragraph 52.

53.    Payer platforms are software platforms that allow payers to consolidate multiple aspects of their business on a single platform, including by providing them the ability to retrieve EHRs at scale through smooth, automated processes, and then to store and analyze those records.  Competitors within the Payer Platform market sell and license such software.

**ANSWER:**  Epic denies the allegations in Paragraph 53, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 53, and therefore denies them.

54.    Historically, in order to obtain medical records, payers had to request them manually from the suppliers of medical records, such as healthcare providers or, later, Epic.  In either case, both before and since the rise of EHRs, the payer would have to request the records through comparatively inefficient means (like email) and receive them through even more inefficient means (like fax).  Even once the records were received, there was no scalable system for centralizing, storing, aggregating, or analyzing them.  Thus, the introduction of payer platforms allows payers to both more easily obtain medical records and more effectively use them to process claims and assess risk.  It also allows payers to consolidate those tasks into a single platform, thereby increasing efficiencies and reducing costs.

**ANSWER:** Epic denies the allegations in Paragraph 54, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 54, and therefore denies them.

55. Payer platforms like Epic's and Particle's join together multiple complementary services to create a new product that provides distinct value to customers. The first is record retrieval functionality. The exact method of retrieval varies by product, but the common thread is that payer platforms interface directly with EHR platforms to pull medical records *digitally*, *instantaneously*, and *at scale*, vastly increasing the efficiency of the process. The second service payer platforms offer is a centralization and storage service. By using a payer platform to request and obtain medical records, users automatically receive digital versions of the records in a centralized, organized, and searchable/sortable database, rather than from a fax machine or email, which then requires manually filing or sorting the records the payer received. Third, payer platforms offer various analytics services tailored to payer needs, allowing payers to aggregate large data sets to monitor their members' health and risk.

**ANSWER:** Epic denies the allegations in Paragraph 55, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 55, and therefore denies them.

56. Payers consistently need to utilize all of these functions, and offering a single platform that integrates these operations and allows payers to utilize them at scale substantially reduces payers' costs and eliminates the friction associated with juggling multiple applications and vendors. In addition, the ability to retrieve medical records *instantaneously* and *at scale* is a function that no other type of product or service available to payers can fulfill, as all alternative methods for obtaining medical records are manual processes that take time and cannot efficiently scale. Payer platforms thereby provide a unique customer benefit that generates unique demand. One testament to the unique demand that payer platforms generate is how rapidly the market has grown since their introduction just a few years ago. As a result of the unique demand they generate, there are no reasonably interchangeable substitutes for payer platforms. Other types of platform software or methods for retrieving medical records do not have the same use case or application, and are therefore not the types of product to which customers of payer platforms would turn for the same essential purpose. Furthermore, customers of payer platforms recognize that they constitute a unique type of product and that other types of software are not reasonably interchangeable with payer platforms. Furthermore, payer platforms have unique pricing and price-demand curves vis-à-vis other types of software, including software in the healthcare industry.

**ANSWER:** Epic denies the allegations in Paragraph 56, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 56, and therefore denies them.

57.     Furthermore, payer platforms cost much less on a per-record basis than traditional, manual services that assist with medical records.  Because of this and the other facts cited above, a hypothetical monopolist of payer platforms can profitably implement a SSNIP, because payer platform users would not switch to other types of products (e.g., traditional services that assist with medical records) in sufficient numbers to make the increase unprofitable. Payers also have not found it in their interest to switch back to those traditional, manual methods because they lack the core utility and functionality of payer platforms.

**ANSWER:**  Epic denies the allegations in Paragraph 57, except states that (i) it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 57, and therefore denies them, and

(ii) certain allegations in Paragraph 57 purport to state a legal conclusion to which no response is

required.  To the extent that a further response is required, Epic denies the allegations of the

paragraph.

58.     The geographic scope of the payer platform market is the United States. The United States, at both the federal and state level, has a unique regulatory scheme that controls how payers operate and run their business.  Furthermore, payers insure United States citizens and residents, and are therefore located within the United States.  Providers of payer platforms are accordingly located within the United States.

**ANSWER:**  Epic denies the allegations in Paragraph 58, except states that (i) it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 58, and therefore denies them, and

(ii) certain allegations in Paragraph 58 purport to state a legal conclusion to which no response is

required.  To the extent that a further response is required, Epic denies the allegations of the

paragraph.

59.     Epic is a monopolist or is dangerously likely to become a monopolist in the payer platform market.  As of November 2023, every single one of the seven largest health plans in the country used Epic's EPP, with that network growing rapidly.[13]  EPP's customers include such health insurance giants as Aetna, Anthem, Blue Cross Blue Shield, Humana, and Highmark, among others.  Given the recent introduction of the payer platform market, those

---

[13] https://www.beckershospitalreview.com/ehrs/epic-expands-reach-among-payers-retail-disruptors.html

39

health insurance companies that do *not* use EPP typically have not yet begun to use a payer platform at all, and still obtain their medical records through fax and other manual processes. However, more payers enter the market every day as the unique purpose and use these platforms provide becomes more apparent and the inertia typical of large payers gives way to market forces.  It is because the market is growing so rapidly that Epic's efforts to exclude competition come at such a critical point.  Many payers who have not yet entered the market remain up for grabs.  If Epic can stave off competition at this critical juncture, the number of uncommitted payers will eventually dwindle to next to nothing and the market's high switching costs will take effect, allowing Epic's dominant position to crystallize.

**ANSWER:**  Epic denies the allegations in Paragraph 59 and the accompanying footnote, except (i) admits that Epic Payer Platform customers include Aetna, Anthem (now "Elevance Health"), certain Blue Cross Blue Shield Plans, Highmark, and Humana, among others, (ii) refers to the Becker's article cited therein for its contents, and denies them, (iii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 59, and therefore denies them, and (iv) states that certain allegations in Paragraph 59 purport to state a legal conclusion to which no response is required.  To the extent that a further response is required, Epic denies the allegations of the paragraph.

60.    Epic's control over EHR Software and/or EHR provision services also establish and reinforce its market power in the payer platform market, as Epic has the ability to exclude competition from the payer platform market.  Payer platforms and EHRs are complementary products; all users of payer platforms request and use EHRs as a fundamental input for their overall business.  By withholding access to EHRs, threatening to withhold access, or making payers fear they cannot receive EHRs from Epic software, Epic can cripple a competitor's current and future business prospects virtually overnight.  This is exactly what happened in this case, as discussed further below.

**ANSWER:**  Epic denies the allegations in Paragraph 60, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 60, and therefore denies them.

61.    Epic also has the ability to control prices in the payer platform market. EPP is higher-cost than Particle.  It is lower-quality.  It is not a preferred solution, but Epic is able to charge these higher prices and not compete on price with competitors such as Particle due to its dominance of the payer platform market.

**ANSWER:** Epic denies the allegations in Paragraph 61, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic, or products other than Epic's in Paragraph 61, and therefore denies them.

62.     As of today, on information and belief, EPP has over 90% market share in the payer platform market. The only significant competitor to have ever arisen in the payer platform market is Particle itself. To Particle's knowledge, no other company has introduced a platform that allows payers to automatically request and retrieve medical records at scale, and that integrates the functions of requesting, receiving, storing, and analyzing medical records, such that a payer would view it as a commercially viable alternative to EPP. Although Particle offers a product that effectively competes with EPP, its customer base remains small compared to the payer platform empire that Epic has quickly amassed since launching EPP, as Epic entered the payer market far more recently. And, although Particle was growing at an exponential rate, that growth abruptly tailed off due to Epic's anticompetitive conduct. Epic therefore no longer has any competitors threatening to take away any meaningful share from it in the payer platform market.

**ANSWER:** Epic denies the allegations in Paragraph 62, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 62, and therefore denies them.

63.     There are also substantial barriers to new entry in the payer platform market. A payer platform provider must, in the first instance, design and implement a platform capable of receiving, integrating, and making useful a number of different types of inputs for a payer's business. Further, similar to EHR Software, there are substantial lock-in effects and switching costs from selecting and then implementing a payer platform. Epic specifically magnifies the lock-in effects of its systems, meaning that the customers it has already obtained (which is the vast majority of them to date) face even higher switching costs than typical payer platform users. Payer platform providers must also comply with significant and varied regulatory schemes. And any payer platform that is not Epic must be able to circumnavigate the artificial barriers to entry that Epic erects in this market, such as the conduct described herein.

**ANSWER:** Epic denies the allegations in Paragraph 63, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 63, and therefore denies them.

64.     The quality of healthcare in the U.S. is on par with other developed nations, but the cost of healthcare is nearly double that of comparable countries.[14]  The result is that many Americans lack health insurance or cannot afford coverage for their medical needs.  As of 2023, the cost of healthcare in the U.S. was about $12,555 per capita, whereas the comparable average in other developed countries was just $6,651.[15]  Thus, the federal government has turned to legislation, regulation, and private litigants to help address this issue.

**ANSWER:**  Epic denies the allegations in Paragraph 64 and accompanying footnotes, except (i) refers to the Business Insider and Peterson-KFF articles cited therein for their contents, and denies them, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 64, and therefore denies them.

65.     In December 2016, Congress passed the 21st Century Cures Act ("Cures Act"), which included numerous provisions designed to reduce the cost of healthcare.  As particularly relevant to this lawsuit, the Cures Act required that EHR be interoperable with other healthcare software systems and prohibited "information blocking" by EHR providers.  Rules implementing this provision of the Cures Act were finalized in 2020.  Those rules define information blocking as a practice that "is likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information."[16]  By its express terms, the Cures Act applies to health information technology developers such as Epic.[17]

**ANSWER:**  Epic denies the allegations in Paragraph 65 and accompanying footnotes, except (i) refers to the statutes and rules cited therein for their contents, and (ii) states that certain allegations in Paragraph 65 purport to state a legal conclusion to which no response

---

[14] *See* Josh Barro, "The American Health Care System Sucks," Business Insider, dated October 31, 2013, available at https://www.businessinsider.com/the-american-health-care-system-sucks-2013-10 (last accessed May 20, 2022).

[15] "Peterson-KFF, "How does health spending in the U.S. compare to other countries?," dated January 23, 2024, available at https://www.healthsystemtracker.org/chart-collection/health-spending-u-s-compare-countries/#GDP%20per%20capita%20and%20health%20consumption%20spending%20per%20capita,%202022%20(U.S.%20dollars,%20PPP%20adjusted) (last accessed September 13, 2024).

[16] 42 U.S.C.§ 300jj–52(a)(1)(A).

[17] *Id*. at .§ 300jj–52(a)(1)(B)(i).

is required.  To the extent that a further response is required, Epic denies the allegations of the

paragraph.

66.    Epic fought these efforts tooth and nail.  As one article put it, "Epic is doubling down on its monopolistic hold on American health care and would be blocking vital improvements in it."[18]  In an effort to undermine the Cures Act, Epic engaged in a full-throated campaign to block the flow of patient data out of its systems and into the hands of patients, doctors, and vendors that could help improve healthcare.  Epic CEO Judy Faulkner even pressured Epic's largest clients to go on record in opposition to the goal of increasing interoperability, stating:  "HHS needs to hear from you so they understand that you are [sic] feel these issues are important.  Very little time is left."[19]  In an eerie portent of things to come, Epic assured its clients that wide access to EHR would be available for exchange between healthcare systems—when Epic became the sole provider of IT services for all healthcare systems.

**ANSWER:**  Epic denies the allegations in Paragraph 66 and accompanying

footnotes, except refers to the Stat News and Becker's articles cited therein for their contents,

and denies them.

67.    Epic also threatened to sue the U.S. Department of Health and Human Services ("HHS") over Cures Act rulemaking.[20]  Epic's purported justification for the suit was "patient privacy" but this was merely a smokescreen to protect its business interests.  And, ultimately, its efforts failed.  The Cures Act and associated rules went into effect.

**ANSWER:**  Epic denies the allegations in Paragraph 67 and the accompanying

footnote, except refers to the Politico article cited therein for its contents, and denies them.

68.    One of the key difficulties that payers have faced historically is obtaining medical records at scale.  Payers need to quickly access large quantities of medical records in order to process a constant stream of claims from their members and understand population risk. As discussed above, before the rise of payer platforms, payers had to obtain healthcare information record-by-record through manual requests, often receiving them by fax machine or other time- and effort-intensive means.  This led to massive inefficiencies, resulting, for example,

---

[18] *Epic's call to block a proposed data rule is wrong for many reasons*, Kenneth D. Mandl and Isaac S. Kohane, https://www.statnews.com/2020/01/27/epic-block-proposed-data-rule/.

[19] *Epic CEO Judy Faulkner asks hospitals to oppose HHS' interoperability rule*, Heckers Hospital Rule, https://www.beckershospitalreview.com/ehrs/epic-ceo-judy-faulkner-asks-hospitals-to-oppose-hhs-interoperability-rule.html.

[20] *Tahir* et al., "Epic's Faulkner warns of lawsuit for interop rules," dated XX, available at https://subscriber.politicopro.com/article/2020/01/epics-faulkner-warns-of-lawsuit-for-interop-rules-1869015 (last visited May 20, 2022).

in weeks-long delays in processing claims if human error led to a medical record being forgotten, misrouted, or lost.

      **ANSWER:** Epic denies the allegations in Paragraph 68, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 68, and therefore denies them.

