**quinn emanuel** trial lawyers | new york

295 5th Avenue,, New York, New York 10016 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S EMAIL ADDRESS
adamwolfson@quinnemanuel.com

December 15, 2025
**VIA ECF**

The Honorable Naomi Reice Buchwald
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   *Particle Health Inc. v. Epic Systems Corporation*, 1:24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

      In accordance with the Court's November 13, 2025 Order, Plaintiff Particle Health Inc. ("Particle") respectfully requests that the Court compel Defendant Epic Systems Corporation ("Epic") to search for, collect, and produce documents (1) dating back to 2021, and (2) from Epic custodians Judith Faulkner, Katie O'Brien, Seth Howard, and Robert Klootwyk (the "Disputed Custodians"). Each of the Disputed Custodians is highly relevant to the three topics the Court set for initial discovery. However, despite refusing to represent that the Disputed Custodians do not have any documents relevant to the initial discovery topics, Epic refuses to search their files. Nor has Epic made any showing that searching their files and producing responsive documents would be overly burdensome. Epic also refuses to produce documents beginning in 2021, when its Epic Payer Platform ("EPP"), was widely launched and subscribed to by some of Epic's most key EPP customers. Epic's refusal to search the files of the Disputed Custodians from 2021 is not in keeping with Rule 26's low bar for relevance, nor the spirit or letter of the Court's phased discovery. Epic's efforts to shield plainly relevant discovery are particularly unfair and inconsistent with due process where Epic has indicated it will move for early summary judgment following the conclusion of this discovery phase.

**I.     Background**

      On November 13, 2025, the Court entered the parties' joint proposed schedule for the three, market definition-related topics the Court set for initial discovery (the "Phase I Topics"). On November 12, 2025, Epic served its Responses and Objections to Particle's First Set of Requests for Production Nos. 3–6 and 9 and Second Set of Requests for Production relevant to the Phase I Topics ("Epic's R&Os").[1] Ex. 1 (Epic's R&Os to Particle's First Set of Requests for Production); Ex. 2 (Epic's R&Os to Particle's Second Set of Requests for Production).

---

[1]  Particle had previously designated Request Nos. 3–6 and 9 from its First Set, which was initially served prior to the Court's Order on Epic's Motion to Dismiss, as those it wished to pursue in Phase 1 Discovery. Particle's Second Set was served after the Court's Order on Epic's Motion to Dismiss and consisted solely of Requests tailored to the Phase 1 Topics.

**quinn emanuel urquhart & sullivan, llp**

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

On November 18, 2025, Particle requested to meet and confer regarding, *inter alia*, Epic's R&Os, including specifically whether Epic was willing to exchange organizational charts or other similar documents "[i]n order to facilitate productive discussion of search terms and custodians." Ex. 3 (11/18/25 Email from S. Becker). The parties then met and conferred on November 24, 2025. *Id.* (11/25/25 Email from L. Beck). During that meet and confer, Epic claimed it has no organizational charts or other documents that would shed light on Epic's organizational structure and allow Particle to identify relevant custodians. *Id.* Epic also indicated it intended to search the files of only two individuals—Jim McDermott and Patrick Schenk. *Id.*

Particle explained that neither counsel's investigation nor the publicly available information indicated that Mr. McDermott or Mr. Schenk were the most relevant custodians and that Particle had identified other individuals that its client and publicly available information indicated were highly relevant to the Phase I Topics. *Id.* At Epic's request, counsel for Particle followed up the next day and provided a list of eight Epic employees whose files it believed Epic should search. *Id.* In proposing these document custodians, Particle detailed the custodians' known involvement with EPP and their clear relevance to the Phase I Topics based on extensive diligence performed by counsel, including through discussions with Particle and third parties, and through information available in the public record. *Id.*

Epic replied by letter on December 1, 2025, agreeing to consider just one of the eight custodians Particle's counsel had identified (Derek De Young), and declining to provide information on any of the other identified individuals or to confirm their relevance. Ex. 4 (12/1/25 Letter from M. Addis) at 1–2. Moreover, although Epic agreed to a process by which the parties would exchange search terms and run any proposed revisions from opposing counsel in good faith to assess relevance and burden, Ex. 3 (12/1/25 Email from M. Vaughn), when Particle urged that such a good faith process should include—consistent with standard practice—identifying and testing terms against proposed custodians, *id.* (12/2/25 3:26 AM Email from L. Beck), Epic indicated that it would not agree in advance to collect and run test searches on the custodial files of additional custodians but would consider each request when received, *id.* (12/2/25 11:49 AM Email from M. Vaughn).

