**quinn emanuel** trial lawyers | new york

295 5th Avenue,, New York, New York 10016 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S EMAIL ADDRESS
adamwolfson@quinnemanuel.com

December 24, 2025
**VIA ECF**

The Honorable Naomi Reice Buchwald
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     *Particle Health Inc. v. Epic Systems Corporation*, 1:24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

I write in further support of Plaintiff Particle Health Inc.'s ("Particle") letter motion to compel Epic to produce documents from 2021 and from the Disputed Custodians. Dkt. 57 ("Mot.").

As an initial matter, what is particularly notable about Epic's seven-page letter is what it does not say. *See* Dkt. 60 ("Opp."). Continuing the pattern Epic began in conferrals, it does not once deny in those seven pages that the Disputed Custodians and files from 2021 are highly likely to have information relevant to the Phase I Topics. Rather, through careful language, Epic repeatedly evades the points Particle raised in its Motion and, in doing so, implicitly concedes them. For example, Epic spends almost two pages on Judith Faulkner alone, yet ***never once*** denies that Ms. Faulkner's files contain information relevant to the Phase I Topics. Instead, Epic concedes Ms. Faulkner's relevance by arguing—without support—that Ms. Faulkner is not "likely to have *non-cumulative* relevant documents." Opp. at 4. If Ms. Faulkner's documents are cumulative of other custodians' documents on Phase I Topics, that is because ***she has relevant documents in the first place***. This concession is incredibly important, because it frames Epic's entire approach to the Disputed Custodians and Ms. Faulkner in particular.[1]

Tellingly, Epic's primary tactic in opposition is to fixate on *Particle*: Particle is supposedly at fault for asking "different questions" that have "shifted" over time in the meet and confers. Opp. at 5. But Epic ignores that Particle's legitimate efforts to gather information were necessitated by Epic's refusal to provide basic organizational information—which is standard practice at the outset of discovery—or otherwise provide straightforward answers to questions about the Disputed Custodians' roles and their involvement in Epic's payer platform business, and with respect to Particle specifically. Epic even considers it "remarkabl[e]" that Particle served interrogatories. *Id.* at 1. Of course, Particle only served these interrogatories after weeks of stonewalling by Epic's

---

[1] *See also*, *e.g.*, Opp. at 5 (objecting that "Particle has offered no basis to show why Ms. O'Brien is likely to have *non-cumulative* relevant documents regarding the narrow Phase I Topics.").

quinn emanuel urquhart & sullivan, llp
ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

counsel, who refused to provide answers to simple questions.[2]  Even putting that aside, there is nothing "remarkable" about "seeking names of witnesses with knowledge of information relevant to the subject matter of the action," or the "existence, custodian, location, and general description of relevant documents … or information of a similar nature," as Local Rule 33.3(a) expressly permits.  The only remarkable aspect of the situation is that, *fourteen months* after a complaint was filed, an extremely well-resourced, sophisticated defendant still believes it can flout the rules by resisting answering rudimentary, fundamental inquiries about its personnel and files.

As detailed below, Epic's approach is also inconsistent with well-established authority: once a requesting party establishes relevance, the burden shifts to the responding party to demonstrate ***with specificity*** that the discovery is cumulative, duplicative, or unduly burdensome.  *See* Fed. R. Civ. P. 26(b)(2) & 34(b)(2); *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2023 WL 2871090, at *5 (S.D.N.Y. Apr. 10, 2023) (Buchwald, J.).  Epic does not even attempt to meet this burden for either category of documents Particle seeks; *i.e.*, documents going back to 2021 and documents from the Disputed Custodians.  Epic's conclusory assertions and objections fall flat, and Particle's motion to compel should be granted.[3]

### I.  Documents From 2021 Are Relevant And Not Unduly Burdensome

Epic should be required to produce documents from 2021 that are relevant to the Phase I Topics.  Epic's opposition on this issue is meritless.

