# CRAVATH

Lauren A. Moskowitz
lmoskowitz@cravath.com
T+1-212-474-1648
New York

April 30, 2026

Particle Health Inc. v. Epic Systems Corporation, No. 24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

I write on behalf of Epic Systems Corporation ("Epic") to propose next steps following Phase I discovery.  (*See* Dkt. No. 56; Dkt. No. 73 at 2.)  Epic submits that the appropriate next step is for Epic to move for summary judgment on Particle Health Inc.'s ("Particle") antitrust market definition, and Epic respectfully requests a pre-motion conference to do so.[1]  *See Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 337, 339 (S.D.N.Y. 2009) (granting early summary judgment where "full blown antitrust discovery . . . would serve only to increase the cost of litigation without any benefit").

Particle alleges a "payer platform market" limited to platforms that offer all of three "specific features" to payers—(i) record retrieval "digitally, instantaneously, and at scale"; (ii) data centralization and storage; and (iii) analytics tailored to payer needs.  (Dkt. No. 42 at 23 (citing Compl. ¶ 55).)  Particle further alleges "there are only two competitors in its proposed product market, Epic and Particle".  (Dkt. No. 42 at 29 (citing Compl. ¶ 75).)  The Court, in its September 5, 2025 Memorandum and Order, directed the parties to conduct discovery into (a) whether the parties' products serve the same type of customers; (b) whether the parties' products offer the same services, namely the services mentioned in (i)-(iii) above; and (c) whether other vendors offer products that "suit payer[s'] needs".  (Dkt. No. 42 at 31.)  Particle's documents and testimony demonstrate that the parties' products serve different customers and offer disparate services, and that other vendors' products offer a subset of the three services identified by Particle and compete for payers' business.  Particle's market definition fails as a matter of law, and summary judgment on Particle's remaining antitrust claims is warranted.

## I.    Legal Standard.

"The relevant market must be defined as all products reasonably interchangeable by consumers for the same purposes".  *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155-56 (2d Cir. 2011) (citation omitted) (summary judgment on Sherman Act claims appropriate because the "market alleged in the [plaintiff's] complaint is legally insufficient").  Two products are reasonably interchangeable "if consumers would respond to a slight increase in the price of one product by switching to another product".  *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 248 (S.D.N.Y. 2000) (citation omitted), *aff'd,* 315 F.3d 101 (2d Cir. 2002).  "Where a defendant puts the existence of a plaintiff's alleged market at issue on a motion for summary judgment, the

---

[1] As Epic seeks to file an early motion for summary judgment based only on Phase I discovery, Epic respectfully requests that the Court allow it to move for summary judgment again at a later date, should the motion be denied.

**NEW YORK**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
T+1-212-474-1000
F+1-212-474-3700

**LONDON**
100 Cheapside
London, EC2V 6DT
T+44-20-7453-1000
F+44-20-7860-1150

**WASHINGTON, D.C.**
1601 K Street NW
Washington, D.C. 20006
T+1-202-869-7700
F+1-202-869-7600

CRAVATH, SWAINE & MOORE LLP

plaintiff must come forward with admissible evidence that, construed in the plaintiff's favor, raises a genuine issue of material fact on the market definition issue or suffer an adverse judgment". *Emigra Grp.*, 612 F. Supp. 2d at 359. Courts grant summary judgment in favor of a defendant where, as here, an antitrust plaintiff "has not met its burden" to show "that 'market realities' support the market it has alleged" and the evidence "demonstrate[s] a far broader relevant market than that identified in the . . . [c]omplaint". *PepsiCo*, 114 F. Supp. 2d at 247-48 (citation omitted). Courts reject attempts to conform a market to a plaintiff's allegations rather than market realities. *See id.* at 249 (rejecting market where "[plaintiff] has chosen to define the . . . market to suit its desire for high [defendant] market share, rather than letting the market define itself"); *see also Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 180 (2d Cir. 1987) (affirming summary judgment where plaintiffs' market was "an awkward attempt to conform their theory to the facts they allege").

