**quinn emanuel** trial lawyers | new york

295 5th Avenue, New York, New York 10016 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S EMAIL ADDRESS
adamwolfson@quinnemanuel.com

April 30, 2026
**VIA ECF**

The Honorable Naomi Reice Buchwald
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     *Particle Health Inc. v. Epic Systems Corporation*, 1:24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

We write on behalf of Plaintiff Particle Health Inc. ("Particle") regarding its proposals for next steps, as instructed by the Court. Dkt. 54. In its Motion to Dismiss Order, the Court noted the parties disagree about "one of the foundational facts in this case—whether the parties' products perform the same basic functions…." Dkt. 42 at 30. To resolve this question, the parties have conducted "initial limited discovery," Dkt. 54, on: "(i) the definitions of 'payer' and 'payvider,' and whether either or both of the parties' payer platform products have payers and/or payviders as customers; (ii) the exact functions offered by the parties' payer platform products, and specifically the unique characteristics identified by Particle (i.e., retrieval at scale, storage, and analytics); and (iii) the existence of alternative products available to suit payer needs," Dkt. 42 at 31.

Phase I discovery, now complete, makes clear the next step is full discovery. Both parties' payer platforms (i) compete for the same customer base; (ii) have identical core functionalities; and (iii) have no reasonably interchangeable substitutes. And as detailed below, the record contradicts many of the representations Epic's counsel made to the Court at the Motion to Dismiss hearing and in briefing contesting these three points—for example, Epic's counsel told the Court it does not query at scale when its own documents say that it does.

Revealingly, after repeatedly telling Particle and the Court that it planned to seek summary judgment after Phase I discovery, *see, e.g.*, Dkt. 43 at 1; Dkt. 51 at 1, 3, Epic stated during the parties' April 9 and 13 conferrals that it was not certain that it would do so. It then took nearly an additional two weeks—until the day before the parties were to submit their respective letters—to state that it would, in fact, seek summary judgment on market definition.

This vacillation tells the Court everything it needs to know. As discussed below, Phase I documents and testimony have shown that any request for summary judgment on market definition would be premature for at least two reasons. *First*, Particle has yet to obtain full discovery into any element of its claims—as Epic itself has already acknowledged, "[the] three fact issues ***do not encompass all of the facts that may ultimately bear on market definition*** if the case proceeds past Phase 1." Dkt. 51 at 1 (emphasis added); *see* Fed. R. Civ. P. 56(d); *Elliott Assocs., L.P. v. Republic of Peru*, 961 F. Supp. 83, 86 (S.D.N.Y. 1997) ("It is the duty of this court under Rule 56(f) to ensure that the parties have been given a reasonable opportunity to make their record complete

before ruling on a motion for summary judgment."). *Second*, the limited record bearing on just a subset of factual market definition questions *already* reveals numerous genuine factual disputes that preclude any summary judgment on market definition and Epic's monopoly power. The appropriate next step is thus full discovery, including on Particle's tortious interference claim, which this Court sustained. Dkt. 42 at 57.

## I.    The Phase I Record Supports Particle's Proposed Market Definition

### A. Topic 1: The Parties' Products Both Compete for Payers and Payviders

Phase I discovery has confirmed that both Particle and Epic's payer platform products compete directly for the same set of customers: payers engaged in value-based care that are actively involved in improving the health and treatment of their members.

Epic specifically targeted "payviders" for Epic Payer Platform ("EPP"). Epic discussed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 at 2, and identified ▮▮▮▮▮▮▮▮▮▮▮▮▮ (*i.e.*, payviders) as its ▮▮▮▮▮▮▮▮▮ Ex. 2 at 7. Particle's payer platform—now called Signal[1]— is likewise marketed to ▮▮▮▮▮ Ex. 3 (Prestinario Dep.) at 83:17–18; 249:6–11.

Epic and Particle engaged in direct competition for these kinds of customers. For example, Epic targeted ▮▮▮▮, *see* Ex. 4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, a ▮▮▮▮▮▮▮▮▮▮▮ Ex. 3 at 228:2–5. Jason Prestinario, Particle's CEO, testified that Particle had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ until ▮▮▮▮ informed Particle it ▮ ▮▮▮▮▮▮▮▮▮▮▮▮ with Particle because it was ▮▮▮▮▮▮▮▮ ▮▮▮▮ for reasons not shared under advice from counsel. Ex. 3 at 228:2–16. Epic also successfully contracted with ▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 5 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮ later told Particle it was interested but wanted to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3 at 243:15–244:1. ▮▮▮ also an EPP customer, *see* Ex. 6, declined to engage with Particle after Epic falsely characterized Particle as a ▮▮▮▮▮ Ex. 3 at 244:3–9. These examples show EPP customers evaluating Particle's platform as an alternative but backing away after Epic's intervention.

