**quinn emanuel** trial lawyers | new york

295 5th Avenue, New York, New York 10016 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S EMAIL ADDRESS
**adamwolfson@quinnemanuel.com**

May 1, 2026
**VIA ECF**

The Honorable Naomi Reice Buchwald
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     *Particle Health Inc. v. Epic Systems Corporation*, 1:24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

I write on behalf of Plaintiff Particle Health Inc. ("Particle") in short reply to Defendant Epic Systems Corp.'s ("Epic") letter of last night. In the parties' meet and confers, Epic was not clear it would use this opportunity to submit a pre-motion conference request rather than a letter on proposed next steps following Phase I discovery, as the Court ordered. Particle was therefore caught somewhat unawares by what it reviewed. In large part, Particle's own letter of yesterday (Dkt. 80) identifies the genuine disputes of material fact—even on the limited record to date—that would preclude summary judgment on market definition and therefore render motion practice on that issue wasteful and useless. Still, some points in Epic's letter merit response.

As an initial matter, it is telling Epic did not squarely answer the Court's three questions for Phase I discovery, Dkt. 78, despite asserting during multiple conferrals that answering these questions was the only thing these letters were meant to do. In contrast, Particle did, noting how the record to date shows the parties' payer platform products not only directly compete with one another for payer and payvider customers, but also that those products have identical combinations of core functionalities designed for payer businesses and, in Epic's own words (and as supported by the documents and testimony from both sides), do not compete with more limited narrow point solutions; *e.g.*, products with just one of the broader collection of functionalities included in the payer platform. Dkt. 80. "[W]hen determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents." *Fed. Trade Comm'n v. Tapestry, Inc.*, 2024 WL 4647809, at *20 (S.D.N.Y. Nov. 1, 2024) (internal quotation omitted). When a defendant's ordinary course documents admit—repeatedly—that their comprehensive platform product has no comparable product type in the market, but then the defendant fails to address that fact with the Court, it shows why seeking summary judgment on market definition would simply waste court and party resources and impose further unwarranted delays.

But that is not the end of it. Epic's letter further demonstrates the futility of its anticipated market definition motion because it elides the central inquiry for reasonable interchangeability. Just as it did at the motion to dismiss phase, Epic focuses on how each party's payer platform product obtains records for the bidirectional data exchange between payers and providers rather than why and how payers **use** a payer platform. *See* Dkt. 42 ("In defining the boundaries of a market for antitrust purposes, courts generally perform an analysis of '[t]he reasonable

interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it[.]'") (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008)). As Particle pointed out in its letter, the record to date shows payer platform users purchase and use those products due to the availability of their unique combination of features. It is irrelevant, as Epic argues, that some payer platform customers use only some of the features rather than all, or that some potential customers will buy a different product if they want only one feature. That would be like saying smartphones are not their own product category simply because not all smartphone users utilize every single feature available on the device, or because some users that want just a phone or just a camera or just a computer for emails purchase and use other devices. For those that want the combination of features a smartphone provides—even if they do not use every single one—it is clear that no reasonable substitutes exist. So it is with payer platforms, as even the limited record to date shows. *See generally* Dkt. 80.

As to Epic's focus on how the parties' payer platform products obtain records, that issue is primarily about Epic's anticompetitive conduct and control over data access, not a dispositive market-definition distinction. EPP operates within a walled garden network in which it can leverage providers that run Epic's EHR software to directly exchange records with payers through Epic-controlled rails. Particle uses the national interoperability networks to serve the same payer-platform demand, including bidirectional clinical-data workflows between payers and providers, but without limiting access to Epic providers. Epic tries to transform this access-pathway difference into a product market distinction by arguing that EPP queries records for "operations and payments" while Signal queries records only for "treatment." That attempt to redirect the proper inquiry ignores two key factual points (and genuine disputes).

First, as Particle pointed out in its letter. Epic quite literally lists ███████████ ██████████████████. Dkt. 80, Ex. 17 at 4–5.

Second, as highlighted from the Complaint on, Particle's Signal payer platform functionality is not limited to the initial purpose for which records are queried (Dkt. 1 ¶ 75; Dkt. 28 at 6-7. Once records are lawfully retrieved for treatment, that data can also support permissible secondary uses, including operations and payment-related activities, where applicable law and network rules permit. That is why and how both parties' payer platform products provide the same core functionalities: both products allow payer and payvider customers to operationalize clinical data across treatment, operations, and payment workflows. Dkt. 80 at 3-4. Epic's attempt to draw a bright-line market distinction based on the legal means by which a payer originally retrieves records ignores what the products—and product *users*—actually do with the data after retrieval.

Epic tries to suggest otherwise through misdirection. In its letter, Epic quotes the Federal Register to say "Only health care providers, not health plans, conduct 'treatment.'" Dkt. 78 at 2 (quoting Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82627 (Dec. 28, 2000)). But the full quote (which is about a rule for the exchange of protected health information), with the portions Epic omitted in emphasis, is:

> Only health care providers, not health plans, conduct ''treatment'' for purposes of this rule. ***A health plan may, however, disclose protected health information without consent or authorization for treatment purposes if that disclosure is made to a provider. Health plans may have information the provider needs, for example information from other providers or information about the patient's treatment***

2

*history, to develop an appropriate plan of care.*

Furthermore, that is only "*without* consent or authorization." Epic ignores (and tries to hide from the Court) that patients' prior authorizations and consents allow treatment queries by payers even under Epic's own citation's plain language. Thus, payers involved in treatment—*i.e.*, payviders acting as "business associates" of providers under HIPAA—may query such information for treatment purposes.[1] But, in any event, this is not a *market definition* question; it is just about when and how a payer can obtain records.

What all of this shows is that, just as Particle noted in its letter, the proper next step in this case is full discovery. Epic may present factual arguments that ultimately persuade a jury Epic Payer Platform—which Epic stated has no comparable product—is nevertheless in a relevant product market broader than payer platforms. But the idea that discovery should be delayed on the hope that the Court will resolve this "deeply fact-intensive inquiry" now, *see* Dkt. 42 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)), asks too much. Rule 56 does not support such a result and it is better, as well as in keeping with the Federal Rules, for the parties to proceed to full discovery on Particle's claims.

Respectfully submitted,


*/s/ Adam B. Wolfson*
Adam B. Wolfson

Copies To:
All Counsel of Record
BY ECF

---

[1]  Indeed, Carequality (the interoperability network framework provider Particle currently uses) literally told this to Epic in the parties' dispute, given Particle's clients act as "business associates" under HIPAA for providers. *See* Carequality Dispute, Final Resolution (Redacted), at ¶ 3.c., *available at* https://carequality.org/wp-content/uploads/2024/10/Carequality-Dispute-_Final-Resolution_-Redacted.pdf ("While the SMEs [subject matter experts] acknowledged that HIPAA does not consider the activities of health plans to be 'treatment' (see 65 Fed. Reg. 82627), *the SMEs clarified that health plans can be business associates of health providers and make treatment related requests as part of their business associate services for health care providers*.") (emphasis added).