# CRAVATH

Lauren A. Moskowitz
lmoskowitz@cravath.com
T+1-212-474-1648
New York

May 5, 2026

<u>Particle Health Inc. v. Epic Systems Corporation</u>, No. 24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

I write on behalf of Epic Systems Corporation ("Epic") in response to Particle Health Inc.'s ("Particle") April 30, 2026 and May 1, 2026 letters (collectively, "Particle's letters") regarding Particle's proposed next steps following Phase I discovery.  (Dkt. Nos. 77, 83.)  In short, Particle's letters cast mischaracterized aspersions to deflect from the fact that Phase I discovery has demonstrated that there is no evidence to support Particle's alleged "payer platform market".  Particle's attempt to use its inability to turn up evidence supporting its alleged "payer platform market" to turn this case into a fishing expedition is misguided, at best.  Epic maintains that the proper next step is for Epic to move for summary judgment on the market definition underlying Particle's remaining antitrust claims.

Particle's letters fail to engage with the fact that the undisputed evidence is fatal to Particle's antitrust market definition—specifically, evidence demonstrating that payers have no unique demand for a single platform offering the "unique characteristics identified by Particle (*i.e.*, retrieval at scale, storage, and analytics)" (Dkt. No. 42 at 31).  Indeed, Particle's letters do not contest that the evidence from Particle Signal and Epic Payer Platform customers and competitors that Epic cites in its letter (*see* Dkt. No. 78 at 3-5) contradicts Particle's alleged market, including ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (*id.* at 4).  Instead, Particle attempts to diminish the significance of such undisputed evidence by analogizing to smartphones—arguing that smartphones are "their own product category" even though "not all smartphone users utilize every single feature available on the device" (Dkt. No. 83 at 2).  That analogy has things backwards.  Smartphones would be a market if customer demand were for devices that offer phone capability, streaming capability, *and* a camera; but smartphones would *not* constitute a market if market evidence showed that demand splintered those services such that many consumers were happy to replace smartphones with some combination of flip phones (for telephony), tablets (for streaming), and digital cameras (for taking photos).  That is exactly the case here:  Particle has chosen to define its alleged product market to include only platforms that it claims offer all three specific services to payers.  (Dkt. No. 42 at 23 (citing Compl. ¶ 55).)  Particle must therefore be able to set forth evidence that demand by payers for software products "that offer one-stop shopping for [the three] services . . . is sufficiently inelastic to make that a distinct market".  *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 354-55 (S.D.N.Y. 2009) (granting summary judgment on market definition grounds where plaintiff "failed to adduce proof that" customers that "might prefer a single source provider" "would not surrender that preference" for a partial- or single-service provider in response to a price increase).  Particle cannot do so.  Indeed, Particle fails to point to any evidence that would support its exclusion of

**NEW YORK**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
T+1-212-474-1000
F+1-212-474-3700

**LONDON**
100 Cheapside
London, EC2V 6DT
T+44-20-7453-1000
F+44-20-7860-1150

**WASHINGTON, D.C.**
1601 K Street NW
Washington, D.C. 20006
T+1-202-869-7700
F+1-202-869-7600

CRAVATH, SWAINE & MOORE LLP

products that offer just retrieval at scale, just storage, just analytics, or some combination thereof, from the alleged "payer platform market". And Particle's conclusory assertion that "no reasonable substitutes exist" "[f]or those that want the combination of features", "even if they do not use every single one" (Dkt. No. 83 at 2) is insufficient to raise a disputed issue of material fact to defeat summary judgment. *See Emigra Grp.*, 612 F. Supp. 2d at 355 ("The existence of one-stop shopping, and a group of customers with a preference or even demand for it, is insufficient to define a relevant market.").

Rather than engage with the fundamental deficiencies with its antitrust market definition, Particle baselessly accuses Epic of "[s]erious [c]redibility [c]oncerns". (Dkt. No. 77 at 4.)

*First*, Particle asserts that "Epic's own documents contradict" that "Epic Payer Platform facilitates exchanges for non-treatment purposes alone". (*Id.* at 4-5 (citing Dkt. No. 21 at 9).) That is false. As set forth in Epic's April 30, 2026 letter, Epic Payer Platform supports payers' retrieval of records for non-treatment purposes only; as a result, payers are limited to receiving the minimum necessary information. (*See* Dkt. No. 78 at 2-3.) Epic Payer Platform's ███████ ██████████████—Particle's purported support for its assertion—do not say otherwise. ███████████████████████████████████████████████████████████████████ language that Particle conveniently omits. (Dkt. No. 77-17 at -7900 (emphasis added).) Of course, *provider* users of Epic Payer Platform, who are outside the payer market that Particle has alleged, may use data obtained from Epic Payer Platform for treatment purposes. However, consistent with federal regulation,[1] *payer* customers of Epic Payer Platform—the only customers in the alleged relevant market—"████████████████" and instead only "███████████ ███████████" (Dkt. No. 77-9 at 110:23-111:5, 112:3-13).[2] And Epic Payer Platform's ██████ ███████████████████████████████ makes clear that payers may only request records for non-treatment purposes using Epic Payer Platform. (*See* Dkt. No. 78-5 at -7323 ██████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████.)

