**quinn emanuel** trial lawyers | new york

295 5th Avenue, New York, New York 10016 | TEL (212) 849-7000 FAX (212) 849-7100

June 5, 2026

WRITER'S EMAIL ADDRESS
**adamwolfson@quinnemanuel.com**

**VIA ECF**

The Honorable Naomi Reice Buchwald
United States Courthouse, 500 Pearl St.
New York, NY 10007-1312

Re:    *Particle Health Inc. v. Epic Systems Corporation*, 1:24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

We write on behalf of Plaintiff Particle Health Inc. ("Particle") in response to the Court's questions from its May 27, 2026 Order. Counsel is available at the Court's convenience to answer any follow-up questions. We believe the below shows this case should proceed to full discovery.

### 1.    What is Particle's definition of the relevant product market?

The relevant product market is the market for payer platforms, which are software platforms whose unique combination of features lets healthcare payers collaborate effectively with providers. This collaboration supports payers who engage in *value-based* care models, wherein the payer takes an active role in improving the healthcare quality of its members. *See, e.g.*, Ex. 1 at 251:6-7 ("███████████████████████████████████████████████."); Ex. 2 at 51:5-11 (value-based care is "████████████████████████████████ ████████████████████████████████").

A core defining feature of payer platforms is that they enable the exchange of clinical data between payers and providers. With the payer platform, payers and providers can exchange data *in real time* (meaning data is received instantaneously as it is generated), *bidirectionally* (meaning data can be both retrieved from and shared with providers), and *at scale* (meaning many thousands or even millions of records can be retrieved at once). Payer platforms also facilitate analysis of the input data through (1) real-time alerts about patient clinical events and encounters, (2) interfaces that allow a payer to analyze raw clinical data and share insights with providers, and (3) storage of clinical data so that users can monitor member health over time. These features help payers with value-based care models improve the quality and timeliness of their members' healthcare.

### 2.    How does each party define the terms "payer," "payvider," and "provider"? Each party shall also explain whether, and to what extent, those categories overlap and provide at least one example of each.

A **payer** is an organization that assumes the financial risk of paying for a patient's healthcare (*e.g.*, Cigna, Humana). A **provider** is an entity that administers healthcare to patients, such as a hospital or doctor's office (*e.g.*, Mount Sinai Health System).

**quinn emanuel urquhart & sullivan, llp**

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

The parties define "payvider" differently. For Particle, **payvider** broadly encompasses all entities engaged in a value-based care model (*i.e.*, one in which the provider receives augmented payments from payers for improving the health of its patients and/or the payer actively partners with the provider to improve the health of its members) (*e.g.*, ███████████████████████). Ex. 2 at 11:16-22, 22:2-20. Epic defines "payvider" more narrowly to refer to the ███████████ ███████████████████████████████████████████." Ex. 1 at 16:11-21. The parties thus disagree as to which organizations that engage in value-based-care models (or that act on behalf of organizations that engage in such models) qualify as "payviders." Ultimately, however, that disagreement is merely semantic. As explained in response to Qs. 7 & 9, the relevant market definition question is reasonable interchangeability of use of *a product*; not how the parties categorize their customers. Payer platforms are a product that serve organizations that engage in value-based care, regardless of whether those organizations are called a "payvider." There is no dispute that both EPP and Signal serve such organizations. *See, e.g.*, Ex. 1 at 251:6-7, *supra*.

Given that the parties disagree as to the scope of *the term* "payvider" but not the set of organizations that payer platforms serve, Particle respectfully submits that the more descriptive term to refer to the parties' overlapping customer base is "**payers engaged in value-based care**."[1]

3. **What percentage of EPP's and Particle Signal's customer bases are payers, payviders, and/or providers?**

**Epic Payer Platform.** Particle understands that 100% of Epic Payer Platform's customers are payers engaged in value-based care. Thus, they all are "payviders" under Particle's definition (*i.e.*, they are organizations engaged in a value-based care model). Under Epic's narrower definition—requiring both an insurance arm and a delivery arm—a smaller subset would qualify as "payviders," with the balance characterized as "payers." Either way, none are pure "providers," and the product's functions do not vary by which label applies.

**Particle Signal.** 100% of Signal's customers are "payviders" under Particle's definition (*i.e.*, they are organizations engaged in a value-based care model). One is a payer engaged in value-based care (Curative), while the remainder are either (1) risk-bearing providers (*i.e.*, providers that have taken on a payer role for a specific patient population) or (2) health technology companies acting as a "Business Associate" under HIPAA for value-based care payers or risk-bearing providers. Ex. 2 at 18:18-28:20.[2]

4. **Specifically, what further discovery does Particle contend is necessary before the Court can evaluate the sufficiency of its claims?**

This Court ruled that Particle plausibly alleged claims under Section 2 of the Sherman Act and for tortious interference with contract. *See generally* Dkt. 42. Before the Court can evaluate these claims under Rule 56, Particle seeks additional discovery in accordance with Rule 26(b).

