# CRAVATH

Lauren A. Moskowitz
lmoskowitz@cravath.com
T+1-212-474-1648
New York

June 5, 2026

Particle Health Inc. v. Epic Systems Corporation, No. 24-cv-07174-NRB (S.D.N.Y.)

Dear Judge Buchwald:

I write on behalf of Epic Systems Corporation ("Epic") to answer the questions in the Court's May 27, 2026 Order.  (Dkt. No. 92.)

**1.      What is Particle's definition of the relevant product market?**

Particle has defined the relevant product market as a "payer platform market" limited to products that offer to payers each of the following features—(i) record retrieval "at scale"; (ii) data "centralization and storage"; and (iii) "analytics services tailored to payer needs".  (Compl. ¶ 55; *see also* Dkt. No. 28 at 13.)  **Record retrieval at scale**, according to Particle, refers to "query[ing] national interoperability networks to retrieve new clinical records across unaffiliated providers".  (Dkt. No. 78-1 at 52.)  Notably, Particle's CEO testified (as Particle's corporate representative) that ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (Ex. 1 at 87:6-11, 90:25-93:5, 94:18-96:5; Dkt. No. 78-1 at 9.)  **Data centralization and storage**, according to Particle, enables customers to "centralize, organize, search, sort, and retain copies of records".  (Dkt. No. 78-1 at 17.)  **Analytics tailored to payer needs**, according to Particle, refers to processes to standardize and deduplicate patient data and provide "real-time insights and alerts" regarding "patient interactions across the health care system" that are reflected in that data.  (Dkt. No. 78-3 at 9, 14; *see also* Ex. 1 at 102:9-106:21.)

Particle maintains—incorrectly—that its alleged "payer platform market" consists of only two products:  Epic Payer Platform and Particle Signal.  (*See, e.g.*, Compl. ¶¶ 62, 75; Ex. 1 at 247:14-21 (███████████████████████████████████████████ ████████████████████████████████████████████████████████████████.)

**2.      How does each party define the terms "payer," "payvider," and "provider"? Each party shall also explain whether, and to what extent, those categories overlap and provide at least one example of each.**

**Payer**:  The parties agree that a payer is an organization that is responsible for covering the cost of medical care, such as a health insurance company (*e.g.*, Blue Cross Blue Shield of Minnesota).  (*See, e.g.*, Ex. 2 at 308:9-13 (████████████████████████); Ex. 1 at 10:22-11:4 ████████ ████████████████████████████████████████████████████).)

**NEW YORK**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
T+1-212-474-1000
F+1-212-474-3700

**LONDON**
100 Cheapside
London, EC2V 6DT
T+44-20-7453-1000
F+44-20-7860-1150

**WASHINGTON, D.C.**
1601 K Street NW
Washington, D.C. 20006
T+1-202-869-7700
F+1-202-869-7600

CRAVATH, SWAINE & MOORE LLP

**Provider**:  The parties agree that a provider is an organization that provides treatment directly to patients, such as a health system (*e.g.*, NYU Langone Health and Memorial Sloan Kettering Cancer Center).  (*See, e.g.*, Ex. 2 at 326:24-327:11 (███████████████████████████████);  Ex. 1 at 86:12-87:5, 88:8-89:10 (███████████████████████████████).)

**Payvider**:  Epic does not endorse the term "payvider", which is jargon that does not have an accepted industry meaning.  Epic understands "payvider" to most commonly refer to an organization that has both a payer entity and a provider entity within the overall corporate organization.  Whether or not affiliated under the same corporate umbrella, Epic treats provider entities and payer entities as separate customers for different products.  For example, UnitedHealth Group operates UnitedHealthcare—a health insurance company (a payer)—and OptumCare—a treatment organization (a provider).  As a payer, UnitedHealthcare is permitted to request and receive only the "minimum necessary" information in a patient record under HIPAA and is an Epic Payer Platform customer.  As a provider, OptumCare can obtain full patient records for treatment purposes under HIPAA and is an Epic EHR software customer. (Ex. 2 at 260:20-261:12 ███████████████████████████████████ ███████████████████████).)  Epic does not treat the payer entity of a "payvider" any differently from how it treats a standalone payer just because the former is affiliated with a provider.  Thus, the term "payvider" has no real-world implication for Epic:  Epic refers to a "payer" as encompassing both standalone payer entities (*e.g.*, Blue Cross Blue Shield of Minnesota) and payer entities that are part of a broader organization that also has a separate provider entity (*e.g.*, UnitedHealthcare).  The same holds true for providers—Epic uses the term to refer to both standalone provider entities (*e.g.*, NYU Langone Health) and provider entities within a broader organization that also has a separate payer entity (*e.g.*, OptumCare).