      69.    Epic's EPP was the first platform that allowed payers to automatically request and instantaneously receive records at scale. Its release in 2021 represented the advent of the payer platform market as it is defined herein, quickly displacing older services and technologies that sought to assist payers with medical records but which could not deliver them quickly and at scale. Between 2021 and late 2023, EPP's customer base expanded rapidly. However, despite the rapidly growing interest in this new type of software platform, no competitors initially emerged to challenge EPP in the first few years of its existence.

      **ANSWER:** Epic denies the allegations in Paragraph 69.

      70.    EPP's lack of competitors was not due to any special aspect of EPP itself. Instead, it was due to the fact that Epic had leveraged its preexisting dominance in EHR Software and EHR Provision Services to ensure that no competing payer platform could pull records from Epic's EHR systems at scale; specifically, by making such pulls technologically impossible. The only payer platform that could facilitate access to Epic-stored medical records in a scalable way was EPP. It was thus no wonder that EPP had no meaningful competitors: any competing platform would be unable to provide the key service customers sought—retrieval of medical records at scale—with respect to between 81-94% of all patients in the United States. That inability made any attempt at competition impossible.

      **ANSWER:** Epic denies the allegations in Paragraph 70.

      71.    Epic was able to engage in this anticompetitive preemption (at least, at this early phase) by exploiting gaps in the prevailing regime for medical records exchange. Federal law requires EHR companies like Epic to make their records widely available for "treatment" purposes. For this and other reasons, a robust and standardized system has developed for exchanging records for "treatment" purposes, including exchange networks like Carequality. With the right tools, any platform can plug in to these networks to pull medical records for their users at scale, including from Epic's EHR system. For non-treatment purposes, however, no such centralized system with widespread buy-in exists, primarily because Epic has ensured that one does not emerge. Although Carequality allows participants to make non-treatment requests through it, Epic does not respond to them, making Carequality effectively useless for purposes other than treatment-related requests. The Carequality Steering Committee has repeatedly fielded proposals from members to require that participating EHR companies, including Epic, respond to queries for non-treatment purposes such as healthcare operations and research. In polls and surveys, such proposals have overwhelming support from Carequality membership, as they would increase the utility of Carequality and the interoperability of medical records. Nonetheless, every time such a proposal goes to a vote of the Carequality Steering Committee,

the Committee (over which Epic holds outsized power, as detailed below) miraculously rejects it, despite its constituency's overwhelming support for the proposal.

**ANSWER:** Epic denies the allegations in Paragraph 71, except (i) refers to the federal regulations referenced therein for their contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 71, and therefore denies them.

72.    Epic's efforts to stymie the creation of a centralized exchange regime for non-treatment requests previously blocked all competition in the payer platform market because payers have not traditionally been able to utilize the "treatment" use case due to the view that typical payer use cases for records—like processing claims—do not involve providing healthcare services to patients.  Thus, payers fell through the cracks, allowing Epic to give them only two options:  (1) obtain Epic records one-by-one through antiquated means like fax machines, or (2) use EPP.

**ANSWER:** Epic denies the allegations in Paragraph 72.

73.    Particle first started in 2018 as a platform that healthcare organizations could use to retrieve records through exchange networks like Carequality, typically utilizing the "treatment" use case.  For much of its existence, Particle only provided a record retrieval platform for traditional healthcare providers and health technology companies, and it did not cater to payers.  In late 2023, however, by recognizing and responding to a key shift in the way certain payers conduct their business, Particle became the first company to introduce competition to the payer platform market.

**ANSWER:** Epic denies the allegations in Paragraph 73, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 73, and therefore denies them.

74.    What Particle recognized is as follows.  In recent years, many payers have begun to offer new, innovative treatment-related services to their members and members' doctors, such as creating personalized treatment plans for their members' doctors.  This trend began with the Affordable Care Act's emphasis on value-based care and has led to a fundamental change in many payers' business model, with them providing or facilitating many services historically limited to providers.  Particle realized in 2023 that this new frontier of "pay-vider" activity therefore allowed certain payers, under certain circumstances, to obtain records utilizing "treatment" queries.  This meant that payers could, for the first time, obtain records utilizing the centralized exchange networks like Carequality—which in turn meant they could, for the first time, use platforms like Particle to obtain records at scale, rather than having to rely solely on EPP.  This shift in the services payers provide opened the door to competition in the payer platform market.

**ANSWER:** Epic denies the allegations in Paragraph 74, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 74, and therefore denies them.

75. In 2023, Particle began to work with these "pay-viders," providing them with medical records obtained through Carequality in order to facilitate the treatment-related services they provide to physicians. For some payers, Particle has entered into direct customer relationships for use of its payer platform as an independent piece of software. For others, Particle services them by contracting with separate software vendors to integrate Particle's payer platform capabilities into those vendors' software for specific payers, at the request of those payers. Under HIPAA, Carequality rules, and these payers' agreements with physicians, once the payers obtain and use the records through Particle to assist with physicians' treatment of patients, they can then also use those records for "secondary uses," which are any other lawful purpose (*e.g.* processing an insurance claim). In this way, Particle became the first (and, to date, only real) competitor to EPP in the payer platform market.[21]

**ANSWER:** Epic denies the allegations in Paragraph 75 and the accompanying footnote, except (i) refers to HIPAA, the Carequality rules, and the payers' agreements referenced therein for their contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 75, and therefore denies them.

76. Under the system Particle pioneered, everyone benefits. Payers benefit because it breaks EPP's monopoly grip over the payer platform market and provides them with new and lower-cost options for retrieving records at scale. Patients benefit because it pushes their health plans to offer more robust treatment-related services to help them understand and improve their health—in addition to lowering prices for payers, which can translate to lower premiums. Healthcare providers benefit because the treatment-related services offered by payers under this system typically take the form of assistive services for doctors, and because patients are better able to pay for the treatment they offer. Competition benefits because companies like Particle are able to gain share in a rapidly-growing market that they would otherwise be unable to obtain due to Epic's anticompetitive conduct. The only party that does not benefit is Epic, because it must face actual competition.

---

[21] Notably, Epic has never claimed that Particle's business model violates any law or Carequality rule. Nor could Epic make such an argument. The mechanism by which EPP pulls records for payers also relies on secondary use principles and is, at a high level, quite similar to Particle.

**ANSWER:** Epic denies the allegations in Paragraph 76, except states that (i) it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 76, and therefore denies them, and (ii) certain allegations in Paragraph 76 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

77.    Epic first learned about Particle encroaching on its comfortable position atop the payer platform market in late 2023 and quickly began trying to thwart Particle's forays into that market. In late 2023, Epic discovered that Particle had contracted with a separate software vendor to integrate Particle's payer platform capabilities into software used by Blue Cross Blue Shield of Michigan, and that Blue Cross Blue Shield of Michigan was using Particle's payer platform capabilities to prepare "Gaps in Care" reports for doctors treating individual patients. Epic immediately (and predictably) took issue with Particle providing medical records to payers at scale, asking to meet with Particle and bombarding it with questions. When Particle explained how and why these activities fit the "treatment" use case and that secondary use was permitted, Epic indicated that it understood the model and did not dispute that Particle was correct. Instead, just a few weeks later, Epic began a comprehensive, multi-pronged campaign to destroy Particle by any means necessary.

**ANSWER:** Epic denies the allegations in Paragraph 77.

78.    Epic's anticompetitive scheme involves a number of interrelated acts meant to disrupt Particle's current business and future prospects, and to secure a permanently-dominant position in the payer platform market. A key part of this scheme is that Epic is abusing its position as the dominant supplier of EHRs to harm Particle, and by extension payer platform competition. However, that is not the only mechanism for its various anticompetitive acts (even if it is the backdrop for them). As described below, Epic's anticompetitive scheme generally involves (a) cutting off Particle customers' access to Epic-stored medical records unless they terminate their relationships with Particle, (b) obstructing and slow-walking the approval process for new Particle customers (and existing customers who wish to expand) to begin receiving Epic records, (c) using its broad reach and recognized dominance over EHRs to stoke baseless privacy and security fears among Particle's existing and potential customers, (d) attempting to overwhelm Particle and its systems by pushing its EHR software customers to bombard Particle with a large number of burdensome yet unfounded information requests, and (e) abusing and manipulating the Carequality dispute process to drain Particle's resources and cast further baseless doubt on its integrity. These acts serve to build on and amplify each other. At its core, however, the guiding principle of this scheme is simple: "death by a thousand cuts."

**ANSWER:** Epic denies the allegations in Paragraph 78.

79.    In late March, 2024, Particle discovered that Epic had suddenly ceased responding to medical record requests from 34 separate Particle customers representing 119 different medical record end-points and collectively providing healthcare to over one million patients.  Each of the cut-off customers received notice from Epic that they had been suspended from receiving medical records through Carequality queries to Epic.  The Particle customers suddenly cut off by Epic— who were seemingly chosen at random—constituted roughly 20% of Particle's overall userbase.  The majority of cut-off customers were Particle's traditional healthcare provider and health tech customers, who still provide most of Particle's revenue.

**ANSWER:**  Epic denies the allegations in Paragraph 79, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 79, and therefore denies them.

80.    In the early days after Epic suspended Particle's customers, its stated reasons for doing so repeatedly shifted.  On an April 8, 2024 call, Epic first stated that the suspension of these Particle connections was due to a "technical" issue.  Then Epic changed its story and admitted that it *had* intended to suspend certain Particle connections, but only for two Particle customers.  Finally, Epic revealed that it intentionally suspended all 119 of the Particle connections.

**ANSWER:**  Epic denies the allegations in Paragraph 80, except refers to the

source of the purported quote cited therein for its contents.

81.    The excuse Epic settled on for cutting off these customers is transparently pretextual.  As it would later explain in the manufactured Carequality dispute it brought (discussed further below), Epic claims it cut off these dozens of Particle's customers because it allegedly discovered that *three* had labelled certain queries for "treatment purposes" when they should have been labeled for some other purpose.  Notably, Epic's claim regarding improper treatment queries is *not* related to any claim that Particle's model for providing medical records to payers is impermissible.  Indeed, only one of the three Particle customers accused of improperly using "treatment" queries is associated with a payer at all, and Epic has raised no issues with the records requests made by Particle's several other payer customers.  Instead, Epic's pretextual justification revolves around a claim that these three customers had simply lied about their intended uses for the records.

**ANSWER:**  Epic denies the allegations in Paragraph 81, except refers to Epic's

Pre-Dispute Statement referenced therein for its contents.

82.    Despite cutting off EHR access to far, far more than three Particle customers, Epic did not make any allegations of mislabeling or other wrongdoing against any of those other Particle customers.  Moreover, Epic's suspensions have been haphazard and seemingly random, often treating two Particle customers who provide identical services differently.

ANSWER:  Epic denies the allegations in Paragraph 82.

83.    The inconsistencies in Epic's story reveal its supposed justification for the pretext it is:  if Epic were concerned about three Particle customers mislabeling requests, it would have no reason to suspend dozens of other, completely unrelated Particle customers against whom it has made no allegations of wrongdoing.  If Epic were concerned over those other parties' uses of Epic medical records, it would make no sense to treat such similarly-situated parties differently.  Over the ensuing months, and in response to Particle filing a counter-dispute within Carequality, Epic has slowly restored EHR access to some Particle customers while continuing to add additional customers to the list of suspended Carequality connections.  The result has been a morass of confusion, which is apparently intentional.  These Particle customers do not know if or when they will be cut off again, and Epic has continued to pull additional Particle customers into the mix for no reason at all (beyond Epic's anticompetitive intent and the effects it knows this confusion causes).

ANSWER:  Epic denies the allegations in Paragraph 83, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 83, and therefore denies them.

84.    By cutting off Particle customers from accessing Epic medical records, Epic had an immediate and devastating effect on those businesses, and made continued association with Particle (and therefore Epic's only major competitor in the payer platform market) untenable for them.  For payers, medical records are an essential part of their business—without medical records, a payer cannot assess claims, underwrite risk, or provide any of their treatment-related services to medical professionals.  Medical records are also essential to Particle's traditional healthcare provider and health tech customers, who need medical records to onboard new patients and understand the care that existing patients have received from other providers.  When Epic suspended Particle's customers from receiving Epic-stored medical records, it instantly shut off those customers from a substantial majority of all medical records in the United States, crippling their ability to function and provide healthcare (and healthcare coverage) to patients.

ANSWER:  Epic denies the allegations in Paragraph 84, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 84, and therefore denies them.

85.    *Epic-stored* medical records specifically are important for businesses like Particle's customers because medical records are not fungible; a Particle customer cannot simply replace an Epic-stored medical record with one stored by another EHR Software company—when onboarding a new patient, for example, a Particle customer needs *that patient's* (and only that patient's) medical records.  If any portion of that patient's medical history is within Epic's control, there is nothing the provider can substitute for them.  Care for a substantial majority of patients is thereby brought to a standstill if a payer cannot obtain their full records, particularly

when one considers that between 81-94% of patients in the U.S. have at least one medical record stored as an Epic EHR. That is what happened when Epic suspended Particle customers: over 40,000 medical record queries made to provide treatment to patients for medical care were blocked by Epic's suspension.

**ANSWER:** Epic denies the allegations in Paragraph 85, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 85, and therefore denies them.