Accordingly, the parties exchanged initial search-term and custodian proposals for their own documents on December 2, 2025. *Id.* (12/2/25 12:01 PM Email from M. Vaughn; 12/2/25 12:06 PM Email from L. Beck). Particle proposed six custodians for its own document search, including its current and former CEOs, and Epic continued to propose only three custodians. *Id.* Following this proposal, on December 4, 2025, Particle wrote to Epic explaining once again the relevance of the custodians Particle had identified—discussed further below—and requesting that Epic's counsel investigate the relevance of these individuals in good faith. Ex. 5 (12/4/25 Letter from A. Wolfson) at 1–4.

During the following week, the parties continued to negotiate search terms and custodians. At Epic's request, Particle added an additional two custodians to its proposed list of six, and ultimately agreed to collect and review 89,722 documents across these eight custodians. Ex. 3 (12/11/25 Email from L. Beck). Epic, in turn, eventually agreed to a total of six custodians and to collect and review 57,959 documents across those six custodians. Ex. 6 (12/11/25 Letter from M. Addis) at 2. Throughout the Parties' extensive discussions and correspondence about the Disputed Custodians, Epic consistently and noticeably declined to represent that they lacked documents

2

relevant to the Phase 1 Topics and refused to run hit reports across all custodians as Particle repeatedly requested. *Id.*

In a final attempt to obtain straight answers from Epic regarding the clear relevance of the Disputed Custodians, on December 12, 2025, Particle's counsel requested that Epic answer the following questions:

1. Do Ms. Faulkner's custodial files contain documents relevant to any of the three Phase I Topics?

2. Do Ms. O'Brien's custodial files contain documents relevant to any of the three Phase I Topics?

3. Do Mr. Howard's custodial files contain documents relevant to any of the three Phase I Topics?

4. Do Mr. Klootwyk's custodial files contain documents relevant to any of the three Phase I topics?

5. Has Ms. Faulkner attended any meeting (whether called an "execution meeting" or otherwise, whether virtual, in-person, or telephonic) where Particle's payer platform was discussed in relation to Epic Payer Platform? As we have explained, we do not know the precise names for Epic's internal meetings (and should not be prejudiced for this).

6. Has Ms. Faulkner received or sent any documents (including emails, notes, presentations, or meeting materials) discussing Particle's payer platform in relation to Epic Payer Platform?

7. Has Ms. O'Brien attended any meeting (whether called an "execution meeting" or otherwise, whether virtual, in-person, or telephonic) where Particle's payer platform was discussed in relation to Epic Payer Platform?

8. Has Ms. O'Brien received or sent any documents (including emails, notes, presentations, or meeting materials) discussing Particle's payer platform in relation to Epic Payer Platform?

9. Please describe the steps taken in Epic's "reasonable investigation" referenced throughout your letter to help us understand the scope of the investigation. We are not seeking privileged information or work product.

Ex. 3 (12/12/25 Email from J. Braun). Epic refused to answer a single one of these questions. Ex. 7 (12/12/25 Letter from M. Addis).

Although the parties have largely reached agreement as to search methodology, Epic refuses to collect critical documents from 2021 and continues to refuse to answer even basic questions regarding the relevance of the Disputed Custodians or to collect and run search terms against their data to assess relevance and burden. This raises substantial problems because, of the

3

six custodians Epic has agreed to search, its original two proposals, Messrs. McDermott and Schenk, appear to be the least relevant, and it appears that Epic is trying to shield its most relevant custodians from discovery during this phase. Such problems are amplified by Epic's already-stated intention to take another "early shot" at Particle's case via an early motion for summary judgment on market definition, and its seemingly improper intention to force Particle to survive summary judgment on that issue without full discovery. *See, e.g.*, *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 n. 5 (1986) (noting the nonmoving party must have "had the opportunity to discover information that is essential to his opposition" to the motion for summary judgment). In fact, in addition to limiting the sources of relevant information, Epic also appears to be planning to withhold documents responsive to Particle's document requests regarding the Phase I Topics (to which it has already agreed to respond) if Epic deems, in its unilateral view, such documents not sufficiently "related" to the Phase I Topics. Ex. 3 (12/12/25 Email from L. Beck)—a separate issue the Parties are currently discussing. Particle was therefore required to move to compel.