*First*, Epic advances a spurious argument that Particle's request as to time period is "untimely."  The parties continued to negotiate search terms and custodians through December 12 and did not reach impasse as to any issue until that date.  For instance, Epic proposed further search terms on December 9, which Particle ran hit reports for in good faith and as required.  Dkt. 57-7 at 2.  And when Epic purported to make its "final" counterproposal as to its own documents on December 11, specifically requesting that Particle state whether there were any outstanding disputes, Particle promptly confirmed that there were outstanding disputes as to the time period and the Disputed Custodians.  Dkt. 57-3 at 2-3.  Epic's "untimeliness" claim is disingenuous and belied by the clear record of the parties' negotiations.

*Second*, Particle has surpassed the "relatively low threshold" to demonstrate the relevance of Epic's 2021 documents to the Phase I Topics.  *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014).  Epic argues that its 2021 documents are irrelevant because Particle's payer platform did not enter the market until 2023.  Opp. at 6.  Because EPP was widely launched in 2021 and Epic entered some of its critical EPP partnerships with payers during that year, it is "highly likely that Epic discussed EPP's capabilities and uses, as well

---

[2]  Particle served reasonable interrogatories, sacrificing the resources (and the interrogatory count) to do so just to seek the kinds of basic information that parties who cooperate with each in good faith regularly provide at the start of a discovery process.  *See* Dkt. 60-2.

[3]  Epic's own approach to discovery contradicts its claims that discovery, though narrowed topically, should be minimal.  While claiming that Particle's request for 58,000 documents from six Epic custodians is excessive, Epic has demanded that Particle review *over 89,000 documents from eight custodians*.  Epic also has served *twelve third-party subpoenas* requesting information on a broad range of topics that call for custodial and non-custodial collections.  Epic cannot credibly claim burden while imposing greater discovery obligations on Particle and third parties.

alternative products, during that time frame." Mot. at 5-6. Those issues are at the heart of the Phase I Topics including "the exact functions offered by the parties' payer platform products" and "the existence of alternative products available to suit payer needs," as ordered by the Court. Dkt. 42 at 31. Whether Particle's payer platform competed with EPP upon its launch is just one narrow issue within the Phase I Topics. How EPP functions, how it was marketed, and who it competed with prior to Particle's payer platform launch is equally relevant to the Phase I Topics. Indeed, Particle's complaint contains extensive discussion of relevant events relating to EPP that date back to 2021, including EPP's "release," its "quick[] displac[ement] of older services and technologies that sought to assist payers with medical records," and the absence of "competitors emerg[ing] to challenge EPP in the first few years of its existence." Dkt. 1 ¶ 69. Nothing in the Court's motion to dismiss decision detracted from the relevance of these events. *See* Dkt. 42 at 30 (citing Dkt. 1 ¶ 69 and recognizing Particle pleaded a relevant product market); 47 ("The complaint, taken as a whole, alleges Epic's willful intent to acquire monopoly power in the payer platform market via anticompetitive conduct."); 51 ("Particle has alleged that Epic has engaged in various forms of anticompetitive conduct that have stifled competition in the payer platform market[.]"); n.25 (referring to allegations of Epic outflanking competition from 2017 to 2022).

*Third*, Epic has provided no evidence—no affidavits, no cost estimates, not even hit count data—that establishes burden. It is black-letter law that raising "burden," without more, is not an *ipse dixit* out from discovery. *John Wiley & Sons*, 298 F.R.D. at 186 ("General and conclusory objections as to … burden are insufficient to exclude discovery[.]") (internal quotation omitted).[4] Further, Particle is willing to address any purported burden concerns through standard deduplication processes and reasonable search terms. Particularly on something as important as date range, Epic's refusal to engage in good faith discovery negotiations is highly prejudicial.

## II. The Disputed Custodians Are Relevant And Not Unduly Burdensome

Particle has met its low burden of demonstrating relevance for each of the Disputed Custodians. Further, where there has been zero document production to date, the responding party cannot hide ex ante behind warnings of cumulativeness; nothing yet has accumulated. *See Felder v. Warner Bros. Disc.*, 2025 WL 1718098, at *10 (S.D.N.Y. June 20, 2025).