## II.   Epic Payer Platform and Particle Signal Provide Different Services to Different Customers and Are Not Reasonably Interchangeable Substitutes.

As noted above, the Court asked whether Epic and Particle offer functionally similar products to the same set of customers and "whether the parties' products are truly in competition with one another". (Dkt. No. 42 at 29, 31.) Phase I discovery has established that Epic Payer Platform and Particle Signal—the product Particle claims competes with Epic Payer Platform in the alleged "payer platform market" (*see, e.g.*, Ex. 1 at 14)—serve different use cases and provide for the exchange of different amounts or types of health information. They are not reasonably interchangeable.

As Epic explained in connection with its Motion to Dismiss, HIPAA regulations dictate what protected health information can be shared with whom and for what purpose. (Dkt. No. 21 at 5.) Disclosure must be limited to the "minimum necessary to accomplish the intended purpose" unless the disclosure is for "treatment". 45 C.F.R. § 164.502(b). "Only health care providers, not health plans, conduct 'treatment'". Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82627 (Dec. 28, 2000). To ensure the networks designed to accommodate these information exchanges encourage compliance, health care providers and health plans retrieve different health information: *providers* retrieve complete patient data for treatment purposes (typically through an exchange such as Carequality), while health plans (or *payers*) retrieve only the "minimum necessary" information from a patient record to process and pay claims, for example—*i.e.*, for non-treatment purposes. This regulatory framework explains why Epic Payer Platform and Particle Signal are not reasonably interchangeable—the products address disparate demands, and as a result, appeal to different customers.

*First*, Particle Signal supports *only* treatment use cases, whereas Epic Payer Platform supports *only* non-treatment use cases, resulting in a different set of health information exchanged on their respective platforms. ██████████████████████████ ████████████████████. (Ex. 2 at 16:18-17:4 (emphasis added).) Indeed, Particle has 10 Signal customers, "all of which are payviders" (Ex. 3 at 10)—entities that Particle claims ████████ ████████████████████████████ (Ex. 2 at 14:12-19). By contrast, Epic Payer Platform cannot be used to retrieve records for treatment purposes; Epic Payer Platform facilitates payers' retrieval of records solely for non-treatment purposes (*i.e.*, payment and operations purposes). (Ex. 4 at 308:9-20, 311:1-20; Ex. 5 at -7263 (████████████ ████████████████████████████████).) All payer customers of Epic Payer Platform offer a health plan—████████████████ (Ex. 4 at 308:9-13)—and they can only utilize Epic Payer Platform to request records for non-treatment purposes (*id.* at 323:17-324:6 (████████████████ ████████████████")). As a result, Epic Payer Platform customers, ████████

██████████████ (Ex. 2 at 234:12-235:7), can retrieve only the "minimum necessary" information from a patient's records (Ex. 4 at 308:21-309:12).

*Second*, Particle Signal queries both Epic and non-Epic providers through the Carequality network, whereas Epic Payer Platform queries only a subset of Epic providers outside of Carequality or any other national interoperability network.  Particle Signal "facilitates the retrieval of patient health records at scale through the Carequality framework" (Ex. 1 at 9), which enables users to "simultaneously query thousands of health systems, providers, and health information exchanges" (Ex. 3 at 13).  Particle can therefore ████████████ ████████████████████████████████████████████████. (Ex. 2 at 91:14-93:5.) However, unlike Particle Signal, Epic Payer Platform ████████████████████ ██████████████████████████████████████████████████. (Ex. 4 at 311:10-312:3.)  ████████████████████████ ██████████████████████████████████. (*Id.* at 279:14-280:16.)

These distinctions show that Epic's and Particle's products are not reasonable substitutes for one another.  *See Fed. Trade Comm'n v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 416 (S.D.N.Y. 2024) ("[F]unctionally similar products may be in separate product markets . . . [if] consumers do not treat them as substitutes". (citations omitted)).  Particle customers that use Signal for treatment-based record retrieval requests would not switch to Epic Payer Platform—a platform that does not support requests for treatment purposes or access to non-Epic customers' patient records.  Similarly, Epic Payer Platform payer customers would not be able to switch to Particle Signal because ████████████████████████████████████████████ ██████████████. (Ex. 2 at 16:18-17:4.)