The Phase I record thus confirms that both parties' payer platform products compete for the same customers.[2] Full discovery is necessary to explore the scope of that competition, including how Epic's conduct toward customers shared with Particle distorted that competition.

---

[1] Particle launched Signal in January 2024 after years of iteration and development. Ex. 3 at 77:3–83:13. Particle alleges that Epic learned about Particle's payer platform offering and the potential threat it posed from Blue Cross Blue Shield of Michigan, a *payvider*, in late 2023, and soon after launched its anticompetitive campaign. Dkt. 1 ¶ 77.

[2] The parties' definitions of "payvider" differ only at the margins: Particle defines all payers offering ▮▮▮▮ ▮▮▮▮▮▮ and other services that actively seek to improve patient treatment, ▮▮▮▮▮▮▮▮▮▮▮ as ▮▮▮▮▮ Ex. 3 at 11:16–22; Epic, as those payer entities that also operate a separate ▮▮▮▮▮ Ex. 9 (Schenk Dep.) at 16:11–21. This distinction does not affect market overlap because both parties' products serve the same customer base: healthcare payers that take an active role in improving the health and treatment of their members through value-based care. Ex. 9 at 251:6–7 ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮; Ex. 3 at 18:18–20:8 (Particle's payer/payvider customers ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮). Moreover, even under Epic's own definition, both parties' core payer customers qualify as payviders. Epic's Rule 30(b)(6) witness confirmed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

## B. Topic 2: Both Products Improve Treatment Via the Same Core Functions

The Phase I record also confirms that both products are designed specifically to help value-based care payers improve treatment outcomes for their members. This is evident from the substantially identical core set of functions shared by both products:

**Real-time retrieval at scale.** Epic has advertised EPP's ability to ███████████████ ████████████████████ Ex. 7 at 3 (emphasis added), and stated that EPP is ██████████ ███████████████████████████████████████████ Ex. 8 at 7. Notably, Epic's counsel told the Court the opposite at oral argument. *See* Dkt. 40 at 21:15–16 (stating EPP "is not pulling at scale"). Particle's Signal product likewise retrieves records at scale ██████████ ████████████████ ████████ Ex. 3 at 92:4–13. Both products allow for instantaneous retrieval and access to medical records in ███████████ Ex. 10 at 10; Ex. 3 at 86:15–87:5.

**Bidirectional data exchange.** Epic markets EPP as delivering ████████████ █████████████████████ sharing ████████████████ to ██████████████████ ██████████ Ex. 11 at 2; *see also* Ex. 12 at 2 ████████████████████████████ ██████████ ); Ex. 8 at 8 ████████████████████████████████████ ████████ ███ ████ ██████ ██████ ████ █████████ █████████ ██████ ████████████████████████████████ ). ████████ marketing materials confirm ██████ ██████████████████████████████ *See* Ex. 6 at 8 (EPP allows ████████ ███████████████████████████████████████████ ). Particle likewise offers payers the same ability to ████████████████████████████████████████ ████████ and provide █████████████████████████████ Ex. 13 at 10, 12.

**Centralizing and storing clinical data.** Epic markets ████████████████ as a feature of EPP and touts that the ████████████████████████████████████████████ ██████████████████████████████ Ex. 10 at 10. Particle likewise offers the ability to ████████████████████████████████ Ex. 3 at 84:14–85:10.

**Alerting to patient medical events.** One of EPP's core features is ████████████ ██████████████████████████████████████████████ ██████████████████████████████████ Ex. 15 at 25; *see* Ex. 16 at 3, 9 (touting EPP's ability to give payers ██████████████████████████████████████████ ████████████████████████ ); Ex. 6 at 8 (████████████████████████ ████████████████████████ ). Particle offers the same: █████████████████ █████████████████████████████████████ Ex. 13 at 17.

**Data analysis and processing.** Both parties' payer platform products transform raw clinical data into clean, normalized, deduplicated information matched to specific patients. Ex. 3 at 102:14–106:21 (describing Signal's ████████████████████████████████ ); Ex. 7 at 3 (describing the ways EPP ████████████████████████████████████ ██████████████████████████████████████████████ ).

---

████████████████████████████████████████████ Ex. 9 at 264:14–265:4. Particle's ████████████████████████████████████████████ Ex. 3 at 371:18–372:11.

At bottom, these core features combine to serve the same purpose: helping payers improve treatment outcomes—and thus reduce costs—by unlocking and harnessing vast and constant flows of member data to facilitate collaboration with providers. *See* Ex. 3 at 18:5–7 ███████████ ███████████████████████████████████████████████; Ex. 6 at 8 ████████████ █████████████████; Ex. 18 at 3 (marketing EPP's ability to ████████████████ ██████████████). The products' unique combination of features and identical purpose confirms that they compete with each other in the same relevant product market. Dkt. 42 at 21 (this Court noting "the boundaries of a market for antitrust purposes" are defined by "[t]he reasonable interchangeability of use") (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008)).