*Second*, Particle casts doubt on Epic's prior representations that Epic Payer Platform does not allow for retrieval "at scale". (*See* Dkt. No. 77 at 5.) But Epic Payer Platform does not allow for retrieval "at scale", as that term is defined by Particle. Particle's letters ignore Particle's own CEO's testimony regarding what Particle means by the term retrieval "at scale" in defining its alleged market. Particle's CEO testified that ██████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████.

---

[1] Contrary to Particle's suggestion that Epic selectively quoted from the Federal Register (*see* Dkt. No. 83 at 2), the fact that payers can "*disclose* protected health information" to *providers* "for treatment purposes" does not change anything about whether payers themselves can receive or use protected health information for treatment purposes, which they cannot. Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82627 (Dec. 28, 2000) (emphasis added) ("Only health care providers, not health plans, conduct 'treatment' for purposes of this rule.").

[2] Particle attempts to minimize the distinction between treatment and non-treatment requests by noting that "[o]nce records are lawfully retrieved for treatment, that data can also support permissible secondary uses, including operations and payment-related activities". (Dkt. No. 83 at 2.) But this point is not relevant to whether Particle Signal and Epic Payer Platform are reasonably interchangeable. Ultimately what matters for substitutability is whether a payer customer on Epic Payer Platform could switch to Particle Signal for record retrieval services and the answer must be no, because, as Particle's CEO testified, "████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████". (Dkt. No. 78-2 at 16:18-17:4, 18:4-7 (emphasis added).)

(Dkt. No. 78-2 at 87:6-11, 90:25-93:5, 94:18-96:5; *see also* Dkt. No. 78-1 at 9.)[3]  Particle's letters do not dispute—and the evidence makes clear—that Epic Payer Platform retrieves records only from Epic providers and does not offer a solution for payers to retrieve records from non-Epic providers or to retrieve any records through any national interoperability network.  (*See, e.g.*, Dkt. No. 78-4 at 311:1-20 (████████████████████████████████████ ██████████████████████).)  Particle does not—and cannot—dispute that Epic Payer Platform has not previously and does not currently offer clinical data exchange with non-Epic providers, meaning that Epic Payer Platform does not allow for retrieval "at scale", as that term is defined by Particle.

*Third*, contrary to Particle's claim that Epic's documents are inconsistent with its representations in the case to date that "[m]yriad software products exist to address payers' health record needs that appear to compete with Particle's and Epic's products" (Dkt. No. 77 at 5), Epic's documents—as well as the documents of third parties—in fact demonstrate that Epic Payer Platform has many competitors.  (*See, e.g.*, Ex. 1 at -2766 (████████████████████ ████████████████████████████████); Ex. 2 at -1803 (████████████████ ████████████████████); Ex. 3 at -0740 (████████ ████████████); *see also* Dkt. No. 78-12 at -0004 (████████████████████ ████████████████████████.)  Importantly, Particle does not—because it cannot—cite to a single Epic document identifying Particle Signal as a competitor to Epic Payer Platform.  And the marketing and sales communications that Particle cites, ████████████ ████████████████████████ (*see, e.g.*, Dkt. No. 77-19 at 7), do not support the conclusion that Epic Payer Platform and Particle Signal are somehow in a distinct antitrust product market of two that does not also include other products that provide a subset of the functionalities.  These comparative marketing statements about the breadth of Epic Payer Platform's capabilities necessarily presuppose the existence of alternative products and are fully consistent with Epic's prior representations regarding the existence of other competitors (*see, e.g.*, Dkt. No. 21 at 14).[4]

As there is no evidence to support Particle's alleged "payer platform market", summary judgment on Particle's remaining antitrust claims is warranted.

Respectfully submitted,

*/s/ Lauren A. Moskowitz*

Lauren A. Moskowitz

---

[3] Such testimony from Particle's CEO contradicts Particle's prior representations to the Court that "at scale" merely means "[a] lot at once" and "when we are talking about obtaining records at scale, we are talking about thousands, hundreds of thousands of records all at once".  (Dkt. No. 40 at 3:14-18.)

[4] In any event, the relevant question for how an antitrust product market must be defined is whether customers (here, payers) treat alternative products as interchangeable with Epic Payer Platform, which the evidence shows they do (*see* Dkt. No. 78 at 5).  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (stating that products are "reasonably interchangeable if *consumers* treat them as 'acceptable substitutes'" (emphasis added) (citation omitted)); *see also AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 920 F. Supp. 1287, 1297 n.7 (S.D.N.Y. 1996) ("For antitrust purposes, however, the relevant market is determined by reasonable interchangeability, . . . not by laymen's comments made in a competitive business environment".), *aff'd*, 181 F.3d 216 (2d Cir. 1999); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 121 (3d Cir. 2021) (agreeing with district court's refusal to rely on corporate executive's statement that "[defendant] does not have direct competitors" for purposes of "defining the relevant market").

The Honorable Naomi Reice Buchwald
  United States Courthouse
    500 Pearl St.
      New York, NY 10007-1312

Copies To:

All Counsel of Record

BY ECF