**Antitrust claims.** Phase I discovery was "focused," "narrow," and "limited." Dkt. 47. It only addressed threshold questions about product overlap—specifically, whether EPP and

---

[1]  Epic's 30(b)(6) witness himself stated that "payvider" is "███████████████████." Ex. 1 at 16:11-21.
[2]  HHS defines a "Business Associate" as a person or entity that performs certain functions or activities that involve the use or disclosure of protected health information on behalf of, or provides services to, a "Covered Entity" under HIPAA. https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html.

Particle's platform serve similar customer needs with comparable functions—but the full extent of relevant market evidence a plaintiff may use to prove its claims is broader. *See* Dkt. 52. Discovery on market definition can and regularly does include, *inter alia*: the parties' actual, empirical competitive dynamics and those of any alleged alternatives; customer perceptions of substitutability; barriers to entry and expansion in the product market; competitive constraints, if any, on the defendant's conduct; the defendant's internal competitive assessments of its product and potential threats; evidence of actual competition including customer switching and win/loss data; and pricing data. In addition to this discovery on market definition, Particle seeks discovery relevant to the other antitrust elements, including that which concerns: Epic's exclusionary conduct; anticompetitive effects in the market; market power; and Epic's intent and knowledge regarding its competitive position. Phase I discovery overlapped in part with discovery relevant to the broader analysis of market definition and the other antitrust elements, yet Phase I was, per Court order and the parties' agreement, limited in search parameters (including custodians, terms, date range, and locations/files to be searched). *See* Dkt. 59. The parties also only each deposed one corporate designee on topics confined to the Phase I questions. However, although additional discovery is necessary before the Court can evaluate claims and issues under a summary judgment standard, due to the discovery already completed, Particle believes it can complete the remaining discovery efficiently and is prepared to propose a schedule and plan at the Court's direction.

**Tortious interference claim**. The Court also found Particle's tortious interference with contract claim plausible, though discovery on this claim has not occurred. The passage of time without discovery on this claim raises a meaningful risk of prejudice to Particle due to, *inter alia*, "the likelihood that evidence … will be lost and … trial will be made more difficult." *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 195 (2d Cir. 1999). Since this claim is not contingent on the outcome of Phase I discovery or market definition more generally, *see* Dkt. 42 at 57 n.27, Particle contends that discovery should proceed promptly, regardless of the outcome of Phase I. As with the discovery on all elements of Particle's antitrust claims, Particle served requests for document production in February 2025 that cover many, but not all, of the relevant topics, so Epic has been on notice of the discovery that Particle contends is necessary to prosecute its claims.

5.  **Does Particle contend that a customer who is only a "payer" takes an active role in improving the health and treatment of their members through value-based care?**

Yes. Every payer has a financial incentive to keep its members healthy because every payer bears the cost of members' care. A payer loses money when members are hospitalized or let treatable conditions worsen. That financial risk incentivizes payers to identify care gaps, alert treating physicians, manage high-risk members, and work with providers to improve outcomes.[3] Value-based contracts heighten the incentive by changing how much financial risk rests with the payer versus the provider.

HIPAA authorizes payers to perform many of the above activities as "health care operations," including "case management and care coordination" and "contacting of health care providers and patients with information about treatment alternatives." Ex. 3, 45 C.F.R. § 164.501; *see also* Ex. 4, 45 C.F.R. § 164.506. But "health care operations" does not reach all pertinent

---

[3]  Epic's own 30(b)(6) witness confirmed this directly, noting that a payer can use EPP to "██████████████ ███████████████████████████," and "████████████████████████ ████████████████████." Ex. 1 at 131:24-132:21.

activities in a value-based care model. Individualized, patient-specific treatment activity requires a "treatment" purpose of use, which is why payers enter Business Associate agreements with providers and query records for treatment purposes, as Carequality confirmed regarding Particle's business. However a given request for records is labeled (whether as treatment or healthcare operations), payers take an active role in their members' care, and payer platforms are tools that let them do it.

**6. What is Epic's definition of "healthcare operations"?**

Epic does not appear to have its own definition of "healthcare operations," but instead expressly uses HIPAA's definition of "healthcare operations" under 45 C.F.R. § 164.501. *See, e.g.*, Ex. 5 (███████████████████████████████████████████████████████ ."). HHS defines "healthcare operations" to encompass a wide range of business and administrative activities "of the covered entity to the extent that the activities are related to covered functions." 45 C.F.R. § 164.501. Operations include "case management and care coordination, contacting of health care providers and patients with information about treatment alternatives; and related functions that do not include treatment." *Id.*

**7. Can EPP and Particle Signal be used by different types of customers in different ways?**

Both products provide a range of similar functionality that entities engaged in value-based care may use at their discretion. Although there are differences at the margins in the exact scope of functionality each provide, both products serve payers and "payviders" (however defined) with core retrieval, storage, and analytics functions that support value-based care models.