Particle's definition of payvider has evolved throughout this case.  The latest definition appears to be that a payvider is a ████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████.  (Ex. 1 at 11:13-12:5 (emphases added); *see also* Dkt. No. 77 at 2 n.2.)  For example, Particle claims that ██████████████████████████████████████████ (*see* Ex. 1 at 21:21-22:5); however, Particle's CEO testified ███████████████████ ███████████████████ (*id.* at 20:21-25 (███████████████)), such as ██████ ███████████████████████████████████████████████████████████████ ██████████████████ (*id.* at 20:5-20).  Similarly, only one of Particle's payvider customers—████████████████ (*id.* at 27:13-28:11); ███████████████ ████████████████ (*id.* at 28:12-20).  Thus, according to Particle's definition of a "payvider"— and in contrast to Epic's understanding of the term—an entity need not operate as a provider (*i.e.*, by providing treatment services directly to patients) or as a payer (*i.e.*, by offering a health plan to members) for Particle to consider it a payvider.  Particle's definition of payvider includes entities that do not themselves operate as payers or providers, rendering it a meaningless term.

3.      **What percentage of EPP's and Particle Signal's customer bases are payers, payviders, and/or providers?**

**Epic Payer Platform.**  Epic Payer Platform has 23 payer customers,[1] all of which offer health insurance (*see* Ex. 2 at 308:9-13), consistent with the definition of payer above (*see supra* No. 2).  Although many of Epic Payer Platform's payer customers are part of a larger umbrella

---

[1] Epic's Payer Platform customer base has continued to grow since Phase I discovery closed, but Epic relies on the numbers as they existed during discovery; the nature of those customers remains the same.

organization that also has a provider entity that delivers patient care, only the payer entity of that organization is considered a payer customer of Epic Payer Platform.  Because Epic treats payer and provider entities sitting under the same "payvider" umbrella separately, Epic does not have definitive information on how many Epic Payer Platform payer customers are part of an organization that also has a provider entity.  However, of its 23 payer customers, roughly 70% have separate provider entities that separately license Epic EHR software.  Providers that are customers of Epic's EHR software may choose to exchange certain data with Epic Payer Platform payer customers with whom they agree to establish a connection (*see* Ex. 2 at 311:21-312:12), and are referred to as Epic Payer Platform "Provider Users" (Dkt. No. 77-17 at -7899).  Epic Payer Platform has over 300 "Provider Users", though they are not included in Particle's alleged "payer platform market", which Particle has limited to payers only.  (*See supra* No. 1.)

**Particle Signal.**  Although Particle alleges a product market restricted to payers (*see, e.g.*, Compl. ¶¶ 53, 55), Particle represents that Particle Signal's customer base is exclusively "payviders", as Particle defines that term.  (Dkt. No. 78-3 at 10 ("Particle currently services 10 customers that use Signal, all of which are payviders.").)  Indeed, ████████████████████████
████████████████████████████████.  (Ex. 1 at 16:18-17:4 (emphasis added).)  It is undisputed that Particle Signal's customers do not—and cannot—include payer-only entities, *i.e.*, entities that do not perform treatment services either directly or indirectly (and thus, are not "payviders" pursuant to Particle's own definition of that term).  And Particle has not alleged that Particle Signal has any "provider" customers—in fact, Particle's CEO testified ████████████
███████████████████████████████ (*id.* at 140:9-141:4).

4.      **Specifically, what further discovery does Particle contend is necessary before the Court can evaluate the sufficiency of its claims?**

Particle has not identified the specifics of the remaining discovery it contends is necessary to complete before the Court can evaluate the sufficiency of its remaining Sherman Act claims. Epic believes that no further discovery is necessary to serve this purpose.