86.    Shortly after Epic suspended the 119 Particle connections discussed above, it fully revealed the anticompetitive nature of its scheme by informing those suspended businesses that it was preventing them from accessing medical records because of their association with Particle. For example, one (now former) Particle customer is a healthcare analytics company called XCures. On January 28, 2022, Particle and XCures executed a contract titled "Particle Platform Agreement" under which Particle agreed to provide XCures with the right to use Particle's platform in exchange for monthly fees. In an amendment to that contract dated December 20, 2023, Particle and XCures renewed XCures's subscription for a one year term beginning on January 1, 2024. On June 12, 2024, after its access to Epic records had been suspended for two months, Particle introduced representatives of XCures to Epic in the hopes they could resolve any issues Epic might have had with XCures. Following that meeting, XCures's CEO informed Particle that Epic told XCures its access to Epic data would be restored if it ended its relationship with Particle. Twelve days later, on June 24, 2024, XCures sent the following letter to Epic:



**ANSWER:** Epic denies the allegations in Paragraph 86, except (i) refers to the

June 24, 2024 letter and the "Particle Platform Agreement" cited therein for their contents, and

(ii) states that it is without knowledge or information sufficient to form a belief as to the truth of

the allegations concerning persons or entities other than Epic in Paragraph 86, and therefore

denies them.

87.    Kno2, the company to which XCures switched its Carequality
connections, is a close ally of Epic's.  Notably, Kno2, unlike Particle, does *not* compete with
Epic in the payer platform market.  Although Kno2 offers a record retrieval service providing a
platform to connect to Carequality, it only pulls records for traditional healthcare companies, *not
payers*, and does not offer the centralization and suite of analytics services that make Particle
a further threat to Epic's EPP.  In addition, Particle now knows that Kno2 worked closely with
Epic in the Carequality dispute Epic raised against Particle (discussed further below), including
by providing Epic with evidence that Epic used to claim one Particle customer was making
requests for non-treatment purposes.  On information and belief, Kno2 collaborated with Epic in
this way because it understood it would benefit from Epic sending business its way, if it helped
eliminate EPP's only real competitor to date.  Thus, 12 days after Particle learned that Epic had
offered to restore XCures's connections if it breached its contract with Particle, XCures informed
Epic that it had succumbed to Epic's coercion and switched to a non-competing, Epic-friendly
service.  In doing so, XCures ceased paying its monthly subscription fees to Particle prior to the
contract termination date of January 1, 2025, thereby breaching its contract with Particle.
Shortly after XCures sent Epic the above letter, Epic restored virtually all of XCures's EHR
access.

**ANSWER:** Epic denies the allegations in Paragraph 87, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 87, and therefore denies them.

88.    On information and belief, Epic made similar representations to numerous
other Particle customers, implicitly or explicitly, to coerce them into dropping Particle, and it has
accomplished Epic's goal of harming Particle.  Even for those Particle customers who have not
outright repudiated their contracts, Epic's conduct has soured their relationship with Particle and
forced Particle to make dramatic concessions, including substantial refunds, to avoid losing their
business.  Since Epic began its campaign, at least ten significant Particle customers have either
repudiated their contracts, threatened to do so, or demanded that Particle make material
concessions to prevent them from doing so.

**ANSWER:** Epic denies the allegations in Paragraph 88, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 88, and therefore denies them.

89.     In addition to sabotaging Particle's relationships with its existing customers, the threat of Epic cutting off their access to records if they associate with Particle has scared away numerous prospective customers, including many with whom Particle was in advanced talks.  For example, on June 11, 2024—two months into Epic's campaign to sabotage customers that associated with Particle—the president and cofounder of one of Particle's prospective customers (with whom Particle had been in advanced talks) sent an email to the Particle account executive in charge of the relationship.  In that email, he wrote the following (emphasis added):

> I wanted to let you know we will not be able to continue in our discussion of signing onto Particle.  After due diligence on the HIE's [*i.e.* Health Information Exchanges] and Particle we decided ***the current dispute with Epic presents too much of a risk*** as we begin our pilots with customers.
>
> ***We were invested in pursuing this agreement*** having spent significant time with our legal team and ***were nearly complete implementing the Particle API into our tech stack***.  Unfortunately the noise around Particle is just too risky for us to commit to a commercial relationship.
>
> While the team advising us on pursuing an HIE connection was bullish on our use case by being under the Particle umbrella ***our advisors felt we would be under additional scrutiny.  Our ability to be successful as a company is tied to our access to the HIE and Particles current dispute puts this connection at risk***.
>
> Really appreciate all the support you've provided in walking us through the different options for using Particle.
>
> ***Happy to revisit the discussion if the current situation is resolved***.

**ANSWER:** Epic denies the allegations in Paragraph 89, except (i) refers to the purported June 11, 2024 email from Particle's prospective customer cited therein for its contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 89, and therefore denies them.

90.    Thus, the president of this prospective customer made abundantly clear that, but for the risks presented by Epic's arbitrary and discriminatory shutoffs of Particle customers, it would have finalized the deal and entered into a commercial relationship with Particle. The email also demonstrates exactly how the healthcare community understood the arrangement Epic was offering: if you work with Particle, you will receive "additional scrutiny" and your access to critical healthcare information will be "put[] … at risk."

**ANSWER:** Epic denies the allegations in Paragraph 90, except (i) refers to the

purported June 11, 2024 email from Particle's prospective customer cited therein for its contents,

and (ii) states that it is without knowledge or information sufficient to form a belief as to the

truth of the allegations concerning persons or entities other than Epic in Paragraph 90, and

therefore denies them.

91.    The story of this customer mirrors those of numerous other prospective customers with whom Particle was in active talks prior to Epic's anticompetitive scheme. The prospective customers with whom Particle was in advanced talks prior to Epic's conduct, and who suddenly either abandoned a potential relationship with Particle or substantially postponed discussions for reasons related to Epic's conduct, include at least the following organizations: Beeline Rx, Power Life Sciences, Leafwell, and Medvise. On information and belief, the number of potential Particle customers deterred by Epic's conduct with whom Particle was *not* yet in contact is significantly higher still, as the number of new prospective customers expressing interest in Particle's platform has gone down significantly.

**ANSWER:** Epic denies the allegations in Paragraph 91, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 91, and therefore denies them.

92.    In addition to blocking Particle's customers from receiving medical records generated by Epic customers, Epic has also blocked Particle customers from *sharing* medical records back with Epic customers. In order to retrieve records through Carequality, participants are also required to share data back with the network. Not only is this required, but many Particle customers rely on this functionality to share records back with other organizations to whom they are referring patients. By cutting off Particle customers' Carequality connections with Epic, Epic also prevents Particle customers from sharing records with Epic's EHR customers. This aspect of Epic's conduct both further increases the pain on businesses that choose to maintain a relationship with Particle and collaterally harms Epic's ***own customers***. For example, one adversely-affected Particle customer is a specialty cancer treatment network called OneOncology. OneOncology operates community oncology practices, and it needs to send medical records from those smaller practices (which do not use Epic's EHR Software) to large academic medical centers (which do) when its patients are escalated to that setting. Epic's suspension prevented them from doing so. As a result, not only was OneOncology unable to

assist in the transition of its patients—leading it to threaten to breach its contract with Particle—Epic's own medical center customers became unable to onboard new cancer patients who came to them from OneOncology and were in dire need of medical care. Epic's suspension of OneOncology adversely impacted the treatment of over 2,900 patients. OneOncology's case shows just how far Epic is willing to go to harm Particle: it is willing to cut off its own customers from vital patient data, risking the lives of the most vulnerable patients in the process.

ANSWER: Epic denies the allegations in Paragraph 92, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 92, and therefore denies them.

93. Epic's decision to cut off Particle's customers from receiving and transmitting vital data has had its intended effect on Particle: since Epic began its campaign, Particle has been losing customers. That is no surprise. Given the essential nature of the input Epic provides for these customers, Epic's suspension created an untenable situation for them. Some have found it in their interests to breach ongoing contracts and face the risks of doing so rather than continue to have their business ground to a halt by their inability to access Epic-stored medical records. Particle's prospective customers, too, have dried up, preferring to stay away for fear that a similar fate could befall them if they work with Epic's competitor.

ANSWER: Epic denies the allegations in Paragraph 93, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 93, and therefore denies them.

94. Concurrent with its decision to suddenly cut off a substantial number of Particle customers, Epic put in place a new policy that significantly slows down the process for new Particle customers (and existing customers who wish to expand) to begin receiving medical records from Epic, and which applies *only* to Particle customers. With this policy, Epic created yet another hurdle to deter and/or punish any company that dealt with its competitor.

ANSWER: Epic denies the allegations in Paragraph 94.

95. When a new customer wishes to open up a connection with an EHR provider through the Carequality framework, the customer must be added to that EHR provider's "Carequality directory." The process is typically done automatically and, under normal circumstances, takes a maximum of two days. The only source of lag is a programmatic refreshing of the EHR provider's Carequality directory, which in Epic's case occurs every 24-48 hours. Thus, it has traditionally taken Particle one to two days to onboard new customers such that they can begin requesting Epic-stored medical records.

**ANSWER:** Epic denies the allegations in Paragraph 95, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 95, and therefore denies them.

96.     Beginning in April 2024, Epic instituted a new, unprecedented policy that *every* new Particle connection—which included new customers and also expansions of existing customers, such as a new doctor's office being added to a network—had to be individually approved by Epic's "Care Everywhere Governing Council." The "Care Everywhere Governing Council" is a 15-member body made up of Epic-friendly volunteers from among Epic's HER software customers that oversees Epic's record-sharing activities at the highest level. Requiring every Connection to receive individualized approval through a single, executive-level body was a dramatic deviation from the standard practice for approval of new Connections. Unlike the typical automated and seamless process, Epic's new policy (on information and belief, intentionally) created a single chokepoint for new Particle customers—one that is slow-moving, deliberative, and opaque. This new across-the-board policy applies *only* to Particle customers, and it only began once Epic initiated its anticompetitive campaign against Particle in April 2024. *No* other group of connections is required to obtain approval directly from Epic's Care Everywhere Governing Council with any consistency, much less across the board. In fact, Particle is only aware of a few isolated instances in which *any* non-Particle customers were required to obtain manual approval *at all*. Epic's discriminatory policy against Particle customers has had its intended effect of dramatically increasing the duration and burden of the onboarding process for Particle's customers.

**ANSWER:** Epic denies the allegations in Paragraph 96, except (i) admits Epic's Care Everywhere Governing Council comprises fifteen representatives each elected by Epic's healthcare provider customers, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 96, and therefore denies them.

97.     In addition to requiring approval from a single, centralized council, Epic has further increased the duration and burden of the onboarding process by conducting a painstakingly slow and in-depth level of review for each new Particle customer—one that it does not apply to any other group of applicants. By this point, Epic's procedure when a new Particle customer seeks to onboard follows a familiar pattern. First, Epic will demand that the customer provide Epic with in-depth information about its business model, use of records, data maintenance processes, and more. Then, once the Particle customer provides that information, Epic will go silent for extended periods of time, only to appear again weeks later to ask for more information. And the cycle repeats. All in all, the onboarding process that typically takes *two days* has, since April 2024, taken new Particle customers far longer on average—in many cases over a *month*. For at least one Particle customer, the onboarding process took almost *three months*. This extended process creates friction between Particle and its customers and sends a

clear message to the customers:  beware, because Epic is both watching you and will make your day-to-day business difficult.

ANSWER:  Epic denies the allegations in Paragraph 97, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 97, and therefore denies them.

98.    One Particle customer, which provides software for physicians that assists with patient care, provides an example of this process.  This customer first sought approval to connect with Epic in June 2024.  Epic requested extensive information from the customer shortly thereafter, which it quickly provided.  But once the customer provided Epic with the information it requested, Epic went silent.  On July 19—roughly a month after Particle's customer sent the requested information—Particle's CEO, on behalf of the customer, emailed Epic to check in on the status of the application.  Four days after that, Epic finally responded to inform Particle and the customer that it had *more* questions.  Again, Particle's customer answered those questions immediately.  Two more weeks of silence followed, after which Epic reached out again, informing the customer that it had been approved to query Epic records for some of its software's users, but *again* requesting additional information for others.  This Particle customer only received full approval to query Epic-stored medical records on *September 3*—almost *three months* after it had first requested to connect to Epic.

ANSWER:  Epic denies the allegations in Paragraph 98, except (i) refers to the emails referenced therein for their contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 98, and therefore denies them.

99.    Epic has also instituted a practice where, as part of the review process for instituting new connections or reinstating preexisting connections, it forces Particle customers to acknowledge that Epic provides alternative services and platforms for retrieving Epic-stored medical records.  This practice sends a clear message to the Particle customer:  if you drop Particle, you will have a much easier time obtaining EHRs directly from Epic.  This contributes to the coercion Epic applies more broadly through actual or threatened suspensions and delays in approval.

ANSWER:  Epic denies the allegations in Paragraph 99.