## II.     Legal Standard

In order to establish its initial right to discovery under Rule 26(b)(1), Particle need only make an initial showing of relevance—a burden that is "not heavy." *Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 120 (S.D.N.Y. 2019), *on reconsid.'n in part*, 2019 WL 5287931 (S.D.N.Y. Sept. 20, 2019). Once met, Epic must "justify curtailing discovery." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2023 WL 2871090, at *5 (S.D.N.Y. Apr. 10, 2023); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 102 (S.D.N.Y. 2013) (same).

Relevance "is an extremely broad concept for purposes of discovery." *Edmar Fin. Co., LLC v. Currenex, Inc.*, 347 F.R.D. 641, 646 (S.D.N.Y. 2024). It includes "any matter that bears on, or that reasonably could lead to other matters that would bear on, any issue that is or may be in the case." *Benavides v. Serenity Spa NY Inc.*, 166 F. Supp. 3d 474, 490 (S.D.N.Y. 2016) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Accordingly, courts in this District repeatedly emphasize that "[w]here relevance is in doubt, the district court is to be permissive." *Kiss Nail Prods., Inc. v. Lashify, Inc.*, 2024 WL 1466815, at *2 (S.D.N.Y. Apr. 4, 2024); *accord, e.g.*, *Popovchak v. United Health Grp. Inc.*, 2025 WL 1312879, at *2 (S.D.N.Y. May 6, 2025) (same); *In re Welspun Litig.*, 2018 WL 4693586, at *3 (S.D.N.Y. Mar. 4, 2018) (quoting *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 301 (S.D.N.Y. 2003)) (same).

Although, consistent with the Sedona Conference Principle 6, courts often recognize that the responding party is generally "best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing [its] electronically stored information," that deference is not a blanket defense. *Rio Tinto PLC v. Vale, S.A.*, 306 F.R.D. 125, 127028 (S.D.N.Y. 2015) (citing Sedona Principle 6). The Rules require a reasonable, good-faith search and production effort, which includes identifying the appropriate custodians. *Solomon v. Fordham Univ.*, 2024 WL 3273112, at *10 (S.D.N.Y. July 2, 2024).

These Rule 26 principles apply with equal force to disputes over document custodians. Under Rule 26, where a requesting party has made the initial showing of relevance, the producing party is not entitled to unilaterally define or limit the universe of custodians whose files it searches without carrying its burden to justify exclusion. *See, e.g.*, *Felder v. Warner Bros. Discovery*, 2025 WL 1718098 (S.D.N.Y. June 20, 2025) (applying Rule 26 principles and burden-shifting

4

framework to motion to compel custodians). "Under the Federal Rules of Civil Procedure, … it is not generally up to one party to determine what discovery another party needs." *Set Cap. LLC v. Credit Suisse Grp. AG*, 2025 WL 1294373, at *7 (S.D.N.Y. May 5, 2025) (internal quotation omitted). To withhold responsive information—and to avoid search and production of files likely to have information that bears on relevant topics or that could reasonably lead to matters involving relevant topics—the producing party must show that the requested information is unreasonably cumulative, duplicative, or disproportionate, or "not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). Courts routinely compel requested discovery where the responding party has not supported its burden objections with affidavits, hit counts, or other particularized, concrete metrics. *See, e.g.*, *Stinson v. City of New York*, No. 10 CIV. 4228 RWS, 2015 WL 4610422, at *4 (S.D.N.Y. July 31, 2015) (granting additional custodians where defendants provided "no affidavits or other evidence tending to show that searching the ESI of the requested custodians is not reasonably practicable without undue cost").

Certainly there is no objective, facial burden from the reasonable number of custodians Particle requests, even considering the specific limitations of Phase I, and Epic has not identified any authority suggesting that the custodians Particle has requested are inappropriate or burdensome on their face. The current dispute is about whether Epic should search ten individuals' files rather than six, when Particle has (at Epic's request) agreed to search eight custodians' files, including both its current and former CEO.