### A. Particle Has Demonstrated Relevance

#### 1. Seth Howard

As Particle stated in its Motion, publicly available documents indicate that Mr. Howard possesses a unique "role at the intersection of product feature design and strategic decision-

---

[4] *See, e.g.*, *Felder v. Warner Bros. Discovery*, 2025 WL 1718098, at *10 (S.D.N.Y. June 20, 2025) ("WBD cannot object to searches on burden grounds without substantiating its burden claim with a hit report.") (overruling objection as to burden with respect to six custodians); *In re Allergan PLC Sec. Litig.*, 2020 WL 4034751, at *1 (S.D.N.Y. Mar. 30, 2020) ("As part of the negotiation process over search terms, the defendants must provide the plaintiff with the hit counts for searches run with proposed terms—regardless of whether the defendants believe the terms are proper."); *Fritz v. LVNV Funding, LLC*, 587 F. Supp. 3d 1, 4-5 (E.D.N.Y. 2022) ("The party objecting to a discovery request must describe the burden of responding to the request by "submitting affidavits or offering evidence revealing the nature of the burden.").

making" related to EPP, including the solicitation of feedback from payers to improve the product. Mr. Howard has precisely the type of role that would have documents regarding Phase I Topic 2, "the exact functions offered by the parties' payer platform products."

Epic's only response is to deflect, claiming that it "has already agreed to review documents from multiple custodians who are involved in a variety of functions related to" EPP. Opp. at 5. But Particle has never argued for Mr. Howard as a custodian simply because he is involved in "functions related to Epic Payer Platform." *Id.* Rather, he is a key custodian because of his "gap-bridging role that relates features to strategy," Mot. at 8—a role that Epic ***never*** denies and ***never*** claims any other custodians possess. Indeed, Particle has repeatedly raised this argument, and Epic has never once offered a substantive rebuttal.

    2. *Judith Faulkner*

Particle believes that Ms. Faulkner is a necessary custodian because she has been the "final decision-maker regarding EPP" and was "intimately involved with" Phase I Topics, including EPP's development, marketing, and market positioning. Mot. at 5. ***Epic does not deny this***. Instead, Epic quarrels with Particle's sources, arguing that articles showing Ms. Faulkner marketing EPP alongside other Epic products somehow *disproves* her involvement with EPP. Opp. at 4. But, of course, a hands-on CEO can be involved with the marketing of one product while simultaneously promoting others. More importantly, Epic knows the truth of Ms. Faulkner yet refuses to clarify it.

Epic also evades key facts establishing relevance. Particle explained that Ms. Faulkner participated in a 2023 panel with the CEO of a large payer, and on that panel, the participants discussed how payers can leverage large-scale data obtained through EPP. Mot at 6-7. Tellingly, Epic did not even acknowledge this fact, *at all*. Similarly, when Particle noted that Ms. Faulkner has attended multiple meetings (at least one in her own office) where Particle's payer platform was discussed in relation to EPP, specifying the time period of such meetings, Epic's response was to claim Ms. Faulkner did not discuss "competition" between the platforms, and then bemoan that it could never "ever answer" whether Ms. Faulkner attended any meeting that involved discussion of Particle's product in relation to EPP. Opp. at 4.

Epic's legal authorities fare no better. It selectively quotes *In re LIBOR*, 2023 WL 2871090, for the notion that "courts deny requests to add 'high-level executives' as custodians because they are 'unlikely to possess unique information' about business activities from which they are more 'removed' than their subordinates." Opp. at 3-4 (quoting 2023 WL 2871090, at *10). That statement omits key context: in *In re Libor*, this Court denied a request for searches of specific custodians "who were so far removed *from the LIBOR submission process* that they are unlikely to possess unique information, *such as* junior team members, high-level executives, employees from unrelated departments," and others. *Id.* (Emphases added.) Here, in contrast, Ms. Faulkner is not removed from Epic's product development, marketing, and competitive strategy. Epic has not even contested this. Similarly, *Allianz Global Investors GmbH v. Bank of America*, 2021 WL 5299238 (S.D.N.Y. Oct. 18, 2022), turned on the parties' *agreement* that the requested custodians "had no involvement in" the relevant activities. *Id.* In contrast, here, the requesting party believes (and the responding party has not actually denied) that the high-level executive was closely involved with the relevant topics at issue.