Particle's own documents reflect that ████████████████████████████████ ██████████████.  Indeed, despite Particle alleging a two-player product market in which only Epic and Particle allegedly compete (Dkt. No. 42 at 29 (citing Compl. ¶ 75)), ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████. (Ex. 6 at -0504.)  ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████. (Ex. 7 at -6620.)  Particle's admissions in written discovery also confirm that Epic and Particle are not in the same market.  Particle "denie[d] that Innovaccer", another company that services payers, "competes with Particle in the payer platform market" because "[u]nlike Particle, Innovaccer does not query national interoperability networks to retrieve new clinical records across unaffiliated providers". (Ex. 1 at 51.)  The same is true as to Epic Payer Platform, and thus, Particle's admission applies by extension.  Particle and Epic simply do not compete in the market as defined by Particle.

### III.    The Combination of Record Retrieval, Storage, and Analytics Fails To Support a Distinct "Payer Platform Market".

The Court's September 5, 2025 Memorandum and Order also specifically ordered discovery into the "unique characteristics identified by Particle": (1) retrieval of records "at scale", (2) storage and centralization of that data, and (3) analytics.  (Dkt. No. 42 at 31.)  Phase I discovery has shown that Particle's proposed market definition rests on the flawed premise that payers have unique demand for a single platform offering these three specific functions.  "[T]o find that a 'cluster' of goods or services defines the relevant market, the evidence must show that the particular cluster . . . is the 'object of consumer demand'".  *PepsiCo*, 114 F. Supp. 2d at 251

(citation omitted).  Here, the evidence shows that the combination of record retrieval, storage, and analytics services in a single platform is not the "object" of payer demand.

██████████████████████████████████████████████████████████████
██████████████████████████████████ (Ex. 2 at 258:18-259:4) and, in fact, █████████████
██████████████████████████████████████████
███████████████████████████████ (*id.* at 379:15-380:21). ████████████████████
████████████████████████████████████████████████. (Ex. 4
at 317:4-11.)

**Particle's own payer customers use other vendors in addition to Particle for some or all three of the alleged "unique characteristics".**  As the Court posited in its September 5, 2025 Memorandum and Order, "Particle's payer platform product may not always contain all three of the characteristics it contends are uniquely designed to suit payer needs (*i.e.*, retrieval of records instantaneously and at scale, storage, and analytics)".  (Dkt. No. 42 at 26-27 n.19.)  That is precisely what discovery has borne out.  For example, ██████████
████████████████████████████████████████████
██████████████████████████████████ a different Particle product marketed and sold to non-payers (Workbench) ████████████████████████████
████████████████████████████. (Ex. 3 at 9; Ex. 2 at 143:8-144:11, 148:4-8; Ex. 8 at Slide 84.) ███████████████████████████████████████████████
████████████████████. (Ex. 2 at 142:9-14.)

Moreover, Particle admitted in its written discovery responses that "some Particle customers may use one or more vendors other than Particle to retrieve patient health records or clinical data" (Ex. 1 at 19), "to store patient health records or clinical data" (*id.* at 20), or "to perform analytics" (Ex. 1 at 21, 23).[2]  These admissions are fatal to Particle's market definition.  Courts reject product markets defined around a cluster of goods or services where consumers treat "one-stop" vendors and partial-service vendors as acceptable substitutes.  *See Emigra Grp.*, 612 F. Supp. 2d at 354 ("If . . . buyers could and would respond to a price increase by a full line seller by shifting all or part of their business to partial line or single product sellers, or by making or providing the product or service themselves, then a cluster market would not be appropriate.").  Even if combining these three functions into a single platform may result in a more comprehensive product, it does not support the conclusion that Epic Payer Platform and Particle Signal are in a distinct product market that does not also include all other products that provide only a subset of these three functionalities.[3]

---

[2] Particle's attempt to qualify these admissions by asserting that such other vendors do not provide "the integrated suite of functionalities provided by Particle's products"—namely, record retrieval, storage, and analytics— (Ex. 1 at 19-23) is irrelevant, because, as explained above, the evidence does not show that payers have any unique demand for a platform that combines these three functions.  Indeed, the evidence shows that payers can and do use a combination of products for such functions.  (*See* Section IV).