### C. Topic 3: There Are No Reasonable Substitutes for Payer Platforms

Before Particle's market entry, Epic's documents show it repeatedly asserted Epic Payer Platform had **no** competitors. In numerous customer RFPs across several years, Epic was asked to identify EPP's competitors by name. Epic consistently identified ████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 19 at 7; Ex. 4 at 9. These statements align with Epic's internal position: key employees stated in emails that ████████████████████████████, Ex. 20 at 2; that █████████████████████████████████ Ex. 21 at 3; and that███████████ ████████████████████████████████████████████ Ex. 22 at 2.[3]

If other vendors perform any of the individual payer platform functions, Epic refers to them as ███████████████████████████████████████████████████████████████████ ██████████████████ Ex. 23 at 2. Epic does not view these ██████████████████ as competitive threats, because ███████████████████████████████████ *Id.* Internal Epic emails confirm that █████████████████████████████████████████████████████████ ███████████████████████████████████████ Ex. 12 at 2. And many of the same RFP responses mentioned above confirm Epic does **not**████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 16 at 3. Epic's customer feedback confirms the same point: ████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 24 at 10 (emphasis added).

To the extent Epic argues the Phase I record supports a different interpretation on market definition, that is for a factfinder to resolve.[4] It certainly is not a basis for summary judgment.

### II.    Epic's Representations to this Court Raise Serious Credibility Concerns

Phase I discovery has raised serious concerns about Epic's representations. For example, regarding treatment uses, Epic stated in its motion to dismiss briefing that "Epic Payer Platform facilitates exchanges for non-treatment purposes alone." Dkt. 21 at 18. And at oral argument, Epic

---

[3]  Epic's Rule 30(b)(6) witness further admitted, repeatedly, that████████████████████████████ ████████████████████ Ex. 9 at 221:2–7; 224:13–225:2; 228:6–9.

[4]  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," including at summary judgment).

stated that "Epic, for example, when it's working with payers, they only exchange the minimum necessary and not the full patient record because they are not performing treatment." Dkt. 40 at 5:3–5. But Epic's own documents contradict this claim. EPP's formal  Ex. 17 at 4–5. At deposition, Epic's Rule 30(b)(6) representative ████████████████ ███████████████████████████, Ex. 9 at 107:10–116:11, requiring intervention by his counsel.

And regarding the scale of data retrieval, Epic at oral argument asserted that EPP "is not pulling at scale." Dkt. 40 at 21:15. Epic further stated, repeatedly, that payers using EPP do not receive "the full patient record," but only limited data such as "the diagnosis specific to [a] procedure" needed for coverage. *Id.* at 5:3–6; 6:13–17; 20:17–23. But Epic advertises that ████ ██████████████████████████████████ Ex. 7 at 3, and that ████████████ ██████████████████████████████████ Ex. 26 at 5. Epic also markets EPP's ability to ████████████████████████ Ex. 18 at 3. EPP does this by ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████ even if those conditions are not part of an authorization request. Ex. 25 at 3.

Epic has also represented throughout this litigation that "[m]yriad software products exist to address payers' health record needs that appear to compete with Particle's and Epic's products," Dkt. 21 at 23, and that "Epic's Payer Platform product was not the first and is not the only of its kind," Dkt. 53 at 16. These representations contradict Epic's repeated answers to questions about EPP's competitors: ████████████████ *See* Exs. 19–22.

Epic has shown a pattern of presenting a version of its product and its market position to this Court that its own documents and its designee's testimony contradict. These inconsistencies preclude summary judgment and warrant scrutiny of Epic's factual representations going forward.

## III.    Conclusion and Proposed Next Steps

Phase I discovery has "shed light" on key factual questions bearing on market definition, as the Court intended, Dkt. 42 at 30, revealing a viable market definition backed by Epic's own documents, Epic's own customer feedback, and Epic's own witness's admissions. Accordingly, any motion for summary judgment on this limited record and procedural history would be premature and meritless. The case—filed in September 2024—should proceed to full discovery on all of Particle's surviving claims.

For these reasons, Particle respectfully requests that the Court direct the parties to confer on a schedule for full fact and expert discovery covering all issues relevant to this litigation. Particle anticipates a short fact and expert discovery schedule given the amount of discovery already completed. In the alternative, Particle requests a conference with the Court regarding these important issues given their significance at this juncture and its right to be heard.

Respectfully submitted,

*/s/ Adam B. Wolfson*
Adam B. Wolfson


Copies To:
All Counsel of Record
BY ECF