The customers' specific reasons for using those functionalities may diverge when those reasons are assessed under the HIPAA framework and, as discussed below, "Treatment" under HIPAA does not define the market. Whatever the permissible purpose, Epic's customers use EPP for the same retrieval, storage, and analytics functions that support value-based care arrangements. Moreover, Epic's customers *can* use EPP for "Treatment" purposes, subject to having a bona fide treatment purpose under the applicable HIPAA regulations. Likewise, Particle's customers *can* use Signal's storage and analytics functions for legally permissible non-treatment purposes, provided they have originally obtained the records for treatment.

**8. Does either party contend that a payer or payvider may request or use records or data for treatment purposes through either EPP or Particle Signal?**

Yes. A payer or payvider may request records for treatment purposes through either EPP or Signal. All of Particle's queries are made under a treatment purpose. Ex. 2 at 17:24-18:7. Carequality confirmed this is permissible.[4] Although Epic tries to disclaim this fact now, Epic's ██████████████████████████ ███████████████████. Dkt. 77, Ex. 17 at 4-5; *see* Ex. 1 at 107:10-116:11 (contrasting ███ ████████ with Epic's litigation position); *see also* Dkt. 77 at 4-5 (documenting contradictions).

---

[4] *See* Carequality Dispute, Final Resolution (Redacted), at ¶ 4.b., *available at* https://carequality.org/wp-content/uploads/2024/10/Carequality-Dispute-_Final-Resolution_-Redacted.pdf.

**9. Does either party contend that the permissible purpose associated with a request for records or data is a defining characteristic of the relevant product market?**

Particle does not. Antitrust market definition turns on reasonable interchangeability of use of *a product*. *See* Dkt. 77 at 4; Dkt. 83 at 1-2. As the Phase I record shows, payer platform customers care about what is in the data and what they can do with the data, not the regulatory framework under which they retrieve that data (except insofar as they abide by relevant regulations). *See generally* Dkt. 83. And, as discussed below, even if payer platforms differ in the HIPAA-based "purpose" for their original data retrieval, customers can then *use* that lawfully obtained data for other, permissible "secondary" uses (and both EPP and Signal do, in fact, put data to the full panoply of permissible secondary uses). The initial purpose under which records were retrieved therefore has no relation to the relevant product market definition.

**10. To the extent that Epic contends that EPP supports only non-treatment requests from payers, the parties shall explain whether, and under what circumstances, payers or payviders may use EPP to obtain and/or use records or data for treatment-related purposes. In that context, how do the parties define "treatment"?**

"Treatment" is a regulatory term. HHS defines it to mean: "the provision, coordination, or management of health care and related services by one or more health care providers, including the coordination or management of health care by a health care provider with a third party; consultation between health care providers relating to a patient; or the referral of a patient for health care from one health care provider to another." Ex. 3, 45 C.F.R. § 164.501. Although Epic contends EPP only queries records for payment and operations purposes, Carequality has explicitly held that a payer platform acting as a Business Associate of a provider may query records for treatment purposes. *See* n.4, *supra*, ¶ 3(c). This means that EPP *may*, but does not have to, query records for treatment purposes as that term is defined under HIPAA, as Epic's documents confirm.

An important follow-up: once payers have obtained records for a lawful purpose, HIPAA permits them to use that information for *any* of "treatment, payment, or health care operations." *Bedard v. LeBlanc*, 2022 WL 22972442, at *2 (D. Vt. Nov. 8, 2022) (citing 45 C.F.R. §§ 164.502(a)(1)(ii), 164.506(a), 164.506(c)(1)). Thus, even when a query is *originally* made for one purpose, that data can *then* be used for another, approved purpose, *i.e.*, for a "secondary use."

Epic recognizes as much in its customer-facing "███████████████████████ ███████████████████████████. *See* Q. 8, *supra*. Epic itself therefore recognizes that, *even if* ███████████████████ ████████████████████████. The only difference between EPP and Signal is that Signal engages in ███████████████████████████████ ████████████████████████████████████████. This is a distinction without a difference for market definition: both products provide identical core functionality and differ only in how they obtain relevant data, because Particle faces initial-retrieval constraints that Epic does not.

Respectfully submitted,

*/s/ Adam. B. Wolfson*
Adam B. Wolfson

Copies to:
All counsel of record