5.      **Does Particle contend that a customer who is only a "payer" takes an active role in improving the health and treatment of their members through value-based care?**

Particle represented in its April 30, 2026 letter that Particle Signal's customer base includes "payers engaged in value-based care that are actively involved in improving the health and treatment of their members" (Dkt. No. 77 at 2).  However, Particle has made clear that ████████
████████████████████████████████████.  (Ex. 1 at 16:18-17:4.) The fact that Particle's customers purportedly perform treatment, however, does not speak to whether they are also "improving" treatment.  Indeed, while an Epic Payer Platform payer customer may help "improve" the treatment that providers ultimately provide, this does not mean that the payer is *itself* providing treatment, as only providers can do so.  (*See* Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82627 (Dec. 28, 2000) ("Only health care providers, not health plans, conduct 'treatment'"); Ex. 1 at 12:6-13:5 (███████████████████████████████████████████
██████████████); Ex. 2 at 121:12-124:19.)  Thus, whether a payer that is not a "payvider" can "take[] an active role in improving the health and treatment of their members" is irrelevant.

6.      **What is Epic's definition of "healthcare operations"?**

Epic utilizes HIPAA's definition of "healthcare operations" (42 U.S.C. § 1320d *et seq.*), which references a list of specific non-treatment activities.  *See* 45 C.F.R. § 164.501.  These activities

include, for example:  (i) conducting quality assessment and improvement activities (*e.g.*, Healthcare Effectiveness Data and Information Set ("HEDIS") reviews—a framework that payers use to measure performance, including, for example, quality assessments of preventative care such as breast cancer screenings and immunizations); (ii) developing clinical guidelines and protocols in an effort to control costs (*e.g.*, developing guidelines for managing specific conditions, such as asthma or diabetes); (iii) conducting patient safety activities as defined in applicable regulations (*e.g.*, identifying high-risk members and providing direct case management to ensure patient safety); and (iv) conducting or arranging for medical review, legal, and auditing services, including fraud and abuse detection and compliance programs. Each of these non-treatment activities could form the basis for requesting specific minimum necessary patient data through Epic Payer Platform for a healthcare operations purpose.

**7.    Can EPP and Particle Signal be used by different types of customers in different ways?**

Epic Payer Platform is used by different types of customers in different ways.  Particle Signal is used by one type of customer in a singular way, which is different from the way Epic Payer Platform is used by any type of customer.

**Epic Payer Platform**.  Epic Payer Platform facilitates payers' retrieval of records solely for non-treatment (*i.e.*, payment and healthcare operations) purposes.  (Ex. 2 at 308:14-20.)  Thus, all of Epic Payer Platform's payer customers may retrieve only the "minimum necessary" information from a patient record.  (*Id.* at 308:21-309:21.)  Such requests are sent to Epic Payer Platform "Provider Users" (providers that use Epic's EHR software and choose to exchange certain data with Epic Payer Platform payer customers with whom they agree to establish a connection); they do not utilize Carequality or any other treatment-based exchanges and Epic Payer Platform cannot be used to obtain records from entities that use other EHR software (*e.g.*, Oracle or athenahealth software).  (*Id.* at 311:1-313:13.)  There are no differences in how Epic Payer Platform can be used by standalone payer entities (*e.g.*, Blue Cross Blue Shield of Minnesota) and payer entities that are part of a broader organization that also has a separate provider entity under the same corporate umbrella (*e.g.*, UnitedHealthcare).

"Providers Users" of Epic Payer Platform described above are not included in Particle's alleged market (*see supra* Nos. 1, 3) and can use Epic Payer Platform differently from payers.  (Dkt. No. 77-17 at -7899, -7900.)  ███████████████████████████████████████ ████████████████████████████.  (Ex. 3 at -6741 (██████████████ ███████████████████████████████); *see also* Ex. 4 at -6722 (same).)