100.    Epic's slow-walking of approval for Particle's customers (and only Particle's customers) is clearly discriminatory and in violation of Carequality's rules.  Indeed, it was in violation of Epic's *own* protocols until shortly before it began its anticompetitive campaign.  Epic maintains a "Carequality Phonebook Support Policy" which sets out its policy with regard to adding new entries to its Carequality Directory.  Before February 2024, the policy had a section titled "Implementors not in good standing."  An "Implementer" is the party, such as

Particle, that helps the new entry connect to Carequality.  The policy previously read:  "For entries whose Carequality Implementor has an ongoing dispute or is deemed not in good standing by Epic or Carequality, Carequality administrators may delay processing the entry while the issue is under investigation."  In February 2024, however—three weeks before Epic initiated its dispute against Particle—Epic revised the policy.  The section titled "Implementers not in good standing" became "*Ongoing disputes and* implementers not in good standing.  As relevant here, Epic revised the body of the section to expand its applicability to all "entries who are the subject of a pending dispute under the Carequality dispute resolution process."  With regard to such entries, Epic further revised the policy such that, rather than merely allowing itself to "delay processing the entry while the issue is under investigation," Epic gave itself permission to "***delay processing the entry until the Dispute has been fully resolved***."  Below is a redline showing the full set of revision Epic made to this provision of its policy in February 2024:



As these edits show, Epic made this revision in the hope that it would provide Epic with cover to discriminate against Particle's customers after initiating a Carequality dispute, which it did three weeks after making this revision.

**ANSWER:**  Epic denies the allegations in Paragraph 100, except refers to the current Carequality Phonebook Support Policy and its prior iterations for their contents.

101.    Epic's discriminatory treatment of Particle customers in the Carequality onboarding process has further raised the cost and difficulty for healthcare companies who wish to associate with Particle, creating further incentive for them to abandon their relationships with Particle.  At the same time, it has created additional fears among Particle's prospective customers that they will be targeted with discriminatory treatment by Epic if they associate with Particle, leading many to forego pursuing otherwise-profitable relationships with Particle in the first place.

**ANSWER:** Epic denies the allegations in Paragraph 101, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 101, and therefore denies them.

102.    Around the same time that Epic began its suspension campaign of Particle's customers, it also began to actively cultivate a widespread and insidious misperception in the marketplace that (i) Particle had somehow acted unethically and introduced "security and privacy risks" for its customers, and (ii) *all* Particle connections had been shut off. On April 10, 2024, Epic released an "Issue Notification" regarding its dispute with Particle. The headline of the notification, in bold type at the top, read, "Third-Party Security and Privacy Risk." Though the statement was ostensibly intended for Epic customers including healthcare providers across the country (and in fact, was emailed directly to thousands) it was not marked confidential and, as Epic knew it would be (and, on information and belief, intended), was quickly picked up by the media. Within days, numerous news outlets had published articles repeating Epic's misleading statements about purported "security and privacy risks" introduced by Particle.

**ANSWER:** Epic denies the allegations in Paragraph 102, except (i) admits that it sent an Issue Notification to customers on April 10, 2024 (the "Issue Notification"), (ii) refers to the Issue Notification cited therein for its contents, and (iii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 102, and therefore denies them.

103.    The substance of the "Issue Notification" vaguely described Epic's supposed issues with Particle, painting a clearly false and misleading picture of Particle as a bad actor. The document stated that Epic had "serious concerns about security and privacy arising from activities of a third-party participant implementer in Carequality (Particle Health)." It stated that "Particle Health … might be inaccurately representing the purpose associated with [its] record retrievals." Beyond the ominous conclusions, however, Epic's statement provided nothing to substantiate any wrongdoing by Particle. The actual substance of Epic's dispute was an allegation that three Particle *customers* had wrongfully claimed a purpose of "treatment" when making record requests through Particle. Epic's statements did not explain what "activities of … Particle Health" led to its supposed "concerns about security and privacy," or how Particle itself—as opposed to a potential tiny subset of its customers—was "inaccurately representing" anything.

**ANSWER:** Epic denies the allegations in Paragraph 103, except refers to the Issue Notification cited therein for its contents.

104.    Epic's statement to the public contained no substantiation of wrongdoing by Particle because there is none.  Indeed, when Epic notified Particle weeks earlier about potentially inappropriate records requests by three of its customers, Particle immediately began to investigate and entered into an ongoing dialogue with Epic.  By the time Epic released its public statement and cut off Particle's customers, Particle had *already removed* two of the alleged wrongdoers' connection to Carequality, as Epic obliquely acknowledged in its statement. The only reason Particle had not suspended the other one was because of a disagreement with Epic's unreasonably cramped definition of "treatment," over which the parties had been engaged in an active dialogue.[22]  Nor could Epic fault Particle for any failures in its diligence or screening of these customers, whom it promptly removed when alerted to issues.  When Particle onboarded these customers, it worked closely with Carequality administrators and performed independent and fulsome inquiries into their represented use cases, including by requiring them to submit legal memoranda attesting to their bases for asserting treatment use cases.  Before onboarding them, Particle also required each customer to execute a contract promising that all queries would be directed toward a legitimate treatment use case.

**ANSWER:**  Epic denies the allegations in Paragraph 104 and the accompanying footnote, except (i) refers to the Issue Notification cited therein for its contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 104, and therefore denies them.

105.    The closest Epic's "Issue Notification" came to making any actual accusations against *Particle*—rather than Particle's customers—was a vague and unexplained allegation that Particle was "obscuring provider-level details of connections through a generic gateway" when making requests for its customers.  As Particle later demonstrated during the Carequality dispute related to these issues, Epic's allegation of a gateway that "obscur[es]" the details of the requesting organization is so unequivocally and demonstrably false that it is perplexing Epic even attempted to assert it—a point with which Carequality itself agreed. Contrary to Epic's statements, ***every single request made using Particle's Carequality connection clearly states the name of the requesting party exactly where a provider like Epic would expect to find it***.  The sole substantive accusation Epic made against Particle in its "Issue Notification" was made up from whole cloth.

---

[22] Particle was ultimately vindicated *vis-à-vis* this customer in the manufactured Carequality dispute Epic brought, with the Carequality Steering Committee finding that the customer *had* made its requests for "treatment" purposes. Epic's attempts to cabin the definition of "treatment" are unsurprising; as discussed above, "treatment" requests limit Epic's ability to direct the flow of the records it stores, and by extension its power to exclude competition.

**ANSWER:** Epic denies the allegations in Paragraph 105, except refers to the

Issue Notification cited therein for its contents.

106.    Viewed as a whole, Epic's statements within its "Issue Notification" conveyed two clear misrepresentations to the public. The first was a general message that Particle was a bad actor—that it was somehow responsible for a small handful of its customers allegedly misstating the purpose of their requests, and that it had itself somehow engaged in dishonest behavior in order to compromise patient privacy and security. The public got this message—which was contrary to the actual substance of Epic's supposed dispute—loud and clear. For example, a CNBC article published two days after Epic released its "Issue Statement" began by characterizing Epic's statement as follows:

> Epic Systems, the largest provider of software for managing medical records, says a venture-backed startup called Particle Health is using patient data in unauthorized and unethical ways that have nothing to do with treatment.[23]

Likewise, the news outlet DMR News reported that Epic had "taken action against Particle Health, a venture-backed startup, for allegedly misusing patient data."[24] The notion that Particle itself "us[ed] patient data in unauthorized and unethical ways" or "misus[ed] patient data" is absolutely, unequivocally false. Indeed, that allegation is not even related to the supposed issues Epic has pressed when forced to clarify its positions, which, again, concern only whether a small handful of Particle *customers* had properly utilized the "treatment" use case (as opposed to another permitted use case) for retrieving medical records through a connection to Carequality that Particle had facilitated. But by obfuscating the true nature of the dispute and blurring the lines between the actions of Particle and the actions of its customers, Epic successfully created the impression that *Particle itself* had illegally harvested patient data for some nefarious purpose.

**ANSWER:** Epic denies the allegations in Paragraph 106 and accompanying

footnotes, except (i) refers to the Issue Notification cited therein for its contents, (ii) refers to the

CNBC and DMR News articles cited therein for their contents, and denies them, and (ii) states

that it is without knowledge or information sufficient to form a belief as to the truth of the

allegations concerning persons or entities other than Epic in Paragraph 106, and therefore denies

them.

---

[23] https://www.cnbc.com/2024/04/12/epic-systems-boots-particle-health-for-unauthorized-sharing-of-data-.html

[24] https://www.msn.com/en-us/health/other/epic-systems-halts-data-sharing-with-particle-health-over-misuse-concerns/ar-BB1lGFg4

107.    Another misrepresentation Epic made in this statement about Particle was a message intended for Particle's existing and potential customers—namely, that Particle is a data security risk.  Particle's customers, in addition to using Particle to request records, use the platform to store substantial amounts of valuable data.  Data security is paramount for those customers.  By releasing a statement about Particle with the words "**Third-Party Security and Privacy Risk**" in large font at the top, and which stated that Epic had "serious concerns about security and privacy arising from activities of … Particle Health," Epic associated Particle with security issues and sowed doubt directly into Particle's customer-base about the integrity of Particle as a data storage platform.  Epic chose the words "Security and Privacy" despite the actual supposed basis for its dispute having almost nothing to do with "Security" as that word is typically used.  Indeed, the nature of Epic's "Issue Notification" statement was (on information and belief, intentionally) akin to the type of notice informing customers of a hack or data breach, in order to provide that misimpression as to Particle's business.

**ANSWER:**  Epic denies the allegations in Paragraph 107, except (i) refers to the Issue Notification cited therein for its contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 107, and therefore denies them.

108.    In addition to statements that falsely painted Particle as a bad actor and a data security risk, Epic's "Issue Notification" also contained blatant falsehoods about Epic's own course of conduct that amplified the harm caused by its decision to cut off Particle customers.  In describing its response to the supposed "Third-Party Security and Privacy Risk" introduced by Particle, Epic stated, "On March 21, Epic filed a formal dispute with Carequality, and *Epic Carequality Administrators suspended Particle Health's gateway connection to Epic community members*."  This statement, of course, was not true:  Epic had suspended a large swath of Particle customers from accessing Epic records through Carequality, but other customers' connections remained active.

**ANSWER:**  Epic denies the allegations in Paragraph 108, except refers to the Issue Notification cited therein for its contents.

109.    This lie, too, was immediately picked up by the media.  In the same article discussed above, CNBC reported that Epic had "cut off data access to a startup called Particle Health," and that it "told customers in a notice on Thursday that it cut off its connection to Particle."[25]  DMR News reported that Epic "announced in a notice last Thursday that it had severed its data connection with Particle Health."[26]  Even after Particle attempted to clarify in a

---

[25] https://www.cnbc.com/2024/04/12/epic-systems-boots-particle-health-for-unauthorized-sharing-of-data-.html

[26] https://www.msn.com/en-us/health/other/epic-systems-halts-data-sharing-with-particle-health-over-misuse-concerns/ar-BB1lGFg4

public statement a few days later that connectivity to Epic remained active for many Particle customers, news outlets continued to repeat Epic's lie that Particle had been totally disconnected from Epic.  For example, the news outlet Modern Healthcare published an article on April 17, 2024—two days *after* Particle issued its clarifying statement—stating that, "On March 21, Epic stopped responding to data-sharing queries from customers of Particle Health on the Carequality national interoperability framework," and attributing that fact to Epic.[27]

> **ANSWER:**  Epic denies the allegations in Paragraph 109 and accompanying footnotes, except refers to the CNBC, DMR News, and Modern Healthcare articles cited therein for their contents, and denies them.

110.    Over the ensuing months and to this day, Epic has continued to make hundreds of additional false and disparaging statements to the healthcare community regarding Particle.  For example, on June 28, 2024, Epic sent out a follow-up email to hundreds of customers regarding supposed "Inappropriate Disclosures" of their patient's data "via Particle Health."  While purporting to provide an update on the supposedly improper requests made by one Particle customer—which Particle had removed from its system months earlier after Epic raised issues— Epic told the healthcare community, "we are pleased that after eight months of resistance [Particle] ha[s] now acknowledged wrongdoing and have provided a contact for assisting you in your investigation."  Particle had not and has not in any way "acknowledged wrongdoing" or anything remotely close.  This aspect of Epic's statement was, again, made up from whole cloth.

> **ANSWER:**  Epic denies the allegations in Paragraph 110, except (i) admits that Epic sent an email to certain customers on June 28, 2024, and (ii) refers to the June 28, 2024 email cited therein for its contents.

111.    Epic's falsehoods about Particle are material to Particle's ability to compete.  Reputation and credibility are vitally important in the healthcare industry, particularly among actors who are responsible for handling sensitive patient information.  Even the mere specter that an organization might be vulnerable to a security breach or prone to misusing patient data is enough to tank its ability to compete for business from the healthcare providers and payers who Particle relies on to survive.  Epic's representations regarding the status of its connections to Particle are also material:  by telling the world that it had "suspended Particle Health's gateway connection to Epic community members," Epic sent Particle's existing and potential customers the clear message that they would be unable to access Epic records as long as they used Particle as their Carequality connection.  For many customers, of course, that was true.  But by conveying that message to *all* Particle customers, whether existing or potential, Epic

---

[27] https://www.modernhealthcare.com/digital-health/epic-particle-health-dispute-data-sharing-carequality

greatly amplified the fear and uncertainty faced by those customers and gave them additional incentive to abandon their relationships with Particle.

      **ANSWER:** Epic denies the allegations in Paragraph 111, except (i) refers to the

Issue Notification cited therein for its contents, and (ii) states that it is without knowledge or

information sufficient to form a belief as to the truth of the allegations concerning persons or

entities other than Epic in Paragraph 111, and therefore denies them.