### III.  Argument

Documents from 2021 and documents from the Disputed Custodians are highly relevant to the Phase I Topics, and Epic cannot show the burden necessary to overcome their clear relevance. Accordingly, the Court should order Epic to collect and produce same.

#### A.  Documents From 2021 Are Relevant And Not Unduly Burdensome

Epic should be required to produce critical documents from 2021. Although Epic has agreed to produce documents from January 1, 2022 to present, Epic refused Particle's reasonable request for a modest expansion of the time period to January 1, 2021, claiming, without any substantiation, that the date range Epic proposed is "more than sufficient" and that Particle's request would impose "additional burden." Ex. 7 at 1. Epic also claimed that Particle's December 12, 2025 request was too belated for Epic to even consider. *Id.* But this ignores that the parties had continued to negotiate issues in dispute through that date and, in fact, did not indicate any level of agreement as to respective search methodologies until December 12, 2025.

A start date of January 1, 2021 is necessary given that EPP was widely launched in 2021 and Epic entered some of its most key EPP partnerships with payers during that year.[2] Thus, it is highly likely that Epic discussed EPP's capabilities and uses, as well as alternative products, during that time frame, both in terms of internal discussions and documentation, as well as external

---

[2] *See, e.g.*, Jasmine Pennic, "Anthem, Epic Integrates Bi-Directional Data Exchange with Affiliated Health Plans," (May 20, 2021), https://hitconsultant.net/2021/05/20/anthem-epic-data-sharing-collaboration/ ("The integration will enable Anthem to capture consumer health information provided by clinicians, analyze that data, and develop data-driven insights.").

communications with potential customers.  A start date of January 1, 2021 is also reasonable and proportional—although Particle has agreed to produce documents from *2018 to present* and understands that Epic began marketing its own payer platform product in 2019,[3] Particle has reasonably requested documents through only 2021 in order to target the most relevant documents during this phase of discovery.  These earlier documents are critical to understanding how Epic marketed its product early on, which is precisely why Particle has agreed to collect and produce its own early documents through 2018.

Any burden objection by Epic regarding the time frame is baseless and unsubstantiated.  Epic has failed to articulate any specific burden, other than a vague claim that expanding the time period would impose some "additional burden."  Ex. 7 at 1.  Such claims, unsupported by any hit report or data, should be rejected, *see, e.g.*, *Felder v. Warner Bros. Discovery*, 2025 WL 1718098, at *10, and any real burden concerns can be resolved with reasonable search terms.  Accordingly, Epic should be ordered to collect, review, and produce documents from 2021.

### B.     The Disputed Custodians Are Relevant

#### 1. *Judith Faulkner*

Judith Faulkner, Epic's Chief Executive Officer, is famously hands-on and, as Particle explained to Epic's counsel multiple times, Particle understands that she is intimately involved with and knowledgeable about the Phase I Topics; *i.e.*, (1) EPP's customers and whether they are payers or payviders, (2) the functions of EPP, and (3) the existence of alternative products (i.e., competitors) to suit payer needs.  As Particle explained to Epic's counsel, it understands Ms. Faulkner is the final decision-maker regarding EPP and has been involved throughout the process of its development and marketing, including every stage of product development, positioning in the market, strategy, and conversations with customers for EPP.  Ex. 3 (12/10/25 Email from L. Beck); Ex. 5 at 3.  For instance, Ms. Faulkner has spoken about EPP at industry events and explained that half of Epic's health system and medical group customers and seven of the nation's largest payers are connected to EPP, and expressed her views on some of the reasons for EPP's success vis-à-vis other products.[4]  She also participated in a 2023 panel with the CEO of a large payer specifically discussing how payers can leverage large-scale data from EHRs, including data

---

[3] *See, e.g.*, Brock E.W. Turner, "How epic is courting customers outside of hospitals," (January 25, 2024), https://www.modernhealthcare.com/digital-health/epic-customers-hospital-ehr-market-health-grid/#:~:text=In%202019%2C%20Epic%20started%20courting,talk%20about%20the%20Health%20Grid.%E2%80%9D ("In 2019, Epic started courting payer customers with the launch of its Payer Platform, which allows payers to access data from EHRs.").