### 3. Katie O'Brien

Epic covers Ms. O'Brien in three sentences, the longest of which is a quotation of Particle. Opp. at 5-6. Although Epic chides Particle for omitting "any cited support" for the supposition that Ms. O'Brien was known as "Ms. Faulkner's right-hand person, including for major decisions regarding" EPP, *id*., Epic does not rebut the characterization. Epic cannot simultaneously refuse to provide basic organizational information and then fault Particle for lacking detailed knowledge of Epic's internal structure. If Ms. O'Brien were truly uninvolved in matters relevant to product alternatives to EPP, Epic would simply say so (and Particle would not have had to serve interrogatories). Epic's continued evasiveness regarding Ms. O'Brien—which began when they failed to inform Particle she was no longer even an employee of Epic—is inconsistent with Epic's obligations under Rule 26.

### 4. Rob Klootwyk

Particle repeatedly has explained that Mr. Klootwyk likely possesses unique communications regarding the Phase I Topics, particularly Particle's payer and payvider customers and the functions of Particle's payer platform. Mr. Klootwyk was the primary Epic employee with whom Particle dealt during the 2024 Carequality dispute. Epic's claim that the Carequality dispute is "irrelevant" and related only to "the protection of sensitive patient health information" is flat wrong. Opp. at 5. The Carequality dispute also arose from Epic's improper information blocking and intimately involved the identities of Particle's customers, including payviders, and how they used Particle's payer platform. Dkt. 1 ¶¶ 77, 119-121. Mr. Klootwyk undoubtedly discussed Particle's customers and product internally more than anyone else at Epic and, indeed, appears to be the person most knowledgeable at Epic regarding Particle. His conversations and reports to Epic about Particle's customers and payer platform are key to understanding how the parties' products relate to each other (*i.e.* compete) and the relevant market.

## B. Epic Has Not Presented Evidence of Cumulativeness

Where, as here, there has been zero document production to date, vague cumulativeness objections, without more, should not defeat relevant discovery. *See Felder*, 2025 WL 1718098, at *10.[5] "The mere existence of overlap and some duplication is insufficient to preclude the discovery sought." *Thomas v. City of New York*, 336 F.R.D. 1, 2 (E.D.N.Y. 2020) (citing *Kenyon v. Simon & Schuster, Inc*., 2016 WL 5930265, at *6 (S.D.N.Y. Oct. 11, 2016)). Cumulativeness or duplication must be "unreasonable" to bar discovery. Fed. R. Civ. P. 26(b)(2)(C)(i); *Thomas*, *supra*.

---

[5] In *Felder*, the court granted a motion to compel custodian searches and rejected the defendant's "reliance" on the very cases that Epic now relies upon, including *Allianz Glob.*, as "misplaced" because in those cases "a considerable volume of documents" had already been produced … so the concerns over duplication and burden were significantly greater," justifying the higher standard of requiring a showing that the sought custodians had "unique relevant information not already obtained." 2025 WL 1718098, at *10.

### C. Epic Has Not Presented Evidence of Undue Burden

To resist discovery on grounds of burden, the responding party must do more than simply state that the discovery it refuses to provide "is overly burdensome." Opp. at 7. Epic has not done anything more. Its claims of undue burden should not be credited.

*   *   *

For the foregoing reasons, the Court should order Epic to collect and produce documents (1) from 2021 and (2) from the Disputed Custodians.

Respectfully submitted,

*/s/ Adam B. Wolfson*
Adam B. Wolfson