[3] Similarly, ████████████████████████████████████████████████████
████████████████ (Ex. 4 at 212:20-213:4, 317:12-23, 318:23-319:1)—████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████ (*id.* at 92:7-21). ███
██████████████████████████████████████████████████████
███████████████████████████████. (*Id.* at 280:6-16 (████████████████
██████████████████████████████████████████████████████).)

**IV.    Particle's Alleged "Payer Platform Market" Fails To Include All Reasonably Interchangeable Substitutes.**

Given that there is no evidence to support defining the alleged "payer platform market" to include only products that offer the combination of retrieval, storage, and analytics services, Particle's alleged "payer platform market" fails because it excludes numerous reasonably interchangeable products—*i.e.*, all the vendors offering only one or two of the at-issue services. *See City of New York*, 649 F.3d at 156 (affirming dismissal on summary judgment where "[t]he market alleged in the City's complaint ignores the competition"); *see also Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 161 (W.D.N.Y. 2000) ("The relevant product market must encompass all the sellers of the particular product at issue, as well as reasonable substitutes".).

Particle itself has admitted that it "is aware of companies other than Epic and Particle that offer services payers may use to retrieve patient health records or clinical data" (Ex. 1 at 58), and that "Particle is not the only company that facilitates payers' retrieval of patient health records or clinical data from non-Epic providers" (*id.* at 59).  Third-party discovery corroborates these admissions.  For example, ███████, an Epic Payer Platform customer, also uses ███████████ ███████████████████████████████████████████████████████████████ (Ex. 9 at -0528; Ex. 10 at -0576).  And ███████████████ uses both Epic Payer Platform and ██████████████████████████████████████████████████████████████ ████████████████████████.  (Ex. 11 at -0290.)  Additional third-party discovery further corroborates Particle's admissions, establishing that ████████████████████████████, among others, offer services that payers may use to retrieve records or clinical data.  (*See, e.g.*, Ex. 12 at -0001 (██████████████████████████████ ████████████████████████████████████); Ex. 13 at -0055 (███████████████████ ███████████████████████████████████████████); Ex. 14 at -0263 (███████████████████████████████████████████████████████████████ ███████████████████); Ex. 15 at -0001, -0002 (███████████████████████ ██████████████████████████████████████████).)  These companies are competitors of Epic Payer Platform.  In fact, ██████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████.  (Ex. 12 at -0004.)

The evidence also demonstrates that there are other alternatives payers consider and use for analytics, including ████████████████████████████████████████ (Ex. 8 at Slide 84; *see also* Ex. 2 at 148:4-8)—"████████████████████████████████ ████████████" (Ex. 4 at 92:7-21).  Moreover, a KLAS industry report recognized MedInsight as the "Best in KLAS winner for Data Analytics Platforms (Payer)" and listed "other vendors who offer data analytics platforms for payer[s]", including MedeAnalytics, Clarify Health Solutions, Arcadia CareJourney, Cedar Gate Technologies, Cognizant, Cotiviti, Innovaccer, and IQVIA.  (Ex. 16 at -0004-06.)  All of these competitors also must be considered when defining the relevant market, which Particle fails to do.

*            *            *

As there is no evidence to support Particle's alleged "payer platform market", summary judgment on Particle's remaining antitrust claims is warranted.

Respectfully submitted,

*/s/ Lauren A. Moskowitz*

Lauren A. Moskowitz

The Honorable Naomi Reice Buchwald
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Copies To:

All Counsel of Record

BY ECF