**Particle Signal**.  Particle Signal is used only by one type of customer—payviders as defined by Particle.  (*See supra* Nos. 2, 3.)  Epic's understanding is that all customers use Particle Signal in the same way, namely, ████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████) (Ex. 1 at 17:19-18:7, 87:6-11, 90:25-93:5, 234:12-235:7) and then to obtain "real-time insights into patient interactions across the health care system" as reflected in those records (Dkt. No. 78-3 at 9; *see also* Ex. 1 at 112:13-17).

**8.    Does either party contend that a payer or payvider may request or use records or data for treatment purposes through either EPP or Particle Signal?**

**Epic Payer Platform**.  Epic Payer Platform facilitates payer requests for records—including from payers that are under the same corporate umbrella as a provider entity that delivers treatment (*i.e.*, payviders pursuant to Epic's definition (*see supra* No. 2))—only for payment and

healthcare operations purposes—not for treatment purposes.  (*See supra* No. 7; *see also* Ex. 2 at 308:14-20 (                                                                    , 323:17-324:6 (                                                                                                                                                                                          ).)

**Particle Signal**.  Particle contends that all Particle Signal customers—each of which is a "payvider" as Particle defines that term *(see supra* Nos. 2, 3)—may request and use records only for treatment purposes.  Particle Signal queries health information networks and exchanges like Carequality solely under a treatment purpose of use.  (*See supra* Nos. 1, 7; *see also* Ex. 1 at 234:12-235:7                                                                                                                                                       ).)

9.       **Does either party contend that the permissible purpose associated with a request for records or data is a defining characteristic of the relevant product market?**

Epic does not contend that the "permissible purpose" associated with a records request is a defining characteristic of Particle's alleged market.  Even so, certain distinctions between Epic Payer Platform and Particle Signal—which stem from the "permissible purpose" associated with a records request—make clear that the products are not reasonably interchangeable substitutes, and thus cannot both be included in the same properly defined antitrust market.  *See City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("The relevant market must be defined as all products reasonably interchangeable by consumers for the same purposes".).  Epic Payer Platform and Particle Signal obtain two different types of records from two different sources:  payers using Epic Payer Platform can retrieve only non-treatment records (*i.e.*, only the "minimum necessary" information under HIPAA) directly from a subset of Epic EHR provider customers (*i.e.*, not through Carequality or another exchange), whereas Particle Signal customers obtain full treatment records and do so only through exchanges like Carequality (and regardless of the EHR software the provider uses).  (*See supra* Nos. 1, 7, 8.)  Indeed, Particle "denie[d] that Innovaccer", another company that serves payers, "competes with Particle in the payer platform market" because "[u]nlike Particle, Innovaccer does not query national interoperability networks [*i.e.*, exchanges] to retrieve new clinical records across unaffiliated providers".  (Dkt. No. 78-1 at 52.)  The same exact thing can be said about Epic Payer Platform.

10.      **To the extent that Epic contends that EPP supports only non-treatment requests from payers, the parties shall explain whether, and under what circumstances, payers or payviders may use EPP to obtain and/or use records or data for treatment-related purposes.  In that context, how do the parties define "treatment"?**

There are no circumstances in which any payer using Epic Payer Platform—whether it is a standalone payer entity or a payer entity within a broader organization that also has a separate provider entity under the same corporate umbrella—can make a request for records or data for treatment purposes through Epic Payer Platform.  Epic Payer Platform supports payers' requests for records or data solely for non-treatment purposes.  (*See supra* No. 8.)  As a result, the records and data that payers retrieve via Epic Payer Platform are limited to the "minimum necessary" information pursuant to HIPAA.  (Ex. 2 at 308:21-309:21; *see also* Dkt. No. 78 at 2 (citing 45 C.F.R. § 164.502(b)).)  Epic's definition of "treatment" is coextensive with HIPAA regulations, which define "treatment" as the provision, coordination, or management of health care and related services by one or more health care providers.  *See* 45 C.F.R. § 164.501.

Respectfully submitted,

*/s/ Lauren A. Moskowitz*

Lauren A. Moskowitz

The Honorable Naomi Reice Buchwald
   United States Courthouse
     500 Pearl St.
       New York, NY 10007-1312

Copies To:

All Counsel of Record

BY ECF