      112.    Epic's falsehoods about Particle were also likely to induce reasonable reliance. As the dominant EHR company, Epic is a familiar name to healthcare organizations across the country, whereas Particle is a relative newcomer. By virtue of Epic's position as the source of the vast majority of medical records in the United States, its statements on health data issues have weight and credibility. That is why, for example, Epic's mere decision to release a statement regarding Particle sparked a flurry of media coverage across the country—when Epic speaks, healthcare organizations listen to what it has to say. Healthcare organizations' high sensitivity to (and legal requirements regarding) patient data-related issues also makes them especially likely to rely on statements, like Epic's, that alert them to potential issues of patient privacy. The caution and sensitivity that sparks that reliance is reasonable, given obligations healthcare organizations must meet with respect to patient privacy. In addition, Epic's statements on patient privacy and security have baseline credibility because Epic is bound by a web of laws and regulations that lead recipients to believe that any data security or similar concerns it raises are motivated by its own interest in ensuring compliance with those laws. Here, the problem is that Epic has used those typical indicia of trustworthiness to spread falsehoods to hundreds in a way that they are likely to believe. Epic's statements regarding its own connections to Particle were also likely to—and did— induce reasonable reliance, as healthcare organizations have no reason to suspect Epic of lying about its own course of conduct.

      **ANSWER:** Epic denies the allegations in Paragraph 112, except (i) refers to the

Issue Notification cited therein for its contents, and (ii) states that it is without knowledge or

information sufficient to form a belief as to the truth of the allegations concerning persons or

entities other than Epic in Paragraph 112, and therefore denies them.

      113.    Epic's falsehoods about Particle have continued for a prolonged period of time. Long after releasing its "Issue Statement," Epic has continued to double down on its allegations falsely accusing Particle of wrongdoing. Between its initial statement and its June 28 email repeating its lies and stating that Particle had "acknowledged wrongdoing" with respect to its customers, over two months passed during which it regularly repeated such statements to members of the healthcare community. Epic's intention to double down on its lies was apparent since it began making them: in the weeks following Epic's initial statement, representatives of Carequality proposed that Epic, Carequality and Particle issue a joint press release correcting the record and explaining that (i) Particle remains in good standing on Carequality; and (ii) Epic is

actively responding to queries by Particle Connections.  Epic refused to agree to submit a joint press release and (through back channel communications with Carequality that it kept from Particle), persuaded Carequality not to issue a statement.  It thus ensured that the public's false perceptions would remain uncorrected.

> **ANSWER:**  Epic denies the allegations in Paragraph 113, except (i) refers to
>
> Epic's June 28, 2024 email and the proposed joint statement cited therein for their contents, and
>
> (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of
>
> the allegations concerning persons or entities other than Epic in Paragraph 113, and therefore
>
> denies them.

114.    Epic's falsehoods are not readily susceptible of neutralization by Particle. As stated above, Epic is a far more established player in the healthcare industry with a much broader reach than Particle.  Given Epic's role in the healthcare system, if it takes issue with Particle, there is a reasonable and widespread belief among healthcare industry participants that Particle *must* have done something wrong.  Particle's inability to neutralize Epic's statements is borne out by the fact, also stated above, that media outlets continued to report that Particle customers had been totally disconnected from Epic's health records even after Particle put out a statement attempting to correct the record.  Further preventing Particle from neutralizing Epic's falsehoods is the fact that the reality of the situation is complex.  Understanding Particle's side of the story requires a relatively sophisticated knowledge of health information exchange and interoperability.  By contrast, Epic's version of events ("Third-Party Security and Privacy Risk") is impactful and, at a surface level, easy to understand (even if it is incorrect).  Thus, the only effective way for Particle to correct an organization's misunderstanding is to engage with that organization directly to provide the truthful (and complex) sequence of events.  For the relatively few organizations with which Particle has been able to engage directly (not for lack of trying), it has had some success in clearing the misunderstandings Epic cultivated.  But Particle cannot possibly hope to correct a market-wide disparagement and disinformation campaign through individualized conversations with hundreds of providers.  Nor can Particle devote the resources necessary to combat the prolonged smear campaign without jeopardizing the quality of its current operations and relationships.  But of course, that is Epic's very goal.

> **ANSWER:**  Epic denies the allegations in Paragraph 114, except states that it is
>
> without knowledge or information sufficient to form a belief as to the truth of the allegations
>
> concerning persons or entities other than Epic in Paragraph 114, and therefore denies them.

115.    In addition to destroying public trust in Particle, Epic's disparagement campaign had another purpose and effect:  directing thousands of healthcare providers to contact Particle regarding the use of their health records and thereby overwhelming Particle's systems and resources.  Each of Epic's issue notifications and subsequent statements to its EHR customers proceeded in the same way:  first, stoking baseless fears about Particle's use of their

patient's records, as described above; second, suggesting to those customers that it is important for them to "investigate" the issue; then third, providing them with Particle's contact information and directing its customers to reach out to them.

      **ANSWER:** Epic denies the allegations in Paragraph 115, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 115, and therefore denies them.

      116.    For example, Epic's initial "Issue Notification" states on the last page, "All electronic health records your organization might have disclosed to Particle Health through its gateway and to its participants were requested under a Treatment Permitted Purpose. There is no programmatic way to determine whether those requests were appropriately made under a Treatment Permitted Purpose." Epic then spends much of the rest of the page providing directions "To help you prioritize your investigation," before stating, "If, during your investigation, you have questions about any of the record retrievals made by Particle Health or one of its participant organizations, contact Particle Health at support@particlehealth.com." Similarly, in Epic's June 28 email to customers where it stated that Particle had "acknowledged wrongdoing," Epic also stated that Particle "ha[s] provided a contact for assisting you in your investigation" before providing Particle's contact information.

      **ANSWER:** Epic denies the allegations in Paragraph 116, except refers to Epic's Issue Notification and June 28, 2024 email cited therein for their contents.

      117.    These messages naturally raised concerns about patient privacy and regulatory compliance for Epic's thousands of healthcare provider customers and, immediately after doing so, guided them to direct those concerns toward Particle. As a result, concerned healthcare providers immediately began bombarding Particle with calls and emails seeking to investigate what they had been led to believe was a major data breach for which Particle was responsible. Healthcare providers, of course, have every right to know where their patients' data is going and how it is being used, so Particle has had no choice but to locate the information requested by each and every provider and otherwise assist in each and every investigation. The process for locating and investigating such information for even a single provider is complex and in-depth and can involve weeks of back-and-forth. Particle has continued to receive a barrage of requests from providers since April 2024 up through the filing of this complaint.

      **ANSWER:** Epic denies the allegations in Paragraph 117, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 117, and therefore denies them.

      118.    Particle is a small company with few employees and limited resources. It does not have the capacity to both properly conduct its business and assist with investigations and information requests from hundreds of separate providers. Epic knows this. By informing

thousands of healthcare providers that their patients' data may be at risk, then directing them to look to Particle for answers, Epic has brought Particle's operations nearly to a standstill. Employees who would otherwise be tasked with developing the business, courting new customers, or improving Particle's software have instead been distracted with demonstrating to hundreds of healthcare providers exactly how and why their patients' data has been retrieved. At the same time, these distractions have sapped employee morale by forcing Particle's employees to engage in tedious data collection rather than the roles they were hired to perform.

**ANSWER:** Epic denies the allegations in Paragraph 118, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 118, and therefore denies them.

119.    Carequality maintains a private dispute resolution process that allows members to resolve issues regarding Carequality's rules. Around the same time that Epic began making its disparaging and defamatory public statements about Particle, it also initiated a manufactured and pretextual dispute within Carequality.

**ANSWER:** Epic denies the allegations in Paragraph 119, except (i) admits that Carequality's rules include a defined dispute resolution process to address conflicts between members (the "Carequality Dispute Resolution Process"), and (ii) states that certain allegations in Paragraph 119 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

120.    Particle's dispute had no basis and no purpose other than to distract Particle, drain its resources, legitimize Epic's anticompetitive conduct, and subject Particle to public scrutiny. On April 24, 2024—roughly a *month* after first filing its dispute—Epic finally submitted a "Pre-Dispute Statement," which purported to lay out the bases for its dispute. As with its public statements, Epic's dispute statement was heavy on innuendo and light on detail. In it, Epic discussed its supposed concerns about non-treatment use cases for three Particle customers, then stated—with no substantiation or explanation whatsoever—that Epic was "concerned the problem may be much broader than these three organizations." As to why Particle should be held responsible for alleged improper requests by three individual customers, Epic offered nothing other than its "serious doubts" about Particle's integrity.

**ANSWER:** Epic denies the allegations in Paragraph 120, except (i) admits that the Pre-Dispute Statement was submitted on April 24, 2024, and (ii) refers to Epic's Pre-Dispute Statement cited therein for its contents.

121.    Similar to Epic's "Issue Notification" to its customers, the closest Epic's pre-dispute statement came to making any actual accusations against *Particle* to justify a dispute against *Particle*—rather than a tiny subset of Particle's customers—was an allegation that Particle "masks some of its customers' identities when they request medical records" through a "gateway designed to mask the identity of groups requesting data."  As Particle quickly showed in its counterstatement, that accusation was just as wholly divorced from reality in the context of the Carequality dispute as it was when Epic made it in the "Issue Notification" to its customers. Again:  ***every single request made using Particle's Carequality connection clearly states the name of the requesting party exactly where a provider like Epic would expect to find it***. Without its completely fact-free "masking" claim, Epic not only lacked any specific allegations of wrongdoing by Particle, but also its supposed "concerns" about Particle's integrity became facially absurd because ***Epic itself had previously responded to requests from those three customers***.  In light of the fact that Epic could see exactly who was making each request, Epic offered no explanation for why it was somehow wrong for Particle to *allow* the requests, but not wrong for Epic to *respond* to them.  As discussed below, Carequality itself agreed Epic had no basis to make its masking complaint.

**ANSWER:**  Epic denies the allegations in Paragraph 121, except refers to Epic's

Pre-Dispute Statement and Issue Notification cited therein for their contents.

122.    Despite Epic's frivolous dispute having no basis in fact or Carequality's rules, Epic resisted all efforts to end the dispute.  During the course of the dispute, which lasted for five months, Particle approached Epic at least five separate times to inquire whether there were any mechanisms Particle could put in place to resolve the issues raised in the dispute.  Epic refused to even engage in such conversations.  Instead, it continued to press forward with its claims of wrongdoing by Particle.  As the dispute dragged on, Epic made no effort to substantiate its "concern[] [that] the problem may be much broader than these three organizations," confirm its "serious doubts" about Particle's integrity, or prove that Particle operates a "gateway designed to mask the identity of groups requesting data."  Instead, it shifted focus to harping on the supposed wrongdoing of the three Particle customers, with no attempts at connecting any wrongdoing to *Particle itself*.  Even as it failed to advance any theory for how Particle violated Carequality's rules, however, Epic obstructed and drew out the Carequality process to make its dispute as burdensome as possible for Particle.  For example, for much of the dispute, Epic refused to provide Particle with the chief piece of evidence it claimed supported its allegation that one Particle customer was not making requests for treatment purposes.

**ANSWER:**  Epic denies the allegations in Paragraph 122, except (i) admits that

the Carequality Dispute Resolution Process commenced in March 2024, and the Carequality

Steering Committee issued its findings and resolution in August 2024, and (ii) refers to Epic's

Pre-Dispute Statement purportedly quoted therein for its contents.

123. Historically, disputes between Carequality members have been informal and inexpensive, almost always facilitating settlements among members within a few weeks. But, this particular dispute dragged on for over five months due to Epic's behavior, with Epic repeatedly brushing aside all attempts at reconciliation. Meanwhile, Epic insisted on expanding the traditionally informal process into a full-blown arbitration proceeding, with experienced (and expensive) counsel on both sides, multiple hearings, and formal submissions. It demanded extensive information from Particle, while at the same time refusing to provide such information itself. Indeed, this was *the first time in the history of Carequality* that a dispute reached the point of a formal hearing and submissions to the panel. And, at least in the substance of the panel's findings, it completely vindicated Particle.

**ANSWER:** Epic denies the allegations in Paragraph 123, except (i) admits that Epic was represented by counsel in connection with the Carequality Dispute Resolution Process, and that as part of that process, it made submissions to the Panel and participated in two hearings, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 123, and therefore denies them.

124. In a decision dated August 29, 2024, the Carequality Steering Committee found Particle did *nothing wrong*. No improper masking, no violations of HIPAA or other statutes, no knowledge by Particle of improper practices by any customers, no improper practices at all by the only accused customer who Particle kept on its system after the dispute began, no shortcomings in its screening processes, no violations of Carequality rules, nothing. With regard to Epic's "masking" claim, the decision stated, "*the Steering Committee does not believe that Particle utilized a 'masking gateway.'*" With regard to Particle's responsibility for the three customers' alleged mislabeling, it stated, "it does appear that *Particle conducted diligence* on each of these Connections," and, "*Particle's current onboarding process … appears to be relatively robust*." The decision contained no finding that Particle had violated any Carequality rules. In short, Carequality found Epic's dispute was as baseless as Particle contended from the very start of the process.