[4] *See, e.g.*, Eric Wicklund, *healthleaders*, "4 Key Takeaways From The Epic UGM," (Aug. 27, 2024), https://www.healthleadersmedia.com/innovation/4-key-takeaways-epic-ugm;  Heather Landi, *Fierce Healthcare*, "Epic Touts New AI Applications to Streamline Charting and Bring Research Insights to the Point of Care," (Aug. 21, 2024), https://www.fiercehealthcare.com/ai-and-machine-learning/epic-touts-new-ai-applications-streamline-charting-and-bring-research

6

obtained through EPP, to offer treatment-related services.[5] As another example of Ms. Faulkner's in-the-weeds involvement at Epic, Particle understands that Ms. Faulkner is typically listed as the primary contact in Epic's contracts to receive any notice relevant to Epic's agreements with third parties (including EPP). Ex. 3 (12/10/25 Email from L. Beck). This level of CEO involvement is perhaps unsurprising, given payer platforms are a groundbreaking product. Indeed, this is why Particle agreed to search its own CEOs' files for Phase I discovery, as well as others of its top-level executives.

Notably, Epic has never once claimed that Ms. Faulkner lacks documents relevant to Epic's strategic and competitive positioning of EPP, including in relation to other products available to payers. To the contrary, Epic's statements throughout this negotiation process have only confirmed that Ms. Faulkner does, in fact, "play[] a role in strategy and market positioning with respect to Epic Payer Platform." Ex. 6 at 2. When Particle directly asked Epic if "Ms. Faulkner's custodial files contain documents relevant to any of the three Phase I Topics," Epic refused to answer. Ex. 3 (12/12/25 Email from L. Beck); Ex. 7. This silence confirms what Particle has been arguing all along: **Ms. Faulkner's position as an active and involved decision-maker regarding EPP's use cases, purposes, and relationship to other products makes her a highly relevant custodian at this phase of discovery**. Indeed, because the process of defining a product market often involves inquiry into "economic realities and industry practice," "courts regularly consider ordinary course documents when defining the relevant market," including and particularly documents from the files of executives. *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 362–63 (S.D.N.Y. 2024) (analyzing executive statements and "several internal documents in which Defendants recognized HCP programmatic advertising as a distinct market"). Courts "have repeatedly held that ordinary course documents can and should play a role in analyzing competitive dynamics and evaluating whether certain products qualify as reasonable substitutes that must be included in the market." *Id.* (collecting cases).

Particle also explained that it understands Ms. Faulkner has attended multiple meetings during which she and colleagues at Epic specifically discussed competition with Particle and its payer platform. Ex. 5 at 3. Particle has explained to counsel that it understands these meetings may have been referred to internally as "execution meetings" or "strategic discussions" and has repeatedly asked Epic to confirm whether Ms. Faulkner did indeed engage in such discussions regarding Particle. In response to Particle's direct questioning, Epic has been unable to deny that Ms. Faulkner attended meetings discussing Particle in relation to EPP. Ex. 6 at 3. It has claimed only that any such meetings she attended either were not "execution" meetings or did not involve what Epic's counsel considers, in its narrow definition, to be "competition" with Particle. *Id*. When Particle followed up and explicitly asked whether Ms. Faulkner had "attended any meeting (whether called an "execution meeting" or otherwise, whether virtual, in-person, or telephonic) where Particle's payer platform was discussed in relation to Epic Payer Platform," Epic refused to answer. Ex. 3 (12/12/25 Email from J. Braun); Ex. 7. These shifting responses are inconsistent with counsel's good faith obligations in discovery under Rule 26. Ms. Faulkner's intimate involvement in the minutiae of Epic's day-to-day business is also consistent with public

---

[5] Heather Landi, *Fierce Healthcare*, "Epic, Elevance Health CEOs Made a Pitch For Harnessing Data, AI to Support Providers," (Dec. 11, 2023), https://www.fiercehealthcare.com/health-tech/epic-elevance-health-ceos-make-pitch-harnessing-data-ai-support-providers

allegations, such as a now-public government investigation into Epic's anticompetitive abuses.[6] It is also consistent with how Ms. Faulkner inserts herself into that business, such as by listing herself as the primary contact in Epic's contracts to receive any notice relevant to Epic's agreements with third parties (including EPP). Ex. 3 (12/10/25 Email from L. Beck).