**ANSWER:** Epic denies the allegations in Paragraph 124, except refers to the Carequality Steering Committee Resolution cited therein for its contents.

125. However, Carequality's vindication of Particle on the merits was not the end of the story. While Epic pushed forward its baseless dispute to burden and distract Particle, it also used its power and influence over Carequality and/or worked behind the scenes to manipulate Carequality and bias the resolution in Epic's favor, regardless of the dispute's merits. As a result of this manipulation, despite being unable to find that Particle did anything wrong or violated any Carequality rules, the Steering Committee nonetheless miraculously imposed a six-month "corrective action plan" on Particle; *i.e.*, require Particle to change its practices in certain

ways untethered to Carequality's rules or Particle's behavior. While this result was far less than Epic had asked for, it nonetheless imposed further burdens on Particle's ability to compete and was instituted, on information and belief, solely to appease Epic.

**ANSWER:** Epic denies the allegations in Paragraph 125, except (i) admits that the Carequality Steering Committee imposed a corrective action plan on Particle, (ii) refers to the Carequality Steering Committee Resolution cited therein for its contents, and (iii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 125, and therefore denies them.

126. Epic obtained this result through a variety of illicit means. First, as by far the largest provider of records through the Carequality framework, Epic holds outsized power over the organization and has wielded that power to threaten Carequality's very existence by repeatedly raising the specter of it leaving the organization, including during the pendency of the Particle dispute. Without Epic, Carequality is irrelevant, because an organization focused on facilitating the exchange of EHRs has no real purpose if an EHR provider controlling the full medical history of between 81-94% of U.S. patients will not allow third parties to request its records using that organization's network. These repeated threats therefore hang over Carequality like a Damocles sword and infected how it assessed the end result of the Particle dispute. Because of these threats, the Carequality Steering Committee had overwhelming incentive to provide at least some concessions to appease Epic, even if it could not justify finding for them on the merits. That is what occurred here.

**ANSWER:** Epic denies the allegations in Paragraph 126.

127. Another source of power Epic wields over Carequality arises from the makeup of the Carequality Steering Committee. That Committee is composed of representatives from major players in the healthcare industry, each of which have business interests in remaining on friendly terms with Epic. The votes of those members are visible, and the threat of a Steering Committee member disrupting his or her organization's relationship with Epic by voting for a resolution Epic disfavors is very real and, given Epic's broad dominance, very scary. In many cases, those relationships are personal. Indeed, one of the businesses represented on the Carequality Steering Committee *is Epic itself*. And although Epic's representative purported to recuse himself for the purposes of this dispute, he remains closely connected to his peers on the Steering Committee who were active decisionmakers in the end result.

**ANSWER:** Epic denies the allegations in Paragraph 127, except (i) admits that the Carequality Steering Committee is composed of representatives from the healthcare industry, that Epic currently has a representative on the Steering Committee, and that the Epic representative recused himself from the Steering Committee for purposes of the Carequality

Dispute Resolution Process that Epic initiated against Particle, and (ii) states that it is without

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

persons or entities other than Epic in Paragraph 127, and therefore denies them.

128.    On information and belief, Epic has leveraged its power over Carequality to obtain results that favored it for as long as it has been a participant in the network.  For example, as discussed above, the Carequality Steering Committee has repeatedly voted upon measures advanced by members to require that participants respond to requests for non-treatment purposes, like operations.  Epic has disfavored these measures because they would disrupt its scheme to preempt or limit competition in the payer platform market and other markets.  Thus, despite their overwhelming popularity with the Carequality membership base, these initiatives have mysteriously been voted down each time they are brought.  There is no explanation for the rejection of these proposals other than Epic's undue influence.  Requiring companies like Epic to respond to EHR requests for operations purposes would serve only to increase efficiencies and lower costs for healthcare industry participants, and enhance competition in markets such as the payer platform market.  Thus, on information and belief, Carequality's continuing limitation to "treatment" requests is one example of Epic flexing its power over the Carequality Steering Committee to anticompetitive ends.

**ANSWER:**  Epic denies the allegations in Paragraph 128, except states that it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning persons or entities other than Epic in Paragraph 128, and therefore denies them.

129.    With these varied sources of leverage as the backdrop, on information and belief, Epic also worked behind the scenes in its dispute with Particle to coerce and/or obtain the Steering Committee's agreement to impose a remedy on Particle despite the clear finding that Particle did not violate the law or Carequality's rules.  Evidence of Epic's behind-the-scenes communications emerged at various points during the dispute.

**ANSWER:**  Epic denies the allegations in Paragraph 129.

130.    For example, as discussed briefly above, Carequality planned early on to issue a press release to confirm that Particle remained a Carequality member in good standing and that Epic records were still available to many Particle customers.  Carequality proposed that press release in an April 17 email to Particle and Epic, which contained a draft statement.  In that email, Carequality wrote, "We believe it is in everyone's best interest to issue a joint statement setting forth the basic facts regarding the dispute and those involved," and, "we plan to post by end of day today."  The statement Carequality intended to publish clarified that the parties were working to "help minimize disruptions to data exchange between Epic and all of Particle Health's other connections, which are not involved in the dispute," and that "Carequality has not been presented with any definitive evidence that supports a broader suspension of … Particle Health."  Particle responded with minor proposed edits in the main email chain, which Carequality accepted.  Epic did not respond to the email chain.

**ANSWER:** Epic denies the allegations in Paragraph 130, except (i) admits that Carequality circulated a proposed joint statement by email on April 17, 2024, (ii) refers to the proposed joint statement cited therein for its contents, and (iii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 130, and therefore denies them.

131.    At 5:00 PM that day, however, Carequality did not publish the statement as it said it would.  Instead, a few hours later that evening, Particle's CEO received a call from the Executive Director of Carequality, who informed him that Carequality would not be publishing a statement like the one it had circulated earlier.  When asked why, Carequality's Executive Director revealed that Epic had conveyed—through back-channel communications in which Particle was not included and of which it was unaware—that Epic did not want such a statement published.  At 7:00 PM that evening, Carequality emailed the parties again, this time to inform them that it would not publish any statement on the dispute at all.  On information and belief, this was not the only time Epic conveyed its preferences to Carequality through back-channel communications, and Epic used similar tactics to ensure that the ultimate resolution put out by Carequality would harm Particle and benefit Epic, even if the Steering Committee could not find any wrongdoing by Particle.

**ANSWER:** Epic denies the allegations in Paragraph 131, except (i) refers to the Carequality email cited therein for its contents, and (ii) states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 131, and therefore denies them.

132.    Carequality's resolution itself is further evidence of Epic's undue influence, as the remedy it imposed benefits Epic despite findings that Particle was always in the right and that, as Particle noted throughout the process, Epic's dispute was meritless.  The "corrective action plan" imposes a variety of requirements on Particle that allow Epic and its proxies to stop the flow of record requests from Particle's platform with essentially no notice and no due process (including whenever Epic decides to change its own rules, without any input from Carequality).  The resolution also ordered Particle to produce certain information that only Epic had ever previously, privately demanded of Particle—and then only well after the hearing had concluded.  These results indicate Epic's back-channel communications and influence, because the Steering Committee was clear that Particle did not violate any Carequality rules or any applicable laws or regulations.

**ANSWER:** Epic denies the allegations in Paragraph 132, except (i) admits that the Carequality Steering Committee imposed a corrective action plan on Particle, and (ii) refers to the Carequality Steering Committee Resolution referenced therein for its contents.

133.    In total, Epic's frivolous dispute had the effect of draining Particle's resources—forcing it to spend hundreds of thousands of dollars in legal fees to defend against a claim the Steering Committee itself found has no basis in fact or Carequality rules, and which, on information and belief, Epic never intended to have merit. All the while, the pendency of a publicly-known dispute brought by Epic against Particle maintained the cloud over Particle's reputation that Epic's public statements placed, allowing it to become cemented in the public's mind. Finally, the remedy Epic coerced the Steering Committee into imposing ***after finding in favor of Particle on the merits*** only compounds those problems and provides Epic further means to interfere with Particle's business and customer relationships. These effects, individually and in combination, have further materially dampened Particle's ability to compete in the payer platform market.

**ANSWER:** Epic denies the allegations in Paragraph 133, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 133, and therefore denies them.

134.    Given the above facts, Epic's gameplan is clear: block meaningful competition for payer platforms by preventing Particle's customers from obtaining the medical records critical for their use of Particle's platform while also creating substantial fear, uncertainty, and doubt about Particle's continued viability and erecting as many roadblocks as possible to prevent it from focusing on and investing in its business. That is blatantly anticompetitive, and Epic's scheme is designed to let it dominate and control the payer platform market as an extension of its EHR monopoly.

**ANSWER:** Epic denies the allegations in Paragraph 134, except states that certain allegations in Paragraph 134 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

135.    Epic's explanation to date has been that it is acting to protect patient privacy. But Epic has presented no credible evidence or other support substantiating its claims. Epic has identified nothing about Particle's conduct that poses any threat to patient privacy. Even if, as Epic claims, the three accused Particle customers requested records for purposes other than treatment, that does not mean they accessed those records in violation of patient privacy—both HIPAA and the Carequality framework provide numerous permissible bases for accessing medical records other than treatment. In any event, the activities of three of Particle's customers

do not explain the way Epic has acted with respect to *other*, unaccused Particle customers and Particle *itself*.

> **ANSWER:** Epic denies the allegations in Paragraph 135, except (i) admits that three Particle customers inappropriately used Carequality to obtain records for non-treatment purposes, and that Epic's actions were undertaken to protect the privacy and security of patient data, and (ii) refers to HIPAA and the Carequality framework cited therein for their contents.

136.    Moreover, the way Epic has acted upon its supposed concerns for patient privacy flatly contradicts any claim to be acting in the interests of patients.  First, Epic repeatedly rebuffed Particle's attempts to engage with it on patient privacy issues amidst the Carequality dispute.  Second, Epic's decision to cut off records access to 119 Particle Connections blocked over 40,000 records requests that were made to facilitate the treatment of patients.  Third, Epic's decision to prevent Particle customers from *sharing* records with Epic EHR users harmed and will continue to harm Epic's **own customers**.  For example, Epic's actions have already compromised the care of severely ill cancer patients, among others.  In reality, for these reasons and many more, Epic's complaints are pure pretext and do not actually present any legitimate business or procompetitive justifications.

> **ANSWER:** Epic denies the allegations in Paragraph 136.

137.    Instead, the true purpose of Epic's outrageous accusations and conduct has been to block competition.  The timing of Epic's conduct gives this away:  it was immediately after learning that Particle had, through one of its customers, helped provide EHRs to Blue Cross Blue Shield of Michigan and that Particle was expanding into the payer market that Epic began its campaign of anticompetitive conduct.  Further, the conduct itself has little to no connection to any goal other than eliminating competition from the payer platform market.  For example, if the primary motivator underlying Epic's conduct was a concern that three Particle customers had made treatment requests for non-treatment purposes, it would have no reason to shut off records access for dozens of *other* Particle customers that had no connection to those three.  Nor would it have a reason to make restored access to Epic records for those other parties contingent on ending their relationship with Particle, as it did for XCures.  Nor would it have a reason to subject *new* Particle customers to a burdensome, drawn-out onboarding process that it does not apply to any other parties.  Nor would it have reason to continually paint Particle *itself*—as opposed to the accused Particle customers—as a bad actor to the healthcare community, despite lacking any basis for Particle's culpability in any wrongdoing.  Nor would it insist on pushing forward with a costly Carequality dispute despite utterly lacking any basis in fact or Carequality's rules, even amidst Particle's repeated attempts to reach an amicable conclusion.

> **ANSWER:** Epic denies the allegations in Paragraph 137.

138.    Epic's conduct is also irrational but for its anticompetitive effects.  When clients use Particle's payer platform, the value of Epic's underlying EHR System is increased because payers use and request more EHRs from the EHR System.  This rationally allows Epic to charge more money for its EHR System and therefore make additional profit.  In other words, Epic's conduct is irrational but for its anticompetitive effect because it makes Epic's own primary product—its EHR software—less interoperable and less attractive to customers.  Consistent with these economic facts, Epic has put together what it calls an App Orchard, or a set of applications that are able to integrate with Epic's EHR Software.  This is economic evidence that Epic realizes expanded access to and demand for records from its EHR Software is rational as it increases the value of its EHR Software for healthcare providers.  By disabling Particle's customers' access to Epic EHR, Epic's EHR Software becomes less valuable and thus less profitable.  It is only if Epic successfully eliminates competition in the payer platform market that Epic's strategy vis-à-vis Particle makes economic sense, as it could then charge supracompetitive prices for Epic's own alternative EPP while also expanding use of its EHR Software.

**ANSWER:**  Epic denies the allegations in Paragraph 138.

139.    Furthermore, there are substantially less restrictive alternatives to Epic's conduct, such as:  permitting payers to access EHRs unfettered by the artificial limitations Epic has tried and is trying to place on them; not utilizing Carequality and its processes in a way meant to harm competition; not disparaging a rival in order to scare away its current and prospective customers, because that rival is the only major competitive threat that has yet arisen in the payer platform market; and so on.  To meet its supposed concern of ensuring that parties seeking records for non-treatment purposes do not receive Epic records on the Carequality system, an obvious less restrictive alternative is to shut off records access to the parties that actually engage in such conduct, rather than shutting off records access to dozens of other parties with no connection to such conduct—all of whom are customers of a competitor.