Together, this information is more than sufficient to meet Particle's minimal burden to show relevance under Rule 26(b)(1) that justify the inclusion of Ms. Faulkner as a custodian. Nevertheless, Epic has continued to claim—without any fact-based explanation—that her documents are outside the scope of Phase I and that she is not relevant. Ex. 6 at 2–3. But Epic has not explained how it actually investigated relevance or burden as required (or provided Particle with straight answers regarding Ms. Faulkner's involvement in EPP)—it has simply resorted to generically disputing Particle's diligence information without any factual support or straightforward representations that might shed light on relevance. But generic arguments unsupported by any concrete metrics on relevance or burden fall far short of Epic's burden to justify curtailment of discovery. For these reasons, just as Particle has agreed to search its own CEOs' files for Phase I-related materials, so should Epic search Ms. Faulkner's files for the same.

   2. *Seth Howard*

Seth Howard, Epic's Vice President of Research and Development, is another Epic employee likely to possess non-cumulative documents relevant to the Phase I Topics. Public reporting confirms that Mr. Howard has had unique involvement in Epic's strategic decision-making regarding specific features of EPP and how those features relate to EPP's broader competitive positioning. For example, the news source Fierce Healthcare reported that Mr. Howard has overseen the solicitation of feedback from payers and helped develop a "clear set of shared priorities to improve prior authorization, automate claims management and make medical policy more transparent" for payers.[7] Mr. Howard's role at the intersection of product feature design and strategic decision-making renders him uniquely likely to possess documents relevant to the Phase I Topics, which largely involve this precise intersection. This role also differentiates Mr. Howard from the other custodians Epic has offered, none of whom appear to possess the same type of gap-bridging role that relates features to strategy.

Particle further understands that Mr. Howard had regular communications with third parties regarding issues with EPP's software and functionality, both of which are central to the Phase I Topics—in particular, "the functions of EPP." Ex. 6 at 4. Far from denying that Mr. Howard had such communications, Epic has resorted to claiming only that such communications were not "frequent" based on an amorphous investigation it refused to describe, and that the

---

[6] On December 10, 2025, the State of Texas brought antitrust claims against Epic in the District Court of Tarrant County, Texas. *See* Ex. 8 (*State of Texas v. Epic Systems Corporation*, 236-372872-25, Complaint).

[7] Heather Landi, *Fierce Healthcare*, "Epic Unveils AI Solutions for Clinicans, Patients and RCM, Gives Sneak Peek at Cosmos AI for Risk Prediction," (Aug. 19, 2025), https://www.fiercehealthcare.com/health-tech/epic-unveils-major-ai-features-ai-charting-microsoft-cosmos-ai-risk-prediction-and-rcm.

already agreed to custodians are sufficient (without explaining why Mr. Howard's documents would be cumulative). *Id.*

### 3. Rob Klootwyk

Rob Klootwyk, Epic's Director of Interoperability, is also likely to possess non-cumulative documents relevant to the Phase I Topics. Mr. Klootwyk was the primary Epic employee with whom Particle dealt during the 2024 Carequality dispute, meaning he is highly familiar with Particle's product and has doubtless discussed it internally—likely more than anyone else at Epic. These discussions are of core relevance to the Phase I Topics. The ways Epic internally understands and characterizes Particle's product and its features—including as a competitor to its own, as vertically related, or otherwise—are key to understanding how the parties' products relate to each other and the relevant market. Epic has admitted as much, having agreed to respond to multiple document requests and run search terms related to Particle's competitive positioning vis-à-vis Epic. *See, e.g.*, Ex. 1 at 11; Ex. 2 at 7–8. Given his unparalleled exposure to Particle, Mr. Klootwyk is one of the individuals most likely to possess these types of documents Epic has already agreed to produce.

Epic has expressed unfounded concerns that including Mr. Klootwyk as a custodian would pull in documents concerning the Carequality dispute that are not relevant to the Phase I Topics. However, that is a concern that the Parties can address (and have addressed) through the selection of search terms, and by their agreement on the scope of Particle's requests for production. The fact that Mr. Klootwyk may possess *other* documents highly relevant to later stages of discovery in this lawsuit does not allow Epic to exclude him from the initial discovery the Court ordered.