**ANSWER:**  Epic denies the allegations in Paragraph 139.

140.    Epic's anticompetitive behavior means that payers have no meaningful choice in the payer platform market aside from Epic, regardless of price or quality.  This is bad for payers, patients, healthcare workers, and competition.

**ANSWER:**  Epic denies the allegations in Paragraph 140.

141.    The only entity that will benefit from that outcome is Epic itself.  Rather than compete on the merits, Epic will win customers in the payer platform market simply by existing and denying other market participants access to their platform or data.  And given its track record of cementing a competitive moat around its EHR offering, Epic is sure to similarly lock in hospitals and other healthcare organizations to its proprietary software once its market power is established.

**ANSWER:**  Epic denies the allegations in Paragraph 141.

74

142.    These problems are broadly recognized in the EHR market, and will extend to the payer platform market if Epic is allowed to continue its anticompetitive campaign. As described by a CEO of a major healthcare system in Minnesota:[28]

> I will submit that one of the biggest impediments to innovation in health care is Epic, because the way that Epic thinks about their [intellectual property] and the IP of others that develop on that platform.  There are literally billions of dollars in the Silicon Valley chasing innovation in health care.  And yet Epic has architected an organization that has its belief that all good ideas are from Madison, Wisconsin.  And on the off chance that one of us think of a good idea, it's still owned by Madison, Wisconsin.

**ANSWER:**  Epic denies the allegations in Paragraph 142 and the accompanying footnote, except refers to the 4sight Health article cited therein for its contents, and denies them.

143.    Nor is Epic's conduct limited to Particle.  As the first company to figure out a way to overcome Epic's restraints on competition in the payer platform market, Particle represents not just a single competitor to Epic, but an entire mode of competition.  Epic knows that if Particle succeeds in competing with it in the payer platform market, Particle will not be the last company to challenge Epic's monopoly.  That is why it is so important for Epic to utterly destroy Particle:  it must not only destroy a fledgling competitor, but show the whole industry that there will be no circumventing the moat Epic tries to place around its monopoly.  There is therefore a substantial risk that Epic's conduct will result in the elimination of all meaningful competition in the payer platform market, leaving Epic as the only real competitor left standing and leading to the same sort of lock-in effects that characterize its ever-growing stranglehold on EHR Software and/or EHR Provision Services.  That is not only harm to competition; it is elimination of competition.

**ANSWER:**  Epic denies the allegations in Paragraph 143, except states that certain allegations in Paragraph 143 purport to state a legal conclusion to which no response is required.  To the extent that a further response is required, Epic denies the allegations of the paragraph.

144.    Epic's conduct will also substantially harm payers, patients and healthcare providers.  As previously noted, Particle's innovations substantially benefit all.  Payers benefit because it breaks EPP's monopoly grip over the payer platform market and provides them with new and lower-cost options for retrieving records at scale.  Patients benefit because it pushes their health plans to offer more robust treatment-related services to help them understand and

---

[28] *Interoperability Battle Lines: Data Freedom Fighters vs. Entrenched Data Blockers*, 4sighthealth, https://www.4sighthealth.com/interoperability-battle-lines-data-freedom-fighters-vs-entrenched-data-blockers/

improve their health—in addition to lowering prices for payers, which can translate to lower premiums. Healthcare providers benefit because patients have a wider variety of treatments available to them, as well as better ability to pay for treatments from the healthcare providers. Competition benefits because companies like Particle are able to gain share in a rapidly-growing market that they would otherwise be unable to obtain due to Epic's anticompetitive conduct.

**ANSWER:** Epic denies the allegations in Paragraph 144, except states that certain allegations in Paragraph 144 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

145.    Epic's conduct has caused, and will continue to cause substantial antitrust injury to Particle in the form of lost customers and revenue. If Particle's customers cannot receive the EHR data stored and maintained in Epic's systems, and cannot remain confident that Epic will provide them with EHRs in accordance with the law and its standard practices, Particle will not be able to sell its products in the payer platform market and lose payer customers that have any substantial number of insureds with records in Epic's EHR System.

**ANSWER:** Epic denies the allegations in Paragraph 145, except states that (i) it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 145, and therefore denies them, and (ii) certain allegations in Paragraph 145 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

146.    Particle's injury is of the type the antitrust laws were intended to prevent. Epic's conduct is harming competition as a whole, with widespread and substantial effects in the payer platform market and the dangerous probability that competition will be eliminated in the payer platform market to the benefit of Epic and no one else.

**ANSWER:** Epic denies the allegations in Paragraph 146, except states that certain allegations in Paragraph 146 purport to state a legal conclusion to which no response is required. To the extent that a further response is required, Epic denies the allegations of the paragraph.

147.    Epic's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

(a)    Epic provides EPP throughout the United States;

(b)    Epic has used instrumentalities of interstate commerce to provide EPP throughout the United States;

(c)    In furtherance of the anticompetitive scheme alleged herein, Epic employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

(d)    The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Epic has inflicted antitrust injury by artificially excluding Particle and other competitors and causing the other antitrust injuries described herein.

**ANSWER:** Epic states that the allegations in Paragraph 147 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 147.

148.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to Particle's allegations that Particle purports to reallege and incorporate in Paragraph 148.

149.    Epic has a market share of over 90% in the payer platform market, which is a market with high barriers to new entry, as described herein.

**ANSWER:** Epic states that the allegations in Paragraph 149 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 149.

150.    Epic has monopoly power in the payer platform market, which is the relevant market in which Epic and Particle compete.

**ANSWER:** Epic states that the allegations in Paragraph 150 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 150.

151.    Epic has willfully acquired and maintained monopoly power in the payer platform relevant market, by means of predatory, exclusionary, and anticompetitive conduct, as alleged herein.

**ANSWER:** Epic states that the allegations in Paragraph 151 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 151.

152. Epic's conduct has no legitimate business purpose or procompetitive effect.

**ANSWER:** Epic states that the allegations in Paragraph 152 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 152.

153. There are less restrictive alternatives to the restraints Epic has imposed.

**ANSWER:** Epic states that the allegations in Paragraph 153 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 153.

154. Epic's conduct has had a substantial effect on interstate commerce.

**ANSWER:** Epic states that the allegations in Paragraph 154 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 154.

155. Particle has suffered antitrust injury as a result of Epic's anticompetitive conduct in the form of current and future lost customers and revenue. Epic's conduct has harmed competition overall in the payer platform relevant market.

**ANSWER:** Epic states that the allegations in Paragraph 155 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 155.

156. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to Particle's allegations that Particle purports to reallege and incorporate in Paragraph 156.

157.    Epic has a market share of over 90% in the payer platform market.

**ANSWER:**  Epic states that the allegations in Paragraph 157 purport to state a legal conclusion to which no response is required.  To the extent that a response is required, Epic denies the allegations in Paragraph 157.

158.    Epic specifically intended to monopolize the payer platform market by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

**ANSWER:**  Epic states that the allegations in Paragraph 158 purport to state a legal conclusion to which no response is required.  To the extent that a response is required, Epic denies the allegations in Paragraph 158.

159.    Epic attempted to monopolize the payer platform market by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

**ANSWER:**  Epic states that the allegations in Paragraph 159 purport to state a legal conclusion to which no response is required.  To the extent that a response is required, Epic denies the allegations in Paragraph 159.

160.    There is a dangerous probability Epic will achieve monopoly power in the payer platform market due to Epic's anticompetitive conduct.  Specifically, by taking all meaningful competitive options off the table other than EPP, Epic's own payer platform, Epic will achieve an unassailable, dominant position in the payer platform market.

**ANSWER:**  Epic states that the allegations in Paragraph 160 purport to state a legal conclusion to which no response is required.  To the extent that a response is required, Epic denies the allegations in Paragraph 160.

161.    Epic's conduct has no legitimate business purpose or procompetitive effect.

**ANSWER:**  Epic states that the allegations in Paragraph 161 purport to state a legal conclusion to which no response is required.  To the extent that a response is required, Epic denies the allegations in Paragraph 161.

162.    There are less restrictive alternatives to the restraints Epic has imposed.

**ANSWER:** Epic states that the allegations in Paragraph 162 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 162.

163.    Epic's conduct has had a substantial effect on interstate commerce.

**ANSWER:** Epic states that the allegations in Paragraph 163 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 163.

164.    Particle has suffered and will continue to suffer antitrust injury as a result of Epic's anticompetitive conduct in the form of current and future lost customers and revenue. Epic's conduct has harmed competition overall, and, if left unchecked, will permanently harm competition in the payer platform relevant market.

**ANSWER:** Epic states that the allegations in Paragraph 164 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 164.

165.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to Particle's allegations that Particle purports to reallege and incorporate in Paragraph 165.

166.    Epic has monopoly power in the EHR Software and/or EHR Provision Services market(s), as alleged herein.

**ANSWER:** Epic states that the allegations in Paragraph 166 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 166.

167.    Epic has used its monopoly power in the EHR Software and/or EHR Provision Services market(s) in an exclusionary and anticompetitive manner to foreclose competition, gain a competitive advantage, and/or destroy a competitor in the payer platform relevant market, as described herein.

**ANSWER:** Epic states that the allegations in Paragraph 167 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 167.

168.    Epic's conduct has no legitimate business purpose or procompetitive effect.

**ANSWER:** Epic states that the allegations in Paragraph 168 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 168.

169.    There are less restrictive alternatives to the restraints Epic has imposed.

**ANSWER:** Epic states that the allegations in Paragraph 169 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 169.

170.    Epic's conduct has had a substantial effect on interstate commerce.

**ANSWER:** Epic states that the allegations in Paragraph 170 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 170.

171.    Particle has suffered and will continue to suffer antitrust injury as a result of Epic's anticompetitive conduct in the form of current and future lost customers and revenue. Epic's conduct has harmed competition overall, and, if left unchecked, will permanently harm competition in the payer platform relevant market.

**ANSWER:** Epic states that the allegations in Paragraph 171 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 171.

172.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to Particle's allegations that Particle purports to reallege and incorporate in Paragraph 172.

173.    As alleged above, Epic has entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power in the relevant market for payer platforms.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required. To the extent a further response is required, Epic denies the allegations in Paragraph 173.

174.    As alleged above, Epic has conditioned the provision of EHR Provision Services on the boycotting of Particle's competing platform.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required. To the extent a further response is required, Epic denies the allegations in Paragraph 174.

175.    As alleged above, Particle's former customers have consummated agreements to restrain competition by acquiescing to Epic's conditions on dealing and communicating their acquiescence to Epic. Particle's former customers and former prospective customers who have abandoned their relationships with Particle have engaged in individualized dealings with Epic.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required. To the extent a further response is required, Epic denies the allegations in Paragraph 175.

176.    As alleged above, Epic has also consummated agreements to restrain competition with Carequality, members of the Carequality Steering Committee, the Epic Care Everywhere Governing Council and, on information and belief, still others that will be revealed by discovery.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 176.

177.    These contracts, combinations, or conspiracies include but are not limited to tying arrangements and vertically-arranged boycotts.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 177.

178.    Epic's conduct has had an anticompetitive effect in the relevant market for payer platforms.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 178.

179.    Epic's conduct has no legitimate business purpose or procompetitive effect.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 179.

180.    There are less restrictive alternatives to the restraints Epic imposed on the relevant market for payer platforms.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 180.

181.    Epic's conduct has had a substantial effect on interstate commerce.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 181.

182.    Particle has been or will be injured in its property as a result of Epic's conduct.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 182.

183.    Particle has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Particle has been and will be injured by the harm to competition as a result of Epic's conduct.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fourth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 183.

184.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:**  Epic restates and incorporates by reference each of its responses to Particle's allegations that Particle purports to reallege and incorporate in Paragraph 184.

185.    As alleged above, Epic has entered into one or more contracts, combinations, conspiracies, or arrangements to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power in the relevant market for payer platforms.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fifth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 185.

186.    These contracts, combinations, conspiracies, or arrangements include but are not limited to tying arrangements and vertically-arranged boycotts.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fifth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 186.

187.    Epic's conduct has had an anticompetitive effect in the relevant market for payment platforms.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fifth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 187.

188.    Epic's conduct has no legitimate business purpose or procompetitive effect.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fifth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 188.

189.    There are less restrictive alternatives to the restraints Epic imposed on the relevant market for payment platforms.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fifth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 189.

190.    Particle has been or will be injured in their property as a result of Epic's conduct.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fifth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 190.

191.    Particle has suffered and will suffer injury of the type that the New York antitrust laws were intended to prevent.  Particle has been and will be injured by the harm to competition as a result of Epic's conduct.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Fifth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 191.

192.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to Particle's allegations that Particle purports to reallege and incorporate in Paragraph 192.

193.    Particle and XCures entered into a "Particle Platform Agreement" on January 28, 2022, and an amendment to that agreement on December 20, 2023. The Agreement was at all relevant times a valid, binding, and enforceable contract. Under that contract, XCures agreed to pay monthly fees to Particle until January 1, 2025 in exchange for the right to use Particle's product.

**ANSWER:** Epic states that the allegations in Paragraph 193 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 193, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 193, and therefore denies them.

194.    At all relevant times, Epic was aware of the contract and its importance to Particle.

**ANSWER:** Epic states that the allegations in Paragraph 194 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 194, except states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 194, and therefore denies them.