### 4. Katie O'Brien

Katie O'Brien, Epic's former head of Strategic Partnerships and Procurement Oversight, also likely possesses non-cumulative documents relevant to the Phase 1 Topics. Ms. O'Brien's title expressly includes "strategic partnerships," and Particle understands that she will be in possession of documents related to payers relevant to the first of the Phase I Topics and competitive products to EPP (or the absence thereof) relevant to the third of the Phase I Topics. Critically, during her time at the company, Ms. O'Brien was also known as Ms. Faulkner's right-hand person, including for major decisions regarding EPP. Epic has refused to investigate or confirm the extent of Ms. O'Brien's involvement in EPP, whether she in fact possesses documents relevant to the Phase I Topics, or was in fact Ms. Faulkner's right-hand person with respect to major decisions regarding EPP. Ex. 6 at 3. In fact, only at Particle's urging did Epic disclose that Ms. O'Brien is no longer employed by Epic, although Epic continues to refuse to disclose whether it has any ongoing cooperation or similar agreement with Ms. O'Brien. Instead of engaging in a good-faith exchange of information to assist the parties in assessing relevance and burden, Epic has refused to provide basic information or even test search terms against Ms. O'Brien's documents.

### C. The Disputed Custodians Would Not Impose Any Undue Burden

Given each custodian's relevance, Epic's burden is to "justify curtailing discovery." *See, e.g.*, *In re LIBOR-Based*, No. 11 MDL 2262 (NRB), 2023 WL 2871090, at *5. This it cannot do. As an initial matter, the unsubstantiated and generic arguments Epic has made regarding the

9

Disputed Custodians (as described above) do not meet this burden. Neither do several other unfounded arguments it has made throughout this process.

*First*, Epic argues without any support that "the cost and burden" of adding the Disputed Custodians would be "disproportionate." Ex. 7 at 3. But Epic has not provided a single piece of evidence to that effect, and courts within this District have observed that a party "cannot object to searches on burden grounds without substantiating" the claim "with a hit report." *Felder*, 2025 WL 1718098, at *10. Epic has nonetheless refused to provide hit counts for the Disputed Custodians despite Particle's requests. Thus, Epic fails on this argument due to a failure to substantiate its claims.

*Second*, Epic claims that the Disputed Custodians are "unlikely to have non-cumulative relevant documents," Ex. 7 at 3, but that claim is likewise unsubstantiated and implausible. Indeed, aside from rejecting Particle's diligence as to the Disputed Custodians, Epic has refused to run hit reports as to the Disputed Custodians based only on its "reasonable investigation"—an investigation it refuses to describe. *Id*. Parties negotiating search protocols routinely identify the number of "unique" documents to each other, *i.e.* the number of documents pulled by search terms that are only within one custodian's files and not within others'. If the Disputed Custodians had low numbers of unique documents, that would show they are, in fact, likely cumulative of other custodians. But Epic refuses to provide such information. In the absence of hit reports or detailed explanations regarding the Disputed Custodians' involvement in EPP, neither Particle nor the Court can meaningfully assess Epic's duplication argument, which rests solely on blanket claims.

*Third*, Epic argues that the Disputed Custodians are irrelevant because Epic's proposed custodians sufficiently cover the Phase I Topics, *see, e.g.*, Ex. 6 at 4. But, besides the lack of actual proof discussed above, the "mere existence of overlap and some duplication is insufficient to preclude" discovery, *Thomas*, 336 F.R.D. at 2, and Epic has made no effort to demonstrate that there is any duplication, let alone that it would be "unreasonably cumulative or duplicative" as Rule 26(b)(2)(C) requires. *Kenyon v. Simon & Schuster, Inc.*, 2016 WL 5930265, at *5-6 (S.D.N.Y. Oct. 11, 2016). Furthermore, to the extent there is any overlap (and Epic has yet to demonstrate any), Epic can and should use basic ESI procedures to eliminate duplication and burden. *See Felder*, 2025 WL 1718098, at *11 ("[T]o the extent that ESI searches reveal emails from these custodians that are duplicative of emails from other custodians, the duplication can be easily eliminated through the deduping process."); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 106 (S.D.N.Y. 2013) ("[D]efendants may continue to utilize procedures to eliminate duplicative search output from their production.").

\*     \*     \*

For the foregoing reasons, the Court should order Epic to collect and produce documents (1) from 2021 and (2) from the Disputed Custodians.

Respectfully submitted,

*/s/ Adam B. Wolfson*
Adam B. Wolfson