195.    XCures has breached its valid and enforceable contract with Particle. XCures ceased paying its monthly fees to Particle in June 2024, prior to the termination date of January 1, 2025.

**ANSWER:** Epic states that the allegations in Paragraph 195 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 195, except states that it is without knowledge or information

sufficient to form a belief as to the truth of the allegations concerning persons or entities other than Epic in Paragraph 195, and therefore denies them.

196.    Epic intentionally procured XCures' breach without justification, with the purpose of harming Particle, as well as unfairly restraining competition in the EHR software market, EHR Provision Services market, and payer platform market. Epic's conduct was improper, conducted with malice, and is without privilege or justification.

**ANSWER:** Epic states that the allegations in Paragraph 196 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 196.

197.    The breach of the contract would not have occurred but for Epic's conduct.

**ANSWER:** Epic states that the allegations in Paragraph 197 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 197.

198.    Because of Epic's conduct, Particle has suffered, and continues to suffer, damages in an amount to be determined at trial.

**ANSWER:** Epic states that the allegations in Paragraph 198 purport to state a legal conclusion to which no response is required. To the extent that a response is required, Epic denies the allegations in Paragraph 198.

199.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to Particle's allegations that Particle purports to reallege and incorporate in Paragraph 199.

200.    As alleged above, Epic knowingly interfered with Particle's concrete prospective business relationship with numerous prospective customers, including at least: Beeline Rx, Power Life Sciences, Leafwell, and Medvise.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Seventh Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 200.

      201.    Epic acted in bad faith and used wrongful and oppressive means and tactics, for wrongful motives, in interfering with Particle's prospective advantageous business relations with its prospective customers, including at least Beeline Rx, Power Life Sciences, Leafwell, and Medvise, through the conduct described herein.

      **ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Seventh Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 201.

      202.    The loss or material degradation of these business relationships with at least Beeline Rx, Power Life Sciences, Leafwell, and Medvise, would not have occurred but for Epic's activities, as these prospective customers' decisions not to pursue or to postpone relationships with Particle either expressly cited Epic's conduct, or occurred, without warning and in a sudden break from the course of prior dealing, immediately after Epic began its conduct.

      **ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Seventh Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 202.

      203.    Because of Epic's conduct, Particle has suffered, and continues to suffer, damages in an amount to be determined at trial.

      **ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Seventh Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 203.

204.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to

Particle's allegations that Particle purports to reallege and incorporate in Paragraph 204.

205.    Beginning in April 2024 Epic has published numerous false and defamatory statements about Particle, including an April 10, 2024 "Issue Notification" regarding Epic's dispute with Particle.  The Issue Notification falsely characterized Particle as a bad actor and data security risk.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Eighth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 205.

206.    Through its Issue Notification and subsequent statements, Epic has, directly or by intentional implication, published at least the following falsehoods concerning Particle:

(i)    "Activities of … Particle Health" are responsible for "serious concerns about security and privacy" of patient medical records

(ii)    Particle Health has "inaccurately represent[ed] the purpose associated with [its] record retrievals."

(iii)    Particle Health has not "fulfill[ed] its obligations as a Carequality implementer."

(iv)    Particle Health has "obscur[ed] provider-level details of connections through a generic gateway."

(v)    Particle Health has "admitted wrongdoing" in connection with its customers' retrieval of medical records.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Eighth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 206.

207.    The statements were initially published to Epic customers and quickly picked up by the media.  Within days, Epic's statements were in the public view, as numerous news outlets published articles repeating Epic's false statements about purported "security and privacy risks" introduced by Particle.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Eighth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 207.

208.    Epic knew its statements were false when published or published them with a reckless disregard for the truth.  Epic is uniquely well-positioned to know that Particle poses no security risks, works diligently to address any third-party security concerns, has not obscured the identity of its connections, and has upheld its obligations as a Carequality implementer.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Eighth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 208.

209.    Epic's false statements are defamatory because they call into question Particle's basic integrity regarding the security of EHRs in a business in which security is a paramount concern.  Epic's statements are defamatory per se because they injure the Particle business.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Eighth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 209.

210.    Epic's statements are not privileged.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court dismissed Particle's Eighth Cause of Action, and accordingly, no answer to this paragraph is required.  To the extent a further response is required, Epic denies the allegations in Paragraph 210.

211.    Because of Epic's statements, Particle has suffered, and continues to suffer, damages in an amount to be determined at trial.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Eighth Cause of Action, and accordingly, no answer to this paragraph is

required. To the extent a further response is required, Epic denies the allegations in

Paragraph 211.

212.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

**ANSWER:** Epic restates and incorporates by reference each of its responses to

Particle's allegations that Particle purports to reallege and incorporate in Paragraph 212.

213.    Beginning in April 2024 Epic has published numerous false and defamatory statements about Particle's products and services, including an April 10, 2024 "Issue Notification" regarding Epic's dispute with Particle. The Issue Notification falsely indicated that Particle introduced data security and privacy risks to its customers, and that Particle customers were unable to access Epic-stored EHRs through the Particle platform.

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required. To the extent a further response is required, Epic denies the allegations in

Paragraph 213.

214.    Through its Issue Notification and subsequent statements, Epic has, directly or by intentional implication, published at least the following falsehoods concerning Particle's services and products:

(i)    Particle's platform poses a "security and privacy risk."
(ii)   Particle's platform was unable to retrieve Epic-stored medical records for any customers because Epic had "suspended Particle Health's … gateway connection."

**ANSWER:** In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required. To the extent a further response is required, Epic denies the allegations in

Paragraph 214.

215.    The statements were initially published to Epic customers and quickly picked up by the media.  Within days, Epic's statements were in the public view, as numerous news outlets published articles repeating Epic's false statements about purported "security and privacy risks" introduced by Particle.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 215.

216.    Epic knew its statements were false when published or published them with a reckless disregard for the truth.  Epic is uniquely well-positioned to know that Particle poses no security risks, works diligently to address any third-party security concerns, and that Particle maintained continuing access to Epic EHRs.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 216.

217.    Epic's false statements constitute trade libel because they denigrate the quality of Particle's goods or services.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 217.

218.    Epic's libelous statements have injured Particle's business by causing existing and/or prospective customers to lose trust in Particle's goods or services and abandon or decline to pursue business relationships with Particle.

**ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 218.

      219.    Epic's statements are not privileged.

      **ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 219.

      220.    Because of Epic's statements, Particle has suffered, and continues to
suffer, damages in an amount to be determined at trial.

      **ANSWER:**  In the Motion to Dismiss Memorandum and Order, the Court

dismissed Particle's Ninth Cause of Action, and accordingly, no answer to this paragraph is

required.  To the extent a further response is required, Epic denies the allegations in

Paragraph 220.

      221.    Plaintiff hereby demands a trial by jury of all the claims asserted in this

Complaint.

      **ANSWER:**  Epic states that Paragraph 221 is a request for a jury trial to which no

response is required.  To the extent a response is required, Epic acknowledges that Particle

purports to demand a trial by jury on all claims asserted in the Complaint and denies that Particle

is entitled to a jury on issues and claims not triable to a jury.

      WHEREFORE, Plaintiff Particle prays for judgment against Defendant Epic as
follows:

      A.    Adjudication that the acts alleged herein constitute monopolization in
violation of the Sherman Act, 15 U.S.C. § 2;

      B.    Adjudication that the acts alleged herein constitute attempted
monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

      C.    Adjudication that the acts alleged herein constitute monopoly leveraging
in violation of the Sherman Act, 15 U.S.C. § 2;

      D.    Adjudication that the acts alleged herein violate the state laws alleged
herein;

E.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the federal statutes, state statutes, and state common law cited herein;

F.      Pre-judgment and post-judgment interest on such monetary relief;

G.      Equitable relief in the form of enjoining Epic from engaging in the anticompetitive and tortious conduct alleged herein;

H.      Equitable relief as may be required to restore competition and to prevent the recurrence of future antitrust and tort violations alleged herein;

I.      The costs of bringing this suit, including reasonable attorneys' fees; and

J.      All other relief as the Court deems just and proper.

**ANSWER:**  Epic states that the unnumbered "wherefore" clause and paragraphs following are a prayer for relief to which no response is required.  To the extent a response is required, Epic denies that Particle is entitled to any relief whatsoever.

## EPIC'S AFFIRMATIVE AND OTHER DEFENSES

Epic asserts the following defenses.  In asserting these defenses, Epic does not assume the burden of proof with respect to any issue as to which applicable law places the burden of proof on Particle.

## FIRST DEFENSE

### (Failure To State a Claim)

Particle's claims are barred, in whole or in part, because Particle fails to state a claim on which relief can be granted.

## SECOND DEFENSE

### (No Relevant Product Market)

Particle's claims are barred, in whole or in part, because the Complaint has insufficiently alleged a relevant product market.

## THIRD DEFENSE

### (Lack of Anticompetitive Conduct)

Particle's claims are barred, in whole or in part, because Epic's alleged conduct did not unreasonably restrain trade.

## FOURTH DEFENSE

### (Lack of Anticompetitive Harm)

Particle's claims are barred, in whole or in part, because none of Epic's alleged actions or omissions substantially lessened competition within any properly defined market.

## FIFTH DEFENSE

### (Lack of Causation)

Particle's claims are barred, in whole or in part, because of a lack of causation, including, without limitation, because any injuries or damages that may have been suffered were not caused solely or proximately by any act or omission of Epic.

## SIXTH DEFENSE

### (Procompetitive Conduct)

Particle's claims are barred, in whole or in part, because Epic's conduct was lawful, pro-competitive, and based on legitimate business and economic justifications.

## SEVENTH DEFENSE

### (Lack of Antitrust Standing)

Particle's claims are barred, in whole or in part, because Particle has not suffered antitrust injury or any injury of the type the antitrust laws were intended to prevent.

## EIGHTH DEFENSE

### (Lack of Standing)

Particle's claims are barred, in whole or in part, because Particle lacks standing.

## NINTH DEFENSE

### (Lack of Injury-in-Fact)

Particle's claims are barred, in whole or in part, because it has sustained no injury-in-fact by any act or omission of Epic.

**TENTH DEFENSE**

**(Speculative Damages)**

Particle's claims are barred, in whole or in part, because any damages that Particle purports to have suffered are too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

**ELEVENTH DEFENSE**

**(Unclean Hands)**

Particle's claims are barred, in whole or in part, by the doctrine of unclean hands.

**TWELFTH DEFENSE**

**(*In Pari Delicto*)**

Particle's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

**THIRTEENTH DEFENSE**

**(Unjust Enrichment)**

Particle's claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Particle.

**FOURTEENTH DEFENSE**

**(Adequate Remedy at Law)**

Particle is not entitled to seek equitable relief because the injury or damage Particle alleges and would be entitled to recover following resolution of Epic's antitrust claims, if there is any, would be recoverable in an action at law for damages.

## FIFTEENTH DEFENSE

### (Failure To Mitigate)

Particle has failed to mitigate or to attempt to mitigate damages, if in fact any damages have or will be sustained, and any recovery by Particle must be diminished or barred by reason thereof.

## SIXTEENTH DEFENSE

### (Acts of Claimant)

Without conceding that any act of Epic's caused damage to Particle, Particle is not entitled to recover damages from Epic because Particle's damages, if any, were caused by Particle's own conduct, for which Epic has no liability.

## SEVENTEENTH DEFENSE

### (Acts of Third Parties)

Without conceding that any act of Epic's caused damage to Particle, Particle is not entitled to recover damages from Epic because Particle's damages, if any, were caused by the conduct of third parties, for which Epic has no liability.

## EIGHTEENTH DEFENSE

### (No Damages or Treble Damages)

Particle has failed to state an adequate basis for an award of damages, including treble damages, including because Particle has not been injured or incurred any damages and because the alleged conduct was not a material or proximate cause of any injury to Particle.

### NINETEENTH DEFENSE

### (No Punitive Damages)

Particle's claims for punitive damages are barred because Epic did not commit any cognizable tort with malice or fraud.

### TWENTIETH DEFENSE

### (No Interest, Costs, or Attorneys' Fees)

Particle is not entitled to interest, costs, or attorneys' fees in connection with this action.

### TWENTY-FIRST DEFENSE

### (Due Process)

Particle's claims for punitive damages are barred because they would violate the United States Constitution to the extent the imposition of punitive damages may constitute a deprivation of property without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Epic prays for judgment as follows:

1.      Dismissing with prejudice Particle's Complaint in its entirety;

2.      Denying the monetary, injunctive, equitable, declaratory, and other relief Particle requests; and

3.      Granting such other and further relief to Epic as the Court deems just and proper, including, but not limited to, costs and reasonable attorneys' fees incurred by it in defending this action.

Dated:  November 3, 2025                    Respectfully Submitted,

                                           */s/ Lauren A. Moskowitz*
                                           Lauren A. Moskowitz
                                           Margaret T. Segall
                                           Lauren M. Rosenberg
                                           **CRAVATH, SWAINE & MOORE LLP**
                                           Two Manhattan West
                                           375 Ninth Avenue
                                           New York, NY 10011
                                           Telephone:  (212) 474-1000
                                           lmoskowitz@cravath.com
                                           msegall@cravath.com
                                           lrosenberg@cravath.com

                                           *Attorney for Defendant Epic Systems
                                           Corporation*